1  Keri Curtis Axel (Bar No. 186847)
2    kaxel@waymakerlaw.com
   Jose R. Nuño (Bar No. 312832)
3    jnuno@waymakerlaw.com
4  WAYMAKER LLP
   515 S. Flower Street, Suite 3500
5  Los Angeles, California 90071
   Telephone: (424) 652-7800
6  Facsimile:  (424) 652-7850
7
8  Attorneys for Defendant
   Yasiel Puig Valdes
9

10              UNITED STATES DISTRICT COURT

11    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  UNITED STATES OF AMERICA,      Case No.: 2:22-cr-00394-DMG

14              Plaintiff,         **YASIEL PUIG'S NOTICE OF
15                                 MOTION AND MOTION TO
        v.                         COMPEL DISCOVERY
16                                 REGARDING SELECTIVE
17  YASIEL PUIG VALDES,            PROSECUTION**

18              Defendant.         [*Declarations of Keri Curtis Axel and
19                                 Jose R. Nuño filed Concurrently*]
20
21                                 Hearing Date:  March 15, 2023
                                   Courtroom of Hon. Dolly M. Gee
22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

TO THE COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on March 15, 2023 at 8:30 a.m., or as soon thereafter as the matter may be heard in front of the Honorable Dolly M. Gee, located in Courtroom 8C of the United States Courthouse, 350 West 1st Street, Los Angeles, California 90012, Defendant Yasiel Puig Valdes ("Puig") will and hereby does move for an order compelling the Government ("Government") to produce discovery regarding selective prosecution. Counsel for Puig have raised the issue of selective prosecution with the government on numerous occasions including on November 28, 2022, and November 30, 2022. As explained in the contemporaneously-filed Declaration of Keri Curtis Axel ("Axel Decl."), Mr. Puig's counsel have repeatedly asked to meet and confer in person regarding the selective prosecution issue, but the United States Attorney's Office ("USAO") has refused to do so. (Axel Decl. ¶¶ 4-5.) The USAO has also refused to provide discovery related to selective prosecution to Mr. Puig's counsel. (*Id.* at ¶¶ 6-7.) The assigned prosecutors have met and conferred with the defense as to this Motion (*id.* ¶ 8), and tentatively agreed to a hearing date of March 15, 2023, subject to potentially requesting additional time depending on the nature of evidence and allegations. (*Id.* ¶ 9.)

This Motion is based on this Notice, the attached memorandum of points and authorities, the declarations of Keri Curtis Axel and Jose R. Nuño, the pleadings, papers and records in this action, any matters of which this Court shall take judicial

1   notice, and such further evidence or argument as Puig may present prior to or at any

2   hearing on this Motion.

3

4   DATED: February 10, 2023           WAYMAKER LLP

5

6                                 By: _____

7                                     Keri Curtis Axel

                                    Jose R. Nuño

8                                     *Attorneys for Defendant Yasiel Puig*

                                    *Valdes*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

WAYMAKER

**TABLE OF CONTENTS**

I.     INTRODUCTION ...............................................................................................1

II.    FACTUAL AND PROCEDURAL BACKGROUND.........................................2

    A.   The Government's Investigation of Sand Island Sports ...............................2

    B.   The Government's Interviews of the Sand Islands Sports Agents, All of
       Whom Were Not Black ...............................................................................3

    C.   Interviews of Black Athletes and Managers .....................................................4

    D.   The Interview of Yasiel Puig ..........................................................................5

    E.   The Government Quickly Moves to Investigate and Charge Puig ...................7

    F.   The Government's Threatens to Arrest Puig and Makes Misleading Press
       Statements...................................................................................................9

    G.   Other Examples of Disparate Treatment in Interviews  [UNDER SEAL].....10

    H.   Allegations of Discrimination Within the USAO ............................................11

    I.   Puig's Requests for Discovery Materials on Selective Prosecution
       Are Denied................................................................................................12

III.   ARGUMENT ...................................................................................................13

    A.   The Equal Protection Clause Bars Race-Based Differences in Prosecutorial
       Discretion. ................................................................................................13

    B.   Implicit Biases Against Black Men Affect the Government's View of Who Is
       Credible and Who Deserves Punishment. ......................................................14

    C.   Biases Against Individuals from Latin American Countries Also Affect
       Determinations of Their Credibility.................................................................17

    D.   The Government's Treatment of Puig Compared to Similarly-Situated
       Individuals of Other Races Demonstrates a Discriminatory Effect..............19

    E.   Puig is Entitled to Additional Discovery to Further Establish the
       Government's Impermissible Motive...............................................................21

IV.  CONCLUSION .................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Pacific Shores Properties, LLC v. City of Newport Beach,*
   730 F.3d 1142 (9th Cir. 2013) ............................................................................22

*Sacramento Nonprofit Collective v. Holder,*
   855 F. Supp. 2d 1100 (E.D. Cal. 2012) .............................................................20

*United States v. Blowers,*
   268 Fed. Appx. 504 (9th Cir. 2008) ...................................................................14

*United States v. Abarca,*
   Case No. 18-mj-02075-BGS-JLS-1
   2018 WL 3025803 (S.D. Cal. Jun. 15, 2018) .....................................................13

*United States v. Arenas-Ortiz,*
   339 F.3d 1066 (9th Cir. 2003) ......................................................................14, 20

*United States v. Armstrong,*
   517 U.S. 456 (1996) .....................................................................................13, 20

*United States v. Batchelder,*
   442 U.S. 114 (1979) ............................................................................................13

*United States v. Bourgeois,*
   964 F.2d 935 (9th Cir. 1992) ................................................................13, 20, 21

*United States v. Smith,*
   231 F.3d 800 (11th Cir. 2000) ............................................................................22

*United States v. Turner,*
   104 F.3d 1180 (9th Cir. 1997) ............................................................................22

*Wayte v. United States,*
   470 U.S. 598 (1985) ............................................................................................13

**Statutes**

18 U.S.C. § 371 ............................................................................................................2

18 U.S.C. § 1001 ................................................................................................*passim*

18 U.S.C. § 1955 ...........................................................................................2, 3

18 U.S.C. § 1957 ...............................................................................................2

26 U.S.C. § 7206 ...........................................................................................2, 3

31 U.S.C. §§ 5363, 5366 ...................................................................................3

**Other Authorities**

Christopher Ingraham, *Black men sentenced to more time for*
  *committing the exact same crime as a white person, study finds*,
  The Wash. Post, Nov. 16, 2017 ........................................................... 15

Fatma E. Marouf, *Implicit Bias and Immigration Courts*,
  45 New Eng. L. Rev. 417 (2011) ......................................................... 14

Jerry Kang, *Implicit Bias: A Primer,*
  *National Center for State Courts* (2009),
  https://www.courts.ca.gov/documents/BTB_XXII_WEDF_3.pdf ................... 14

John Barkai, *Article: What's a Cross-Cultural Mediator to Do?*
  *A Low-Context Solution for a High-Context Problem*,
  10 Cardozo J. Conflict Resol. 43, 56-57 (2008)................................... 18

Justin D. Levinson, *Forgotten Racial Equality: Implict Bias,*
  *Decisonmaking and Misremembering*,
  57 Duke L.J. 345 (2007) ...................................................................... 16

Liu Tong, *Article: Applying Hall's High Context and Low Context*
  *Cultures Model to Analysis the Implicationsi of Cultural Differences*
  *on Functioning in Cross-cultural Groups* ............................................ 17

Melissa L. Breger, *Making the Invisible Visible: Exploring Implicit*
  *Bias, Judicial Diversity, and the Bench Trial* (2019)........................... 14

Mikah K. Thompson, *BIAS ON TRIAL: TOWARD AN OPEN*
  *DISCUSSION OF RACIAL STEREOTYPES IN THE*
  *COURTROOM*, 2018 Mich. St. L. Rev., 1243 (2018)........................... 16

*On Addressing the Problem of Implicit Bias in Juror Decision Making,*
  *49CT. REV. 190 (2013)* ...................................................................... 14

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Yasiel Puig ("Puig") brings this motion to seek discovery concerning selective prosecution, that is, discovery relevant to show that similarly situated individuals of a different race and cultural background than Puig were not prosecuted. The discovery to date has made clear that biases – whether explicit or implicit – affected the government's view of the credibility of Puig and other Black men in the investigation.  The evidence shows that the government was inclined to view Black men as untruthful and uncooperative and non-Black men as truthful and cooperative, despite evidence to the contrary, and when non-Black men made false statements, they were given the opportunity to correct or rehabilitate those statements, and were not charged.

Although Puig need only show "some evidence" to meet his burden, substantial evidence already exists to show discriminatory effect and intent here. But only the government possesses information as to the practices of the government prosecutors and agents in this and other cases, and whether and how those patterns and practices have played out over time, in how they have treated witnesses, assessed the credibility of those witnesses, and whom they have charged. The government has refused to produce documents such as manuals showing how their agents were trained to take interviews, the agents' and prosecutors' historical practices regarding interviews, and even relevant information such as notes of witness interviews in this very case that might further show how these witnesses were given opportunities to prepare for their interviews, refresh recollection, and supplement or rehabilitate their statements over time – opportunities that were not provided to Puig.  The requested discovery to support Puig's selective prosecution claim should be compelled.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Government's Investigation of Sand Island Sports

In September 2017, the Department of Homeland Security ("DHS") and the Internal Revenue Service ("IRS"), along with the United States Attorney's Office for the Central District of California ("USAO") started an investigation into an online sports gambling business called Sand Island Sports/Bet Prestige ("Sand Island Sports Matter"). (*See* First Superseding Indictment, Dkt. 54, at 2-3.) The investigation soon focused on Wayne Nix, a former minor league professional baseball player, who used a variety of well-placed agents to place and accept bets, and was associated with a toll-free telephone service and betting websites based in Costa Rica, including www.sandislandsports.com. (*Id.* at 3.) Through his personal experience in baseball and his connections to these well-placed agents, Nix developed a client list of current and former professional athletes and other prominent individuals for Sand Island Sports. (*Id.*) One of these well-placed agents was Agent 1, a former collegiate baseball player turned private baseball coach who had access to professional athletes that Nix did not, such as Puig. (*Id.*)

Based on the discovery to date, the investigative phase of the Sand Island Sports Matter began in or around September 2017 and was substantially concluded by the end of 2021. The government ultimately charged seven defendants, including one entity and these six individuals for gambling-related charges ("Sand Island Sports Defendants"):

| Name | Charges | Date Charged |
|------|---------|--------------|
| Edon Kagosoff | 18 U.S.C. § 371 | February 15, 2022 |
| Wayne Nix | 18 U.S.C. § 371;<br>26 U.S.C. § 7206 | February 15, 2022 |
| Joseph Castelao | 18 U.S.C. § 1955 | February 7, 2022 |
| Kenneth Arsenian | 18 U.S.C. § 1955;<br>18 U.S.C. § 1957; | December 13, 2021 |



| | 26 U.S.C. § 7206;<br>31 U.S.C. §§ 5363, 5366 | |
| Howard Miller | 18 U.S.C. § 1955 | March 10, 2022 |
| Matthew Funke | 18 U.S.C. § 1955;<br>31 U.S.C. §§ 5363, 5366 | December 15, 2021 |

Three additional individuals have been charged in connection with the Sand Island Sports Matter, but not for gambling activities: Puig; Agent 1; and Erik Hiljus (charged for subscribing to a false tax return in November 2022).  Puig is the sole individual on this list who only placed bets, rather than participating in the gambling business itself.

The investigation into the Sand Island Sports Matter was made public on February 7, 2020, when the investigative team executed search warrants on the homes of several of the above defendants. (Declaration of Jose R. Nuño ("Nuño Decl."), ¶ 4.)  During the time period between when the investigative team executed the search warrants and the filing of charges against Nix, the investigative team interviewed numerous individuals, including certain principals and agents involved in the business ("Sand Island Sports Agents"),[1] as well as athletes and managers who placed bets.  (*Id.* ¶ 5.) However, the pattern or practice of the investigative team in conducting these interviews was markedly different depending on whether the individual being interviewed was Black, such as Puig, or not Black.

## B.    The Government's Interviews of the Sand Islands Sports Agents, All of Whom Were Not Black

Despite being the actual targets of the investigation, the Sand Islands Sports Agents —none of whom are Black— were consistently treated respectfully by the

---

[1]  The government has liberally placed under seal virtually all of the reports of interview in this case, so the defense is using pseudonyms (or pseudonymous categories) to refer to the individuals interviewed.  A more fulsome summary is in the Nuño Decl., ¶¶ 6-7.

1    government, even where they made material misstatements of fact to government

2    agents or attempted to destroy evidence. The investigative agents gave these

3    individuals multiple interviews to clarify their statements, and did not charge any of

4    them with making false statements or obstruction of justice.  (*See* Nuño Decl. ¶¶ 6-

5    7.)   As part and parcel of that respectful approach, any interviewee who gave a

6    proffer pursuant to an agreement with the government was advised about the terms

7    of the proffer agreement, such as being told that, if they were less than truthful, it

8    would void the terms of that agreement, as is generally the USAO's practice.  (*See*

9    Axel Decl. ¶ 10.)  None of them were read the text of 18 U.S.C. § 1001 at the

10   beginning of the interview or admonished that it was a federal crime to lie to

11   government investigators.  (Nuño Decl. ¶ 7.)  Black men, however, were treated

12   differently.

13          C.      **Interviews of Black Athletes and Managers**

14          The investigation team's interviews with Black athletes and managers, whose

15   only alleged role was to place, or assist in the placing of, bets through Sand Island

16   Sports, were handled far differently by the investigation team.  In those interviews,

17   the government admonished the Black men that 18 U.S.C. § 1001 made it a crime to

18   lie to federal investigators, and then utilized threats of prosecution to control the

19   interviews.

20          On October 28, 2021, the government interviewed a prominent Black athlete

21   who was cold-called by the government and answered questions without the benefit

22   of counsel. (*See* Nuño Decl., Ex. A.)[2] Despite the fact that he was not under

23

24   _____

25   [2] Notably, there were only a handful of interview reports that the government did
     not produce under seal, and the unprotected reports include the reports of the

26   interview of Puig, the Black athlete (who is a public figure), and the Black manager
     discussed below.  Even post-indictment, the Black men apparently are not worthy of

27   the same level of respect as the non-Black interviewees.  Nevertheless, the defense
     has provided them to the Court under seal with the protected interview reports.

28

subpoena or any compulsion to cooperate and was being asked about events that occurred more than three years before, he agreed to speak with the government agent.  When asked by the agent whether he had ever bet on a game through Nix, he initially answered that he did not recall, but then subsequently corrected himself and recalled that he had, indeed, done so. (*Id.*) The government agent conducting the interview then spontaneously admonished him that it was a crime to make false statements and reminded him that Martha Stewart had been charged with a violation of 18 U.S.C. § 1001. (*Id.*) The IRS agent never did this when interviewing non-Black individuals, even when their failures of memory were more intentional.

As another example, on November 9, 2021, the government interviewed the Black manager of a prominent Black athlete. (Nuño Decl., Ex. B.) Although the investigative team had never read the text of 18 U.S.C. § 1001 to any non-Black individuals interviewed in the course of the investigation – and although it already had conducted at least 19 interviews – it did so in advance of this interview[3] and then admonished the Black manager of the consequences "if he were to lie to the government." (*Id.*) Over the course of the interview, the investigation team then asked the Black manager on two different occasion whether he was being truthful, and not misleading. (*Id.*) The government's approach to Puig—also a Black man—was similar.

### D.    The Interview of Yasiel Puig

On December 14, 2021, the government issued a subpoena to Puig to testify in front of the grand jury on February 16, 2022. Puig, a professional baseball player, was contracted to play in the Korean Baseball League ("KBO"), and was required to be in Korea on February 16, 2022 for spring training.  An attorney for Puig who had

---

[3]  The government would contend that the reading of the statute makes it easier for it to prove that the elements of a violation have been met.  Accordingly, it is a way to set up the witness for possible future prosecution.

1  represented him in an earlier civil matter requested that Puig be interviewed in lieu

2  of appearing before the grand jury. The government agreed, but provided no

3  information to Puig or his attorneys regarding what topics would be covered in the

4  interview other than to say it concerned online gambling. Further, the government

5  did not provide a proffer letter to Puig's attorneys until a day before the scheduled

6  interview, or January 26, 2022.

7      Unlike the other Black men interviewed by the investigation team, Puig's first

8  language is not English and he suffers from a variety of cognitive and social

9  disabilities, including both post-traumatic stress disorder ("PTSD") and attention

10  deficit hyperactivity disorder ("ADHD") which severely limit his temporal

11  processing abilities and executive functioning.  Puig's learning disabilities and

12  secondary language skills are further hampered by the fact that has had very limited

13  formal education, receiving the equivalent of only a third-grade education before he

14  was sent to Cuba's government-run Baseball Academy at the age of nine. This of

15  course is compounded by the fact that Puig is primarily Spanish speaking, having

16  been born and raised in Cuba, which carries a dialect unique from even other

17  Spanish speaking countries.

18      On January 27, 2022, and despite these deficits, the government interviewed

19  Puig remotely via Cisco's WebEx software, a remote video conferencing system.

20  (Nuño Decl., ¶ 11, Ex. C.) The government treated Puig just as it had other Black

21  men in the investigation—and dissimilarly from non-Black individuals. At the

22  outset of the interview, one of the prosecutors advised Puig that lying was a crime

23  that could be prosecuted and one of the agents read the text of 18 U.S.C. § 1001 to

24  Puig, based on a purported "protocol." (*Id.*)[4]

25

26

27  _____

[4] Of the 22 interviews the government has produced to-date that took place prior to

28  Puig's interview, only the Black manager had been read the text of § 1001.

6

Over the course of the interview, Puig was asked to accurately recollect events that had occurred more than two-and-a-half years before, including the details about certain check payments. (*Id.*) Needless to say, Puig did not have perfect recollection of such, in part because of the passage of time and, in part, because he utilized financial managers and other assistants to handle such matters. And like it had done with other Black men, the government utilized this lack of perfect recollection to bully and berate Puig and his lawyers by accusing him of insufficiently cooperating. As Puig attempted to utilize his phone messages to refresh his recollection, the government terminated the interview. (*Id.*) The government was far more generous in granting non-Black witnesses both time and information to refresh their recollections.

### E.  The Government Quickly Moves to Investigate and Charge Puig

Although the government gave multiple non-Black individuals the opportunity to clarify and rehabilitate their statements to the investigation team (*see* Nuño Decl., ¶¶ 6-7), with Puig, the government took a different approach: rather than communicate with Puig's counsel and give him the opportunity to refresh his memory with bank statements and phone records, the government attempted to build a false statements claim against Puig from the beginning. The government did not do this with non-Black interviewees, even where they blatantly lied or obstructed justice and did not suffer from the same language or intellectual disability barriers that Puig did. The stark disparity between how the investigation team treated Puig and other Black interviewees versus non-Black interviews sent a crystal-clear message—Black men who did not meet the investigation team's definition of cooperation (a standard that was markedly different for Black men than non-Black men) would be publicly punished and made an example of.

Puig's name started showing up on Reports of Interviews ("ROIs") as the target of the government's investigation beginning in March 2022 (Nuño Decl., ¶ 15), even though the investigation into the Sand Island Sports operation had

7

essentially concluded by that date.  (*See supra* at p. 2 (chart of Sand Island Sports Defendants).  On March 2, 2022, the investigation team interviewed Agent 1, a non-Black individual. (Nuño Decl., ¶¶ 12-14, Ex. D.) Unlike Puig, Agent 1 was not read the text of 18 U.S.C. § 1001 by the prosecution team at the beginning of the interview nor was he admonished that lying to government agents was a federal crime. (*Id.*) Nor was Agent 1 read the text of 18 U.S.C. § 1001 after he made multiple and easily demonstrable false statements to the government; instead, the government agents ignored the lies or attempted to rehabilitate them to suit their prosecution of Puig. (*Id.*)

For example, Agent 1 initially lied to the government about whether and for how long he took bets directly from Puig and remitted them to Nix. (*Id.*)The government knew immediately that this was false, but it never admonished Agent 1 regarding § 1001 (as they spontaneously did with the Black athlete) or even inquired as to whether he has told the truth (as they did with the Black manager). Instead, the prosecution team gently put text messages in front of Agent 1 to allow him to refresh his memory and rehabilitate his statements about direct bets from Puig. (*Id.*) (By contrast, when Puig attempted to refresh his recollection with text messages, the government agents terminated the interview.)

Not only did Agent 1 lie to the prosecution team about multiple matters, he also admitted that he destroyed his text messages with Puig and his notes about gambling after the Sand Island Sports Matter became known to him.  But despite this knowing destruction of evidence, Agent 1 is not charged with false statements or obstruction of justice. (*Id.*)  (By contrast, Puig is charged with obstruction based solely his alleged statements during the interview.)

In what is perhaps the starkest example of a double-standard, Agent 1 flat out lies to government agents about his latest communications with Puig, stating that the last messages they exchanged were New Years' greetings. (*Id.*)  This is demonstrably false:  In fact, Puig told the government during his January 27

8

interview that Agent 1 had texted him during that interview.  Agent 1 denies this to the government, but the phone records prove that Puig was *telling the truth* and Agent 1 *was lying*.  (Nuño Decl. ¶ 14.) Yet, the government simply believes Agent 1 over Puig and indicts Puig for lies and obstruction rather than Agent 1.

### F.   The Government's Threatens to Arrest Puig and Makes Misleading Press Statements

In May 2022, less than four months after the interview, the government sent a target letter to Puig.  By the time he retained criminal counsel, the government informed counsel that it already had obtained authority to charge Puig and would do so shortly.  The consequences of that would be that DHS would enter a warrant in the system, and he would be arrested abroad during his season in the KBO.  (Axel Decl., ¶ 2.)

The government did not rush to judgment against any other charged defendant.  Almost two years passed between the execution of the search warrants against Sand Island Sports principals and when the charging documents were filed against the Sand Island Sports Defendants in late 2021/early 2022.  No one was summarily arrested.

Upon Puig's initial appearance, the government issued a press release.  Agent 1 had lied, obfuscated, and destroyed evidence, but the USAO released no press release regarding Agent 1's behavior.  Perhaps it was because Agent 1 had no press appeal or perhaps it was because he was not Black. Certainly, the USAO released a press statement about Puig's alleged bad conduct, which trumpeted the unsealing of the Puig information with a quote from the U.S. Attorney stating:  "Mr. Puig's lies hindered the legal and procedural tasks of the investigators and prosecutors."  (Axel Decl., Ex. D)  Further, one of the prosecutors posted a statement on LinkedIn in which he similarly claimed that Puig's "false statements made th[e government's]

job harder." (Nuno Decl., ¶ 17, Ex. G.)[5]  By contrast, the U.S. Attorney's Office press release as to the Sand Islands Sports defendants contained no public statements of the U.S. Attorney.  (Axel Decl., Ex. C.)

The statements about Puig were not only inappropriate but also false.  First, Puig did not lie (unlike Agent 1), and his statements did not nothing to hinder the government's investigation of the Sand Islands Sports Matter.  The Sand Islands Sports Agents had been repeatedly interviewed prior to Puig's interview, and the case was all but wrapped up at the time of his interview. Nothing Puig said (or did not say) had a material effect on the Sand Island Sports Matter. Indeed, the only person the government appears to have been investigating after it interviewed Puig was Puig, himself.  The USAO's public statements calling out Puig was thus little more than an attempt to scold and punish Puig.

**G.     Other Examples of Disparate Treatment in Interviews [UNDER SEAL]**

---

[5] This post has since been taken down. (*Id.*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19      **H.      Allegations of Discrimination Within the USAO**

20      Aside from these clear instances of external biases in witness interviews and

21  charging decisions, the USAO has also faced allegations of internal bias.   In a

22  retaliation lawsuit filed by AUSA Charles Pell, Pell accused the USAO of race-

23  based discrimination by high-ranking employees within the office.  In one instance,

24  Pell alleged that a high-ranking supervisor berated a Latina employee, calling her

25  unprepared and her work product shoddy, consistent with negative tropes associated

26  with Latinos/as as lazy.  In another allegation, Pell claimed that personnel made

27  comments about Black employees wearing "pimp daddy suits" and referred to

28  another Black employee as a "Black mamba."  Pell detailed that a Black prosecutor

11

had prepared a memorandum called "Action Proposals for Racial Justice, Equity, and Inclusion at the U.S. Attorney's Office for the Central District of California." Puig has requested discovery into the USAO's investigation into these allegations, including the memorandum, and any discovery produced to Pell in that case that was settled in March 2022.

## I.   Puig's Requests for Discovery Materials on Selective Prosecution Are Denied

Given the facts here, on January 20, 2023, and February 1, 2023, Puig sent the government discovery requests seeking, among other things, discovery to support a claim for selective prosecution.  These requests included:

- A list of all 18 U.S.C. § 1001 cases charged by the USAO over the past 10 years.
- A list of all cases charged by the prosecutors over the past 5 years.
- All reports of interviews prepared by the assigned Special Agents from the Department of Homeland Security ("DHS") and the Internal Revenue Service ("IRS") over the past 5 years.
- All training materials the IRS and DHS provide to agents concerning how to conduct and take notes of interviews.
- Documents sufficient to show any implicit bias training attended by the members of the prosecution team, including the date(s) of attendance.
- All implicit bias training materials for trainings given or sponsored by the USAO over the past 5 years.
- All interview reports prepared by any agent of any federal or state agency of any interviews led by the prosecutors over the past 5 years.
- Communications among the agents and with any witnesses, or counsel for witnesses, regarding any interviews in this case, and any charging decisions in this case.
- All discrimination or selective prosecution claims or complaints filed with the Department of Justice Civil Rights division or Office of Professional Responsibility over the past 10 years.
- Discovery and internal investigations in the Pell matter, including the office memorandum referenced above.

The government has denied Puig's above-requests.

## III.   ARGUMENT

Whether to prosecute and what charges to file "are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Such discretion is not, however, absolute, and prosecutorial discretion is "subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quoting *Batchelder*, 442 U.S. at 125); *see id.* ("[A]though prosecutorial discretion is broad, it is not 'unfettered.'"). In this case, the USAO has exceeded the constitutional boundaries of its discretion by basing its investigation into Puig, and its ultimate decision to charge Puig, on the "unjustifiable standard" of his race. *Id.*

### A.   The Equal Protection Clause Bars Race-Based Differences in Prosecutorial Discretion.

Prosecutors may not base charging decisions on race because doing so runs afoul of the Due Process clause of the Fifth Amendment. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Wayte*, 470 U.S. at 608.  As such, "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"  *Armstrong*, 517 U.S. at 464 (internal citations omitted). Selective prosecution claims, thus, are judged by the same standards as equal protection claims: the defendant must demonstrate that the prosecutorial decision "had a discriminatory effect" that "was motivated by a discriminatory purpose."  *Id.* at 465; *see Wayte*, 470 U.S. at 608.

To establish the "discriminatory effect" prong, the defendant "must show that similarly situated individuals of a different race were not prosecuted."  *United States v. Abarca*, 2018 WL 3025803, at *2 (S.D. Cal. Jun. 15, 2018). To establish the "motivated by a discriminatory purpose" prong, the defendant must prove that his prosecution was "based on an impermissible motive." *United States v. Bourgeois*, 964 F.2d 935, 941 (9th Cir. 1992).

With respect to a request for discovery on the issue of selective prosecution, "[t]he showing necessary to obtain discovery [on selective prosecution] is somewhat

13

1  less: the defendant must produce '**some evidence** that similarly situated defendants

2  of other races could have been prosecuted but were not." *Arenas-Ortiz*, 339 F.3d

3  1066, 1069 (9th Cir. 2003) (emphasis added); *see also United States v. Blowers,* 268

4  Fed. Appx. 504, 506 (9th Cir. 2008) ("To prevail on a request for discovery on the

5  issue of selective prosecution, [defendant] was required to produce 'some evidence

6  tending to show the existence of the essential elements of the defense.'" (Internal

7  citation omitted)).  Here, the evidence demonstrates a discriminatory effect and

8  intent by the government, and at a minimum, Puig has proffered some evidence

9  tending to show these essential elements such that discovery should be compelled.

10      **B.      Implicit Biases Against Black Men Affect the Government's View**

11           **of Who Is Credible and Who Deserves Punishment.**

12      It is well established that implicit bias is linked to disparities throughout the

13  criminal justice system.[6] Implicit biases can be described as "thoughts and

14  preconceived notions that flow through our minds—often subconsciously—

15  pertaining to particular people, groups, or situations."[7]  Implicit bias, which is

16  "largely automatic and occurs below the level of conscious awareness,"[8] consists of

17  both stereotypes about particular types of groups, and implicit positive or negative

18  attitudes.[9] The data is overwhelming: Black suspects "are more likely to be arrested,

19  more likely to be indicted when they are arrested, more likely to be convicted when

20  they are indicted, and more likely to serve longer sentences on average than their

21

22

23  [6] Jennifer K. Elek, Paula Hannaford-Agord, *First, Do No Harm: On Addressing the*
*Problem of Implicit Bias in Juror Decision Making, 49CT. REV. 190 (2013)*

24  [7]  Melissa L. Breger, *Making the Invsible Visible:  Exploring Implicit Bias, Judicial*

25  *Diversity, and the Bench Trial* (2019) U. of Rich. L. Rev. 1039 (2019).

26  [8] Fatma E. Marouf, *Implicit Bias and Immigration Courts*, 45 New Eng. L. Rev. 417
(2011).

27  [9] Jerry Kang,  *Implicit Bias:  A Primer, National Center for State Courts* (2009),

28  https:// www.courts.ca.gov/documents/BTB_XXII_WEDF_3.pdf
[https://perma.cc/7U2N-4PU6].

14

White counterparts."[10]  Of course, no USAO or individual prosecutor thinks that they are engaging in prejudice. But "research on implicit bias shows that people who embrace egalitarian norms nevertheless harbor invidious implicit associations."[11]

For example, in a November 2017 report, the U.S. Sentencing Commission found that Black men received 19.1% longer sentences than similarly-situated white men.  These "Black/White sentencing disparities, as the Washington Post summarized, were driven, "in large part by 'non-government sponsored departures and variances' — in plain English, sentencing choices made by judges at their own discretion."[12]  But decisions by federal prosecutors are also "driving the disparities."[13]  The implicit biases that drive such disparities include an implicit bias that Black physical traits are more associated with criminality.[14]

Despite the data showing bias at all phases of the criminal justice system, the problem is difficult to root out, in part because prosecutors, judges, and juries believe they are unbiased. Indeed, studies have shown that "thinking oneself to be objective seems ironically to lead one to be less objective and more susceptible to biases."[15] There is also substantial data showing that fact-finders exhibit implicit biases in trial, as judges and juries make credibility assessments to decide who is truthful and who is not.  The legal system is based on a psychological assumption

---

[10] Andrew J. Wistrich and Jeffrey J. Rachlinski, *Implicit Bias in Judicial Decision Making, How it Affects Judgment and What Judges Can Do About It (March 16, 2017)*. Chapter 5: American Bar Association, Enhancing Justice (2017), Cornell Legal Studies Research Paper No. 17-16, Available at SSRN: *https://ssrn.com/abstract=2934295* or *http://dx.doi.org/10.2139/ssrn.293429 5*.

[11] *Id.*

[12]  Christopher Ingraham, *Black men sentenced to more time for committing the exact same crime as a white person, study finds*, The Wash. Post, Nov. 16, 2017 at 1:33 p.m. EST.

[13]  *Id.* (citing example of more Black men being charged with mandatory minimum sentences).

[14] Elek, *First, Do No Harm*, at 192.

[15] Implicit Bias in the Courtroom, 59 U.C.L.A. L. Rev. 1124 at *1173 (2012).

that is taken for granted:  that "individuals can cognitively process, evaluate, and weigh the facts that were presented during trial."[16] But in fact, not only do judges and jurors bring implicit biases to bear in deciding who is telling the truth, but it also causes them to "unintentionally and automatically 'misremember' facts in racially biased ways during all facets of the legal decision making process."[17] Further, "jurors tend to be less suspicious and are willing to give the benefit of the doubt to witnesses who share their identity, but they are more suspicious of witnesses who do not share their identity."[18]

The American criminal defense system rests on the assumption that prosecutors and government agents will be able to make fair, non-biased credibility assessments. But prosecutors and government agents are human and are thus subject to the same implicit biases as judges and juries. In the investigative and charging phases, the prosecution team alone decides which facts it believes to be true and how such facts can be proven in court.  In most instances, the only consequence of a prosecutor disbelieving a witness is that the witness is not called at trial; in that case, any implicit bias on the part of the prosecution team does no harm (at least to the witness). But in a case such as this, where the government is charging obstruction of justice and false statements, what the prosecutors and agents heard, understood, and remembered, and how they (subjectively) evaluated the defendant's credibility, is the very proof upon which the whole prosecution is based.  And given that "implicit bias "predicts more negative evaluations of ambiguous actions by [a Black person],"

---

[16] Justin D. Levinson, *Forgotten Racial Equality:  Implict Bias, Decisonmaking and Misremembering*, 57 Duke L.J. 345 (2007).
[17] *Id.*
[18] Mikah K. Thompson, *BIAS ON TRIAL: TOWARD AN OPEN DISCUSSION OF RACIAL STEREOTYPES IN THE COURTROOM*, 2018 Mich. St. L. Rev., 1243 (2018).

it is hardly surprising that implicit biases could "could influence decision-making in hard cases."[19]

That is precisely the case here. While the prosecution team's biases may not have been overt or explicit, they have repeatedly exhibited biases in the manner in which they treated (and believed) non-Black men and in which they treated (and disbelieved) Black men. The prosecution team has also exhibited bias in whom they have chosen to prosecute for alleged lies (Black men) and whom they have seemingly given a free pass to lie, obfuscate, and obstruct (non-Black men). These biases merit further discovery to ensure that Puig is not being prosecuted because he had the audacity to be "difficult while Black."

### C.   Biases Against Individuals from Latin American Countries Also Affect Determinations of Their Credibility.

In addition to being Black, Puig is also a Latino and a Cuban defector. To date, Puig is seemingly the only interviewee who required an interpreter. Further, in assessing Puig's credibility, the government failed to consider Puig's national origin in assessing his communications to agents and prosecutors at issue even though it is well-documented that individuals from Latin American cultures communicate far differently than the average American citizen. People whose are raised in Latin American culture are "high context," meaning they rely heavily on implicit communication and nonverbal cues.[20]  In these cultures, "the information lies in the

---

[19] Kang, *Implicit Bias:  A Primer*, at 4.

[20] Liu Tong, *Article: Applying Hall's High Context and Low Context Cultures Model to Analysis the Implicationsi of Cultural Differences on Functioning in Cross-cultural Groups*, Academic Journal of Humanitues & Social Sciences Vol.3, Issue 8, 129-30 (chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://francis-press.com/uploads/papers/mHMQT4Zd5J9Li11Dtk0HajMr7MGYYzfhe0XsNOKQ.pdf).

context," and important points may not always be verbalized.[21] This is especially true for individuals from Latin American countries who are comparatively uneducated (*i.e.*, an elementary school-level education at best) and/or may suffer from additional cognitive processing defects. Comparatively, in "low context" cultures such as the United States, context is not as important because communication is often direct and explicit.[22] Additionally, the more educated one is (and the more bereft of cognitive processing defects), the more likely direct and explicit communication is to be effective.

A review of the government's interview memo reflects that this cultural difference was not accounted for in the government interview of Puig and could have easily led to implicit bias in the government's assessment of Puig's credibility and candor. Notably, Puig is the only interviewee in all of the government's discovery that was interviewed through an interpreter.

Even assuming the government's interview memo is accurate (which is contested), the government failed to give Puig any background information to orient Puig (or his attorney) as to the topics of discussion and went directly to asking focused, direct, and often time-specific questions—questions that required Puig to make connections for himself and to anticipate what the government wanted to know. The questions were also presented to Puig by an interpreter who made reported translation errors.

The interview memo makes clear that the government prosecutors and agents expected Puig to do something other than literally answer the question posed, but

---

[21] John Barkai, *Article: What's a Cross-Cultural Mediator to Do? A Low-Context Solution for a High-Context Problem*, 10 Cardozo J. Conflict Resol. 43, 56-57 (2008) (chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://core.ac.uk/download/pdf/32299575.pdf).

[22] *Id*.

Puig lacked the formal education, cultural understanding, and cognitive ability to understand that was being asked of him (and his attorneys lacked the ability to address such dissonance on the fly given the government gave them little to no warning as to their topics of conversation and given the video conferencing format).

The Department of Justice's own Civil Rights website recognizes that cultural and language issues can result in prohibited disparate treatment based on national origin in law enforcement interviews.  (Axel Decl., Ex. B.) As an example of police misconduct that would constitute a deprivation of equal rights, that document highlights a situation in which a police officer, frustrated that a man of Vietnamese origin cannot answer his questions due to his lack of English fluence, arrests the man for disorderly conduct. (*Id.*) That is akin to what happened here—the prosecutors have brought obstruction and § 1001 charges based on implicit biases about how Puig *should have* answered their questions. Whether Puig is being prosecuted and punished for being a disorderly Black man or a disorderly Cuban man is of no moment—both are prohibited motives, implicit or not.

### D.   The Government's Treatment of Puig Compared to Similarly-Situated Individuals of Other Races Demonstrates a Discriminatory Effect.

The government's decision to punish Puig with prosecution—to refuse to believe him, deny him the opportunity to refresh or rehabilitate his recollection, and then indict him—stands in stark contrast with how the government has treated similarly-situated non-Black individuals in the Sand Island Sports Matter. This stark contrast clearly demonstrates a discriminatory effect on Puig. This discriminatory effect is not lessened by the fact that it might be the product of implicit biases toward disbelieving, criminalizing the actions of, and punishing Black men; the effect is just the same: a Black man has been prosecuted for making false statements and obstruction when non-Black men who made demonstrable false statements and purposefully obstructed justice were not.

The evidence is such that Puig believes he has amply demonstrated that the prosecution against him was "motivated by a discriminatory purpose." *Bourgeois*, 964 F.2d at 941. But at this stage, Puig is simply seeking discovery of selective prosecution and the standard is lower—Puig must simply produce *some* evidence that "similarly situated individuals of other races could have been prosecuted but were not." *Armstrong*, 517 U.S. at 469; *see United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003). A "similarly situated" individual is "one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *Sacramento Nonprofit Collective v. Holder*, 855 F. Supp. 2d 1100, 1110 (E.D. Cal. 2012) (citations omitted); *see Arenas-Ortiz*, 339 F.3d at 1068. Here, there are multiple examples of non-Black individuals (and individuals who were not from Latin America) who made false statements to law enforcement officers in violation of § 1001 and obstructed justice who were not prosecuted for such by this same prosecution team.

First, the prosecution team gave non-Black individuals far greater leeway to correct and rehabilitate false statements from the get-go. Non-Black individuals were read proffer agreements, permitted to correct their misstatements (intentional or not) by having their recollection refreshed (or impeached) by text messages or other documents, and given multiple opportunities to cooperate. Black individuals such as Puig were read the plain text of § 1001 and told that any prevarication would result in criminal punishment. The protocol was markedly different between similarly situated individuals on the basis of race, controlling for all other factors.[23]

---

[23] The government has claimed that it was following protocol in admonishing all witnesses of the text of § 1001. The undersigned is unaware of such protocol. The USAO has not provided any evidence of such a protocol nor the materials necessary to test it.  The reports of interviews produced to date show that, to the extent such protocol exists, it evolved only after being used in the interviews of the three Black

---

20

Second, Agent 1, who is not Black, made affirmatively false statements during his interview with the government, destroyed evidence after becoming aware of the government's investigation, and affirmatively attempted to interfere in the investigation by contacting Puig to learn about his interviews with the government. And yet, the prosecution team did not levy either §1001 or obstruction charges against him. Similarly, other interviewees, such as Player R, made false statements to the government and the government politely corrected him and allowed him to rehabilitate his statements with documents and messages. (*See* Section II (G) Under Seal).

Third, there is evidence that non-Black individuals were treated dissimilarly after charging decisions were made as well. Where non-Black individuals were given generous amounts of time to plead guilty to the government's chosen charges (which, to be clear, were not § 1001 or obstruction), and to self-surrender, Puig was threatened with imminent arrest in Korea and extradition to the United States, which would have ruined the sunset of his baseball career. In other words, the government threatened to make the singular Black man charged do a perp walk, while all of the non-Black defendants were allowed to quietly come in through the back door. This is discriminatory effect that is worthy of further discovery.

### E.    Puig is Entitled to Additional Discovery to Further Establish the Government's Impermissible Motive.

In addition to discovery as to whether the government's prosecution of Puig was had a discriminatory effect, Puig is entitled to further discovery as to whether the prosecution team was "motivated by a discriminatory purpose," that is, whether the prosecution was "based on an impermissible motive," whether implicit or

---

men, and after the government had concluded that Puig lied. Even then, the government failed to follow its new protocol when interviewing Agent 1, and did not remember to admonish him, even after he began to lie.

explicit. *Bourgeois*, 964 F.2d at 941. Discovery is warranted here because there is sufficient demonstrable evidence that that the government was motivated to prosecute Puig "at least in part because of . . . its adverse effects upon an identifiable group." *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (quoting *Wayte*, 470 U.S. 598 at 610). In other words, there is evidence that Black men were treated differently over the course of their interviews with the prosecution team and that Puig, a Black man, was punished for alleged prevarications while non-Black individuals whose prevarications were far more intentional were not punished.

Evidence of differential treatment is probative of whether the prosecution was motivated by a discriminatory purpose. *See United States v. Smith*, 231 F.3d 800, 809 (11th Cir. 2000); *cf. Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013) (indicating in a civil case where discrimination is alleged, preferential treatment of a similarly situated person can be evidence of discriminatory intent).

The evidence received by Puig to date demonstrates that there were 19 interviews of non-Black individuals prior to the prosecution team interviewing the first Black man. All of these interviews were cordial and none of them included a recitation of § 1001 at the outset of the interview. The *very first* time the prosecution team interviewed a Black person, this protocol changed and the prosecution team read the Black individual the text of § 1001 at the beginning of the interview, a change in tactic that appears to have been motivated by no other reason than race, which is an impermissible motive. The Black men interviewed by the prosecution team were, in the objective scheme of things, no more culpable than the non-Black men. Indeed, *all* of the Sand Island Sports Agents were not Black; the only Black individuals involved here were athletes and managers who allegedly placed bets. And yet, the prosecution team's tone toward the Black individuals was markedly different from the get-go.

1    The prosecution team's treatment of Puig also differs markedly from similarly

2    situated non-Black individuals. Agent 1, who lied to the prosecution team repeatedly

3    and destroyed evidence when he learned of the investigation, was treated with

4    compassion and respect—he was allowed to refresh and rehabilitate his recollection,

5    was never read the text of § 1001, and was never charged with § 1001 or obstruction

6    of justice for his clear misdeeds. Puig, on the other hand, was repeatedly bullied by

7    the prosecution team during his interview despite obvious translation difficulties,

8    cultural misunderstandings, and what should have been patently obvious cognitive

9    difficulties, never allowed to refresh his recollection despite his attempts to do so,

10   and then charged with felonies after the fact despite the fact that his alleged lie had

11   *zero* effect on the government's investigation.

12   As a specific example, the § 1001 charge, which alleges that Puig "falsely

13   stated that he had never discussed or talked about sports betting with Agent 1." (Dkt.

14   54 at 7.) However, the government's memorandum of interview for Puig clearly

15   shows that, toward the end of the interview, Puig started refreshing his recollection

16   with text messages between him and Agent 1 and, as he was doing so, confirmed

17   that he "had information pertaining to a basketball bet for $40,000. Puig asked

18   [Agent 1] to place the bet for him (Puig) while [Agent 1] was in Las Vegas NV on

19   May 8, 2019." (Nuño Decl., ¶ 13, Ex. D.) Despite correcting himself without any

20   assistance by the government before the conclusion of the interview, Puig is still

21   being charged with a false statement. Agent 1, a non-Black man, also made multiple

22   misstatement of fact during his interview. But the government refreshed Agent 1's

23   recollection and never charged him with § 1001.The evidence all points to the

24   prosecution team wanting to punish Puig for having the audacity to be a Black man

25   who did not conform to their standard of contrition and cooperation.

26   Put simply, there are many reasons why Puig's interview may not have gone

27   as the government expected—lack of preparation by Puig's then-attorneys, cultural

28   differences, Puig's cognitive difficulties, translation difficulties, etc. Yet, the

23

prosecution team just assumed that Puig was lying, scolded him during the interview for not remembering years-old events, and immediately moved to punish him with felony charges after his interview. This was *not* how the prosecution team treated non-Black interviewees, including Agent 1: non-Black individuals were given evidence by the prosecution team to help refresh their recollections, were assuaged instead of scolded, and were asked open-ended questions (as opposed to the closed-ended questions asked of Puig). Non-Black individuals were treated cordially and deferentially; Black mean were treated adversarially.

The post-indictment evidence provides further evidence of discriminatory intent vis-à-vis Puig as a Black man.  The USAO press releases and the prosecutor's statement about Puig's alleged conduct demonstrates a clear intent to scold, admonish, and punish Black men more than multiple similarly-situated non-White men – just the type of bias summarized in the U.S. Sentencing Commission report. Whether implicit or explicit, this is impermissible bias; the Court should thus order further discovery on selective prosecution.

## IV.    CONCLUSION

For the foregoing reasons, Puig respectfully requests that this Court issue an order compelling the government to produce the requested discovery on selective prosecution, and any other relevant discovery.

DATED:  February 10, 2023          WAYMAKER LLP

By: _____
Keri Curtis Axel
Jose R. Nuño
*Attorneys for Defendant Yasiel Puig Valdes*