E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture & Recovery Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0698/2426
        Facsimile: (213) 894-6269/0141
        E-mail:    jeff.mitchell@usdoj.gov
                   daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 22-394-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT YASIEL PUIG VALDES' MOTION TO COMPEL DISCOVERY; DECLARATION OF JEFF MITCHELL; EXHIBITS |
| v. | |
| YASIEL PUIG VALDES, | |
| Defendant. | Hearing Date: March 15, 2023 |
| | Hearing Time: 2:30 p.m. |
| | Location:    Courtroom of the Hon. Dolly M. Gee |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Jeff Mitchell and

Dan G. Boyle, hereby files its Opposition to Defendant YASIEL VALDES

PUIG's Motion to Compel Discovery (ECF Nos. 59, 66).

//

//

This Opposition is based upon the attached memorandum of points and authorities, the declaration of AUSA Jeff Mitchell and attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 22, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____

JEFF MITCHELL
DAN G. BOYLE
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                           PAGE

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   RELEVANT FACTS...............................................3

III.  ARGUMENT.....................................................6

    A.   The Legal Standards for Analyzing Selective
        Prosecution Claims and Requests for Selective
        Prosecution Discovery.......................................6

    B.   Defendant Has Not Satisfied The "Rigorous" Standard.......8

        1.   Defendant's Assertions of Implicit Biases do Not
            Establish Discriminatory Effect or Discriminatory
            Intent..............................................9

        2.   The Government's Interview Process Was Race-
            Neural.............................................10

        3.   Defendant Has Not Identified Any Similarly
            Situated Persons Who Were Not Prosecuted...........13

        4.   Defendant's Arguments About his Personal
            Characteristics Are Not Evidence of Either
            Discriminatory Effect or Intent....................20

        5.   Allegations in a Civil Lawsuit Are Not Evidence
            Under Armstrong....................................20

        6.   Discovery is Not a Substitute for Defendant's
            Burden to Establish Discriminatory Intent Under
            Armstrong..........................................21

    C.   The Requested Discovery Is Overbroad and Irrelevant......24

IV.   CONCLUSION..................................................25

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Cases**

Att'y Gen. of United States v. Irish People, Inc.,
    684 F.2d 928 (D.C. Cir. 1982) ..................................... 8
Ibekwe v. Los Angeles World Airports,
    2016 WL 6822753 (C.D. Cal. Jan. 11, 2016) ....................... 20
United States v. Aguilar,
    883 F.2d 662 (9th Cir. 1989) .................................... 15
United States v. Armstrong,
    517 U.S. 456 (1996) ......................................... passim
United States v. Bass,
    536 U.S. 862 (2002) ............................................. 9
United States v. Bourgeois,
    964 F.2d 935 (9th Cir. 1992) ................................... 13
United States v. Casanova,
    2022 WL 946944 (10th Cir. Mar. 30, 2022) ........................ 9
United States v. Fokker Servs. B.V.,
    818 F.3d 733 (D.C. Cir. 2016) ................................... 7
United States v. Lewis,
    517 F.3d 20 (1st Cir. 2008) ................................. 8, 15
United States v. Martinez,
    589 F. App'x 371 (9th Cir. 2015) ............................... 15
United States v. Ness,
    652 F.2d 890 (9th Cir. 1981) ................................... 22
United States v. Olvis,
    97 F.3d 739 (4th Cir. 1996) ............................... 15, 19
United States v. Smith,
    231 F.3d 800 (11th Cir. 2000) ...................... 14, 18, 22, 23
United States v. Stone,
    394 F. Supp. 3d 1 (D.D.C. 2019) ................................ 14
United States v. Turner,
    104 F.3d 1180 (9th Cir. 1997) .................................. 10
Wayte v. United States,
    470 U.S. 598 (1985) ........................................ 10, 11

**Statutes**

18 U.S.C. § 1001................................................. passim

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3      During an interview on January 27, 2022, defendant YASIEL PUIG

4 VALDES told law enforcement that he had never talked to Agent 1 about

5 sports betting, that a bet he had made had been placed on a website

6 he could not identify through a person whose identity he did not

7 know, and that he did not know the person who had instructed him to

8 send $200,000 in cashiers' checks to Individual A.  These statements

9 were lies.  On March 10, 2022, in a recorded message over WhatsApp

10 regarding the interview, defendant told an associate – in English –

11 that "I no said nothing, I not talking. I said that I only know

12 [Agent 1] from baseball." On July 7, 2022, defendant signed a plea

13 agreement and agreed to plead guilty to making false statements, in

14 violation of 18 U.S.C. § 1001. (ECF No. 6.)

15      Approximately three months after signing the plea agreement, on

16 October 27, 2022, defendant's counsel submitted a letter to the

17 United States Attorney's Office (the "USAO") requesting pre-trial

18 diversion based on defendant's minimal education, ADHD, and cultural

19 background. While this letter discussed defendant's purported limited

20 communication abilities, it did not allege selective prosecution or

21 any race-based issues. (Exhibit A[1].)  This request was denied.

22      On November 17, 2022, defendant's counsel renewed her request

23 for pre-trial diversion, this time based on the claim that defendant

24 had been entrapped. Again, defendant did not mention selective

25 prosecution. In response, the government explained that neither the

26 facts nor the law supported defendant's entrapment theory and agreed

27

28      [1] "Exhibit" or "Ex." refers to the exhibits to the accompanying
Declaration of AUSA Jeff Mitchell.

1  to produce additional discovery establishing the relevant facts.

2  (Exhibit B.)

3      On November 22, 2022, defendant's counsel wrote another letter

4  to the USAO, again requesting diversion, and this time alleging that

5  defendant had been targeted because of his "celebrity status."

6  (Exhibit C.)  Once again, defendant never mentioned selective

7  prosecution or suggested that he had been targeted due to race.

8      Only after the government rejected defendant's multiple requests

9  for diversion and showed that he could not have been entrapped, and

10  almost five months after defendant signed the plea agreement, did

11  defendant claim for the first time that he was the victim of race-

12  based selective prosecution. (Exhibit D.)

13      Defendant's eleventh-hour assertion of race-based selective

14  prosecution bespeaks its hollowness. Moreover, defendant's motion is

15  based on a mischaracterization of facts, which would have been clear

16  to defendant if – before filing the motion – he had reviewed the

17  discovery regarding the underlying sports gambling investigation that

18  the government already voluntarily agreed to produce to defendant

19  when he first raised these issues with the USAO.[2] This discovery

20  shows that defendant was treated fairly and the government's charging

21  decisions were not affected by race in any way. Instead of waiting to

22  review this discovery, defendant filed his motion prematurely and

23  held a press conference on the steps of the First Street Courthouse

24  _____

25      [2] Between December 8, 2022, and January 23, 2023, the government
   produced approximately 64,000 pages of discovery that included
26  reports of investigation related to targets from the larger
   investigation. On February 7 and 8, 2023, the government produced an
27  additional 225,000 pages of discovery from the larger investigation.
   The government anticipates that processing and production of the
28  remaining discovery will be completed by mid-March. (Mitchell Decl.
   ¶ 39.)

alleging that the government was "biased against" defendant.[3]

Defendant's Motion to Compel Discovery is devoid of merit. He has not and cannot sustain his burden of showing any discriminatory intent or effect that would entitle him to the relief he seeks. The charges against defendant arise from the government's review of the evidence and assessment of its prosecutorial priorities, and not from any improper motive. The government respectfully requests that the Court deny defendant's Motion to Compel Discovery in its entirety.

## II.  RELEVANT FACTS

In 2017, the Department of Homeland Security – Homeland Security investigations ("HSI"), and the Internal Revenue Service – Criminal Investigations ("IRS-CI") began investigating an illegal sports gambling business operated by Wayne Nix (the "Nix Gambling Business"). (Mitchell Decl. ¶ 2.) As part of this investigation, Nix's actions to launder his illicit proceeds and hide his income from the IRS came under scrutiny. The money trail led investigators to two cashier's checks that defendant purchased from his bank and sent directly to a significant client of the Nix Gambling Business. (Id. ¶ 7.)

The government then sought to interview defendant, who lived in Florida, and eventually issued a subpoena for defendant to testify before a grand jury on February 16, 2022. (Id. ¶¶ 8-10.) Defendant's then-counsel advised the government that defendant planned to travel to the Republic of Korea, where he played professional baseball, on February 1, 2022. (Id. ¶ 10.) Defendant's counsel asked that the

---

[3] The press conference was reported on KCAL News. https://www.youtube.com/watch?v=hJr9P_WXBlI

3

1   interview be conducted before that date and the government agreed.

2   (Exhibit E.)

3       The government advised counsel of the nature of its

4   investigation. Counsel stated he believed his client was unlikely to

5   have relevant information, but nonetheless requested a proffer

6   (immunity) letter. (Id.) The government provided a standard proffer

7   letter, and advised counsel that defendant was not a target of the

8   investigation. (Id.; Mitchell Decl. ¶ 11.)

9       Defendant's counsel said defendant spoke and understood English

10  but recommended that the government retain a Spanish-language

11  interpreter of Cuban descent to avoid any misunderstanding due to the

12  dialect. (Mitchell Decl. ¶ 14.) Defendant's counsel never indicated

13  that defendant had a learning disability or identified any other

14  factor that might affect defendant's comprehension of the interview

15  proceedings. (Id. ¶ 15.)

16      The interview took place by a Webex video conference on January

17  27, 2022, with the two prosecutors and two special agents ("SA")

18  assigned to the investigation, defendant, defendant's two attorneys,

19  and an independent court-certified Spanish language interpreter of

20  Cuban descent, who had been retained by the government,

21  participating. (Id. ¶¶ 16-17.) Before the interview began, defendant

22  conferred with his attorneys and the interpreter outside the presence

23  of the government. (Id. ¶ 18.) Defendant's attorneys requested that

24  the interview not be recorded and the government acceded to that

25  request. (Id. ¶ 19.) AUSA Mitchell began the interview by reviewing

26  the terms of the proffer letter with defendant, including that any

27  false statements could result in a criminal prosecution, to ensure

28  that defendant was aware of and understood those terms. (Id. ¶ 20.)

AUSA Mitchell then asked HSI SA Jason Canty to read the text of § 1001 to defendant but, when SA Canty began, defendant interrupted and said the agent was wasting defendant's time. (Id.) SA Canty nonetheless finished reading the text of the statute to defendant. (Id.; Motion, Nuño Exh. C, at 2.)

Over the next hour and a half, the government asked defendant about his knowledge of the Nix Gambling Business, and defendant essentially denied all knowledge of the organization and the persons participating in it. (Nuño Exh. C.) The government attempted to refresh defendant's recollection by showing him various documents, including photos of individuals involved in the Nix Gambling Business, at least two of whom defendant had dealt with personally; copies of the cashier's checks defendant had purchased to pay his debts owed to the Nix Gambling Business; images of the Sand Island Sports Website on which defendant had placed 899 sports bets; and a screenshot of the Sand Island Sports website that defendant himself had taken with his cell phone.[4] (Id.) Defendant essentially denied all knowledge of these exhibits and the individuals and transactions they reflected. (Id.)

Towards the end of the interview, defendant indicated that Agent 1 had just sent him a text message and then began to review his prior text messages with Agent 1. (Id.) Defendant found text messages with Agent 1 from 2019 but said there were no messages related to betting on websites. Defendant indicated that the only message he found pertaining to gambling was a text message on May 8, 2019, about a bet

---

[4] This screenshot was recovered from the cellphone used by Nix, to whom it had been sent by Agent 1, who had originally received it from defendant.

1    defendant asked Agent 1, who was in Las Vegas at the time, to place

2    on a basketball game. The government asked a few additional questions

3    and then ended the interview. (Id.)

4        At numerous points during the interview, defendant, his

5    attorneys, and the interpreter spoke offline outside the presence of

6    the government. (Mitchell Decl. ¶ 21.) During a final break, the

7    government privately advised defendant's then-counsel that

8    defendant's statements were contrary to evidence the government had

9    already obtained during the Nix Gambling Business investigation. (Id.

10   ¶ 22.) Counsel conferred with his client outside the presence of the

11   government, but defendant did not change his prior statements.[5] (Id.)

12   **III. ARGUMENT**

13       The Supreme Court has held that a defendant is not entitled to

14   selective prosecution discovery under Rule 16 and, accordingly, a

15   defendant's burden to obtain such discovery is a rigorous one.

16   Defendant has failed to meet this burden.

17       **A.    The Legal Standards for Analyzing Selective Prosecution
             Claims and Requests for Selective Prosecution Discovery**

18

19       Because "[t]he Attorney General and United States Attorneys

20   retain broad discretion to enforce the Nation's criminal laws," a

21   "presumption of regularity supports their prosecutorial decisions

22

23   _____

24       [5] Defendant alleges that, after the interview, the government
     threatened an imminent arrest, extradition from Korea and a "perp
25   walk" – all in marked contrast to the treatment of non-Black
     defendants who were allowed to "quietly come in through the back
26   door." (Motion at 21.) Not so. As the government has previously
     explained, the government only discussed an arrest in response to
27   defense counsel's inquiry and then addressed the topic only in terms
     of standard procedures that applied when an indictment was returned
     and a named defendant was overseas. (ECF No. 46.) Defense counsel did
28   not request that her client be allowed to self-surrender if indicted.
     If she had, the government would have agreed. (Mitchell Decl. ¶ 46.)

1  and, in the absence of clear evidence to the contrary, courts presume
2  that they have properly discharged their duties." United States v.
3  Armstrong, 517 U.S. 456, 464 (1996). This presumption "rests in part
4  on an assessment of the relative competence of prosecutors and
5  courts." Id. at 465. "Such factors as the strength of the case, the
6  prosecution's general deterrence value, the Government's enforcement
7  priorities, and the case's relationship to the Government's overall
8  enforcement plan are not readily susceptible to the kind of analysis
9  the courts are competent to undertake." Id. "Few subjects are less
10 adapted to judicial review than the exercise by the Executive of his
11 discretion in deciding when and whether to institute criminal
12 proceedings, or what precise charge shall be made, or whether to
13 dismiss a proceeding once brought." United States v. Fokker Servs.
14 B.V., 818 F.3d 733, 741 (D.C. Cir. 2016). So "the presumption of
15 regularity" applies to "prosecutorial decisions and, in the absence
16 of clear evidence to the contrary, courts presume that prosecutors
17 have properly discharged their official duties." Id. As a result,
18 "[i]n the ordinary case, so long as the prosecutor has probable cause
19 to believe that the accused committed an offense defined by statute,
20 the decision whether or not to prosecute, and what charge to file or
21 bring before a grand jury, generally rests entirely in his
22 discretion." Armstrong, 517 U.S. at 464.

23      Concerned that selective-prosecution inquiries "will divert
24 prosecutors' resources and may disclose the Government's
25 prosecutorial strategy," the Supreme Court has imposed a "rigorous
26 standard for discovery in aid of such a claim." Armstrong, 517 U.S.
27 at 468. A defendant is not entitled to such discovery under Fed.
28 Crim. R. 16, and instead, must produce "some evidence tending to show

1  the existence of the essential elements of" selective prosecution,

2  namely, "discriminatory effect and discriminatory intent." Id. As to

3  the first of these prongs, "[t]o establish a discriminatory effect in

4  a race case, the claimant must show that similarly situated

5  individuals of a different race were not prosecuted." Id. at 465.

6      The defendant's evidence must be "credible," i.e., something

7  more than "personal conclusions based on anecdotal evidence." Id. at

8  470. "If either part of the test is failed," the defendant cannot

9  "subject[] the Government to discovery." Att'y Gen. of United States

10  v. Irish People, Inc., 684 F.2d 928, 947 (D.C. Cir. 1982); see also

11  United States v. Lewis, 517 F.3d 20, 25 (1st Cir. 2008) ("[D]iscovery

12  will not be allowed unless the defendant's evidence supports each of

13  the two furcula of his selective prosecution theory: failure on one

14  branch dooms the discovery motion as a whole").

15  **B.   Defendant Has Not Satisfied The "Rigorous" Standard**

16      Defendant advances five principal arguments seeking to meet his

17  burden under Armstrong: (1) that the prosecution team held implicit

18  biases against Black and Latin American interviewees regarding their

19  credibility (Mot. at 14-19); (2) that the government treated Black

20  interviewees differently than non-Black Interviewees (Mot. at 4-5,

21  20-21, 23); (3) that the government treated defendant differently

22  than similarly situated interviewees (Mot. at 19-21); (4) that the

23  government failed to acknowledge defendant's unique characteristics

24  based on his cognitive abilities and national origin (Mot. at 17-19);

25  and (5) that a civil lawsuit against the USAO provides evidence of

26  discriminatory motive (Mot. at 11-12). None of these arguments has

27  merit and defendant has not met the rigorous standard set forth in

28  Armstrong.

1          1.    <u>Defendant's Assertions of Implicit Biases do Not</u>
                     <u>Establish Discriminatory Effect or Discriminatory</u>
2                     <u>Intent</u>

3      Although defendant's motion chiefly relies on an argument that

4  implicit biases drove the government's investigatory and charging

5  decisions, he fails to cite to a single case holding that evidence of

6  implicit biases meets a defendant's burden of establishing credible

7  evidence of either discriminatory effect or discriminatory intent.

8  Indeed, defendant's burden here is to present credible evidence of

9  <u>both</u> discriminatory effect and discriminatory intent. <u>See</u> <u>United</u>

10  <u>States v. Bass</u>, 536 U.S. 862, 863 (2002)("In [] <u>Armstrong</u> . . . we

11  held that a defendant who seeks discovery on a claim of selective

12  prosecution must show some evidence of both discriminatory effect and

13  discriminatory intent.").

14      As the Supreme Court stated in <u>Armstrong</u>, discriminatory effect

15  must be established through proof that similarly situated persons of

16  other races were not prosecuted. 517 U.S. at 465. And while the Ninth

17  Circuit has not addressed the role that implicit bias – even if shown

18  – might play in a selective prosecution inquiry, the Tenth Circuit

19  recently held that "awareness of implicit bias or the potential for

20  adverse consequences for African-Americans is not enough to show a

21  discriminatory purpose." <u>United States v. Casanova</u>, No. 20-2159, 2022

22  WL 946944, at *3 (10th Cir. Mar. 30, 2022). In that case, Casanova

23  argued that the investigating agency's alleged failure "to develop

24  any policies or training to counter the effects of implicit bias" was

25  evidence of discriminatory intent. <u>Id.</u> The Tenth Circuit rejected

26  this argument, stating that in <u>Wayte v. United States</u>, the Supreme

27  Court held that establishing discriminatory intent for selective

28  prosecution "implies more than intent as awareness of consequences.

It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." 470 U.S. 598, 610 (1985). As such, the Casanova court held that, even if provable, implicit bias would not satisfy a defendant's burden under Armstrong. Id. See also United States v. Turner, 104 F.3d 1180, 1184 (9th Cir. 1997) ("The kind of intent to be proved is that the government undertook a particular course of action at least in part because of, not merely in spite of its adverse effects upon an identifiable group." (citing Wayte)) Because defendant's Motion relies almost entirely on this theory, it should be denied on this ground alone.

    2.    The Government's Interview Process Was Race-Neutral

    The primary thrust of the defendant's Motion is an argument that Black and non-Black interviewees were treated differently during the Nix Gambling investigation. (Mot. at 5.) Specifically, defendant claims that advising defendant that lying to the government could constitute a crime was somehow threatening and an improper attempt to control the interview, and then suggests that 19 non-Black interviewees were not read the text of Section 1001, although he fails to identify the 19 individuals or provide copies of their interview reports. (Mot. at 5, 22.) Nowhere in defendant's motion, declarations, or exhibits, does he identify the 19 individuals who he suggests were not read the text of § 1001.

    In any case, defendant's claims are simply not true. The government admonished 32 out of 34 interviewees that they could be

prosecuted if they provided false statements.[6] (Exhibit F.) The table in Exhibit F makes clear that the government's practice was consistent and race-neutral. See Wayte, 470 U.S. at 610 (no evidence of selective prosecution where government "treated all reported nonregistrants similarly").

Defendant also suggests that admonishments by agents should be treated differently than admonishments by AUSAs. There is no meaningful distinction between an admonishment by an AUSA and one by an agent. More fundamentally, there was no race-based difference in the ways the agents and the AUSAs approached this case, as defendant implies. The prosecution team's approach to any given individual depended on whether that person was or was not a target of the investigation. (Mitchell Decl. ¶ 6.) The agents obtained search warrants for the targets, none of whom were Black. (Id. ¶ 4.) After the execution of the warrants, attorneys for the targets agreed to interviews but requested proffer letters. (Id. ¶ 4-5.) During the proffers, the AUSAs admonished each target that lying could result in a prosecution for false statements or perjury, pursuant to standard practice. (Exhibit F; Mitchell Decl. ¶ 5.)

For non-targets, instead of obtaining search warrants, the case agents sought voluntary interviews without the participation of an AUSA. (Mitchell Decl. ¶ 6.) During voluntary interviews, the case agents admonished the witness, regardless of the witness' race, by reference to or reading the text of § 1001 to the witness. (Exhibit

---

[6] The only two individuals not admonished were questioned collaterally by agents in other cities who were not part of the Nix Gambling investigation and, in this instance, did not follow the same procedure used by the investigation's case agents. One of these two individuals was Black, the other was not.

11

F; Mitchell Decl. ¶ 42-43.) The case agents referred to or read the text of § 1001 to 18 witnesses who agreed to voluntary interviews, and fourteen of these interviewees were non-Black. (Id.)

Seven additional non-target witnesses initially declined to be interviewed by the agents. After retaining counsel, these witnesses agreed to be interviewed pursuant to a proffer agreement. The AUSAs provide the requested proffer letters and, during the interviews, the interviewees were admonished about the consequences of lying by the participating AUSA, the agents, or both.[7] (Exhibit F.)

Defendant also claims that non-Black interviewees were allowed to correct their statements during later interviews, while "Black individuals such as [defendant] were read the plain text of § 1001 and told that any prevarication would result in criminal punishment." (Mot. at 4-5, 20-21.) The evidence disproves this narrative. The government afforded all witnesses an opportunity to correct misstatements, including defendant. The government gave defendant multiple opportunities to correct his false statements during his interview, showed defendant numerous documents to refresh his memory and, at one point, advised defendant's counsel privately that defendant's statements were contrary to the evidence collected during the investigation and gave defendant another opportunity to revise his prior statements. (Mitchell Decl. ¶ 22.) Defendant, however, persisted in lying and obstructing the investigation. (Mot., Nuño Exh. C; Mitchell Decl. ¶ 22.)

---

[7] Law enforcement attempted two additional non-target witness interviews, however, those witnesses refused to talk to the agents even after obtaining counsel. Both of those witnesses were eventually compelled to testify, either by a court order or subpoena, and admonished by an AUSA. Neither of those witnesses were Black. (Mitchell Decl. ¶ 6)

1    Finally, much of defendant's argument is conclusory and simply
2    asserts, without evidence, that Black interviewees were "bullied"
3    while non-Black interviewees were treated "with compassion and
4    respect." (See, e.g., Mot. at 23.) The government disputes these
5    characterizations. Moreover, these non-factual characterizations are
6    exactly the kind of "personal conclusions" and "anecdotal
7    conclusions" that Armstrong prohibits from being used to support a
8    selective-prosecution discovery demand. 517 U.S. at 470; see also
9    United States v. Bourgeois, 964 F.2d 935, 939 (9th Cir. 1992) ("[T]o
10   obtain discovery on a selective prosecution claim, a defendant must
11   present specific facts, not mere allegations.")

12          3.    Defendant Has Not Identified Any Similarly Situated
                  Persons Who Were Not Prosecuted
13

14   To succeed on his Motion, defendant must offer some credible
15   evidence of discriminatory effect in the form of "similarly situated
16   defendants of other races [who] could have been prosecuted, but were
17   not." Armstrong, 517 U.S. at 469. Defendant has failed to do so.

18   First, defendant's motion is based on the novel premise that
19   even where the government charged other subjects in the same
20   investigation with more serious crimes, the government's decision not
21   to charge them with the same lesser offense with which defendant was
22   charged is evidence of selective prosecution. For example, defendant
23   attempts to meet his burden under the discriminatory-effect prong of
24   Armstrong by asserting that both Nix and Agent 1 lied to
25   investigating agents but were not charged with violations of § 1001
26   and, instead, were given an opportunity to rehabilitate themselves.
27   (See Mot. at 8, 11, 21.) But is it beyond dispute that both Nix and
28   Agent 1 were prosecuted as part of the Nix Gambling Business

13

1    investigation and pleaded guilty to charges carrying far greater

2    sentencing exposure under the U.S. Sentencing Guidelines than

3    defendant faces. (Exhibit G.) The government has charged at least

4    eight individuals, other than defendant, with offenses arising from

5    the Nix Gambling Business investigation that are more serious and

6    carry greater sentencing exposure under the sentencing guidelines

7    than the offenses alleged in the First Superseding Indictment in

8    which defendant is charged. (Id.)

9         Defendant has not cited a single case where a defendant met his

10   burden under Armstrong by arguing that similarly situated persons

11   were only charged with more serious offenses. Neither would such a

12   holding make sense; the plain language of Armstrong refers to

13   circumstances where "similarly-situated defendants of other races

14   could have been prosecuted, but were not." 517 U.S. at 469. While the

15   Ninth Circuit has not precisely defined what it means to be

16   "similarly situated" in the context of Armstrong, other circuits

17   have. For example, the district court in the District of Columbia

18   observed that an individual may be similarly situated to the

19   defendant if he "committed the same basic crime in substantially the

20   same manner as the defendant — so that any prosecution of that

21   individual would have the same deterrence value and would be related

22   in the same way to the Government's enforcement priorities and

23   enforcement plan — and against whom the evidence was as strong or

24   stronger than that against the defendant." United States v. Stone,

25   394 F. Supp. 3d 1, 31 (D.D.C. 2019) (quoting United States v. Smith,

26   231 F.3d 800, 810 (11th Cir. 2000)). The First Circuit has defined a

27   similarly situated offender as "one outside the protected class who

28   has committed roughly the same crime under roughly the same

                                   14

1   circumstances but against whom the law has not been enforced." <u>Lewis</u>,

2   517 F.3d at 27-28. And the Fourth Circuit arrived at a similar

3   holding: "defendants are similarly situated when their circumstances

4   present no distinguishable legitimate prosecutorial factors that

5   might justify making different prosecutorial decisions with respect

6   to them." <u>United States v. Olvis</u>, 97 F.3d 739, 744 (4th Cir. 1996);

7   <u>see also</u> <u>United States v. Aguilar</u>, 883 F.2d 662, 706 (9th Cir. 1989)

8   (considering selective prosecution in First Amendment context, and

9   holding that similarly-situated persons must be "the same in all

10  relevant respects").  As such, Nix and Agent 1 are not "similar

11  situated" to defendant: their conduct included additional violations

12  of federal law, for which they pled guilty. These are plainly the

13  kind of "distinguishable legitimate prosecutorial factors that might

14  justify making different prosecutorial decisions." <u>Olvis</u>, 97 F.3d at

15  744.

16       Second, defendant has only offered a single example of a non-

17  Black interviewee -- identified as Player R in his motion -- who

18  purportedly made false statements but was not prosecuted at all.

19  Defendant, however, fails to mention that Player R essentially

20  admitted his role in the Nix Gambling Business, although he may have

21  been mistaken about precise dates. But even if defendant's

22  characterization of the interview was accurate, which it is not, a

23  single instance of non-prosecution is not sufficient to meet

24  defendant's burden under <u>Armstrong</u>. <u>See</u> <u>United States v. Martinez</u>,

25  589 F. App'x 371, 372 (9th Cir. 2015) ("[T]he numbers involved—three

26  females and two black men—are likely too small to 'tend [ ] to show'

27  discriminatory effect on the basis of race or sex, as a purely

28  statistical matter." (alterations in original)).

Third, and even more damaging to defendant's attempt to show discriminatory effect, are his own references to other Black interviewees who allegedly made false statements to investigators but were not charged.  These instances directly cut against defendant's argument here.

For example, defendant points to the interview of a "Black prominent athlete" (Mot. at 4), who stated that Wayne Nix was merely a "good friend" and that they frequently had dinner and played golf together but stated that he did not recall placing any bets with Nix. (Mot., Nuño Exh. A, at 2.) When agents confronted the athlete with a specific bet he made with Nix, the athlete initially stated that he did not recall, but then admitted that he had placed the bet with Nix, contradicting his earlier statements. The agents then asked the athlete again if he knew what Nix did for a living, but the athlete denied any knowledge of Nix's gambling business. At that point, agents provided their <u>first</u> § 1001 admonishment to the athlete, and he then admitted that he knew Nix was a bookie. As defendant acknowledges, the government has not charged this athlete with a violation of 18 U.S.C. § 1001 – despite this athlete's arguably false statements.

In another example, defendant points to the interview of "a Black manager of a prominent Black athlete." (Mot. at 5.) Defendant claims disparate treatment because the government asked the individual twice during the interview if he was being truthful. (<u>Id.</u>) Defendant fails to advise the Court that this individual was in fact not being truthful. Indeed, the witness's attorney emailed the government after the interview and explained that the individual withheld information about his driver's role in the collection and

payment of illicit gambling proceeds because his driver was in the car with him during the interview. (Mot., Nuño Exh. B at 4.) Despite the technically false statements, the government did not prosecute or threaten to prosecute this individual.

The government's decisions not to charge the prominent Black athlete and the Black business manager with § 1001 violations, notwithstanding their false statements, undercuts defendant's claim that the government's actions arise from bias.  The decision not to charge Player R, who is non-Black, does not show otherwise because defendant is not similarly situated to Player R for numerous reasons. For example, during the interviews at issue, Player R was not aided by counsel, while defendant was represented by a former Federal criminal prosecutor. Player R was approached without prior notice and without opportunity to confer with counsel, while defendant had been on notice of the requested interview for months and had conferred with counsel and negotiated terms of an interview. Player R had not given investigators any indication that he would not be truthful, while defendant had communicated through counsel that he had no relevant information -- an assertion that put investigators on notice of possible dishonesty, given the evidence already obtained during the investigation. Player R did not affirmatively disregard the government's § 1001 admonition, while defendant interrupted the admonishing agent and told the agents they were wasting defendant's time. Player R recanted his untrue statements during the interview when confronted, while defendant did not do so, even after given numerous breaks to confer with counsel and after prosecutors informed his counsel during one of these breaks that the government had evidence that contradicted defendant and showed he was not being

1   truthful. Finally, defendant is unique in that, after his interview,

2   he recorded an audio message explicitly confirming false statements

3   which he had not recanted – which is powerful evidence of guilt.

4   Specifically, on March 10, 2022, in a recorded message over WhatsApp

5   regarding the interview, defendant told an associate – in English –

6   that "I no said nothing, I not talking. I said that I only know

7   [Agent 1] from baseball." See Smith, 231 F.3d at 810 (in evaluating

8   whether parties are similarly situated, court must consider whether

9   "the evidence was as strong or stronger than that against the

10  defendant").

11       Defendant also focuses on purported false statements by Agent 1,

12  but defendant cannot meet his burden of showing that he and Agent 1

13  were similarly situated. First, as noted above, Agent 1 has been

14  charged with a more serious offense, and thus cannot help defendant

15  meet his burden under Armstrong. But even if Agent 1 had never been

16  charged with any crimes, defendant's description of Agent 1's conduct

17  is incomplete and contradicted by the evidence. Defendant asserts

18  that Agent 1 "lied, obfuscated, and destroyed evidence" (Mot. at 9),

19  but this is inaccurate. For example, Agent 1 did not admit to

20  destroying his text messages to undermine the investigation; he

21  deleted these message long before he was contacted by law

22  enforcement. (Mot., Nuño Exh. D; Mitchell Decl. ¶ 25.) Defendant

23  asserts that Agent 1 lied about "whether and for how long he took

24  bets directly from Puig and remitted them to Nix" (Mot. at 9), but

25  Agent 1 freely admitted to placing bets for defendant with Nix and

26  stated that he did so only initially, before defendant was given his

27  own player identification credentials so he could place his own bets.

28  (Mot., Nuño Exh. D) And while Agent 1 did describe his last

1   "exchange" with defendant as occurring in early January, as opposed

2   to late January when defendant was interviewed, Agent 1 also stated

3   that he had tried to contact defendant the day of the interview but

4   had received no response. (Id., at ¶ 38-39.)

5       Other facts distinguish Agent 1's situation from defendant's:

6   Agent 1 had affirmatively sought to cooperate with the government,

7   had truthfully disclosed his role in the Nix Gambling Business, had

8   identified other potential witnesses without prompting, and had

9   provided access to his iCloud account for investigators to review his

10  text messages. (Exhibit H; Mitchell Decl. ¶ 26.) These are certainly

11  the kind of "legitimate prosecutorial factors" which justify

12  "different prosecutorial decisions." Olvis, 97 F.3d at 744.

13      Finally, although not mentioned by defendant, law enforcement

14  did interview one witness who was arguably similarly situated to

15  defendant. This non-target witness was read the text of § 1001 at the

16  beginning of the interview, was represented by counsel, and

17  repeatedly lied during the interview, despite several opportunities

18  to revise his statements. (Exhibit I at 33.) Although this non-target

19  witness is white and has not yet been charged, on August 24, 2022,

20  the government advised this witness's counsel that it intends to

21  charge him with violations of 18 U.S.C. § 1001 as well as money

22  laundering, and this investigation remains ongoing. (Mitchell Decl.

23  ¶ 27, Exhibit J.)

24      In short, defendant has failed to carry his "rigorous" burden of

25  offering evidence of discriminatory effects in the form of examples

26  of similar-situated persons of other races who suffered no sanction.

27  Even taking his allegations as true, defendant's showing is woefully

28  insufficient, comprising only examples of two persons who pled guilty

1  to more serious offenses (Nix and Agent 1), and two Black individuals

2  and one non-Black individual (Player R) who were not prosecuted for

3  arguably false statements during interviews in very different

4  circumstances. Having failed to provide credible evidence of

5  discriminatory effect under Armstrong, defendant's Motion must be

6  denied on that ground alone.

7        4.   Defendant's Arguments About his Personal
             Characteristics Are Not Evidence of Either
8            Discriminatory Effect or Intent

9        Defendant also argues that the government ignored his unique

10  cognitive disabilities and cultural issues arising from his Latin

11  American ancestry and Cuban national origin, which would thus be

12  evidence of a "prohibited motive." (Motion at 19.) But defendant's

13  prior counsel did not notify the government of any purported

14  cognitive issues before his interview. (Mitchell Decl. ¶¶ 14-15.)

15  Defendant cannot meet his burden under Armstrong by alleging that

16  government was not mindful of conditions unknown to investigators.

17  Indeed, when counsel alerted the government to linguistic issues

18  before the interview, the government made accommodations for them by

19  retaining a certified interpreter of Cuban national origin. (Id.)

20        5.   Allegations in a Civil Lawsuit Are Not Evidence Under
             Armstrong
21

22        Defendant also recites allegations made by an AUSA in the USAO

23  in a civil lawsuit. (Mot. at 11-12.) These allegations do not support

24  defendant's Motion, because defendant's burden is to put forward

25  credible evidence, and unproven allegations in a complaint are not

26  evidence. See Ibekwe v. Los Angeles World Airports, No. CV-14-6523-

27  DMG-JPRx, 2016 WL 6822753, at *4 n.6 (C.D. Cal. Jan. 11, 2016)

28  ("Allegations are not evidence.") Further, the civil lawsuit

concerned allegations regarding internal employee matters, not charging decisions, and thus does not provide the credible evidence defendant must present here.[8] Nor would the civil lawsuit be evidence of discriminatory intent here, since neither of the assigned AUSAs in this case were named or identified in the civil lawsuit.

      6.   <u>Discovery is Not a Substitute for Defendant's Burden to Establish Discriminatory Intent Under Armstrong</u>

Finally, defendant is attempting an end-run around the requirement that both prongs of the <u>Armstrong</u> test must be satisfied, arguing, in essence, that because implicit biases must have led to discriminatory effects, defendant needs discovery into whether intentional bias exists on the prosecution team. (Mot. at 21-23.) This argument is incorrect. Defendant seeks to undercut the two-prong <u>Armstrong</u> test by substituting proof on one prong as justification for discovery as to the other: first, defendant asserts that "there is evidence that Black men were treated differently over the course of their interviews with the prosecution team" (<u>i.e.</u>, discriminatory effect) and that "[e]vidence of differential treatment is probative of whether the prosecution was motivated by a discriminatory purpose" (<u>i.e.</u>, that evidence on one prong must therefore satisfy the second for discovery purposes). (Motion at 22.)

---

[8] The U.S. Attorney at the time of the alleged events and settlement stated: "This was a manufactured claim by someone upset with his annual performance review. As clearly stated in the settlement agreement, Main Justice investigated the allegations and found no discrimination or retaliation." https://www.abajournal.com/news/article/federal-prosecutor-reaches-settlement-over-discrimination-in-us-attorneys-office

In support of this theory, defendant cites <u>Smith</u>, 231 F.3d 809, but that decision does not address discovery under <u>Armstrong</u>,[9] nor does it state that the defendant's burden of establishing discriminatory effect and intent under <u>Armstrong</u> are interchangeable. At most, the Eleventh Circuit noted that "the nature of the two prongs of a selective prosecution showing are such that they will often overlap to some extent" (<u>id</u>.), but did not suggest that evidence as to one prong satisfies a defendant's burden as to the other. To the contrary, the <u>Smith</u> court examined both prongs independently, and noted that the defendants there had independently failed to offer evidence on the discriminatory intent prong. <u>Id</u>. at 813 (defendant "also failed to prove by clear evidence discriminatory intent and thereby failed to establish the second prong.") At no point did the <u>Smith</u> court suggest that the second prong under <u>Armstrong</u> rises and falls with the first.

To the contrary, courts have held that defendants cannot effectively shift their burden on either <u>Armstrong</u> prong to the government simply by demanding discovery. As the Ninth Circuit has stated, "[t]he fact that access to the Government's files might be helpful to a defendant seeking to prove discriminatory prosecution does not relieve him of the burden of making an initial showing, nor does that fact, in itself, entitle every defendant raising such a claim to discovery." <u>United States v. Ness</u>, 652 F.2d 890, 892 (9th Cir. 1981) (denying discovery in a selective prosecution claim).

---

[9] In fact, the Court in <u>Smith</u> stated that the question of discovery was explicitly not being considered, as the government had not appealed a related discovery order in the case below. 231 F.3d at 808, n.4.

1   Defendant has offered no credible evidence on the second
2   Armstrong prong. Defendant's conclusory assertions that the
3   government changed its interview protocols with the first Black
4   interviewee for racially motivated reasons are factually incorrect,
5   as detailed above (see section III.B.2, supra) and as the attached
6   exhibits show. (see Exhibit F.)

7   Defendant also identifies press releases and a LinkedIn post as
8   potential evidence of discriminatory intent.[10] (Mot. at 9, 24.) This
9   is also incorrect. As the Supreme Court and numerous courts of appeal
10  have recognized, prosecutors are entitled to consider deterrent
11  effects in selecting cases for prosecution. See Armstrong, 517 U.S.
12  at 465 (unlike courts, prosecutors are uniquely qualified to assess
13  "the prosecution's general deterrence value [and] the Government's
14  enforcement priorities"); see also Smith, 231 F.3d 810 (a similarly
15  situated individual "committed the same basic crime in substantially
16  the same manner as the defendant – so that any prosecution of that
17  individual would have the same deterrence value" (emphasis added)).
18  Defendant cannot seriously dispute that the prosecution of high-
19  profile defendants for violations of § 1001 serves the government's
20  interest in deterring lying to the government.[11] The government's

21

22      [10] Defendant alleges that the AUSA deleted the post on LinkedIn,
23  suggesting that its initial posting was improper. (Mot. n.5) This is
    not accurate – the post was not deleted or modified in any way.

24      [11] The USAO regularly brings charges under 18 U.S.C. § 1001
    against defendants of all races, and often against powerful and/or
25  privileged defendants. See, e.g., United States v. Fortenberry, Case
    No. 21-cr-491 (18 U.S.C. § 1001 charges against sitting U.S.
26  Congressman); United States v. Huizar, Case No. 20-cr-326 (18 U.S.C.
    § 1001 charges against sitting member of Los Angeles City Council);
27  United States v. Englander, Case No. 20-cr-35 (18 U.S.C. § 1001
    charges against former member of Los Angeles City Council); United
28  States v. Baca, Case No. 16-cr-66 (18 U.S.C. § 1001 charges against
    sheriff of Los Angeles County).

1  press releases are evidence of the government's interest in
2  deterrence, emphasizing that "[u]nder our system of justice, no one
3  is above the law," not even a self-proclaimed celebrity such as
4  defendant. (See Mot., Axel Exh. D.)

5      **C.   The Requested Discovery Is Overbroad and Irrelevant**

6      Even though defendant has not met his burden under Armstrong,
7  months ago the government agreed to provide discovery from larger Nix
8  Gambling Investigation. Apparently instead of fully reviewing the
9  discovery being made available to him, defendant demanded the
10  government's internal records, and then brought this motion when
11  these demands were not met. Defendant's discovery requests are
12  overbroad, irrelevant even as to any selection prosecution issues,
13  and appear calculated simply to bog down this action.

14      Simply collecting and producing discovery for a claim of
15  selective prosecution places a large burden on the Government "to
16  assemble from its own files documents which might corroborate or
17  refute the defendant's claim." Armstrong, 517 U.S. at 468.
18  Defendant's discovery requests appear calculated to do exactly that;
19  delay this proceeding through voluminous and burdensome requests
20  which have no relevance to the issue at hand. For example, defendant
21  demands ten years of charging information from the USAO, as well as
22  every single case charged by the assigned AUSAs, including every ROI
23  from any such case, for the previous five years. Even more overbroad
24  is defendant's request for "[a]ll discrimination or selective
25  prosecution claims or complaints filed with the Department of Justice
26  Civil Rights division or Office of Professional Responsibility over
27  the past 10 years." Such information is well beyond the scope of any
28  selective prosecution claim defendant could possibly bring. See Bass,

536 U.S. at 863-64 ("Even assuming that the <u>Armstrong</u> requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants.").

Even more irrelevant is defendant's demand for all "[d]iscovery and internal investigations in the [civil lawsuit]" – a settled civil action which included no allegations of discriminatory prosecution, and which would necessarily include protected personnel information of government employees not involved in this case.

Separately, to the extent defendant's requests seek information relating to the government's training or analysis and considerations for prosecuting false statements cases (<u>see</u>, <u>e.g.</u>, Mot. at 12, seeking communications regarding "any charging decisions in this case"), such requests should be denied because that information falls squarely within this deliberative process privilege and is not discoverable.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to compel discovery.