DECLARATION OF JEFF MITCHELL

I, Jeff Mitchell, declare as follows:

1. I am an Assistant United States Attorney with the United States Attorney's Office for the Central District of California. I represent the government in this matter.

2. Since 2017, the Department of Homeland Security – Homeland Security investigations ("HSI"), and the Internal Revenue Service – Criminal Investigations ("IRS-CI") have been investigating an illegal sports gambling business operated by Wayne Nix (the "Nix Gambling Business").

3. I am currently the lead prosecutor on the Nix Gambling Business investigation, and have overseen this investigation since at least 2019. Through court-authorized wiretaps and search warrants, the government identified a network of thousands of individuals who participated in the Nix Gambling Business in some form, whether as principles, agents, sub-agents, bettors, or agents of bettors.

4. On February 7, 2020, law enforcement executed search warrants at residences of five targets. The prosecution team subsequently identified two additional targets. Some of those targets retained attorneys and eventually agreed to proffers with the government.

5. At the request of the targets' attorneys, the government provided proffer (immunity) letters. At the beginning of each proffer, I went over the proffer letter which each target. My standard practice includes a discussion of the paragraph that advises the target that they can be prosecuted for providing false statements during the proffer.

6. In the summer of 2021, the government began interviewing the non-target witnesses. The non-target witnesses included the sub-agents, bettors, and others. In contrast to the targets, non-targets were typically interviewed by the agents without the AUSAs; however, some of the non-target witnesses retained counsel and also requested proffer letters. When that occurred, the AUSAs typically attended the interviews in order to review the terms of the proffer letter, which is signed by the AUSA, not the agents. Two non-target witness refused to talk to the agents even after obtaining counsel. Both of those witnesses were eventually compelled to testify, either by a court order or subpoena, and admonished by an AUSA. Neither of those witnesses were Black.

7. During the investigation, the government identified two cashier's checks sent directly to a significant client of the Nix Gambling Business ("Individual 13"). These checks had been drawn upon the accounts of the defendant Yasiel Puig Valdes ("defendant").

8. Defendant PUIG and Individual 13 are both residents of Florida. The government submitted a collateral request to the local Florida IRS-CI office to interview both. Individual 13 agreed to be interviewed; however, defendant declined and referred the agents to his attorney.

9. On October 11, 2022, I was provided the name and phone number of defendant's attorney at the time, Scott Lesowitz. I subsequently called and spoke to Mr. Lesowitz, and advised him that we wanted to interview defendant. Mr. Lesowitz indicated that he would speak to his client and call me thereafter; however, I did not receive an answer from Mr. Lesowitz, despite sending several follow-up emails and voicemails.

10. I eventually issued a subpoena for defendant to testify before the grand jury on February 16, 2022. Shortly thereafter, Mr. Lesowitz called and advised me that defendant planned to depart the country on February 1, 2022, for the Republic of Korea, where he played professional baseball, and asked that any interview be conducted on a voluntary basis before that date. I ultimately agreed to this request and scheduled an interview by Webex, a remote teleconferencing platform, for January 27, 2022.

11. During these discussions, I informed Mr. Lesowitz that defendant was not a target of our investigation, and that our questions at an interview would be focused on an unlawful sports gambling organization. Mr. Lesowitz advised me that he was a former criminal AUSA from San Diego, and we discussed potential criminal exposure for defendant. As part of these discussions, I told Mr. Lesowitz that it was my understanding that placing personal bets with an unlawful sports gambling business is not a Federal crime under 18 U.S.C. § 1955, but that individual states may have state laws that prohibit betting with unlawful gambling businesses.

12. During these conversations, Mr. Lesowitz represented to me that defendant was unlikely to have any information relevant to the government's investigation, as I had described it to him. Mr. Lesowitz requested a proffer letter to provide defendant with immunity from statements made during an interview, and I agreed. On January 26, 2022, I sent a standard proffer letter to Mr. Lesowitz. I also included a summary of our conversations regarding the scheduled interview, and asked Mr. Lesowitz to correct and errors in that summary. Mr. Lesowitz did not respond identifying any inaccuracies with this summary.

13. Attached as Exhibit E is a true and correct copy of the January 26, 2022, e-mail I sent to Mr. Lesowitz.

14. During one of my conversations with Mr. Lesowitz, he advised me that even though defendant speaks and understands English, Mr. Lesowitz recommended that we retain a professional Spanish-language interpreter of Cuban descent to avoid any misunderstandings due to the dialect. I agreed, and instructed my assistant to hire an interpreter of Cuban descent from the list of court-certified Spanish language interpreters. The government retained Esther Hermida. Shortly before the interview, I spoke to Ms. Hermida and she confirmed that she was of Cuban descent.

15. Other than this request for an interpreter of Cuban descent, during these discussions, Mr. Lesowitz did not indicate that defendant had any learning or cognitive disability, or identify any other issue that might affect defendant's comprehension during an interview.

16. On January 27, 2022, I hosted the Webex interview, which began as scheduled at 1:30 p.m.

17. Defendant's two defense attorneys and Ms. Hermida joined the interview, and the government was represented by the assigned prosecutors and two special agents ("SAs") assigned to the Nix Gambling Business investigation.

18. While the Webex conference began on time at 1:30 p.m., defendant was not initially present. Defendant eventually arrived at approximately 2:00 p.m. After he arrived, defendant, both of his attorneys, and the interpreter conferred outside the presence of the government.

19. Defendant's attorneys then requested that the interview not be recorded. I agreed to this request.

20. I began the interview by reviewing the terms of the proffer letter with defendant, including that any false statements could result in a criminal prosecution. I then asked HSI SA Jason Canty to read the text of § 1001 to defendant, but when SA Canty began, defendant interrupted and said the agent was wasting defendant's time. SA Canty nonetheless finished reading the text of the statute to defendant.

21. Multiple times during the interview, defendant requested to speak to his attorneys, and the interpreter, outside the presence of the government. I agreed to these requests.

22. Towards the end of the interview, I requested to speak to Mr. Lesowitz directly, separate from his client or the case agents. I then spoke to Mr. Lesowitz over the telephone and advised him that I believed defendant had made multiple statements during the interview which had been contrary to the evidence obtained during the investigation. Mr. Lesowitz then conferred with his client outside the presence of the government and the interview then resumed, but defendant did not recant any of his prior false statements.

23. The interview terminated shortly thereafter, and I spoke again to Mr. Lesowitz by telephone, and again advised him that I believed defendant had lied during the interview. I also advised him the government would discuss internally whether to seek an indictment based on this conduct.

24. Subsequent to defendant's interview, the agents attempted to contact Agent 1. On or about February 3, 2022, I was contacted by counsel to Agent 1. Agent 1's counsel indicated to me that his client

1  wanted to cooperate with the government, and was prepared to disclose
2  his role in placing bets for defendant with the Nix Gambling
3  Business. Counsel also advised that Agent 1 was very nervous, but
4  that he expected Agent 1 to identify another potential witness.  A
5  true and correct copy of an email I sent reflecting this disclosure
6  is attached as Exhibit H.
7       25.  The report of Agent 1's interview indicates that Agent 1
8  did not retain his text messages (Mot., Nuño Exh. D), but defendant's
9  motion claims that Agent 1 intentionally deleted his text messages to
10 obstruct the government's investigation.  After reading defendant's
11 motion, the government re-interviewed Agent 1.  Agent 1 stated that
12 he deleted his text messages before learning of the government's
13 investigation. Agent 1 explained that he deleted the messages due to
14 his frustration with defendant not paying his gambling debts to the
15 Nix Gambling Organization.
16      26.  After the first interview, Agent 1 provided consent for the
17 government to obtain his archived iCloud account data to allow
18 investigators to review his old text messages.
19      27.  As described in the Government's Opposition to Defendant's
20 Motion to Compel Discovery, the government interviewed another
21 witness in 2021 who also lied to investigators.  That witness is
22 identified in Exhibit F as Individual 6.  After obtaining a Court
23 Order compelling a witness to testify in the grand jury against
24 Individual 6, and obtaining permission to provide Use Immunity to a
25 second witness, I subsequently advised Individual 6's counsel that he
26 had been elevated to a target.  On August 24, 2022, I conducted a
27 reverse proffer and advised Individual 6 and his counsel that the
28 government intends to seek an indictment charging a violation of 18

6

U.S.C. § 1001, as well as money laundering offenses. Exhibit J to this Declaration contains two PowerPoint slides from the reverse proffer which I presented to Individual 6 and his counsel. This investigation remains ongoing.

28. On October 27, 2022, defense counsel Keri Curtis Axel contacted me by letter requesting pretrial diversion for defendant, raising issues including defendant's purported financial status, cognitive disabilities, and charity work.[1] While this request discussed defendant's purported limited communication abilities, it did not allege any race-based issues. A true and correct copy of this letter is attached as Exhibit A.

29. I forwarded defendant's request for diversion to my supervisor, who subsequently met with Ms. Axel to discuss diversion. Ultimately, the USAO declined defendant's request for diversion.

30. After defendant's request for diversion was declined, on November 17, Ms. Axel contacted me by phone and advised that she now believed that Agent 1 had entrapped her client. I agreed to provide Ms. Axel with additional discovery and invited her to the USAO to review the discovery on November 22, 2022, to show that neither Agent 1 nor Individual B (as identified in defendant's plea agreement) could have legally or factually entrapped defendant. A true and

---

[1] While the government would not ordinarily put a defendant's request for diversion before the Court, in this case defendant has affirmatively raised these letters in his Motion and suggested that the government's failure to respond to his satisfaction may itself be evidence of selective prosecution. See ECF 59-1 (Axel Decl. ¶ 4-5; Mot. at i.) Accordingly, the government is obligated to provide a complete record of these communications to avoid mischaracterization. The government is requesting sealing of these letters because they detail sensitive or non-public medical information or diagnoses.

correct copy of my responsive correspondence with defense counsel, dated November 19, 2022, is attached as Exhibit B.

31. On November 22, 2022, defense counsel delivered a letter written directly to the U.S. Attorney and Criminal Chief, again requesting diversion, but now asserting that defendant had "a potential entrapment defense" based on purported conduct of Agent 1 and Individual B. Counsel again did not allege any race-based selective prosecution, and instead, stated that defendant had been targeted due to his "celebrity status." A true and correct copy of this letter is attached as Exhibit C.

32. On November 28, 2022, defense counsel sent a "private personal appeal" to the U.S. Attorney again requesting diversion, and for the first time, alleged "selective prosecution issues and the implicit biases of government agents." Counsel also requested that her letter with the allegations of selective prosecution not be shared with the assigned prosecutors and instead "implore[ed] [the US Attorney] to take a meeting, as there are things I can only say privately." A true and correct copy of this letter is attached as Exhibit D. This direct appeal was denied by letter from the Chief of the Criminal Division on December 8, 2022.

33. At defendant's request, beginning in December 2022, the government began producing discovery from the larger Nix Gambling Business investigation, beginning with approximately 54,271 pages of documents that included reports of investigation related to targets from the larger investigation.

34. On January 23, 2023, the government produced an additional 10,000 pages of discovery from the larger investigation.

8

35. On February 3, 2023, while the government's productions were ongoing, defense counsel contacted the government by email, stating defendant's intention to bring a motion to dismiss the indictment based on selective prosecution grounds, as well as to seek associated discovery.

36. On February 7, 2023, the government produced an additional 223,329 pages of discovery from the larger investigation.

37. On February 8, 2023, the government produced an additional 2,048 pages of discovery from the larger investigation.

38. On February 10, 2023, I advised defense counsel via email that there was still a significant amount of discovery from the broader Nix Gambling Business investigation that the government was in processing of producing, and described these categories of evidence, including interview reports of several targets and witnesses. Later that evening, defendant filed the instant motion.

39. At present, the government has produced just under 300,000 pages of discovery to defendant, as well as recordings and native files, and discovery remains ongoing. The government expects the discovery production to be complete by mid-March.

40. Attached as Exhibit F is a chart of all interviews conducted as part of the Nix Gambling Investigation. Attached as Exhibit K is an unredacted chart reflecting the same information, with all interviewees identified by name.

41. Attached as Exhibit I is a compilation of all reports for the interviews reflected in Exhibit F.

42. At least four of the witness interviews were recorded with audio and/or video and a report has not yet been created. I have listened to the audio recordings and learned the following:

        a.   At the 2:00 minute mark of the interview of Individual 9, the agent read 18 U.S.C. § 1001 to the witness.

        b.   At the 8:59 minute mark of the interview of Individual 13, the agent read 18 U.S.C. § 1001 to the witness.

        c.   At the 17:15 minute mark of the interview of Individual 26, I advised Individual 26 and his attorney that the witness could be prosecuted for false statements and at the 27:15 minute mark the agent read 18 U.S.C. § 1001 to the witness.

        d.   At the 3:00 minute mark of the interview of Individual 27, the agent read 18 U.S.C. § 1001 to the witness.

43. Some of the identified individuals were interviewed more than once. Because defendant's motion alleges that the government did not read the § 1001 statute, I have included only reports to substantiate or contradict that claim.

44. Attached as Exhibit G is a chart of all individuals who have pled guilty in the Nix Gambling Business investigation. In addition, one corporate defendant has also pled guilty. See <u>United States v. Celebrity Financial LLC,</u> Case No. 22-cr-81-DMG.

45. In defendant's motion, he again alleges that the government threatened him with arrest. The government, however, did not have any conversations with defendant himself. I did, however, have conversations with counsel, Ms. Axel. Ms. Axel was concerned about interfering with defendant's baseball season in Korea. I recall several conversations in which she raised concerns about Korean authorities arresting defendant if the case was made public. During the first conversation, Ms. Axel indicated that an indictment could result in defendant being arrested in Korea, which would result in an extradition. At that time, I had not considered a foreign arrest or

extradition, and had not contacted anyone from the Department of Justice, Office of International Affairs, which is responsible for extraditions. Even though I had not considered a foreign arrest or extradition at that time, I am generally aware of the process from a prior case in 2009. I also recall conversations in the past with agents from Homeland Security Investigations in which they have advised me that they are required to enter arrest warrants into a central database shortly after they receive a warrant. Based on this knowledge, I confirmed Ms. Axel's concerns that an indictment could result in a foreign arrest and extradition.

46. I am aware that defense attorneys will often request that their clients be permitted to self-surrender at the courthouse before any warrants are submitted. Ms. Axel never requested that defendant be allowed to self-surrender if the government obtained an indictment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on February 22, 2023.

_____
AUSA JEFF MITCHELL

11