Keri Curtis Axel (Bar No. 186847)
  kaxel@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Attorneys for Defendant
Yasiel Puig Valdes



# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>YASIEL PUIG VALDES,<br><br>　　　　　Defendant. | Case No.: 2:22-cr-00394-DMG<br><br>**DEFENDANT YASIEL PUIG'S REPLY IN SUPPORT OF MOTION TO COMPEL DISCOVERY REGARDING SELECTIVE PROSECUTION** |

# TABLE OF CONTENTS

**Page**

I. ARGUMENT .................................................................................................... 1

    A. Neither the Defense's Efforts to Raise the Selective Prosecution Issue Nor the Merits of the Case Are Relevant to this Motion. .............. 1

        1. The Defense Promptly Raised the Selective Prosecution Issue with the USAO. ................................................................. 1

        2. The Merits of the Case Are Not Relevant But Do Not Support the Government's Prosecution Decision In Any Event. ........................................................................................ 4

            (a) *The Government's Opposition Includes New Allegations That Undermine the Report's Reliability.* ............................................................................ 4

            (b) *The Voicemail Message Does Not Support Obstruction.* ........................................................................ 5

    B. The Government's Practices Regarding Admonishing and Evaluating the Credibility of Black Witnesses Demonstrates Bias. ................................................................................................... 6

    C. The Government Has No Answer to Puig's Disparate Treatment. ........ 8

        1. Agent 1 Lied and Obstructed and Continues to Do So. .............. 8

        2. Black People Were Treated Disparately from Player R. ............. 9

        3. The Government's Disparate Treatment of Puig in the Management of This Case Also Demonstrates Bias. ................. 10

    D. The Government Should Be Compelled to Produce Discovery. ........... 11

        1. Puig Has Demonstrated a Discriminatory Effect. ...................... 12

        2. Puig Has Demonstrated a Discriminatory Purpose. ................... 14

II. CONCLUSION ............................................................................................... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Sacramento Nonprofit Collective v. Holder*,
    855 F. Supp. 2d 1100 (E.D. Cal. 2012) .............................................................. 13

*United States v. Arenas-Ortiz*,
    339 F.3d 1066 (9th Cir. 2003) ........................................................................... 12

*United States v. Armstrong*,
    517 U.S. 456 (1996) ....................................................................... 4, 11, 12, 14

*United States v. Blowers*,
    268 Fed App'x 504 (9th Cir. 2008) .............................................................. 11, 12

*United States v. McGraw-Hill Cos., Inc.*,
    2014 WL 1647385 (C.D. Cal. Apr. 15, 2014) ....................................... 12, 14, 15

*United States v. Mumphrey*,
    193 F. Supp. 3d 1040 (N.D. Cal. 2016) ....................................................... 12, 15

*United States v. Turner*,
    104 F.3d 1180 (9th Cir. 1997) .......................................................................... 15

*United States v. Walls*,
    949 F.2d 400 (1991) (unpublished) .................................................................... 4

**Other Authorities**

Andrew J. Wistrich and Jeffrey J. Rachlinski, *Implicit Bias in Judicial
    Decision Making, How it Affects Judgment and What Judges Can
    Do About It* (March 16, 2017 ........................................................................... 15

Chapter 5: American Bar Association, Enhancing Justice (2017),
    Cornell Legal Studies Research Paper No. 17-16, available at
    SSRN: *https://ssrn.com/abstract=2934295* or *http://dx.doi.org/10.2
    139/ssrn.2934295*; Christopher Ingraham ...................................................... 15

Christopher Ingraham, *Black men sentenced to more time for
    committing the exact same crime as a White person, study finds*, The
    Wash. Post, Nov. 16, 2017 ............................................................................... 15

# REPLY MEMORANDUM OF POINTS AND AUTHORITIES

In response to Puig's claim that the government has treated him and other Black men differently than non-Black men, the government contends that its actions were justified because the other Black men lied, too. There can hardly be better proof of implicit bias. The prosecution team interviewed 33 witnesses, only four of whom were Black, of that cohort, the government claims that three Black men made "technically false statements." (Government's Opposition ("Opp.") at 19.) (The government accuses one White man of false statements, but he apparently committed money laundering and tax offenses to boot.) Evidencing its bias, the government accuses both the Black basketball player and Black Manager of falsities, while (kindly) never accusing Player R, excusing his conduct because he "recanted." The government simply cannot see that, when evaluating the credibility of witnesses, its judgment is subjective and clouded by bias.

The government also resorts to inartful mudslinging to avoid the merits of Puig's selective prosecution claims. First, the government asserts prosecutors cannot have treated Puig disparately because (in their view) he merits prosecution. This merits debate dodges the bias inquiry entirely, simply assuming that the government's judgment of who is telling the truth and who is lying is not, itself, biased (and indeed the merits do not assist the government). Second, misrepresenting facts about the nature of defense communications with the U.S. Attorney's Office ("USAO") , the government argues that Puig's claims cannot be credible because the defense raised them late. This is false and also irrelevant.

Puig has met the standard to receive discovery and the Court should compel it.

## I. ARGUMENT

### A. Neither the Defense's Efforts to Raise the Selective Prosecution Issue Nor the Merits of the Case Are Relevant to this Motion.

#### 1. The Defense Promptly Raised the Selective Prosecution Issue with the USAO.

Although irrelevant, the government attempts to cast Puig's Motion as an

1  escalating trial strategy by citing—inappropriately—Puig's Fed. R. Evid. 408
2  correspondence sent to the USAO. The government's statements concerning these
3  communications are misleading; Puig appropriately raised his selective prosecution
4  concerns initially and subsequent discovery has substantiated those concerns.
5        As the Court knows, Puig was in Korea when undersigned defense counsel was
6  retained. As defense counsel previously informed the Court:

> Mr. Puig returned to the United States . . . on November 13. He appeared in this court . . . on November 15, and that is the first time I met him in person, so I've had really just about a week, . . . trying to really understand all the facts.

9  (Reply Axel Decl., Ex. 1 at 5.) While Puig was in Korea, it was near impossible to
10 investigate the underlying facts surrounding Puig's prosecution:

> Mr. Puig speaks Spanish, and even many Spanish speakers have a hard time understanding him. He has a 3rd grade education in Cuba, and we had to address difficult factual legal issues while with a 17-hour time difference and him playing baseball every day. I had no direct access to his phone. I can represent to your Honor that as a white collar defense attorney, I often deal with people's phones and messages, and it is challenging even in the best of circumstances to deal with screen shots, figure out what dates things have happened, et cetera.

15 (*Id.*) Thus, until Puig's return to the U.S., counsel could not fully appreciate the facts.
16       On November 17, 2022, two days after first meeting Puig in person, his
17 counsel requested evidence to investigate a "potential entrapment" defense regarding
18 government cooperators Agent 1 and Individual B. (Reply Axel Decl., Ex. 2.) AUSA
19 Mitchell explained that there could be no entrapment due to the timing of Agent 1's
20 cooperation. Puig's counsel said that, nevertheless: (1) the Court would ask her
21 during any plea colloquy whether she had sufficient information to explore all of his
22 defenses, and thus needed the documents; and (2) regardless of whether the evidence
23 met the defense's elements, the facts "smelled bad," in that it appeared that two
24 cooperators who had acted as bookmakers in the gambling ring—and thus were more
25 culpable than Puig—had manipulated the government to focus on Puig. (*Id.* ¶ 4.)
26       The government did not make their interview reports available for an in-person
27 review by Puig's counsel until November 22—the Tuesday before Thanksgiving.
28 (Reply Axel Decl., ¶ 5.) In advance of the review, the defense prepared a letter asking

the new U.S. Attorney to review the matter. The letter focused on recently-discovered evidence that showed that the facts did not support an obstruction charge. (*Id.*) This letter was hand-delivered when defense counsel appeared at the USAO and therefore did not reflect any information learned in the reports. (*Id.*) The letter requested dismissal of the charges or, in the alternative, reconsideration of Puig's October 27, 2022 diversion request. (*See* Mitchell Decl., Ex. C.)[1]

After reviewing the interview reports on November 22, defense counsel returned to their office and sent the USAO an email—which the government fails to include in its fact recitation—outlining the government's disparate treatment of Puig vis-à-vis Agent 1; calling it "concerning," and requesting dismissal. (Reply Axel Decl., Ex. 3.) As counsel told the Court the following day, "[h]aving looked at the [text] messages" and then Agent 1's "ROI for purposes of entrapment . . . we discovered other things that were more pertinent to obstruction of justice and indeed factual innocence or truthfulness" in Agent 1's statements. (*Id.*, Ex. 1 at 7.)

Then, on November 28—immediately after the Thanksgiving break—the defense sent the USAO a letter alleging that Puig had been the subject of both implicit bias and selective prosecution. The USAO refused a meeting but invited further written explanation to support a dismissal, which the defense submitted on November 30, 2022. (Neither letter mentions entrapment.)[2] Ultimately, the defense's dismissal request was rejected. The chronology here makes clear that, contrary to the Opposition, the defense raised selective prosecution at the earliest opportunity, *i.e.*, immediately after it was given access to the November 22 discovery.

---

[1] Puig's diversion request was based on detailed facts concerning Puig's language issues, cognitive issues (such as ADHD and PTSD), and other personal mitigating factors, which were gathered before Puig returned from Korea. (*See Id.*, Ex. A.)

[2] Once the selective prosecution issue was pending at the USAO, it refused to discuss diversion, making this quibbling over the fact that diversion was raised first appear like a game of "gotcha."

3
PUIG'S REPLY IN SUPPORT OF MOTION TO COMPEL SELECTIVE PROSECUTION DISCOVERY

It was highly improper for the government to file settlement communications under Fed. R. Evid. 408 to try to de-legitimize Puig's motion. *See, e.g., United States v. Walls*, 949 F.2d 400 (1991) (unpublished) ("Admission of statements made during settlement negotiations, whether in a civil or criminal trial, discourages settlement negotiations."). These letters have no bearing here other than to show that the defense attempted to get the attention of USAO supervisors to address the serious flaws, disparate treatment, unfairness, and injustice in this prosecution. When they refused even to meet, the defense had to bring the selective prosecution issue to the Court.

  **2. *The Merits of the Case Are Not Relevant But Do Not Support the Government's Prosecution Decision In Any Event.***

    (a) *The Government's Opposition Includes New Allegations That Undermine the Report's Reliability.*

The government spends most of its factual statement summarizing its view of Puig's interview. Although Puig will defeat the charges at trial, for this Motion, the Court need not consider guilt at all, as the selective prosecution inquiry compares similarly-situated defendants with others who could have been charged. The government claims that its allegations are relevant because one *Armstrong* factor is the "strength of the case." (*See* Opp. at 7.) The defense is hamstrung in responding to these claims in that it must preserve defense strategy for trial, but has submitted information *in camera* to demonstrate that the government's case is in fact weak.

For the record here, the defense notes that the written account of Puig's interview in the government's Opposition departs markedly from its own report, which casts doubt on the government's case. Notable differences include:

| Government's Opposition | Report of Interview ("ROI") |
|---|---|
| "I [AUSA Mitchell] began by reviewing the terms of the proffer agreement with defendant." (Mitchell Decl. ¶21.) | "AUSA Michell also addressed the proffer letter presented to [Puig] and his attorneys and informed [Puig] that an agent would be taking notes …." |
| "Multiple times during the interview, defendant requested to speak to his attorneys, and the interpreter, outside the | The ROI reflects three breaks, On the first, "AUSA Mitchell stated that he could not provide legal guidance and referred [Puig] to his legal representation." The second was |

| | |
|---|---|
| presence the government. I agreed to these requests." (*Id.* ¶ 21.)<br><br>Breaks "at numerous points" (Opp. at 6.)<br><br>"Numerous breaks to confer with counsel" (Opp. at 17.) | requested by Puig. The third was initiated by AUSA Mitchell who asked "to speak with [Puig's]" attorneys on the side." |
| "Defendant . . . said there were no messages related to betting on websites." (Opp. at 5.) | "While he was reviewing his texts with his attorney present, [Puig] stated that he . . . did not see any messages about betting on websites." This merely reflects what he was finding contemporaneously, not whether any messages existed. |
| "Defendant indicated that the only message he found pertaining to gambling was a text message on May 9, 2019. (Opp. at 5.) | [Not in ROI]. |

(b) *The Voicemail Message Does Not Support Obstruction.*

The government starts its brief by recasting Puig's attempt to avoid meddling in the government's investigation as obstruction. It does this by misleading the Court in its description of a voicemail message Puig left with Individual B nearly two months after Puig's interview. Puig had no intent to obstruct the investigation; far from it. The cited voice message comes about only after Agent 1 and Individual B repeatedly tried to get Puig to obstruct the government's inquiry by colluding with them as to what to tell the government, and Puig repeatedly refused. (Reply Axel Decl., Ex. 4.) Most demonstrative of Puig's intent is an earlier interchange by voicemail messages with Individual B wherein Individual B states: "[Agent 1] has to meet with the same people you did, and he wants to make sure he tells them whatever you told them also, nothing different." Puig responds: "I didn't meet up with anyone. He can say whatever he wants I don't know anything about that. They are looking for him not me[.]" (*Id.*) This response alone ("he can say whatever he wants") is inconsistent with any attempt or intent to obstruct justice. Additional evidence to disprove obstruction will be offered at trial.

### B. The Government's Practices Regarding Admonishing and Evaluating the Credibility of Black Witnesses Demonstrates Bias.

The government's ROIs do not support the so-called practices they claim existed regarding admonishing witnesses. The government claims that AUSA Mitchell admonished each target using the proffer agreement. As an initial matter, no admonishment at all is reflected in 13 of the 18 target interviews. This casts doubt not only on the government's alleged practices, but also as to whether or not the ROIs are accurate. Either AUSA Mitchell did not admonish these witnesses as he claims or it was not recorded by the agent. Either way, this is a significantly troubling fact, given that the government's entire case against Puig turns on the accuracy of its ROI.[3]

Further, an AUSA-led admonishment regarding the USAO's proffer agreement is not the same as reading a witness the text of 18 U.S.C. § 1001—particularly not to a person of color with a fear of law enforcement. The agreement does not contain the § 1001 text; instead, the reference to false statements is part of the contractual terms.[4] The typical AUSA admonishment is well captured in Individual 19's ROI:

> AUSA Mitchell provided admonishments regarding the proffer session, specifically against not telling the truth. [Mitchell] warned [witness] that if his statements were not true, all the protections offered under the proffer agreement would be null and void. [Mitchell] further explained that witness could . . . discuss any matter with his attorney during the video teleconference and the proffer session would resume after he had [such] opportunity.

(*Id.*, Individual 19.) To the extent the ROIs are accurate, they capture variations on this theme. (*See, e.g., id.* (Individuals 1, 11, 20) and Nuno Decl., Ex. D (Agent 1).)

There is no evidence that AUSA Mitchell's pattern was anything other than the standard "if you lie, this agreement is void" practice discussed in the Motion, (*see* Axel Decl. ¶ 10), and it likely varied based on factors such as his relationship with

---

[3] To date, the government has refused to turn over the handwritten notes of interviews, even for Puig, where it is clearly *Brady* material.

[4] The proffer agreement states: "The Office reserves the right to use any statements or information provided by your client in any prosecution for false statements, obstruction of justice, or perjury." (Mitchell Decl., Ex. I.)

defense counsel, his assessment of the witness's credibility, etc.[5] Indeed, the inconsistency in the application of the government's admonishment practices illustrates that they were highly subjective, leaving them to be employed differently depending on the prosecution's perceptions of a witness.

The government does not deny this; in fact, AUSA Mitchell's declaration makes clear he was disinclined to believe Puig before the interview began. It is not surprising that he would point to a reason other than bias to explain this prejudice, but the problem with implicit bias, as explained in Puig's Motion, is that it is not an overt, explicit prejudice, and no one wants to admit they have them, despite substantial evidence of that the denial of such biases enforces institutional racism. The numbers do, however, tell a story: prior to the interview of Puig, 33 interviews had been conducted by the prosecution team. In 19 of those interviews, there was no admonishment of any kind (per the ROIs), and in only three was the text of § 1001 referenced (but not read). On only one occasion before Puig's interview was § 1001 read in full, as it was to Puig. Puig's interview involved, uniquely, AUSA Mitchell also advising him that "lying was a crime and could be prosecuted." After Puig's interview, the prosecution team may have tried to be more consistent, but it still made subjective determinations, including providing no advisal (*e.g.*, Individual 21, 6/15/2022) or a standard proffer admonishment (*e.g.*, Agent 1, Individuals 19, 20.)

Whether the prosecution's post-Puig practices (even though not fully consistent) represent a *post hoc* attempt to cover up biases against Puig and the other Black witnesses can only be proven by examining the requested discovery, including five years' of interview reports by the case agents and the AUSA. There is a sufficient basis to compel such discovery to test the prosecution team's practices and whether they have been applied uniformly and differently to persons of color.

---

[5] There are only a few instances in which the prosecutors were present and led the admonishment process and the text of 18 U.S.C. § 1001 was also read.

### C. The Government Has No Answer to Puig's Disparate Treatment.
#### 1. Agent 1 Lied and Obstructed and Continues to Do So.

The government minimizes Agent 1's multiple flat-out false statements and shows its continuing propensity to believe Agent 1's lies, all in an attempt to minimize his obstruction so as to appear unbiased. But Agent's 1 interview was replete with false statements that were either rehabilitated or ignored, and are now just brushed off in the Opposition. For example, the government claims that Agent 1 did not lie about his time and role as Puig's bookmaking intermediary, stating that he "freely admitted to placing bets" for Puig. (Opp. at 18.) In doing so, however, the government ignores Agent 1's clear lie about whether, and for how long, he took bets from Puig. In fact, Agent 1 said that Puig was given online credentials immediately, and did not change his story until the government showed him text messages proving in fact he placed bets at Puig's request for about a month. (Reply Axel Decl., Ex. 5.)

Similarly, during his interview, Agent 1 lied about the last time he had texted Puig, claiming it was on New Year's Eve rather than January 27, 2022. (Nuño Decl., Ex. E.) Agent 1 was twice asked whether there were texts between he and Puig the day of Puig's government interview and Agent 1 said "no." (Reply Axel Decl. Ex. 5.) Although these statements are demonstrably false, the government's Opposition also minimizes them, asserting that Agent 1 admitted he tried to "contact defendant the day of the interview," (Opp. at 19), but avoiding the specific lie regarding the texts. Other lies and obstruction by Agent 1 include: Agent 1 destroyed all texts with Puig; Agent 1 destroyed his notes about gambling, including amounts wagered and owed; and Agent 1 claimed Individual B worked for Puig and was Puig's assistant when Agent 1 knew this was false. The government chose to do nothing these lies.

The government now sponsors yet new prevarications by Agent 1, asserting them as truth. Attempting to minimize Agent 1's deletion of all of his text messages with Puig, and his destruction of betting notes, the government states that—pursuant to a new, third interview with Agent 1—Agent 1 destroyed his texts with Puig due to

frustration with Puig not paying a debt. (*See* Opp. 18; Mitchell Decl. ¶ 25.) Based on this new lie, the government now claims that Agent 1 deleted his texts "long before" he first learned of the government's investigation. (*Id.*) This statement is both illogical (how could he collect a debt without the records?) and false: in his first interview, Agent 1 admitted that he was aware of the government's February 2020 raid on the targets' homes, and claimed that he and Puig no longer placed bets after the raid. (Reply Axel Decl., Ex. 5.) The government simply chooses to ignore this prior admission, however, because it would rather believe that Agent 1 deleted his texts and destroyed his notebooks before learning of the government's investigation, all to defeat the clear inference that he intentionally destroyed evidence.

There is more evidence that Agent 1 did not delete his texts "long before he learned of the investigation": In 2022, he texted Puig "Happy New Year," and later asked Puig if he had spoken with the IRS (*see id.,* Nuño Decl. Ex. E.), but he promptly also deleted these messages such that he told the government he had not "preserve any text messages with Puig" at the time of his initial interview. (Reply Axel Decl., Ex. 5). The government has no justification, other than bias, for believing Agent 1 (nor failing to charge him with 18 U.S.C. § 1001).

### 2. Black People Were Treated Disparately from Player R.

The government also minimizes the gentlemanly treatment it gave Player R, which sharply contrasts not only with Puig, but also with a Black former basketball player. To contrast, Player R lied almost immediately about Nix while the basketball player was forthcoming. For example, when asked their connection to Nix, Player R could not identify him in a lineup and stated that he last spoke to Nix over 7 years previously, despite the fact that he played golf with Nix. (Nuño Decl., Ex. F.) When shown contrary evidence, Player R revised his story with another lie, saying they met in 2013. (*Id.*) Player R was then allowed to go through his messages to further refresh his recollection that he met Nix in 2016. (*Id.*) Then, although Player R claimed he could not remember whether he served as an agent for Nix, he was asked to contact

the government with any further information. (*Id.*) In contrast, the Black basketball player admitted he knew Nix, that they were friends, and had played golf together. (*Id.* at Ex. A.) When asked about placing bets with Nix, the basketball player could not recall, then immediately corrected himself when agents mentioned a bet he made on the Super Bowl. (*Id.*) Thereafter, the player was admonished about making false statements, and warned that Martha Stewart was convicted of § 1001. He was not asked to provide further information if available, but was instead told to not discuss the interview with Nix.

Comparing the Black basketball player's interview with the interview of Player R is instructive. The agent establishes rapport with Player R, who is given the benefit of the doubt, whereas the Black basketball player is not. The government's attempt to dispel the allegations of bias in its treatment of the basketball player by calling him a liar is belied by the evidence. Contrary to the government's assertion, the former basketball player did not contradict his prior statement about betting on the Super Bowl, as he never denied placing any bets.

The government's approach toward Puig is similar. The government acknowledges that, after initially (allegedly) stating that he did not speak about sports betting with Agent 1, Puig was then asked whether he talked about online sports betting, and he said he did not recall. Then later, as he went through his text messages to refresh his recollection (just as Player R did), he provided an example where he texted a bet to Agent 1 and sent him the amount due. But the government fails to give Puig credit for recanting, (Opp. at 17), though it gives Player R credit for such by saying that he "was in disbelief." (Nuno Decl., Ex. F at p. 3.)

### 3. The Government's Disparate Treatment of Puig in the Management of This Case Also Demonstrates Bias.

The government has no answer to the facts regarding its treatment of Puig vis-à-vis the other charged defendants when it comes to procedural fairness. (Mot. at 9.) There are significant disparities between Puig's treatment and these defendants, whom the government calls "similarly situated." With one exception, each was given

the opportunity to be interviewed at least twice, which allowed them both to prepare and to refresh their own recollections with documents and messages.  Further, in most instances, there was substantial time between the first interview and charging:

| Name | Date of First ROI | # Interviews | Date Charged |
|---|---|---|---|
| Target 1 | 2/7/2020 | 6 | 2/15/2022 |
| Target 2 | 2/28/2020 | 1 | 12/15/2021 |
| Target 3 | 4/7/2020 | 2 | 12/13/2021 |
| Target 4 | 5/5/2020 | 7 | 2/15/2022 |
| Target 5 | 12/18/2020 | 2 | 3/10/2022 |
| **Yasiel Puig** | **1/27/2022** | **1** | **8/29/2022\* (plea agmt. signed 7/1/2022)** |
| Individual 14 | 2/23/2022 | 2 | 11/14/2022 |
| Agent 1 | 3/2/2022 | 3 | 11/16/2022 |

The fact that the government refused even to take a meeting here to consider the exculpatory evidence is further evidence of procedural bias, and something that merits discovery as to how the discovery treated other defendants.

**D.     The Government Should Be Compelled to Produce Discovery.**

The government attempts to hide its implicit biases behind a "presumption of regularity" that supports "prosecutorial decisions," (Opp. at 10-11), but all Puig needs to show at this juncture is "*some* evidence tending to show the existence of the . . . discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 468 (1996) (citing *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (emphasis added); *see United States v. Blowers*, 268 Fed App'x 504, 506 (9th Cir. 2008). As to discriminatory effect, Puig is required only to produce "some evidence that similarly situated defendants of other races could have been prosecuted, but were not[.]" *Armstrong*, 517 U.S. at 469. Puig need not now prove selective prosecution beyond a reasonable doubt, by clear and convincing evidence, or even by a preponderance—he need only put forth "a credible showing of different treatment of similarly situated persons. *Id.* at 470. This showing can be made by "identify[ing] individuals who were not Black [or not Latine] and could have been prosecuted for

the offenses for which [Puig] was charged, but were not so prosecuted." *Armstrong*, 517 U.S. at 469; *see United States v. Arenas-Ortiz*, 339 F.3d 1066, 1069 (9th Cir. 2003). The fact that the government "may indeed have many good reasons for its decisions: the relative strengths of each case, general deterrence values, enforcement priorities, and the case's relationship to the Government's overall enforcement plan" is not enough to withstand a motion for discovery. *United States v. McGraw-Hill Cos., Inc.*, 2014 WL 1647385, at *12 (C.D. Cal. Apr. 15, 2014).

Similarly, Puig need only show "*some* evidence" of discriminatory intent. *Blowers*, 268 Fed. App'x at 506; *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1065 (N.D. Cal. 2016). Although the Supreme Court has never addressed *exactly* what "some evidence" of discriminatory intent looks like, *see, e.g. Armstrong*, 517 U.S. at 470, district courts in this circuit have looked to circumstantial evidence that "the government undertook a particular course of action 'at least in part "because of," not merely "in spite of" its adverse effects upon an identifiable group." *Mumphrey*, 193 F. Supp. 3d at 1065 (quoting *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997)); *see McGraw-Hill Cos.*, 2014 WL 1647385, at *12 (finding the evidence "circumstantial but sufficient"). In *Mumphrey*, the court stated that some evidence that "prosecutors who made prosecutorial decisions [were] aware (either individually or collectively) of similarly situated" non Blacks (or Latines) "that could have been presented for prosecution but were not" would be some evidence of discriminatory intent. 193 F. Supp. 3d at 1065.

### 1. Puig Has Demonstrated a Discriminatory Effect.

Puig's opening motion makes the requisite credible showing and entitles him to the discovery requested to ensure that the Government's interest in vigorously prosecuting him for obstruction of justice—but not similarly-situated White, non-Latine individuals—is not based on unconstitutional and impermissible prosecutorial biases, implicit or not. The government's primary response to this is to claim, on the basis of a self-serving affidavit from AUSA Mitchell devoid of any reflection on his

12
PUIG'S REPLY IN SUPPORT OF MOTION TO COMPEL SELECTIVE PROSECUTION DISCOVERY

implicit biases (which introduces new uncorroborated facts, which unfortunately now makes Mitchell a witness), is to claim that Puig was charged on the merits rather than on any bias. But whether Puig is guilty of the charged crimes (to be clear, he is not) is irrelevant to Puig's Motion, which alleges that Puig has been treated disparately from other similarly situated individuals. The issue here is variances in the government's charging decisions that were based on race and/or national-origin based factors, not on the ultimate guilt or innocence of Puig.

By the government's own admission, a "similarly situated" individual is "one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." (Opp. at 18 (citations omitted); *see Sacramento Nonprofit Collective v. Holder*, 855 F. Supp. 2d 1100, 1110 (E.D. Cal. 2012) (citations omitted). That is clearly true when comparing Puig to Agent 1 and Player R, here, both of whom could have been charged with obstruction of justice for any number of material falsehoods, or in Agent 1's case, destroyed evidence and attempted to solicit Puig for information about the government's investigation. Player R, who is neither Black nor Latine, flat out told the government he could not identify Nix from a photo array despite the fact that he had personally played golf with Nix—he could have been charged with obstruction of justice and was not; that is a disparity. Agent 1, who is neither Black nor Latine, dithered about whether and when he took bets from Puig, destroyed text messages with Puig after learning about the investigation, and told a direct lie about his last communications with Puig before his interview with the government—he could have been charged with obstruction of justice and was not; that is a disparity.

As to Player R, the government has *no* answer for why he was not prosecuted for lying to government officials other than to say "a single instance of non-prosecution is not sufficient to meet defendant's burden[.]" (Opp. at 15.) As to Agent 1, the government claims without support, that Agent 1 and Puig were not similarly situated because although Agent 1 lied and destroyed evidence, he *also* committed

13
PUIG'S REPLY IN SUPPORT OF MOTION TO COMPEL SELECTIVE PROSECUTION DISCOVERY

other federal crimes for which he was eventually charged. (Opp. at 18-19.) But that fact does not make him inapposite to Puig at all—both Agent 1 and Puig are alleged to have committed "roughly the same crime" (obstruction of justice) under "roughly the same circumstances" (a government proffer interview), but only the Black Latine was charged with the actual crime. That is *precisely* similarly-situated. *See Armstrong*, 517 U.S. at 470 (stating that necessary evidence was identifying non-Black individuals that could have been prosecuted for the same offenses, but were not). The fact that, ultimately, the government *may* have a non-race based reason for not charging Agent 1 with obstruction of justice is not enough to withstand discovery of selective prosecution. *See McGraw-Hill Cos.*, 2014 WL 1647385, at *12.

### 2. *Puig Has Demonstrated a Discriminatory Purpose.*

Circumstantial evidence that the government charged Puig in this case with obstruction because of his race and national origin, *see Turner*, 104 F.3d at 1184, is written all over the government's papers—the government wants to punish and make an example of the Black Cuban who was not cooperative enough, despite the fact that multiple non-Black, non-Latine with a far better command of English were not made an example of despite their fabrications (which, given their comparative language skills, were more devious in design and execution). This discriminatory purpose is made clear by the government's sleight of hand in presenting the Court with Puig's March 14, 2022 "recorded message over WhatsApp" regarding his interview with the government, wherein Puig "told an associate – in English[6] – that 'I no said nothing.'" (Opp. at 22.) What the government fails to tell the Court is the context of this statement, which is that Agent 1 had repeatedly attempted to get Puig to collude as to what to reveal to the government. In other words, this message was Puig's inarticulate attempt in broken English to get Agent 1 to stop harassing him to break the law, which is the *opposite* of obstruction of justice. (Reply Axel Decl., Ex. 4.)

---

[6] The government's suggestion here that Puig had any significant level of command of the English language is belied by the cited quote.

In any event, Puig has provided the Court with sufficient circumstantial evidence of discriminatory intent to warrant selective prosecution discovery. *See Mumphrey*, 193 F. Supp. 3d at 1065; *McGraw-Hill Cos.*, 2014 WL 1647385, at *12.

- First, Puig has provided evidence that prosecutors have charged a Black Cuban with obstruction of justice when non-Blacks and non-Latines who prevaricated repeatedly to the government were not similarly charged. *See Mumphrey*, 193 F. Supp. 3d at 1065 (stating that discriminatory intent can be found where federal prosecutors make divergent decisions about Blacks and similarly-situated non-Blacks).
- Second, Puig has provided evidence that prosecutors routinely treated Black interviewees differently than non-Black interviewees, both in how they chose to start the interview (for Blacks, a recitation of the language of 18 U.S.C. § 1001 and for Whites, a friendly reminder about the proffer letter) and how they chose to conduct the interview (for Blacks, limited ability to rehabilitate confusion/misstatements and much more antagonistic and for Whites, multiple opportunities to clear up confusion/misstatements and far friendlier interviews).
- Third, Puig has adduced significant statistical evidence that Black men are simply treated differently by prosecutors—and even judges—then non-Black men, both in terms of credibility and punishment. *See, e.g.*, Andrew J. Wistrich and Jeffrey J. Rachlinski, *Implicit Bias in Judicial Decision Making, How it Affects Judgment and What Judges Can Do About It (March 16, 2017)*. Chapter 5: American Bar Association, Enhancing Justice (2017). Cornell Legal Studies Research Paper No. 17-16, available at http://dx.doi.org/10.2139/ssrn.2934295; Christopher Ingraham, *Black men sentenced to more time for committing the exact same crime as a White person, study finds*, The Wash. Post, Nov. 16, 2017 at 1:33 p.m. EST.
- Fourth, Puig has provided evidence that the government's press releases as to him were far different than for non-Black defendants. Player R was also a prominent former Dodger, and yet, he was not charged with a § 1001 violation. Further, the cases cited by the government in support of their "interest in deterring lying to the government," (Opp. at 27), are all about public officials engaged in ongoing and active violations of the public trust. Puig has never been a public official charged with the public trust and the basis for his charge was a singular brief interview with a hostile prosecution team and translation issues.
- Fifth, Puig was charged with a violation of § 1001 even though the Sand Island Sports investigation was over as to all the government's targets.

This evidence of the government's discriminatory intent is all that is required at the discovery request stage. *See Mumphrey*, 193 F. Supp. 3d at 1065; *McGraw-Hill Cos.*, 2014 WL 1647385, at *12. Puig has adduced credible evidence of discriminatory intent and should be permitted to selective prosecution discovery.

## II.     CONCLUSION

For these reasons, the Court should grant defendant's motion to compel.

DATED: March 1, 2023    WAYMAKER LLP

By: */s/ Keri Curtis Axel*
 KERI CURTIS AXEL
 *Attorneys for Defendant Yasiel Puig Valdes*