UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **1** of 7

| Case No. | CR 22-394-DMG | Date | April 10, 2023 |
|---|---|---|---|

| Present: The Honorable | DOLLY M. GEE, UNITED STATES DISTRICT JUDGE |
|---|---|
| Interpreter | N/A |

| Kane Tien | Not Reported | Not Present |
|---|---|---|
| Deputy Clerk | Court Reporter | Assistant U.S. Attorney |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendant(s): | Present | Appt. | Ret. |
|---|---|---|---|---|---|---|---|
| Yasiel Puig Valdes | Not | | ✓ | Keri C. Axel | Not | | ✓ |

**Proceedings: [IN CHAMBERS] ORDER DENYING DEFENDANT'S MOTION TO COMPEL [59, 66]**

Defendant Yasiel Puig Valdes, a former Major League Baseball player who is charged with obstruction of justice[1] and making false statements,[2] brings this motion to compel evidence of selective prosecution. MTC [Doc. ## 59, 66[3]]; *see also* First Superseding Indictment ("FSI") [Doc. # 54].

For the reasons discussed below, the Court **DENIES** the motion.

## I. BACKGROUND

### A. Allegations against Puig

In 2017, divisions of the Department of Homeland Security and the Internal Revenue Service began investigating an illegal sports gambling business Wayne Nix operated. Declaration of AUSA Jeff Mitchell ¶ 2 [Doc. # 73-1]. As alleged in the FSI, Nix, a former minor league baseball player, operated an illegal bookmaking business in the Los Angeles area, including using websites operated by Sand Island Sports. FSI ¶¶ 8–11.

Since 2019, an individual the FSI identifies as "Agent 1" and the parties refer to as "Individual 18," who is a private baseball coach, has allegedly worked for the Nix gambling business. In this capacity, he placed and accepted bets and demanded and collected money owed. *Id.* ¶ 12. According to the Government, Puig met Agent 1 in January 2019. *Id.* ¶ 16. The FSI also identifies "Individual B," a private baseball coach who assisted Puig in placing sports bets with Agent 1 and assisted Agent 1 in attempting to collect associated debts. *Id.* ¶ 18.

---

[1] *See* 18 U.S.C. § 1503(a).

[2] *See* 18 U.S.C. § 1001(a)(2).

[3] Because the MTC refers to sealed information and filings, Defendant filed one version of the MTC under seal [Doc. # 66] and another version not under seal and with redactions [Doc. # 59]. Citations to the MTC are to the sealed version of the MTC. [Doc. # 66.] The Court has avoided referring to any confidential information in this Order.

According to the FSI, beginning no later than May 2019, Puig placed bets with the Nix gambling business through Agent 1. By June 17, 2019, Puig owed $282,900 for sports gambling losses. FSI ¶ 19. Between June 25 and July 3, 2019, Agent 1 and Individual B sent text messages instructing Puig to pay funds to a third person to whom the Nix gambling business owed winnings. *Id.* ¶¶ 17, 20. Puig allegedly sent cashiers' checks to that person on July 3, 2019 and texted a photograph of the shipping label to Agent 1 and Individual B. *Id.* ¶ 22. The next day, Nix provided Puig direct access to the Sand Island Sport websites, and Puig allegedly proceeded to place 899 bets on sporting events through the Nix gambling business, Agent 1, and Sand Island Sports. *Id.* ¶¶ 23–24.

The Government interviewed Puig by videoconference on January 27, 2022, with former defense counsel, special agents, and AUSA Mitchell participating in the call. FSI ¶¶ 25–26. Puig, who was born in Cuba, had a Spanish language interpreter who spoke the Cuban dialect. Mitchell Decl. ¶ 14. The Government brings an obstruction of justice charge against Puig on the basis that he falsely stated during this interview that he had never discussed sports gambling with Agent 1 and that Puig withheld information about Agent 1's involvement in placing bets and collecting debts. *Id.* ¶ 27. The Government also brings a claim against Puig for making false statements during this interview, specifically, that he had never discussed sports gambling with Agent 1, that he had lost $200,000 after placing a bet "with an unknown person on an unknown website," and that he did not know the individual (Individual B) who instructed him to send $200,000 to the third person and had not communicated with Individual B by text message. *Id.* ¶ 29.

On August 29, 2022, the Government filed this case, which initially alleged only one count, for making false statements. [Doc. # 1.] Although the matter was set for a guilty plea hearing, Puig ultimately did not plead guilty. [*See* Doc. # 24.] The Court found Puig in breach of his plea agreement on January 6, 2023. [Doc. # 51.] On January 20, 2023, the Government filed a two-count FSI, which added the obstruction of justice charge. [Doc. # 54.]

**B. Evidence of Target and Non-Target Interviews**

In support of their filings, the parties have filed reports, memoranda, and summaries of the interviews of the target and non-target individuals during the investigation into the Nix gambling business, among other evidence. The Court briefly summarizes the pertinent interview evidence, which underlies the parties' arguments. The Court does not mention evidence submitted by the parties that it does not consider necessary to the resolution of the motion.

According to the Government, six individuals—none of whom are Black—were interviewed in 2020 and 2021 as targets. [Doc. # 77 at 171.] These individuals have each entered guilty pleas to crimes other than making false statements or obstruction of justice. *Id.* at 32. AUSA Mitchell states that most targets retained attorneys and were provided with proffer letters, which AUSA Mitchell reviewed with the targets. Mitchell Decl. ¶¶ 4–5. Mitchell states that his standard practice during a proffer is to discuss "the paragraph that advises the target that they can be prosecuted for providing false statements." *Id.* ¶ 5.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

The parties also filed evidence of non-target interviews of an additional 27 individuals, including Puig, five of whom are Black. [Doc. # 77 at 171; Doc. # 86 at 23–26.] The parties dispute whether admonishments to these non-target individuals evince racially disparate treatment of Black people.

During interviews of Puig and Individual 6, AUSA Mitchell advised the interviewee against making false statements—in Individual 6's interview, referencing 18 U.S.C. § 1001 and that knowing false statements could result in prosecution under that statute, and in Puig's interview, reading the text of § 1001 and admonishing him that lying was a crime that could result in prosecution, as Puig had received a proffer letter before the interview. [Doc. # 68 at 13; Doc. # 77 at 68; Doc. # 86 at 23–26 (Individuals 6, 12); Mitchell Decl. ¶¶ 12, 20.] Individual 6 is not Black, and AUSA Mitchell states that the Government intends to prosecute Individual 6 for making false statements during the interview and other crimes. Mitchell Decl. ¶ 27. Individual 6's interview occurred before Puig's. [Doc. # 86 at 24–25.]

For 18 other non-target individuals, interview records or audio recordings reflect that during interviews of those individuals (Individuals 4, 5, 7–10, 13–17, and 21–27), a special agent advised the interviewee against making false statements, specifically referencing or reading the text of 18 U.S.C. § 1001. [Mitchell Decl. ¶¶ 4, 42 (Individuals 9, 13, 26, and 27[4]); Doc. # 77 at ¶¶ 52 (Individual 4), 59 (Individual 5), 89 (Individual 10), 103 (Individual 14), 109 (Individual 16), 114 (Individual 17), 138 (Individual 21), 142 (Individual 22), 146 (Individual 23), 153 (Individual 24), 161 (Individual 25); Doc. # 68 at ¶¶ 5 (Individual 7), 8 (Individual 8), 31 (Individual 15).] Three of these individuals are Black. Notably, Individual 10 is not Black and was read the text of § 1001 at his interview, which occurred *before* Puig's. [*See* Doc. # 86 at 24–25.]

With an additional four non-target individuals, the Government held proffer meetings at which the Government's records reflect that AUSA Mitchell reviewed the proffer agreement's admonishment against making false statements, although records do not indicate that § 1001 was read to the individual. [*See* Doc. # 68 at 18; Doc. # 77 at 40, 122, 132 (Individuals 1, 18, 19, 20).] None of these four individuals are Black. Further, for Individual 11, who is not Black, the Government provided Use Immunity, which contained a warning against giving false statements, although Puig claims that no admonishment is reflected in the interview report. [*See* Doc. # 86 at 23–26; Doc. # 99 at 4 n.2; Doc. # 99-1 ¶ 5.]

For two non-target individuals, one of whom is Black, no admonishment was given at all—according to the Government, because another field office conducted the interviews. [Doc. # 77 at 46, 49, 171 (Individuals 2, 3).]

Of these non-target individuals interviewed in connection with the Nix gambling business, three—Puig, Individual 14, and Individual 18 ("Agent 1")—have been charged with additional crimes, although not for gambling activities. [Doc. # 77 at 32.] Individuals 14 and 18, who are not Black, are charged with violation of 26 U.S.C. § 7206(1) (false statements on tax returns or other documents). Further, the

---

[4] For Individuals 9 and 27, AUSA Mitchell asserts that a special agent read the text of § 1001 to the individual, which can be heard in an audio recording, although Puig claims that no admonishment is reflected in the interview report. [*See* Doc. # 86 at 23–26; *see also* Mitchell Decl. ¶ 42.] At the hearing, Puig's Counsel acknowledged that admonishments can be heard in the recordings.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page 4 of 7

Government claims that it informed Individual 6 (who is not Black) on August 24, 2022 that it intends to seek an indictment charging him with violation of 18 U.S.C. § 1001 and money laundering offenses. Mitchell Decl. ¶ 27. That investigation remains ongoing. *Id.*

## II. LEGAL STANDARD

A "rigorous" standard applies to obtain discovery in aid of a claim of selective prosecution. *United States v. Armstrong*, 517 U.S. 456, 468 (1996). The defense must come forward with "some evidence tending to show the existence of" discriminatory effect and discriminatory intent. *Id.*

To show some evidence of discriminatory effect, the defense must provide some evidence that similarly situated defendants of other races could have been prosecuted but were not. *Id.* at 469. Hearsay and personal conclusions based on anecdotal evidence are not "some evidence," under this standard. *Id.* at 470.

## III. DISCUSSION

Without "a credible showing of different treatment of similarly situated persons," the Court cannot grant a motion to compel evidence of selective prosecution. *Armstrong*, 517 U.S. at 470. Although Puig devotes a good deal of his brief to assailing the prosecution for implicit bias, the standard that the Court applies is that which the Supreme Court articulated in *Armstrong*. Unless Puig can put forth some evidence that similarly situated persons were treated differently on account of race, his motion fails.

Here, according to the Government, Individual 6 is a non-Black person who was initially interviewed as a non-target, was interviewed before Puig, was warned by AUSA Mitchell during this interview that 18 U.S.C. § 1001 could result in criminal charges for lying, and whom the Government has since elevated to a target and intends to prosecute. [Doc. # 77 at 68; Mitchell Decl. ¶ 27.] According to the Government, at a reverse proffer in August 2022 (before Puig's notice to the Government of his intent to bring a motion for evidence of selective prosecution), the Government informed Individual 6 and his counsel that it intends to seek an indictment charging a violation of 18 U.S.C. § 1001 and money laundering offenses. Mitchell Decl. ¶ 27. The evidence about Individual 6 undermines Puig's claim that the Government has selectively prosecuted Black people for making false statements during interviews.

Moreover, Individuals 7 and 8 are both Black, were advised of § 1001 in their interviews, and could have been prosecuted for making false statements but were not. Individual 7's interview report documents that he initially denied knowing that Nix was a bookmaker, knowing that "anyone placed bets with" Nix, or remembering placing a bet with Nix. Individual 7 then "thought about it" and remembered the bet. During the interview, a special agent informed Individual 7 of § 1001, advised him that the agent did not believe that his answers would trigger a § 1001 violation, and requested that Individual 7 provide truthful answers. [Doc. # 68 at 5.]

Individual 8's interview report similarly indicates that this individual was initially warned about § 1001 and the consequences of making false statements, yet withheld information about his driver's role in collecting and paying gambling proceeds. [Doc. # 68 at 9–10.] His lawyer later disclosed the driver's

role to the Government after the interview. The Government asserts that it is not prosecuting either Individual 7 or 8, even though it could have brought charges for violation of § 1001. This further undercuts Puig's claim that his prosecution is racially motivated.

Although Puig makes much of the alleged favorable treatment of Individual 18 (aka "Agent 1"), who is not Black, Individual 18 is not similarly situated. Individual 18 is being charged with violation of 26 U.S.C. § 7206(1) (fraud and false statements on tax returns and other documents), which exposes him to potentially higher penalties than Puig. *Id.* Moreover, Individual 18 affirmatively sought to cooperate with the Government after his interview—that alone differentiates him from Puig. Mitchell Decl. ¶ 24. The Court also notes that, even when obstruction of justice or making materially false statements is not a charged offense, the Court can take such conduct into account during sentencing. *See* 2021 Sentencing Guidelines at Section 3C1.1.

Similarly, the Court is not persuaded that the Government's treatment of Individual 15, a non-Black individual who is not being charged for misstatements during his interview, shows disparate treatment. Individual 15 is not similarly situated to Puig: according to the Government's interview report, although this individual initially gave conflicting information, he had been forthright about his gambling activities and had fully disclosed his association with the Nix gambling business by the end of the interview. In contrast, the FSI alleges that Puig was not fully forthcoming during his interview.[5] Even assuming that Individual 15 is similarly situated, evidence that the Government prosecuted one Black and one non-Black person based on false statements made during their interviews and did not prosecute two Black persons and one non-Black person for making technically false statements is scant evidence that the Government engaged in racially motivated selective prosecution. *Accord United States v. Diggs*, 613 F.2d 988, 1003 (D.C. Cir. 1979) (holding that where one of a defendant's comparison group of three similarly situated persons was prosecuted for and convicted of similar crimes, it was proper to deny the defendant's motion to compel evidence of selective prosecution).

To support a claim of selective prosecution, Puig must go beyond arguing that there is evidence that could be construed as evidence of discriminatory intent and must show at least some evidence of disparate effect—*i.e.* "that similarly situated individuals of a different race were not *prosecuted*." *See Armstrong*, 517 U.S. at 465 (emphasis added). Thus, for example, Puig's argument that the Government released a press release about his charges, but not Individual 18's, and that AUSA Mitchell made a public statement about Puig, but not other defendants, is not a compelling reason to grant the MTC absent "some evidence" of discriminatory effect. Given Puig's name recognition, the Government is within its discretion to publicize a prosecution that it deems likely to have a deterrent effect on others who contemplate being untruthful to federal investigators, provided of course that the prosecution is not marred by discriminatory animus.

---

[5] The Court understands that Puig has a different view of his statements during the interview. Although Puig maintains his innocence, the inquiry is not whether Puig has a meritorious defense but whether he has come forward with some evidence that other non-Black individuals similarly situated to him were not prosecuted. *See Armstrong*, 517 U.S. at 463; *see also* Reply at 4 (acknowledging that the merits of the case are not "relevant to this motion" (formatting omitted)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES—GENERAL**

Page **6** of 7

Turning next to the manner in which individuals were interviewed, Puig contends that the pattern of interviewing non-Black individuals was different from that of Black individuals, arguing that Black individuals were read the text of § 1001 and admonished that it was a federal crime to lie to investigators, while non-Black individuals were not. MTC at 10. Puig contends that the Government set up Black people by reading § 1001 to them, in order to later prosecute them for making false statements. Defense counsel asserts that, in her experience, Government counsel never reference § 1001 to non-target individuals. [Doc. # 61 ¶ 10.]

The evidence about interviews of witnesses who were not targets of the initial investigation into the Nix gambling business[6] does not support Puig's assertion of race-based differential treatment. In sum, 27 individuals have been identified, including Puig, who were interviewed as non-targets of the investigation into the Nix gambling business. The parties do not dispute that of these individuals, 25 were warned about the consequences of lying in at least one of their interviews, whether by explicit reference to 18 U.S.C. § 1001, by reading the text of § 1001, by reference to proffer agreements that required truthfulness, as part of a use immunity agreement, or by some combination thereof. *See supra* part I(B); Mitchell Decl. ¶ 42; [Doc. ## 68 at 5–31; 77 at 52–171; 86 at 23–26; 99-1 ¶ 5.] The Court does not agree with Puig that an admonition by a special agent is meaningfully different from an admonition by an AUSA for purposes of showing selective prosecution. Nor does the Court find persuasive Puig's argument that referencing the violation of a proffer agreement is significantly different from referring to or reading § 1001—either way, in substance, these interviewees were advised that making false statements put them at risk of criminal liability. If anything, the reading of or reference to § 1001 provides greater transparency regarding the potentially serious consequences of being less than candid. In any event, absent evidence of differential treatment, the Court declines to weigh in on how the Government conducts interviews.

On the current record, the Court finds no evidence to suggest that admonitions were given in anything but a race-neutral manner.[7] Only four of the 25 non-target admonished individuals were Black. As noted, one of the two non-admonished, non-target individuals (whom another field office interviewed) was Black. [Doc. # 77 at 26–29, 171.] This evidence does not reflect a race-based distinction in giving admonishments or support a theory that the prosecution singled out Black interviewees to admonish in order to selectively prosecute them for false statements made during their interviews. Indeed, Puig's own summary of the interviews contradicts his argument that the first time the prosecution interviewed a Black individual, it initiated a protocol of reading the text of § 1001 to the witness. To the contrary, two Black individuals were not given any admonishments at all prior to Puig's interview [*see* Doc. # 86 at 24 (Individual 3 and initial interview of Individual 13)], and references to § 1001 had already occurred in two interviews with non-Black, non-target witnesses prior to Puig's interview. *Id.* (Individuals 9, 10); Doc. #

---

[6] The Court does not discuss the interviews of individuals who were original targets of the internet gambling investigation (who are not Black) in this analysis because these individuals are not similarly situated to Puig. These individuals each face more serious charges than Puig, even though they are not being prosecuted for obstruction of justice or for making false statements. [Doc. # 77 at 32.]

[7] Although the defense argues that Black interviewees were "bullied," while non-Black interviewees were treated with "compassion and respect," these are characterizations of counsel unsupported by evidence. There are no audio or videotapes of interviews demonstrating that Government investigators or prosecutors took on a different tone with similarly situated individuals based on race.

77 at 89; Mitchell Decl. ¶ 42.  Furthermore, interviewers referenced or read § 1001 to five non-Black, non-target individuals prior to Puig's interview.  *Id*. at 24–25 (Individuals 4, 5, 6, 9, 10).  And contrary to Puig's argument that he is uniquely situated as the only person who received a § 1001 admonition *in addition to* the warning about false statements in his proffer letter, Individuals 10, 24, and 25 were also admonished by reference to § 1001 after receiving proffer letters.[8]  [*See* Doc. # 77 at 86, 89, 149, 158; Doc. # 86 at 24–26.]

The Court rejects Puig's unsupported assertion that the prosecution team was "more consistent" in reading § 1001 after Puig's interview in order to hide its racially disparate treatment of Puig.  The overwhelming majority of interviews occurred *before* Puig's counsel gave notice of her motion for selective prosecution in November 2022.  *Id.*  The evidence therefore contradicts Puig's claim of a *post hoc* attempt to cover up bias.  *See* Reply at 10 [Doc. # 81].

## IV.  CONCLUSION

Because Puig has not come forward with some credible evidence of discriminatory intent and effect, the Court respectfully **DENIES** the motion to compel.[9]  *See Armstrong*, 517 U.S. at 470 (requiring evidence of both discriminatory effect and intent to prevail).

**IT IS SO ORDERED.**

---

[8] At the hearing, the Government asserted that Individual 26 also received an admonishment regarding the false statements portion of the proffer letter, but the Court could not locate support for this in the evidentiary record.

[9] Puig argues in his Reply brief at points that he was discriminated against as a Latine individual and for the first time asserts that there was a discriminatory effect on Latine individuals.  Reply at 15.  Puig has not come forward with credible evidence of discriminatory effect on Latine individuals to support such a claim.  Neither side has filed evidence of whether other interviewees were Latine or of whether Latine persons other than Puig have been disproportionately charged with making false statements and obstructing justice.  The Court therefore declines to address this undeveloped argument.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (a court need not address arguments first raised in a reply brief).