E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
JEFF MITCHELL (Cal. Bar No. 236225)
Assistant United States Attorney
Major Frauds Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture & Recovery Section
        1100 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0698/2426
        Facsimile: (213) 894-6269/0141
        E-mail:    jeff.mitchell@usdoj.gov
                   daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 22-394-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S NOTICE OF MOTION AND MOTION FOR ORDER RE: DEFENDANT'S KNOWING BREACH OF PLEA AGREEMENT; MEMORANDUM OF POINTS AND AUTHORITIES |
| v. | |
| YASIEL PUIG VALDES, | |
| Defendant. | Hearing Date: July 5, 2023<br>Hearing Time: 2:30 p.m.<br>Location:    Courtroom of the<br>             Hon. Dolly M. Gee |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Jeff Mitchell and Dan G. Boyle, hereby moves this Court for an Order finding that defendant Yasiel Puig Valdes knowingly breached his plea agreement with the government in this matter, and accordingly, that the

government may seek to admit the factual basis of defendant's plea agreement (ECF No. 6) at trial in this matter.

Plaintiff brings this Motion now to allow any attorney-client privilege issues raised by defendant's anticipated response to be resolved sufficiently in advance of trial to avoid affecting the current August 8 trial date.

This Motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Pursuant to the Local Rules and the Court's Individual Practices, the undersigned sought to confer with defense counsel regarding the content of this Motion by letter dated April 20, 2023, and sent by e-mail on that date, but did not receive a response.

Dated: June 1, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


                                         /s/
                             _____
                             DAN G. BOYLE
                             JEFF MITCHELL
                             Assistant United States Attorneys

                             Attorneys for Plaintiff
                             UNITED STATES OF AMERICA

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................1

TABLE OF AUTHORITIES............................................2

MEMORANDUM OF POINTS AND AUTHORITIES............................1

I.    INTRODUCTION..............................................1

II.   BACKGROUND................................................2

      A.    The Nix Gambling Investigation......................2

      B.    Defendant's Interview...............................2

      C.    Defendant Changes Counsel and Initiates Plea
            Negotiations........................................3

      D.    The Plea Agreement..................................4

      E.    Defendant Fails to Plead Guilty as Agreed...........6

      F.    Relevant Prior Motion Practice......................7

III.  RELEVANT LAW..............................................8

IV.   ARGUMENT..................................................9

      A.    Defendant Knowingly Breached the Plea Agreement.....9

      B.    The Court May Conduct an *In Camera* Inquiry Into Any
            Attorney-Client Discussions or Potential Conflicts...16

CONCLUSION.......................................................19

# **TABLE OF AUTHORITIES**

Cases

Los Angeles Lakers, Inc. v. Fed. Ins. Co.,
   869 F.3d 795 (9th Cir. 2017) ...................................14
Mannhalt v. Reed,
   847 F.2d 576 (9th Cir. 1988) ...................................19
Petrosian v. United States,
   661 F. App'x 903 (9th Cir. 2016) ..............................12
United Stares v. Mezzanatto,
   513 U.S. 196 (1995) ...........................................12
United States v. Burch,
   156 F.3d 1315 (D.C. Cir. 1998) ................................12
United States v. Cha,
   769 F. App'x 435 (9th Cir. 2019) ..............................12
United States v. Clark,
   218 F.3d 1092 (9th Cir. 2000) .................................11
United States v. Cox,
   963 F.3d 915 (9th Cir. 2020) ..................................14
United States v. Jones,
   381 F.3d 114 (2d Cir. 2004) ...................................20
United States v. Krasn,
   614 F.2d 1229 (9th Cir.1980) ..................................11
United States v. McTiernan,
   546 F.3d 1160 (9th Cir. 2008) .................................15
United States v. McTiernan,
   No. CR 06-259-DSF (C.D. Cal. July 7, 2010) ..........15, 16, 17, 19
United States v. Moore,
   164 F.3d 632 (9th Cir. 1998) ..................................18
United States v. Plascencia-Orozco,
   852 F.3d 910 (9th Cir. 2017) ..................................12
United States v. Read,
   778 F.2d 1437 (9th Cir. 1985) .................................11
United States v. Rebbe,
   314 F.3d 402 (9th Cir. 2002) ..................................12
United States v. Sylvester,
   583 F.3d 285 (5th Cir. 2009) ..................................12

Statutes

18 U.S.C. § 1001..............................................4, 16
18 U.S.C. § 1503..............................................4, 13

Rules

Federal Rule of Evidence 403....................................17
Federal Rule of Evidence 410........................4, 9, 12, 13

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On July 7, 2022, defendant Yasiel Puig Valdes ("defendant") executed an agreement with the United States promising to plead guilty to a violation of 18 U.S.C. § 1001 (False Statements), and in return, the government agreed not to, inter alia, prosecute defendant for a violation of 18 U.S.C. § 1503 (Obstruction of Justice) (the "Plea Agreement"). See ECF No  6. The Plea Agreement was in writing, translated into Spanish for defendant, and also executed by defendant's counsel. In the Plea Agreement, defendant and his counsel each certified that defendant was not promised anything beyond the terms of the Plea Agreement; defendant was not threatened or forced in any way into signing the Plea Agreement; and defendant's decision to sign the Plea Agreement was informed and voluntary. The Plea Agreement also included a provision stating that, if defendant breached the agreement, then the agreed-upon factual basis stated in the Plea Agreement (the "Factual Basis") would be admissible in any subsequent post-breach proceedings against defendant – and included an explicit waiver of Federal Rule of Evidence 410 for that purpose.

Defendant did not plead guilty as agreed and promised, and this Court has already found that in failing to do so, defendant breached the Plea Agreement. See ECF No. 51. In so finding, however, the question of whether defendant's breach was "knowing" for the purposes of the waivers set forth the Plea Agreement was explicitly carved out for future briefing. With defendant now proceeding to trial, the government moves this court to make such a finding: that defendant's breach was "knowing," such that the government may offer the Factual Basis at trial, should the government elect to do so.

1   To be clear, the government is not seeking to introduce
2   defendant's entire Plea Agreement, or to inform the jury in any way
3   that the Factual Basis was part of an agreement to plead guilty.
4   Instead, the government proposes to reference the Factual Basis only
5   as a "written statement agreed to and executed by defendant during
6   this investigation." The government's proposed form of this trial
7   exhibit is attached as Appendix A.[1]

8   **II.  BACKGROUND**

9       **A.   The Nix Gambling Investigation**

10      In 2017, the Department of Homeland Security – Homeland Security
11  investigations ("HSI") and the Internal Revenue Service – Criminal
12  Investigations ("IRS-CI") began investigating an illegal sports
13  gambling business operated by Wayne Nix (the "Nix Gambling
14  Business"). See ECF No. 106 (4/10/23 Order denying Def's Mot. to
15  Compel), at 1. As part of this investigation, Nix's actions to
16  launder his illicit proceeds and hide his income from the IRS came
17  under scrutiny. Id. The associated money trail led investigators to
18  two cashier's checks that defendant purchased from his bank and sent
19  directly to a significant client of the Nix Gambling Business. Id.

20      **B.   Defendant's Interview**

21      Defendant was interviewed by Webex video conference on January
22  27, 2022, with the two undersigned prosecutors, two special agents
23  assigned to the investigation, defendant, defendant's two attorneys,
24  and an independent court-certified Spanish language interpreter of

---

25
26      [1] Should the Court grant this Motion, the government may seek to
    offer the Factual Basis in its case-in-chief or reserve the Factual
    Basis to be used on rebuttal or as impeachment evidence. As such,
27  this motion seeks a finding of admissibility based the Plea
    Agreement's terms and Rule 410, not to pre-admit the Factual Basis.
28

1  Cuban descent, who had been retained by the government,

2  participating. Id. Over the next hour and a half, the government

3  asked defendant about his knowledge of the Nix Gambling Business, and

4  defendant largely denied knowledge of the organization and the

5  persons participating in it, as detailed in the Factual Basis. See

6  Appendix A. During the interview, government counsel spoke privately

7  with defendant's then-counsel and stated that the government believed

8  that defendant was being untruthful, and immediately following the

9  interview, informed defendant's then-counsel that the government was

10  considering whether to seek an indictment.

11  **C.   Defendant Changes Counsel and Initiates Plea Negotiations**

12  In May 2022, the government began preparing to obtain an

13  indictment, but on May 25, 2022 the government was contacted by new

14  counsel for defendant, Keri Curtis Axel, and on May 27, 2022,

15  defendant's new counsel advised the government via email that she had

16  authority to engage in plea discussions and requested a reverse

17  proffer to review the evidence.[2] The government agreed to open plea

18  negotiations rather than seeking an indictment at that time.

19  On June 6, 2022, the government conducted a reverse proffer with

20  defendant and his counsel, presenting extensive evidence of

21  defendant's betting history with the Nix Gambling Business, an audio

22  recording of a voicemail in English sent by defendant, and other

23  evidence. See ECF No. 50, at Ex. E. Shortly after the reverse

24  proffer, defense counsel requested a plea agreement that would allow

25  defendant to plead guilty to a single-count information charging him

26

27  [2] This May 27, 2022 e-mail from defense counsel was previously
   submitted to the Court under seal on January 4, 2023. See ECF No. 50,
28  at Ex. C.

3

with the offense of providing false statements, rather than obstruction of justice.

### D. The Plea Agreement

On June 16, 2022, the government extended a plea offer to defendant, and requested a response by June 23rd. See ECF No. 50, at Ex. D. The government and defense counsel then exchanged several rounds of edits to the proposed plea agreement (id.), and approximately three weeks later, on July 7, 2022, defendant and his counsel executed a final version of the Plea Agreement. See ECF No. 6, at 19, 20.

In Paragraph 2(a) of the Plea Agreement, defendant agreed to, inter alia, give up the right to indictment by a grand jury and plead guilty to an information charging a violation of 18 U.S.C. § 1001 (False Statements). See ECF No. 6, ¶ 2(a). In support of this agreement, paragraph 9 of the Plea Agreement stated the agreed-upon Factual Basis, which defendant and the government agreed was accurate and sufficient to support a plea of guilty. See ECF No. 6, ¶ 9; see also Appendix A.

In return, the government agreed to recommend a reduction under the sentencing guidelines pursuant to USSG § 3E1.1, and to not charge defendant with a violation of 18 U.S.C. § 1503 (Obstruction of Justice) relating to the conduct admitted in the Factual Basis of the Plea Agreement. See ECF No. 6, ¶ 3(c-d).

Paragraphs 21-22 of the Plea Agreement addressed the consequences of a breach of the Plea Agreement by defendant. In

particular, paragraph 21 of the Plea Agreement stated that a breach[3] of the Plea Agreement by defendant would relieve the government of its obligations under the Plea Agreement, and paragraph 22 of the Plea Agreement stated as follows:

> Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:
>
> a. Defendant agrees that any applicable statute of limitations is tolled between the date of defendant' signing of this agreement and the filing commencing any such action.
>
> b. Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.
>
> c. Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

ECF No. 6, at 14-16.

The Plea Agreement stated in paragraph 26 that defendant agreed that, as except as set forth in the Plea Agreement, there were "no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise,

---

[3] The Plea Agreement defined a breach as where "defendant, at any time after the effective date of [the Plea Agreement], knowingly violates or fails to perform any of defendant's obligations under this agreement." ECF No. 6, at 21.

1  understanding, or agreement may be entered into unless in a writing
2  signed by all parties or on the record in court." Id., at 17.

3      The Plea Agreement was signed by both defendant and his counsel,
4  as well as by the attorney for the government. Id. at 18. Defendant
5  further certified in the Plea Agreement that (1) the Plea Agreement
6  had been read to him in his primary language, Spanish; (2) that he
7  had carefully reviewed and considered it; (3) that he voluntarily
8  agreed to the terms of the Plea Agreement; (4) that he had discussed
9  the terms of the Plea Agreement with his counsel; (5) that "no
10 promises, inducements, or representations of any kind" had been made
11 to him other than those in the Plea Agreement; and (6) that "[n]o one
12 has threatened or forced [defendant] in any way to enter into [the
13 Plea Agreement]." Id. at 18-19. Defense counsel similarly certified
14 that she had (1) carefully and thoroughly discussed the Plea
15 Agreement with defendant; (2) that, to her knowledge, no "promises,
16 inducement, or representations of any kind" had been made to
17 defendant other than those in the Plea Agreement; (3) that no one had
18 "threatened or forced" defendant into executing that Plea Agreement;
19 and (4) that defendant voluntarily entered into the Plea Agreement.
20 Id. at 19-20. Finally, the Plea Agreement was signed by the
21 interpreter who translated the Plea Agreement for defendant, who
22 certified that the Plea Agreement had been accurately translated. Id.
23 at 19.

24      **E.   Defendant Fails to Plead Guilty as Agreed**

25      The Plea Agreement was filed with the Court on August 29, 2022.
26 See ECF No. 6. At defendant's request, the Plea Agreement was lodged

27
28

6

1  under seal.[4] The government moved to unseal the Plea Agreement and

2  Information on November 10, 2022, see ECF No. 13, and this matter was

3  unsealed on November 14, 2022. See ECF No. 14.

4     Defendant appeared for his change of plea on November 23, 2022,

5  but refused to plead guilty in accordance with the plea agreement

6  that he had signed. See ECF No. 24. At defense counsel's request, the

7  Court scheduled a second change-of-plea hearing on November 29, 2022,

8  but defendant again refused to enter a plea of guilty. See ECF No.

9  26. Defendant then stipulated that did not intend to plead guilty and

10  requested a trial date. See Id.

11     **F.   Relevant Prior Motion Practice**

12     On December 14, 2022, the government moved for a finding that

13  defendant had breached the Plea Agreement, so that the government

14  would be relieved of its obligations under the Plea Agreement, and in

15  particular, so that the government could seek a superseding

16  indictment from the grand jury for a violation of 18 U.S.C. § 1503,

17  which the government was prohibited from seeking under the Plea

18  Agreement (the "Breach Motion"). See ECF No. 33. Defendant opposed

19  the Breach Motion on December 28, 2022 on multiple grounds, but as is

20  relevant here, on reply, the government agreed that the Breach Motion

21  did not govern whether defendant had committed a "knowing breach" of

22  the Plea Agreement for the purposes of paragraph 22 of the Plea

23  Agreement. See ECF No. 43. The Court ultimately granted the Breach

24  Motion, holding that "Defendant did not plead guilty, despite

25  agreeing to do so as part of his plea, and accordingly, breached the

26

27     [4] The basis for the under seal filing have been briefed to the
Court previously, including in the sealed declaration of AUSA Jeff

28  Mitchell dated January 4, 2023. See ECF No. 50, ¶ 17-19.

7

1  agreement," ECF No. 51, at 3, and the grand jury returned the First

2  Superseding Indictment including a § 1503 count on January 20, 2023.

3  See ECF No. 54.

4       Trial in this matter is presently set to begin on August 8,

5  2023. See ECF No. 105.

6  **III.  RELEVANT LAW**

7       Plea agreements are contractual in nature and are measured by

8  contract law standards. See United States v. Krasn, 614 F.2d 1229,

9  1233 (9th Cir.1980). As such, disputes over the terms of a plea

10 agreement are "determined by objective standards." United States v.

11 Read, 778 F.2d 1437, 1441 (9th Cir. 1985) (citing United States v.

12 Travis, 735 F.2d 1129, 1132 (9th Cir. 1984)). When construing the

13 terms of a plea agreement, and the parties' respective obligations

14 under the same, courts employ traditional contract analysis

15 principles. See United States v. Clark, 218 F.3d 1092, 1095 (9th Cir.

16 2000). A court may hold an evidentiary hearing on such a dispute if

17 necessary "to resolve a factual dispute between the parties over what

18 they reasonably understood when entering into a plea agreement" – but

19 need not do so if no factual disputes are raised. United States v.

20 Plascencia-Orozco, 852 F.3d 910, 923 (9th Cir. 2017).

21      While Federal Rule of Evidence 410 generally precludes admission

22 of statements made by a defendant as part of plea discussions, in

23 United Stares v. Mezzanatto, 513 U.S. 196 (1995), the Supreme Court

24 held that a defendant can knowingly and voluntarily waive Rule 410's

25 exclusionary provisions. 513 U.S. at 205, 210-11. Following

26 Mezzanatto, both the Ninth Circuit and other circuit courts have

27 routinely upheld waivers of Rule 410 for plea-related statements.

28

1  See, e.g., United States v. Cha, 769 F. App'x 435, 436 (9th Cir.

2  2019) ("A district court's decision to admit proffer statements is a

3  question of law reviewed de novo."); Petrosian v. United States, 661

4  F. App'x 903, 904 (9th Cir. 2016) ("No Ninth Circuit or Supreme Court

5  precedent, moreover, actually prohibited introduction of the [proffer

6  statements] during the government's case-in-chief"); United States v.

7  Sylvester, 583 F.3d 285, 289 (5th Cir. 2009)(upholding introduction

8  of plea statements in government's case-in-chief based upon valid

9  Rule 410 waiver); United States v. Krilich, 159 F.3d 1020, 1026 (7th

10  Cir. 1999) (upholding validity of Rule 410 waiver; United States v.

11  Burch, 156 F.3d 1315, 1322 (D.C. Cir. 1998) (upholding application of

12  Rule 410 waiver and approving introduction of plea statements).

13       Finally, a defendant bears the burden of establishing that a

14  Rule 410 waiver is invalid. See United States v. Rebbe, 314 F.3d 402,

15  407 (9th Cir. 2002) ("[T]he Federal Rules of Evidence and Criminal

16  Procedure are presumptively waivable. The burden is on [defendant] to

17  overcome this presumption by identifying some affirmative basis for

18  concluding that the Federal Rules cannot be waived" (internal

19  citation omitted)).

20  **IV.  ARGUMENT**

21       **A.  Defendant Knowingly Breached the Plea Agreement**

22       In paragraph 22 of the Plea Agreement, defendant agreed that, in

23  the event the Court found a "knowing breach" of the Plea Agreement by

24  defendant, then the "agreed to factual basis statement in [the Plea

25  Agreement] … shall be admissible against defendant in any such action

26  against defendant." ECF No. 6, at 15.

27       Because the Court has already found that defendant breached the

28

Plea Agreement, see ECF No. 51, and because the Ninth Circuit has expressly found that waivers of Rule 410 such as that in paragraph 22 of the Plea Agreement may be enforced, the question currently before the Court is whether defendant's breach was "knowing" under the terms of the Plea Agreement. The Court should find that it was.

As noted above, plea agreements are governed by contract law, and when interpreting a contractual term, courts begin with the "ordinary and popular" meaning of such terms. See Los Angeles Lakers, Inc. v. Fed. Ins. Co., 869 F.3d 795, 801 (9th Cir. 2017) ("[C]ourts must give a contract's terms their 'ordinary and popular' meaning, 'unless used by the parties in a technical sense or a special meaning is given to them by usage.'" (quoting Palmer v. Truck Ins. Exch., 21 Cal.4th 1109 (1999))).

To determine ordinary meaning, courts typically look to dictionary definitions. See United States v. Cox, 963 F.3d 915, 920 (9th Cir. 2020). Merriam-Webster defines "knowing" as "deliberate" or "having or reflecting knowledge, information, or intelligence." See Knowing, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/knowing. In turn, Merriam-Webster defines "deliberate" as "characterized by or resulting from careful and thorough consideration" or "characterized by awareness of the consequences." See Deliberate, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/knowing. Similarly, Black's Law Dictionary defines "knowing" as "deliberate" or "having or showing awareness or understanding." See Knowing, Black's Law Dictionary (11th ed. 2019). And Black's Law Dictionary defines "deliberate" as "fully considered," "unimpulsive," or

10

1  "intentional." See *Deliberate*, Black's Law Dictionary (11th ed.

2  2019). In sum, applying the common and ordinary meaning of "knowing,"

3  defendant's decision to breach the Plea Agreement by failing to plead

4  guilty as agreed was a "knowing breach," if made after consideration,

5  while aware of the potential consequences, and was not the product of

6  mistake, haste, or impulsiveness. There should be little question

7  that defendant's conduct meets this standard.

8      Defendant had nearly five months between the date he signed the

9  Plea Agreement and his decision not to plead guilty, so his breach

10  was not the product of haste or lack of consideration. Defendant was

11  also given multiple opportunities by the Court to enter a plea of

12  guilty, but still elected not to honor the terms of the Plea

13  Agreement, so his decision cannot fairly be described as impulsive.

14  See ECF No. 24 (continuing and resetting guilty plea hearing). While

15  the government has no insight into discussions between defendant and

16  his counsel, defendant certified in the Plea Agreement that he

17  understood the agreement's terms, had enough time to review and

18  consider it, and had "carefully and thoroughly" discussed it with his

19  counsel. See ECF No. 6, at 19-20.[5] And finally, there is no serious

20  argument that defendant mistakenly believed that failing to plead

21  guilty would not result in a breach of an agreement to plead guilty.

22      Judge Fischer's decision in United States v. McTiernan, No. CR

23  06-259-DSF, 2010 WL 11667960 (C.D. Cal. July 7, 2010), is

24  particularly instructive here, as the facts of that case mirror those

25

26      [5] In addition, the detailed letters sent by defense counsel to
    the U.S. Attorney's Office, which are already before the court under
27  seal (see ECF No. 77, at Exs. A, C, D), corroborate that counsel and
    defendant appear to have carefully discussed this matter.

28

here in many respects. In both cases, the government was investigating an unlawful business where the defendant was a user of an illegal service; in <u>McTiernan</u>,[6] the government was investigating an illegal wiretapping and private intelligence enterprise which McTiernan had engaged to gather information on his business associates, while here, the government was investigating an illegal sports gambling business which defendant used to place wagers on sporting events. In both cases, the defendant was approached and interviewed as a witness, rather than as a target of the investigation. In both cases, the defendant allegedly made false statements regarding his use of the illegal business being investigated, and in both cases the defendant entered into a pre-indictment agreement to plead guilty to a violation of 18 U.S.C. § 1001. In both cases, defendant breached his plea agreement,[7] was indicted on additional related charges, and proceeded to trial.

In <u>McTiernan</u>, the defendant moved <u>in limine</u> to preclude the government from offering, <u>inter alia</u>, the factual basis from McTiernan's plea agreement at trial, arguing that Rule 410 prohibited introducing such evidence and that the Rule 410 waiver in McTiernan's plea agreement had not been knowingly made, because his prior counsel had allegedly failed to advise him of potential grounds for suppression. <u>See</u> 2010 WL 11667960, at *1. Judge Fischer rejected

---

[6] See <u>United States v. McTiernan</u>, 546 F.3d 1160, 1163-64 (9th Cir. 2008).

[7] The most relevant distinction between the facts of <u>McTiernan</u> and those here is that McTiernan completed his plea allocution, but then moved to withdraw his plea shortly thereafter (leading to an interlocutory appeal), while defendant here simply refused to plead guilty as agreed.

1   these arguments, finding that – whatever advice prior counsel had

2   given regarding suppression[8] – the defendant's decision to enter the

3   plea agreement, including the Rule 410 waiver, was "a free and

4   deliberate choice . . . [McTiernan] was not coerced, intimidated, or

5   deceived" and the decision was "made with a full awareness of the

6   nature of the right and the consequences of the decision to abandon

7   it." Id., at *2. These factors "certainly should be sufficient to

8   establish that this Defendant has waived his right not to have

9   certain statements used against him." Id.

10   So too here. Defendant and his counsel certified in writing that

11   defendant had reviewed the terms of the Plea Agreement, understood

12   those terms, and was freely entering into an agreement to plead

13   guilty. See ECF No. 6, at 19-20. And just as McTiernan moved to

14   suppress evidence after breaching his plea agreement (which was

15   denied), defendant here brought a selective prosecution motion after

16   failing to plead guilty (which was denied, ECF No. 106); but as Judge

17   Fischer held, the desire to bring a motion may be grounds to withdraw

18   from a guilty plea, but that does not render the waivers in any such

19   plea agreement invalid. See 2010 WL 11667960, at *1.[9]

20   Based on arguments raised by defendant in his opposition to the

21   Breach Motion, ECF No. 45, the government expects that defendant may

22   argue that his breach was not knowing because he allegedly had little

23

24   [8] In McTiernan, the defendant fired his allegedly-ineffective
25   counsel and disclosed his prior-counsel's allegedly-deficient advice.
     See McTiernan, 546 F.3d 1160, 1164-65.

26   [9] Notably, defendant here never moved to withdraw from his Plea
     Agreement, opting instead to simply breach. See ECF No. 51.
27   Accordingly, the more modest standard for withdrawing a guilty plea
     discussed in McTiernan is irrelevant here.
28

time to consider the Plea Agreement, felt coerced into signing the Plea Agreement based on a fear of extradition from the Republic of South Korea, and/or even if defendant's breach was knowing, the Factual Basis should be excluded under Federal Rule of Evidence 403. See ECF No. 45, at 8-9. None of these arguments has merit, and the government addresses each briefly in turn.

First, as described above, defendant had roughly three weeks to consider various drafts of the proposed plea agreement, and defendant had authorized his counsel to open plea negotiations more than a month earlier. While the government did put time limits on how long defendant had to consider these drafts, this record shows that defendant had ample time to raise any issues he or his counsel identified with the various drafts of the plea as proposed – which they did for three weeks.

Second, any argument that defendant felt coerced into signing the Plea Agreement is contradicted by the certifications in the Plea Agreement, executed by defendant and his counsel. As detailed above, in the Plea Agreement, defendant and defense counsel explicitly certified that no one "threatened or forced [defendant] in any way to enter into [the Plea Agreement]." ECF No. 6, at 18-19. This is confirmed by the factual record: defendant authorized his counsel to open plea negotiations as early as May 27, 2022, before the reverse proffer or any plea was extended, and more than a month before he signed the Plea Agreement. The Plea Agreement was not forced on defendant – he affirmatively requested it and engaged in negotiations to edit it to his liking. The Ninth Circuit has held Rule 410 waivers are enforceable under similar circumstances. See United States v.

14

1    _Moore_, 164 F.3d 632 (9th Cir. 1998) (Rule 410 waiver enforceable as

2    voluntary where defendant "initiated contact with the United States

3    Attorney's Office," "arranged to meet with government attorneys," and

4    was accompanied by counsel for each meeting).

5         Finally, Federal Rule of Evidence 403 is inapplicable here, as

6    the Plea Agreement expressly states that defendant waived "any claim

7    under . . . **_any other federal rule_**, that the statements or any

8    evidence derived from the statements . . . are inadmissible." ECF No.

9    6, at ¶ 22(c) (emphasis added). But even assuming _arguendo_ that

10   defendant did not waive any admissibility challenges to the Factual

11   Basis under Rule 403, courts have routinely found that introducing

12   prior plea statements under a Rule 410 waiver _enhances_ a trial's

13   truth-seeking functions. See _McTiernan_, 2010 WL 11667960, at *2

14   ("Defendant's contention that the statements should be excluded as

15   more prejudicial than probative pursuant to Rule 403 of the Federal

16   Rules of Evidence has no merit. To the contrary, introduction of

17   Defendant's admission of guilt will 'enhance the truth-seeking

18   function of the trial.'" (quoting _Mezzanatto_, 513 U.S. 204)). Nor

19   will admitting the Factual Basis confuse or mislead the jury. As

20   explained above, the government will only refer to the Factual basis

21   as a "statement" executed by the defendant and will not inform the

22   jury that the Factual Basis was part of any plea agreement in its

23   case-in-chief.[10]

24   _____

25        [10] Even if the Factual Basis were to be excluded from the
     government's case-in-chief (for example, on Rule 403 rounds), the
26   government should be permitted to use the Factual Basis for
     impeachment purposes if defendant elects to take the stand in his
27   defense and testifies inconsistently with the admissions stated in
     the Factual Basis. The government respectfully reserves the right to
28                                                  *(footnote cont'd on next page)*

                                    15

**B.  The Court May Conduct an *In Camera* Inquiry Into Any Attorney-Client Discussions or Potential Conflicts**

Courts have broad authority to adjudicate questions of privilege or attorney conflicts. See, e.g., Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988). As a general matter, attorneys have a duty of loyalty to their clients and "conflicts of interest may arise . . . if the attorney reveals privileged communications." Id. (discussing successive representation conflicts). The California Rules of Professional Conduct also provide guidance regarding a defendant's right to conflict-free representation; in particular, CRPC 3.7 states that "[a] lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless. . . the lawyer has obtained informed written consent from the client." See also, United States v. Jones, 381 F.3d 114, 121 (2d Cir. 2004)(court's disqualification of counsel was not an abuse of discretion because of risk that counsel would testify at defendant's trial).

Here, the Court may conduct an in camera inquiry into defendant's discussions with counsel regarding his decision to sign the Plea Agreement, including whether these discussions would place defense counsel in the role of a witness. As noted above, in prior filings, defendant has suggested that he only signed the Plea Agreement because he believed he would be promptly arrested and swiftly extradited from Korea to the United States if he did not sign the proposed plea. See, e.g., ECF No. 45, at 8 (arguing that proposed plea agreement "presented the defendant with a Hobson's choice: agree to a plea agreement or face a mid-season arrest and extradition,

revisit this issue if this Motion is denied and defendant elects to testify at trial.

ruining his season and interfering with his only source of gainful employment. The impossibility of this choice was compounded by the fact that defendant had new counsel, was 17-hours away in a different time zone, has a third-grade education, ADHD, and needed a Cuban translator to understand the government's complex plea agreement and alleged Factual Basis."). In substance, defendant appears to be arguing that the government's plea offer was effectively coercive, and thus, that his decision to sign the Plea Agreement was not truly voluntary.

Assuming that defendant would testify at any hearing on this Motion consistent with these prior arguments, the government would be entitled to cross-examine defendant about his certifications in the Plea Agreement, and specifically, his certification that, "no one has threatened or forced me in any way to enter into this agreement. . . [and] I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason." ECF No. 6, at 18-19. Such questioning, however, could potentially raise issues of attorney-client communications – for example, why defendant believed that he would be promptly extradited if he refused to sign the plea agreement, and why he certified that he was entering the plea free from coercion. More importantly, however, defendant's present counsel <u>also</u> certified that "no one has threatened or forced my client in any way to enter into this agreement; [and] my client's decision to enter into this agreement is an informed and voluntary one." ECF No. 6, at 20. If defendant testifies that he only signed the plea agreement out of

fear of arrest and extradition, his counsel's certification to the contrary risks placing counsel in the role of an adverse witness.

Of course, the government is not privy to defendant's attorney-client communications, nor can the government predict with any certainty whether and in what ways testimony regarding such communications may arise at the hearing on the instant motion or at trial. However, because defendant's opposition to the instant motion or defense at trial may potentially implicate attorney-client communications about the plea agreement and the certifications therein, the government submits that the Court should conduct, in advance of trial, an *in camera* inquiry to ensure that defendant is aware of potential attorney-client privilege and/or conflicts issues that may arise in connection with such communications and that any privilege and/or conflicts waiver by defendant is knowing and voluntary.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court make a finding that defendant's breach of the Plea Agreement constitutes a "knowing breach" under Paragraph 22 of the Plea Agreement, and accordingly, that the government may seek to admit the Factual Basis in the form accompanying this Motion as Appendix A.


Dated: June 1, 2023             Respectfully submitted,

                                E. MARTIN ESTRADA
                                United States Attorney

                                MACK E. JENKINS
                                Assistant United States Attorney
                                Chief, Criminal Division


                                _____/s/_____
                                DAN G. BOYLE
                                JEFF MITCHELL
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

19

1

**Appendix A**

2                    [Proposed Form of Defendant's Statement]

3

4          On or about July 7, 2022, defendant executed the following

5     statement, which was translated to him by a Spanish-language

6     interpreter, and defendant agreed in writing that this statement was

7     true and accurate:

8

9          The Department of Homeland Security, Homeland Security

10    Investigations ("HSI") and the Internal Revenue Service – Criminal

11    Investigation Division ("IRS-CI") in Los Angeles and the United

12    States Attorney's Office ("USAO") for the Central District of

13    California were conducting a federal criminal investigation into

14    federal crimes, including illegal sports gambling and money

15    laundering (the "Federal Investigation").

16         Wayne Nix was a minor league baseball player from 1995 to 2001.

17    Sometime after 2001, Nix began operating an illegal bookmaking

18    business in the Los Angeles area that accepted and paid off bets from

19    bettors in California and elsewhere in the United States based on the

20    outcomes of sporting events at agreed-upon odds (the "Nix Gambling

21    Business"). Through contacts he had developed during his own career

22    in professional sports, Nix created a client list of current and

23    former professional athletes, and others. Nix used agents, including

24    Agent 1, to place and accept bets from others for the Nix Gambling

25    Business, thus expanding the business. Agent 1 was a former

26    collegiate baseball player and a private baseball coach. Beginning in

27    2019, Agent 1 worked for the Nix Gambling Business as an agent. Agent

28    1 placed and accepted bets from others and helped Nix maintain the

Nix Gambling Business by, among other things, demanding and collecting money owed to the Nix Gambling Business by bettors and others.

As part of the Nix Gambling Business, Nix and Agent 1 used the Sand Island Sports websites and call center to create accounts through which wagers would be placed and tracked. Nix provided bettors with account numbers and passwords for the Sand Island Sports websites and directed the bettors to use the Sand Island Sports websites to place bets with the Nix Gambling Business. Bettors would place bets online through the Sand Island Sports websites, and through Nix, Agent 1, and others working at Nix's direction.

Defendant was a professional baseball player who played for the Los Angeles Dodgers between 2013 and 2018. The Dodgers traded defendant to the Cincinnati Reds in December 2018, and the Reds traded defendant to the Cleveland Indians on July 31, 2019. In January 2019, defendant met Agent 1 at a youth baseball camp, and Agent 1 later assisted defendant in preparing for the upcoming baseball season. Individual B was a private baseball coach who assisted defendant with batting practice, but also assisted defendant in placing sports bets with Agent 1 and assisted Agent 1's efforts to collect gambling debts from defendant.

Beginning no later than May 2019, defendant began placing bets on sporting events with the Nix Gambling Business through Agent 1. Defendant called and sent text messages to Agent 1 with wagers on sporting events. After Agent 1 received the wagers from defendant, Agent 1 submitted the bets to the Nix Gambling Business on behalf of defendant. By June 17, 2019, defendant owed the Nix Gambling Business

$282,900 for sports gambling losses.

Between June 25, 2019, and July 3, 2019, in a series of text messages, Agent 1 and Individual B instructed defendant to make a check or wire transfer payable to Individual A. Individual A was a client of the Nix Gambling Business who, in or about June 2019, was owed at least $200,000 in gambling winnings from the Nix Gambling Business.

On June 25, 2019, defendant withdrew $200,000 from a Bank of America financial center in Glendale, California, and purchased two cashiers' checks for $100,000 each that were made payable to Individual A, but did not immediately send the checks due to a dispute over the balance and access to the Sand Island Sports website. Between June 28, 2019, and July 4, 2019, defendant requested direct access to the Sand Island Sports websites, but Nix refused to provide defendant direct access to the websites until defendant paid his gambling debt.

On July 3, 2019, defendant sent the cashiers' checks to Individual A via the United Parcel Service ("UPS") and sent a photo of the UPS shipping label to Agent 1 and Individual B via text message. Agent 1 forwarded the photo of the UPS label to Nix as proof that defendant paid his gambling debt.

The following day, Nix provided defendant direct access to the Sand Island Sports websites. Specifically, on July 4, 2019, Nix sent defendant a text message and assigned defendant player identification number "R182" and password "yp," and provided defendant the Sand Island Sports website addresses. Between July 4, 2019, and September 29, 2019, defendant placed 899 bets on tennis, football, and

basketball games through the Sand Island Sports websites.

On January 27, 2022, defendant was interviewed in the presence of his attorney by HSI, IRS-CI, and the USAO regarding the Federal Investigation. At the beginning of the interview, a Special Agent from HSI admonished defendant that lying to federal law enforcement agents is a crime, and defendant stated that he understood. During the interview, defendant made several false statements to the agents that were material to the investigation. For example, the agents presented defendant a photo of Agent 1 and asked defendant if he ever discussed sports gambling with Agent 1. Defendant falsely stated that he had never discussed sports betting with Agent 1 and that he knew Agent 1 only from baseball. In fact, as defendant then knew, defendant discussed sports betting with Agent 1 via telephone and text messages on hundreds of occasions. In addition, Agent 1 placed several bets for defendant between May and July 3, 2019, that resulted in defendant paying $200,000 to the Nix Gambling Business, and Agent 1 subsequently assisted defendant obtain an account with Sand Island Sports and place 899 additional bets on sporting events through the website between July 4, 2019, and September 29, 2019. The agents also presented defendant with a copy of one of the cashiers' checks he purchased on June 25, 2019, made payable to Individual A, and asked defendant why he sent the cashier's check. Defendant falsely stated that he had placed a bet online with an unknown person on an unknown website that resulted in a loss of $200,000. In fact, as defendant then knew, defendant placed a series of bets directly through Agent 1 that resulted in the gambling loss. Defendant also falsely stated that he did not know the individual who instructed him

4

to send $200,000 in cashiers' checks to Individual A and that he had never communicated with that person via text message. In fact, as defendant then knew, Agent 1 and Individual B instructed defendant via text messages to send $200,000 to Individual A, and defendant had communicated with Agent 1 and Individual B on hundreds of occasions related to defendant's gambling with the Nix Gambling Business.

On March 14, 2022, defendant sent Individual B an audio message via WhatsApp regarding his January 2022 interview with HSI and IRSCI. During the audio message, defendant told Individual B that he "[sat] over there and listen [to] what these people said and I no said nothing, I not talking. I said that I only know [Agent 1] from baseball."