**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-3214 |
| *Plaintiff - Appellant*, | D.C. No. 2:22-cr-00394-DMG-1 |
| v. | |
| YASIEL PUIG VALDES, | |
| *Defendant - Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, Chief District Judge, Presiding

Argued and Submitted May 13, 2024
Pasadena, California

Filed May 29, 2025

Before: Daniel P. Collins, Holly A. Thomas, and Anthony
D. Johnstone, Circuit Judges.

Opinion by Judge Collins

# SUMMARY[*]

## Criminal Law

In an interlocutory appeal by the Government, the panel affirmed the district court's ruling that the factual basis of a pre-indictment plea agreement signed by Yasiel Puig Valdes ("Puig") would be excluded at trial.

Under the plea agreement, Puig would plead guilty to one count of making false statements to federal officers, and in exchange, the Government would recommend a reduced sentence and decline to bring an additional charge of obstruction of justice.

When Puig later declined to plead guilty, the Government declared that Puig was in breach of his plea agreement, and as a remedy it sought to enforce a provision of the agreement waiving all evidentiary objections to the admission of the plea agreement's factual basis at trial. This waiver expressly included any objections based on Rule 410 of the Federal Rules of Evidence, which generally bars the admission, against a defendant, of any statements made during plea negotiations. The district court ultimately held that Rule 410 remained applicable here, and it therefore ruled that the factual basis of Puig's plea agreement would be excluded at trial.

Viewing the language of the plea agreement against the backdrop of caselaw, the panel held that Puig's Rule 410 waiver was not triggered here. Puig's waiver of the protections of Rule 410 was expressly contingent on the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court's finding that there was a "breach of this agreement." The terms of that waiver are most naturally understood as requiring that there be an "agreement" that was enforceable by the court and as to which the court could therefore make the requisite finding of a breach. Because the plea agreement was a Fed. R. Crim. P. 11(c)(1)(A) agreement requiring the district court's approval, and because that approval never occurred, the agreement was not enforceable. The waiver, by its own terms, therefore did not apply. Consequently, Rule 410 remains applicable with full force here, and the factual basis of Puig's plea agreement is not admissible against Puig.

## COUNSEL

Rajesh R. Srinivasan (argued), Jeff P. Mitchell, and Daniel G. Boyle, Assistant United States Attorneys; Bram M. Alden and David R. Friedman, Assistant United States Attorneys, Chiefs; Criminal Appeals Section; E. Martin Estrada, United States Attorney; Office of the United States Attorney, United States Department of Justice, Los Angeles, California; Keri C. Axel, Waymaker LLP, Los Angeles, California; for Plaintiff-Appellant.

Elliott Averett (argued), Bryan Cave Leighton Paisner LLP, Irvine, California; Jean-Claude André and Saurish Appleby-Bhattacharjee, Bryan Cave Leighton Paisner LLP, Santa Monica, California; Olaniyi Solebo, Bryan Cave Leighton Paisner LLP, San Francisco, California; for Defendant-Appellee.

**OPINION**

COLLINS, Circuit Judge:

In July 2022, Defendant Yasiel Puig Valdes ("Puig")
signed a pre-indictment plea agreement with the
Government, under which he would plead guilty to one
count of making false statements to federal officers in
violation of 18 U.S.C. § 1001, and in exchange, the
Government would recommend a reduced sentence and
decline to bring an additional charge of obstruction of justice
under 18 U.S.C. § 1503. When Puig later declined to plead
guilty, the Government declared that Puig was in breach of
his plea agreement, and as a remedy it sought to enforce a
provision of the agreement waiving all evidentiary
objections to the admission of the plea agreement's factual
basis at trial. This waiver expressly included any objections
based on Rule 410 of the Federal Rules of Evidence, which
generally bars the admission, against a defendant, of any
statements made during plea negotiations. The district court
ultimately held that Rule 410 remained applicable here, and
it therefore ruled that the factual basis of Puig's plea
agreement would be excluded at trial. Pursuant to 18 U.S.C.
§ 3731, the Government brought this interlocutory appeal
challenging that pretrial ruling. Although our reasoning
differs somewhat from the district court's, we agree that
Rule 410 remains applicable here, and we therefore affirm.

**I**

We first summarize the Government's allegations
concerning the conduct that underlies the charges it has
asserted against Puig, and we then recount the procedural
history leading to the challenged order holding that various

statements made by Puig during plea negotiations may not be introduced at his trial.

## A

The following allegations are taken from the indictment that the Government filed after Puig declined to plead guilty. These same allegations were also contained in the earlier charging information to which Puig initially agreed to plead guilty.

Beginning sometime after 2001, Wayne Nix, a former minor league baseball player, began operating an illegal sports gambling business in southern California. *See* 18 U.S.C. § 1955 (criminalizing the operation of a gambling business that is illegal under the law of the State in which it is conducted); CAL. PENAL CODE § 337a (generally criminalizing bookmaking and the laying or taking of bets on, *inter alia*, "contest[s] of skill . . . between persons"). To expand his business, Nix used various "agents to place and accept bets from others" on sporting events. One such agent was "a former collegiate baseball player" and current "private baseball coach" identified in the charging documents as "Agent 1." In placing and tracking bets for clients, Nix and Agent 1 made use of various websites hosted by "Sand Island Sports" on "servers primarily located outside the United States." Nix sometimes provided clients with accounts and passwords on these websites, so that they could directly place their bets with Nix's business.

Defendant Yasiel Puig Valdes is a Cuban-born professional baseball player who played for the Los Angeles Dodgers from 2013 through 2018, before being traded first to the Cincinnati Reds in December 2018 and then to the Cleveland Indians in late July 2019. Puig met Agent 1 in January 2019 "at a youth baseball camp," and Agent 1

helped Puig "in preparing for the upcoming baseball
season." In or before May 2019, Puig began placing bets
with Nix's business through Agent 1, with "Individual B"
sometimes acting as an intermediary between Puig and
Agent 1. Puig's ensuing bets were not very successful, and
by June 17, 2019, he had accumulated $282,900 in gambling
debts to Nix's operation.

To settle this debt, Agent 1 and Individual B sent Puig a
series of texts instructing him to make payments directly to
"Individual A," another client of Nix whom Nix "owed at
least $200,000 in gambling winnings." On June 25, 2019,
Puig withdrew $200,000 from a Bank of America bank
account, which he converted into two cashier's checks
payable directly to Individual A. On July 3, 2019, Puig sent
these cashier's checks to Individual A through United Parcel
Service, and he texted a photo of the shipping label to Agent
1 and Individual B. Once Puig had confirmed making these
payments to Individual A, Nix on July 4 granted Puig direct
access to the Sand Island Sports websites by sending him his
assigned account number and password. Between July 4 and
September 29, 2019, Puig placed 899 bets on various
"sporting events" through the Sand Island Sports websites.

Nix's activities came to the Government's attention, and
as part of an investigation into Nix's gambling business, the
U.S. Attorney's Office for the Central District of California
("USAO") sought to interview Puig. The interview occurred
by Webex video conference on January 27, 2022, and it was
attended by Puig, his counsel, and representatives of the
USAO and the investigating agencies. At Puig's request, the
interview was not recorded. Before the interview began, one
of the case agents warned Puig that "lying to federal law
enforcement agents is a crime," and Puig responded that he

understood.  Nonetheless, during the course of the interview, Puig made at least three materially false statements.

First, Puig "falsely stated that he had never discussed or talked about sports betting with Agent 1."  In fact, the Government asserts, Puig had discussed "sports betting with Agent 1 via telephone and text messages on numerous occasions, and Agent 1 assisted [Puig] in placing at least 899 bets on sporting events" between approximately May 2019 and September 2019.

Second, Puig "falsely stated that he had placed a bet online with an unknown person on an unknown website which resulted in a loss of $200,000."  That was false, according to the Government, because Puig had "placed a series of bets directly through Agent 1 that resulted in the gambling loss, and not through a website."

Third, Puig "falsely stated that he did not know the individual who instructed him to send $200,000 in cashiers' checks to Individual A and that he had never communicated with that person via text message."  The truth, according to the charging documents, was that Agent 1 and Individual B had "instructed [Puig] via text messages to send $200,000 to Individual A" and that Puig "had communicated with Agent 1 and Individual B" on many occasions.

**B**

On May 9, 2022, the USAO sent Puig a target letter informing him that he was the target of an investigation involving "false statements to law enforcement officers, in violation of 18 U.S.C. § 1001; and obstruction of justice, in violation [of] 18 U.S.C. § 1503(a)."  By that point in time, Puig was no longer playing baseball in the United States but was instead playing for a team in South Korea.  On June 6,

2022, Puig, his newly retained defense counsel, and his agent (who also functioned as a translator), met with attorneys from the USAO, as well as investigating law enforcement agents, over a Zoom teleconference. The USAO informed Puig of the charges it intended to bring for his alleged false statements at the January 27 interview, but it indicated a willingness to negotiate a pre-indictment plea deal.

On June 16, 2022, the USAO offered Puig a written plea agreement, with a deadline to respond within one week. After Puig's counsel requested edits to the agreement's factual basis and its recommended fine, the parties exchanged several rounds of edits and adjusted the responsive deadline accordingly. An interpreter signed the final version of the plea agreement on June 29, 2022, indicating that she had accurately translated the agreement to Puig on that day. Puig and his attorneys signed the plea agreement on July 7 (with Puig signing via DocuSign from Korea), and the assigned Assistant U.S. Attorney ("AUSA") signed it in late August.

On August 29, 2022, the USAO filed, under seal, a single-count information charging Puig with making false statements in violation of 18 U.S.C. § 1001(a)(2), and the USAO simultaneously lodged a sealed copy of Puig's plea agreement.

Under the terms of the plea agreement, Puig agreed to plead guilty "at the earliest opportunity requested by the USAO and provided by the [c]ourt" to the information's single count alleging a violation of § 1001(a)(2). In exchange, the USAO agreed: (1) to recommend the available reduction in the Sentencing Guidelines offense level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, provided that Puig demonstrate such acceptance "up to and

including the time of sentencing"; and (2) except for criminal tax violations, to decline to "further criminally prosecute [Puig] for violations of 18 U.S.C. § 1503 arising out of [Puig's] conduct described in the agreed-to factual basis" set forth in the agreement.

The plea agreement contained a four-and-a-half page "factual basis" that largely tracked the factual allegations of the charging information, at times almost verbatim. The agreement's factual basis also added a few details that were not in the charging information. These included the detail that, during the interview, Puig had been shown a photo of Agent 1 as well as a copy of one of the cashier's checks that Puig had obtained. The factual basis also contained the following additional statement about an action that Puig took after his January 2022 interview with the USAO:

> On March 14, 2022, [Puig] sent Individual B an audio message via WhatsApp regarding his January 2022 interview with [the USAO]. During the audio message, [Puig] told Individual B that he "[sat] over there and listen [to] what these people said and I no said nothing, I not talking. I said that I only know [Agent 1] from baseball."

The plea agreement stated that it was "effective upon signature and execution of all required certifications" by Puig, his counsel, and the AUSA. The plea agreement also stated that "if defendant, at any time after the effective date of this agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ('a breach'), the USAO may declare this agreement breached." The plea agreement declared that all of Puig's enumerated obligations

under the agreement were material, including his obligation
to plead guilty to the single-count information.

The plea agreement also contained a specific provision
stating that, in the event of an adjudicated breach of the plea
agreement, Puig affirmatively waived the protections of any
provision of law that would have required suppression or
exclusion, at his trial, of "the agreed[-]to factual basis
statement in this agreement." These provisions include
Federal Rule of Evidence 410, which provides in relevant
part that, subject to certain narrow exceptions, evidence of
"a statement made during plea discussions with an attorney
for the prosecuting authority" is "not admissible against the
defendant who . . . participated in the plea discussions" "if
the discussions did not result in a guilty plea." FED. R. EVID.
410(a)(4). Specifically, the plea agreement provided as
follows:

> Following the Court's finding of a
> knowing breach of this agreement by
> defendant, should the USAO choose to
> pursue any charge that was either dismissed
> or not filed as a result of this agreement, then:
>
> . . .
>
> . . . Defendant agrees that: (i) any
> statements made by defendant, under oath, at
> the guilty plea hearing (if such a hearing
> occurred prior to the breach); (ii) the agreed
> to factual basis statement in this agreement;
> and (iii) any evidence derived from such
> statements, shall be admissible against
> defendant in any such action against

> defendant, and defendant waives and gives
> up any claim under the United States
> Constitution, any statute, Rule 410 of the
> Federal Rules of Evidence, Rule 11(f) of the
> Federal Rules of Criminal Procedure, or any
> other federal rule, that the statements or any
> evidence derived from the statements should
> be suppressed or are inadmissible.

Several months after the sealed filing of the information
and the plea agreement, Puig returned to the United States
from South Korea.  The day after his arrival in the United
States, the district court granted the Government's motion to
unseal the case.  On November 15, 2022, Puig was arraigned
on the information before a magistrate judge, who set the
guilty-plea hearing for November 23, 2022 before the
assigned district judge.

At the scheduled hearing on November 23, Puig's
counsel requested a one-week continuance and also stated
her intention to seek "very limited discovery" from the
Government.  Counsel stated that she had recently been
retained in June 2022 while Puig was in South Korea, that
she had faced difficulty communicating with him while he
was playing baseball there, and that she had only met Puig
in person for the first time about a week earlier.  In light of
these factors, counsel argued that she needed more time to
adequately advise Puig on his legal and factual defenses
before pleading guilty.  In particular, Puig's counsel noted
that "one of the plea bargain benefits was not being charged
with obstruction" of justice but that, in light of the
information now available to her, she needed more time to
adequately assess whether Puig had defenses to an
obstruction charge that she had not previously considered.

The district court granted the continuance and reset the change-of-plea hearing to November 29.  As to Puig's request for discovery, the district court instructed Puig's counsel to meet and confer with the Government and to file a formal noticed motion for such discovery in the event that any discovery issues could not be resolved and that Puig was not going to plead guilty on November 29.

On November 28, 2022, Puig informed the Government and the district court that he was withdrawing from the plea agreement, and the district court took the scheduled hearing off calendar.  As defense counsel later explained this decision, she concluded that additional evidence discovered after Puig's return to the United States "undermined the factual basis" stated in the plea agreement and "supported Puig's defenses, at which time he concluded that he could not enter a guilty plea."

**C**

In mid-December, the Government filed a motion asking the district court to find that Puig had breached his plea agreement and that the Government was therefore relieved of its obligations under that agreement, including specifically the obligation not to prosecute Puig for obstruction of justice.  The motion did not ask the district court to determine whether the asserted breach was "knowing," and it did not request any determination as to the applicability of Rule 410.  On January 6, 2023, the district court granted this motion and held that the Government was "relieved of any obligations it undertook in the plea agreement."  The court expressly stated that its ruling did not address whether Puig's breach was "knowing."

Two weeks later, the Government sought and obtained an indictment.  Like the information, the indictment

continued to allege that Puig made the earlier-described three false statements in violation of § 1001(a)(2). However, the indictment added an additional count of obstruction of justice in violation of § 1503(a). That charge was based on the allegation that Puig had "corruptly endeavored to influence, obstruct, and impede the due administration of justice . . . by providing false information to, and withholding information from," the USAO and the investigating agencies. Specifically, the indictment alleged that, in his January 2022 interview, Puig had obstructed justice by falsely claiming that "he had never discussed sports gambling with Agent 1" and by withholding "information about Agent 1's involvement with bets made by [Puig] and the payment of [Puig's] gambling debts."

After the case was set for trial, the Government moved for an order finding that Puig had "knowingly" breached his plea agreement and that, as a result, the Government could admit the plea agreement's "factual basis" at trial. After receiving briefing and argument, the district court denied the motion on August 10, 2023. The court concluded that, because the plea and the plea agreement were "never accepted by the [c]ourt," the terms of the agreement were "unenforceable." The court also amended its earlier January 6, 2023 ruling so that, rather than relying on a finding that Puig had breached the plea agreement, the order's ultimate ruling that the Government was relieved of its obligations under the plea agreement instead rested on the ground that the plea agreement was unenforceable. And because the plea agreement was unenforceable, its waiver of the provisions of Rule 410 was ineffective, and that rule therefore barred admission, at Puig's trial, of the factual basis recited in that agreement.

The Government timely moved for reconsideration. In addition to asking the court to reverse its ruling outright, the Government alternatively asked the district court to allow the plea agreement's factual basis to be used solely for impeachment purposes in the event that Puig testified at trial in a manner that contradicted the factual basis. The district court denied this motion on October 5, 2023. On November 1, 2023, the Government filed a notice of appeal under 18 U.S.C. § 3731, challenging (1) the district court's August 10 order denying the Government's motion seeking admission of the factual basis for Puig's plea agreement; and (2) the district court's October 5 order denying reconsideration. The appeal is timely. *See United States v. Ibarra*, 502 U.S. 1, 6–8 (1991) (holding that a notice of appeal filed by the Government within 30 days of a timely motion denying reconsideration of an order excluding evidence is timely under § 3731 as to both the reconsideration order and the underlying exclusion order); *United States v. Mora-Alcaraz*, 986 F.3d 1151, 1155 (9th Cir. 2021) (same).

## II

On appeal, the Government contends that, even though the district court had not yet accepted either Puig's plea agreement or any guilty plea from him, that agreement remained binding and enforceable, including its waiver of the rule of exclusion contained in Federal Rule of Evidence 410. "Whether the district court is required to enforce a plea agreement is a question of law, which we review de novo." *United States v. Fagan*, 996 F.2d 1009, 1013 (9th Cir. 1993). We also review de novo whether a defendant has validly waived Rule 410's "prohibition against the introduction of plea negotiation statements." *United States v. Rebbe*, 314 F.3d 402, 405 (9th Cir. 2002).

## A

We note at the outset that the Government does not contest on appeal the district court's holding that, in the absence of a valid waiver of the protections of Rule 410, that rule bars introduction of the "factual basis" set forth in Puig's written plea agreement. That is not surprising. In the district court, the Government sought the admission of that factual basis on the express ground that it was a "written statement *agreed to and executed by [Puig]* during this investigation" (emphasis added), and the Government argued that Puig's statement should be admitted without telling the jury that it had been executed as part of a plea agreement. Even in that sanitized form, this written statement attributed to Puig plainly constitutes a "statement made during plea discussions with an attorney for the prosecuting authority," and it is therefore "not admissible against the defendant who . . . participated in the plea discussions" where, as here, "the discussions did not result in a guilty plea." FED. R. EVID. 410(a)(4); *see also* FED. R. CRIM. P. 11(f) (reiterating that "[t]he admissibility or inadmissibility of a plea, *a plea discussion, and any related statement* is governed by Federal Rule of Evidence 410" (emphasis added)).

However, because Evidence Rule 410 and Criminal Rule 11(f) were "enacted against a background presumption that legal rights generally, and evidentiary provisions specifically, are subject to waiver by voluntary agreement of the parties," the Supreme Court has held that, "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of [these] Rules is valid and enforceable." *United States v. Mezzanatto*, 513 U.S. 196,

203, 210 (1995).[1] In *Mezzanatto*, the defendant had agreed,
as a condition of proceeding with an interview with the
prosecutor to explore "the possibility of cooperating with the
Government," that "any statements he made during the
meeting could be used to impeach any contradictory
testimony he might give at trial if the case proceeded that
far." *Id*. at 198; *cf. United States v. Lopez*, 219 F.3d 343,
345 n.1 (4th Cir. 2000) (noting that such an agreement is
often referred to as a "proffer agreement"). During the
ensuing interview, Mezzanatto provided information that
was contradicted by surveillance footage, and the
Government terminated the meeting. *Mezzanatto*, 513 U.S.
at 199. When Mezzanatto later testified at his trial, the
Government used his inconsistent statements from his earlier
meeting with the Government to impeach his testimony. *Id*.
Noting that Mezzanatto had "never complained that he
entered into the waiver agreement at issue unknowingly or
involuntarily," the Court held that his waiver of the
protections of the relevant rules meant that his statements
were properly used against him at trial for impeachment. *Id*.
at 211; *see also Rebbe*, 314 F.3d at 404–09 (holding that,
after plea negotiations failed, the defendant's "proffer
statements" were properly used for rebuttal at trial in light of
the voluntary waivers of inadmissibility that the defendant
had signed prior to his proffer sessions with the prosecutor).

The Government argues that (1) as in *Mezzanatto* and
*Rebbe*, Puig knowingly and voluntarily agreed to waive the
protections of Evidence Rule 410 and Criminal Rule 11(f);
and (2) in accordance with the terms of that waiver, the

---

[1] At the time *Mezzanatto* was decided, the parallel provision currently
contained in Criminal Rule 11(f) was then contained, in somewhat
different form, in Criminal Rule 11(e)(6). *See Mezzanatto*, 513 U.S. at
200.

factual basis contained in his plea agreement should have
been held to be admissible at his trial.  In addressing this
contention, we first consider, in the next section, the latter
question concerning whether the terms of the waiver
contained in Puig's plea agreement were triggered.  And
because we answer that question in the negative, we have no
occasion to further consider whether Puig's assent to that
waiver was knowing and voluntary.

**B**

As noted earlier, under the terms of Puig's plea
agreement, his express agreement to waive his rights under
Evidence Rule 410 and Criminal Rule 11(f) becomes
effective only "[f]ollowing the Court's finding of a knowing
breach of this agreement by [Puig]" and then only if the
USAO chooses to pursue "any charge . . . not filed as a result
of this agreement."  *See supra* at 10–11.  The second
condition was obviously met here, because the USAO did
choose to pursue the obstruction charge that it had agreed
not to file as a result of the plea agreement.  The key
question, then, is what is required to establish the requisite
"Court's finding of a knowing breach of this agreement by"
Puig.

By its plain terms, this latter phrase requires not merely
that Puig perform some specified objective action that
triggers the waiver, but that there be a "Court's finding" that
there was a "breach of this agreement by" Puig.  On this
point, the contrast with *Rebbe* is instructive.  There, the
terms of the waiver applicable to Rebbe's proffer session
stated that the waiver would be triggered "should [Rebbe]
testify, or to rebut any evidence, argument or representations
offered by or on behalf of [Rebbe] in connection with the
trial."  *Rebbe*, 314 F.3d at 404.  Although the district court

would inevitably be (and was) called upon to resolve the parties' disputes as to whether the waiver in *Rebbe* was triggered and effective, the actual trigger for the waiver, and therefore the thing that the court needed to find, was simply that the proffer-session statements *rebutted* Rebbe's testimony or defense at trial. *See id*. at 407 (holding that "the admissibility of the proffer statements was triggered if Rebbe or his attorney presented any evidence or made any arguments and/or representations at trial that were inconsistent with his proffer statements"). Likewise, in *Mezzanatto*, the agreement was that "any statements [Mezzanatto] made during the [proffer] meeting could be used to impeach any contradictory testimony he might give at trial if the case proceeded that far," 513 U.S. at 198, meaning that the waiver was triggered simply by Mezzanatto's giving of contradictory testimony at his trial, *see id*. at 199.

In this case, by contrast, the terms of the waiver were *not* triggered by a simple objective action of Puig, such as failing to plead guilty or giving contrary testimony at a subsequent trial. Rather, by its express terms, the waiver only applied if there was a "Court[] finding" of a "breach of this agreement by" Puig. By requiring that the district court make a finding of a "breach of this agreement," this language necessarily required the court to make the predicate determination that there was a valid "agreement," that there was a "breach" of it by Puig, and that the "Court[]" should enforce that agreement by declaring such a "breach." That, in turn, requires us to consider whether the requisites for a judicially enforceable plea agreement were satisfied here.

Federal Rule of Criminal Procedure 11 recognizes three main categories of plea agreements, and it specifies the procedures applicable to each. The three categories are often

colloquially referred to as "Type A," "Type B," and "Type C" agreements, after the respective subdivisions of the rule—Rule 11(c)(1)(A), Rule 11(c)(1)(B), and Rule 11(c)(1)(C)—that describe each such category. *See United States v. Torres-Giles*, 80 F.4th 934, 936, 938 (9th Cir. 2023). A Type A agreement is one that includes a Government promise to dismiss or not bring other charges; a Type B agreement includes a Government promise to recommend or to not oppose a defendant's requests concerning specified sentencing considerations; and a Type C agreement includes an agreement by both sides as to either a specific disposition or as to the applicability or nonapplicability of specific sentencing provisions or factors. FED. R. CRIM. P. 11(c)(1)(A)–(C). Under the provisions of Rule 11, these different types of agreements are subject to different procedures.

Because a Type A or Type C agreement includes elements that dictate, at least in part, a binding outcome (*e.g.*, that certain charges will not go forward or be brought or that a specific sentence will be imposed or a specific sentencing factor applied), such agreements must be approved by the district court. Specifically, Rule 11 provides that, "[t]o the extent the plea agreement is of the type specified in Rule 11(c)(1)(A) or (C), the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." FED. R. CRIM. P. 11(c)(3)(A). If a court accepts a Type A or Type C agreement, it must inform the defendant that the "agreed disposition will be included in the judgment." FED. R. CRIM. P. 11(c)(4); *see also United States v. Bennett*, 990 F.2d 998, 1002 (7th Cir. 1993) ("[C]ritical to a type (A) or (C) agreement is that the defendant receive the contemplated charge dismissal or agreed-to sentence." (citation omitted)). If the court instead rejects a Type A or

Type C agreement, it must "inform the parties that [it] rejects the plea agreement" and "advise the defendant personally" that "the court may dispose of the case less favorably . . . than the plea agreement contemplated" if the defendant persists in pleading guilty. FED. R. CRIM. P. 11(c)(5)(A), (C). If a court rejects a Type A or Type C agreement after having already accepted a guilty plea, the court must "give the defendant an opportunity to withdraw the plea." FED. R. CRIM. P. 11(c)(5)(B); *see also* FED. R. CRIM. P. 11(d)(2)(A).

By contrast, the district court "plays a different role with a Type B plea agreement." 1A CHARLES ALAN WRIGHT & ANDREW D. LEIPOLD, FEDERAL PRACTICE & PROCEDURE § 181 at p. 272 (5th ed. 2020). Because a Type B agreement only involves a Government agreement to make sentencing *recommendations* or to not oppose the defendant's sentencing *requests*, it "does not provide for any particular disposition, [and] there is nothing about the plea bargain for the court to accept or reject." *Id*. Accordingly, "a district court's purported 'rejection' of a Type B plea agreement at sentencing ha[s] no legal effect." *Torres-Giles*, 80 F.4th at 938.

Because Type A and Type C agreements are subject to court approval, we have long held that the terms of such agreements are generally enforceable only after that approval is given. Indeed, we have generally stated, in broad terms, that a Type A or Type C "plea agreement that has not been entered and accepted by the trial court *does not bind the parties*." *United States v. Kuchinski*, 469 F.3d 853, 858 (9th Cir. 2006) (emphasis added) (quoting *Fagan*, 996 F.2d at 1013); *see also United States v. Savage*, 978 F.2d 1136, 1138 (9th Cir. 1992) (holding that "neither the defendant nor the government is bound by a plea agreement until it is approved by the court"). Here, of course, the plea agreement

was never accepted or approved by the district court before Puig disavowed it, and under this line of authority, the agreement would generally be deemed not to be enforceable by the court.

Viewing the language of Puig's plea agreement against the backdrop of this caselaw, we conclude that Puig's Rule 410 waiver was not triggered here. As we have explained, Puig's waiver of the protections of Rule 410 (and Rule 11(f)) was expressly contingent on the district "[c]ourt's finding" that there was a "breach of this agreement." The terms of that waiver are most naturally understood as requiring that there be an "agreement" that, under our caselaw, was enforceable by the "[c]ourt[]" and as to which the court could therefore make the requisite "finding" of a "breach." And because the plea agreement was a Type A agreement requiring the district court's approval, and because that approval never occurred, the agreement was not enforceable by the court under our precedent. The waiver, by its own terms, therefore did not apply. [2] Consequently, Rule 410 remains applicable with full force here, and the factual basis of Puig's plea agreement is "not admissible against" Puig. FED. R. EVID. 410(a).[3]

---

[2] We reiterate that—as we noted earlier, *see supra* at 17–18—we are not presented with a situation in which a plea agreement contains a severable, broadly framed waiver that is triggered by some objective action of the defendant, without any explicit reference to a "[c]ourt[] finding" of a "breach" of the "agreement." We express no view as to whether, and if so under what circumstances, such a waiver could be deemed to be free-standing and effective even if the plea agreement in which it is contained is not enforceable.

[3] Although the Government argued in its opening brief that the factual basis of Puig's plea agreement should at least be admissible at trial for

## C

The Government makes a number of counterarguments, but none of them are persuasive.

### 1

Noting that Puig's plea agreement expressly stated that it "is effective upon signature and execution of all required certifications," the Government asserts that the agreement, by its terms, was thereby immediately binding on the parties and that it would remain so unless the district court subsequently *rejected* the plea agreement. Quoting *United States v. Hyde*, 520 U.S. 670, 678 (1997), the Government contends that the possibility of court *rejection* of the agreement is best viewed "as 'a condition subsequent' that relieves a defendant of his obligations."**4** Because no such rejection of the agreement ever occurred in Puig's case, the

---

impeachment purposes, the Government clarified in its reply brief that it was *not* contending that, *even if Rule 410 applies*, the Government is nonetheless entitled to a carve-out from that rule's prohibitions if the evidence is used only for impeachment. Rather, the Government has clarified that its only argument on this score is that, if this court concludes "that public policy prohibits the admission of the factual basis in the government's case-in-chief, [the court] should at least permit admission of the [factual basis] for impeachment and rebuttal." Because we do not rely on "public policy," but on the plain text of Rule 410, we have no authority to create exceptions to that rule's terms. And because the Government concedes that Rule 410's terms bar admission of covered statements for any purpose, including impeachment, no impeachment exception is applicable here.

[4] *Hyde* held that, where the district court takes the defendant's guilty plea but defers approving the accompanying Type A plea agreement, the defendant remains bound by that plea in the interim, to the same extent as any other defendant who pleads guilty, but the defendant is entitled to automatically "back out" of the guilty plea if the agreement is later rejected by the court. 520 U.S. at 678.

Government argues, his obligations under the agreement were never terminated and remain in effect. But *Kuchinski* post-dates *Hyde*, and *Kuchinski* explicitly reaffirms our long-standing rule that a Type A or Type C "plea agreement that has not been entered and accepted by the trial court does not bind the parties." *Kuchinski*, 469 F.3d at 858. Moreover, the issue in *Hyde* was not the enforceability of the plea agreement, but the binding nature of a formally accepted *guilty plea*. *Hyde*, 520 U.S. at 677–78 (explicitly rejecting the view that the guilty plea has no validity unless and until the plea agreement is approved, noting that the federal rules "nowhere state that the guilty plea and the plea agreement must be treated identically"). We therefore remain bound by *Kuchinski*. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc).

The Government alternatively argues that *Fagan*, *Savage*, and *Kuchinski* have been "effectively overruled" by *Puckett v. United States*, 556 U.S. 129 (2009), which the Government describes as having held that "plea agreements, like all other contracts, are breached when one party breaks its promise and that the other party is entitled to a remedy in the event of breach." *Puckett*, however, involved a *Type B* plea agreement that involved only sentencing recommendations and that did not require court approval, and *Puckett* therefore says nothing about our caselaw concerning the enforceability of Type A and Type C agreements. *See id*. at 131 (describing the Government's promises in Puckett's plea agreement as consisting solely of sentencing recommendations). In the discussion cited by the Government, *Puckett* instead held that, when a defendant pleads guilty pursuant to a Type B agreement, a subsequent failure by the Government to abide by its agreed-to sentencing recommendations does not vitiate the knowing

and voluntary nature of the guilty plea when entered but instead entitles the defendant to "seek a remedy," which may be "rescission of the agreement" and withdrawal of the plea or "a resentencing at which the Government would fully comply with the agreement." *Id*. at 137–38. *Puckett*'s reaffirmation of the general rule that a party to an enforceable breached plea agreement is entitled to a remedy says nothing about the predicate issue of *when* a plea agreement is enforceable, particularly a Type A or Type C agreement. *Puckett* thus does not overrule *Kuchinski* either.

Consequently, nothing in *Hyde* or *Puckett* undermines our construction of the language of Puig's Rule 410 waiver in light of our settled caselaw. By its terms, that waiver does not apply unless and until there first is a "[c]ourt[] finding" of a "breach" of the "agreement," and for the reasons we have explained, it is not reasonable to read that language as calling for the court to assume this formal role of making legal findings as to the existence of an enforceable agreement and any breach in the *absence* of the court's approval of the agreement explicitly required by Rule 11(c)(3)(A) and our settled caselaw.

**2**

The Government also notes that, in situations where "detrimental reliance is shown," we have recognized an exception to the rule that Type A or Type C plea agreements are only enforceable when approved by the court. *Kuchinski*, 469 F.3d at 858. The Government seeks to invoke that exception here, arguing that, had it known that Puig would not plead guilty, it would have sought a freestanding, separate "proffer" from Puig that would have been enforceable regardless of whether the plea agreement was approved. We reject this contention, because no such

showing of detrimental reliance has been or can be made
here.  It makes no sense to posit, as this argument necessarily
does, that the Government relied on Puig's *not* breaching the
agreement when the Government drafted the agreement's
language *about the consequences of a breach*.  By definition,
such language *assumes* a breach.  Any detriment to the
Government's position here is therefore due, not to any
action of Puig on which it relied, but to the Government's
failure to apprehend the significance of the agreement's
waiver language—which the Government itself drafted.[5]

**3**

The Government insists that declining to find a waiver
here would conflict with the decisions of seven other
circuits.  That is wrong.  The seven cases cited by the
Government in support of this contention are distinguishable
in ways that confirm the correctness of our holding.

As an initial matter, two of the Government's cited cases
concerned *Type B* agreements involving only sentencing
recommendations, which, as we have explained, do not
require court approval at all.  Because such agreements are
not dependent on court approval, it is unsurprising that, in
the cited cases, the courts held that a Rule 410 waiver
contained in such an agreement is enforceable if the
defendant, after knowingly and voluntarily signing it,
breaches the agreement by failing to plead guilty.  *See*
*United States v. Elbeblawy*, 899 F.3d 925, 934–36 (11th Cir.

---

[5] Notably, this is not a case in which, in reliance on the defendant's stated
promises in a Type A plea agreement, the Government arguably allowed
the otherwise applicable statute of limitations on certain non-charged
offenses to lapse.  Here, the Government filed the additional obstruction
charge less than one year after the offense conduct, which was well
within the five-year statute of limitations.  *See* 18 U.S.C. § 3282(a).

2018);[6] *United States v. Mitchell*, 633 F.3d 997, 999, 1002, 1006 (10th Cir. 2011) (describing the agreement as involving only sentencing recommendations).

The Government also cites two cases in which the plea agreement *had* been accepted by the district court before the defendant breached it. *See United States v. Scruggs*, 356 F.3d 539, 542 (4th Cir. 2004) (expressly noting that the district court had accepted both the guilty plea and the plea agreement before the alleged breach); *United States v. Burch*, 156 F.3d 1315, 1318–19, 1323 (D.C. Cir. 1998) (noting that the defendant "specifically had waived his rights under [Rule 410]" "in a Rule 11 colloquy with the trial judge prior to entering the plea" as well as "[i]n his plea agreement," which the trial judge accepted at the same hearing).[7] Of course, if Puig had similarly breached his plea agreement only after the district court had accepted it, our above-described reasoning would not apply and the case would be very different.

The fifth case that the Government cites is *United States v. Washburn*, 728 F.3d 775 (8th Cir. 2013). But the language of the plea agreement in that case specifically provided that Washburn's Rule 410 waiver would be effective "*regardless*

---

[6] The Eleventh Circuit's opinion does not explicitly state what type of plea agreement was at issue, but the opinion notably says nothing whatsoever about any need for court approval. Moreover, the record in that case confirms that the agreement at issue was in fact a Type B agreement that only contained non-binding sentencing recommendations. *See United States v. Elbeblawy*, No. 1:15-cr-20820-BB-1, Dkt. 28-1 (S.D. Fla. Nov. 6, 2015).

[7] The minutes of the change of plea hearing in *Burch* further confirm that the court accepted the plea agreement, because the minutes expressly state that the counts the Government had agreed to drop were "to be dismissed at time of sentencing." *See United States v. Burch*, No. 1:95-cr-00225-PLF-1, minutes of status hearing (D.D.C. Oct. 25, 1995).

*of whether the plea agreement has been accepted by the Court*." *Id*. at 780.   That makes *Washburn* readily distinguishable, because Puig's agreement contains no such language.   Similarly distinguishable is *United States v. Nelson*, 732 F.3d 504 (5th Cir. 2013).   There, the Fifth Circuit enforced a Rule 410 waiver in a Type A agreement that was never presented to or approved by the district court, because the terms of the waiver "explicitly" stated that it would be triggered "if Nelson failed to plead guilty to the Bill of Information." *Id*. at 517.   By contrast, as we have emphasized, Puig's Rule 410 waiver is not triggered by a mere failure to plead guilty but only by a "[c]ourt[] finding" that there was a valid "agreement" that he had "breach[ed]." *See supra* at 17–18.

The last case the Government cites is *United States v. Perry*, 643 F.2d 38 (2d Cir. 1981), but the Second Circuit's one-paragraph discussion of the Rule 410 waiver issue does not describe the type of agreement at issue, whether court approval of the agreement was required, or what the relevant language of the agreement was. *Id*. at 52.  *Perry* therefore provides no guidance with respect to the issues presented here.

In short, the Government has failed to cite any relevant persuasive out-of-circuit authority that would support its position.

\*   \*   \*

For the reasons we have explained, the waiver of the protections of Rule 410 contained in Puig's plea agreement was not triggered here, leaving the provisions of that Rule undisturbed. The district court therefore properly held that the factual basis contained in Puig's plea agreement was inadmissible under Rule 410.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate electronic filing system or, if you are a pro se litigant or an attorney with an exemption from the electronic filing requirement, file one original motion on paper.

**Petition for Panel Rehearing and Petition for Rehearing En Banc (Fed. R. App. P. 40; 9th Cir. R. 40-1 to 40-4)**

**(1) Purpose**
   **A. Panel Rehearing:**
   - A party should seek panel rehearing only if one or more of the following grounds exist:
      - ➢ A material point of fact or law was overlooked in the decision;
      - ➢ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
      - ➢ An apparent conflict with another decision of the Court was not addressed in the opinion.
   - Do not file a petition for panel rehearing merely to reargue the case.

   **B. Rehearing En Banc**
   - A party should seek en banc rehearing only if one or more of the following grounds exist:
      - ➢ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
      - ➢ The proceeding involves a question of exceptional importance; or

➢ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**
- A petition for rehearing or rehearing en banc must be filed within 14 days after entry of judgment. Fed. R. App. P. 40(d).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(d).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-4.

**(3) Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- Attorneys must file the petition electronically via the appellate electronic filing system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-8000.

**Petition for a Writ of Certiorari**
- The petition must be filed with the Supreme Court, not this Court. Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov.

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ➢ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista, maria.b.evangelista@tr.com);
  - ➢ **and** electronically file a copy of the letter via the appellate electronic filing system by using the Correspondence filing category, or if you are an attorney exempted from electronic filing, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to *(party name(s))*:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee | | | | $ |
| | | | **TOTAL:** | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10); TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*