TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
MICHAEL J. MORSE (Cal. Bar No. 291763)
LAURA A. ALEXANDER (Cal. Bar No. 313212)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0304/7367/1019
    Facsimile: (213) 894-0141
    Email:    juan.rodriguez@usdoj.gov
              michael.morse@usdoj.gov
              laura.alexander@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR-22-394-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S NOTICE OF MOTION AND MOTION TO QUASH SUBPOENA FOR TESTIMONY OF AUSA JEFF MITCHELL AND TO EXCLUDE TESTIMONY |
| v. | |
| YASIEL PUIG VALDES, | **Trial Date:** January 20, 20026 |
| Defendant. | **Time:** 8:30 a.m. |
| | **Location:** Courtroom of the Hon. Dolly M. Gee |

Plaintiff United States of America, by and through its counsel of record, the Office of the United States Attorney for the Central District of California and Assistant United States Attorneys Juan M. Rodirguez, Laura A. Alexander, and Michael J. Morse, hereby moves the Court for an Order quashing the trial subpoena for testimony served by defendant YASIEL PUIG VALDES on Assistant United States Attorney

("AUSA") Jeff Mitchell, in the above-referenced case, since any such testimony would be immaterial and unnecessary to any defense case, irrelevant, pursuit to Federal Rule of Evidence 401/402, and cumulative, and unfairly prejudicial, pursuant to Federal Rule of Evidence 403.

This Motion is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 19, 2026.                Respectfully submitted,

                                        TODD BLANCHE
                                        Deputy Attorney General

                                        BILAL A. ESSAYLI
                                        First Assistant United States
                                        Attorney

                                        ALEXANDER B. SCHWAB
                                        Assistant United States Attorney
                                        Acting Chief, Criminal Division


                                              /s/
                                        _____
                                        JUAN M. RODRIGUEZ
                                        MICHAEL J. MORSE
                                        LAURA A. ALEXANDER
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant has subpoenaed the Assistant United States Attorney ("AUSA") who was formerly assigned to this case as the lead prosecutor, AUSA Jeff Mitchell ("AUSA Mitchell"), to testify at trial in defendant's case-in-chief.  AUSA Mitchell was present, along with another then-assigned AUSA, during defendant's interview, as was defendant, defendant's two attorneys, two federal agents, and an interpreter.  Defendant's *Touhy* letter indicates that because AUSA Mitchell was a "percipient witness to [the] interview," and "communicated with [defendant's] then-attorneys before and after the interview of" defendant, his testimony "is directly relevant to the merits of this case[.]" (See Exhibit 1 ("defendant's *Touhy* letter").) But such testimony would be cumulative, since several witnesses are available to offer the same testimony; immaterial and unnecessary to any plausible defense defendant could mount; and should be excluded under Federal Rule of Evidence 403, since any probative value of such testimony would be substantially outweighed by a danger of unfair prejudice, confusing the jury, and creating a sideshow.  Defendant's subpoena should be quashed.

### II.   BACKGROUND

In January 2022, defendant lied and obstructed justice during a videoconference interview with the government.  Present for the interview were two federal agents; two federal prosecutors, including formerly assigned lead AUSA, AUSA Mitchell; the defendant, along with defendant's two former attorneys; and an interpreter.  At trial, the government will call the interpreter, as well as both agents.

1

On January 12, 2026, defense emailed AUSA Mitchell a subpoena, indicating he should "be prepared to be in [Los Angeles] and ready to take the stand in the defense case-in—chief." (See Exhibit 2 ("defendant's email to AUSA Mitchell") at 2.)[1]

## III. ARGUMENT

In criminal cases, subpoenas of witnesses for trial are authorized by Fed. R. Crim. P. 17(a).  Unlike Rule 17(c) regarding subpoenas to produce documents, Rule 17(a) does not expressly provide for a motion to quash or limit the subpoena.  Compare Fed. R. Crim. P. 17(a) with Fed. R. Crim. P. 17(c).  However, federal courts have held that "[r]oughly the same standard applies to subpoenas compelling the attendance of witnesses" and subpoenas under Rule 17(c).  See Stern v. United States Dist. Ct., 214 F.3d 4, 17 (1st. Cir. 2000). The Supreme Court in United States v. Nixon, 418 U.S. 683 (1974), established the standard governing a Rule 17(c) subpoena that has been distilled to three fundamental elements: 1) relevancy; 2) admissibility; and 3) specificity.  Id. at 699-700.  As applied to a Rule 17(a) subpoena, "a subpoena ad testificandum survives scrutiny if the party serving it can show that the testimony sought is both relevant and material."  Stern, 214 F.2d at 17.  Thus, a district court has discretion to quash a Rule 17(a) subpoena "[w]here the testimony sought is cumulative or immaterial."  United States v. Bebris, 4 F.4th 551, 559 (7th Cir.), cert. denied, 142 S. Ct. 489 (2021).  Mere allegations of materiality and necessity are not sufficient to establish that a witness is necessary to a defense, as

---

[1] AUSA Mitchell is no longer assigned to the Los Angeles United States Attorney's Office.  He is now Chief of the Criminal Division of the United States Attorney's Office in the Northern District of California.

required by the rule governing compulsory process. <u>United States v. Leamous</u>, 754 F.2d 795, 798 (8th Cir. 1985), <u>cert. denied</u>, 471 U.S. 1139, 105 S. Ct. 2684, 86 L. Ed. 2d 701 (1985); <u>see also</u> <u>United States v. Redd</u>, 355 F.3d 866, 879 (5th Cir. 2003)(trial court did not violate defendant's compulsory process right in refusing to issue a subpoena for a witness when defense counsel could not inform the court about the nature of the expected testimony, and could only speculate as to whether the testimony would be "both material and favorable" to the defense); <u>see also</u> <u>United States. v. Hernandez-Urista</u>, 9 F.3d 82, 84 (10th Cir. 1993) (defendant failed to specify content of expected testimony and, thus, district court did not abuse its discretion in denying defendant's request for subpoena; defendant merely set forth three questions, answers to which were all given by other witnesses).

Further, where the proposed testimony would be inadmissible at trial under Federal Rule of Evidence 403 because it has minimal probative value that would be substantially outweighed by the risk of unfair prejudice or other consideration under Rule 403, a district court does not abuse its discretion by denying a subpoena to obtain the witness's testimony. <u>See United States v. LeBeau</u>, 867 F.3d 960, 976 (8th Cir. 2017).

     1.   <u>Defendant's Proffer That AUSA Mitchell Would Offer Percipient Testimony Regarding Defendant's January 2022 Interview is Cumulative</u>

In his *Touhy* letter, defendant summarizes AUSA Michell's proposed testimony by pointing out that AUSA Mitchell was present for the interview of defendant in January 2022, thus he is a percipient witness to the charged conduct in this case.  However, such testimony

3

would be cumulative.  The government will call two federal agents who
were present during the interview, IRS-CI SA Seymour, and HSI SA
Jason Canty.[2]  Defendant will of course have the opportunity to cross
examine both government agents.  Any further testimony from AUSA
Mitchell on the same topic would be cumulative

Additionally, as this Court knows, AUSA Mitchell has previously
set forth a detailed declaration regarding events of the defendant's
investigation, which included details about the defendant's January
2022 interview. See Dkt. 73-1.  AUSA Mitchell's discussion of
defendant's January 2022 interview is consistent with the HSI
Memorandum of Investigation ("MOI") written by SA Jason Canty, which
memorialized the interview.  Compare SA Canty's HSI MOI ("HSI
MOI")(attached as "Exhibit 3") with Dkt. 73-1 ¶¶ 16-22 ("Decl. of
AUSA Mitchell" (attached as "Exhibit 4").)

Moreover, defendant can alternatively seek testimony from his
former attorneys who were present for the interview.[3]  Of course,
such testimony would not implicate attorney-client privilege concerns
since defendant's former attorneys' testimony would relay the events
of the defendant's interview, for which government agents were
present.

---

[2] The government will also call Certified Court Interpreter
Esther Hermida, who was present with the defendant during the
interview, providing interpreter services.

[3] Attorney Scott Lesowitz was present telephonically; Steven
Gebelin was physically present with the defendant during the
interview.

4

1

2. **Defendant's Proffer That AUSA Mitchell Would Offer Testimony Regarding Conversations AUSA Mitchell Had with Defendant's Former Attorneys is Immaterial to His Defense**

3

In his *Touhy* letter, defendant states AUSA "Mitchell also communicated with Mr. Puig's then-attorneys before and after the interview of Mr. Puig.  His testimony regarding those communications...is directly relevant to the merits of this case[.]" Although defendant offers scant details regarding the precise communications between AUSA Mitchell and defendant's former attorneys he seeks to elicit at trial, AUSA Mitchell discussed the communications he had with defendant's former attorneys in his declaration.  See id. ¶¶ 9-23.

Those communications can be categorized as follows:  (1) pre-interview communications regarding scheduling of grand jury testimony and ultimately a voluntary interview; (2) pre-interview communications regarding interview topics; (3) a phone conversation AUSA Mitchell had with attorney Lesowitz during the interview, at a break, where AUSA Mitchell told Lesowitz that he (Mitchell) believed the defendant had lied during the interview; and (4) a post-interview telephone conversation between AUSA Mitchell and Lesowitz immediately after, where Mitchell again told Lesowitz that he (Mitchell) believed the defendant had lied during the interview, and that the government would deliberate internally as to whether it would seek an indictment.  See id.

As such, it is difficult to imagine how such testimony would be material to defendant's case-in-chief, should he choose to call AUSA Mitchell.  Certainly pre-interview logistical communications regarding scheduling of grand jury testimony, topics of inquiry, and

ultimately a voluntary interview is immaterial to the defense's case.

Left, then, are the midstream and post-interview phone conversations

between AUSA Mitchell and Lesowitz.  In both calls, AUSA Mitchell

told Lesowitz that defendant was either lying or had lied during the

interview.  Defendant cannot seriously contend that the opinion of

the previously assigned government prosecutor that he lied during the

interview—-the inference, of course, being that he's guilty of the

crimes for which he's charged--could possibly assist his case.  And

even if such statements are relevant to defendant's case-in-chief

(they are not), details of conversations between AUSA Mitchell and

his former attorneys can be elicited directly from defendant's former

attorneys.  Thus, AUSA Mitchell's testimony regarding those

communications, in any event, would be unnecessary and cumulative.

> 3.  <u>Under Rule 403, Any Probative Value of AUSA Mitchell's
> Proffered Testimony is Substantially Outweighed by the
> Danger of Unfair Prejudice, Confusion of the Issue,
> Unnecessarily Cumulative Evidence and the Danger of
> Creating a Sideshow</u>

On February 13, 2023, defendant, with his defense counsel, held

a press conference on the footsteps of the First Street Federal

Courthouse.  In it, defendant and counsel alleged that the

government's prosecution was motivated by bias on the basis of race.

Extensive litigation before this Court followed.  As this Court

knows, in April 2023, this Court denied defendant's motion to compel

evidence of selective prosecution.  <u>Dkt.</u> 106.  This Court again

reiterated that ruling in its December 4, 2025 order.  Dkt.

291("[t]he Court excludes under Rule 403 any evidence or argument

that the investigation into and prosecution of Puig were racially

motivated.")  Thus, this Court has already foreclosed defendant from

6

1  eliciting such testimony.  But to the extent defendant seeks to

2  pursue a theory of bias, vindictiveness, or a "rush to judgment"

3  centered around the formerly assigned AUSA, he should be prevented

4  from doing so.  AUSA Mitchell is no longer involved in this case, and

5  any allegations of misconduct related to AUSA Mitchell are not

6  properly presented before the jury.  See, e.g., United States v.

7  Abboud, 438 F.3d 554, 579 (6th Cir. 2006) ("defense of selective

8  prosecution is a matter that is independent of a defendant's guilt or

9  innocence, so it is not a matter for the jury"); United States v.

10 Berrigan, 482 F.2d 171, 175 (3d Cir. 1973) (allegations of

11 discriminatory prosecution did not raise a defense to be presented to

12 or decided by the jury).  The function of the jury trial is to

13 determine defendant's guilt or innocence; any allegation that a

14 formerly assigned AUSA engaged in improper prosecutorial conduct

15 before trial is irrelevant to that question and not proper trial

16 evidence, especially where as here, such specious allegations have

17 been raised and disposed of by this Court pretrial.  See United

18 States v. Rodella, 59 F. Supp. 3d 1331, 1360-61 (D. N.M. 2014)

19 (evidence of prosecutor's vindictive motive or bias is irrelevant to

20 guilt or innocence and is inadmissible at trial).

21     Put differently, this Court should not allow the defendant to

22 revive his allegations of investigative bias by calling the formerly

23 assigned AUSA in order to accuse him of impropriety, while stopping

24 just short of alleging racial bias.  As discussed below, such

25 testimony would likely veer into the internal communications and

26 mental impressions of the attorneys who then-represented the

27 government in this case, which is foreclosed by attorney work-

28

7

product.  Further, allowing the defendant to elicit testimony of the formerly assigned AUSA, whom this defense team has argued (unsuccessfully) harbored and was improperly motivated by racial bias, would create a sideshow, confusing the jury and distracting them from the issues that matter.  United States v. Kreogh, No. 17-CR-290-D, 2022 WL 129443 (W.D.O.K. Jan. 12, 2022).

In Kreogh, a criminal defendant subpoenaed the formerly assigned lead AUSA to testify at trial regarding investigative interviews for which she was present, and allegations of impropriety, which the court had already disposed of pretrial.  Specifically, defendant sought the formerly assigned AUSA's testimony to demonstrate that she "acted improperly during the government's investigation and preparation, and pressured certain witnesses to alter prior statements or shade their testimony" in favor of the government, despite several other witnesses being available to testify regarding government interviews.  Id. at 1-2.  In quashing the subpoena, the court held that "[d]efendant's strategy of examining [the formerly assigned AUSA] about...interviews and her interview techniques" was "the sort of unnecessary presentation that the court " would not permit counsel for any party to make during jury trial."  Id. at 3.

Here, too, defendant's proffered testimony of AUSA Mitchell is "the sort of unnecessary presentation" that should not be permitted at trial.  This Court should not allow such a spectacle, and exercise its authority under Rule 611 to prevent the defense from turning trial into a showdown between the defense and the formerly assigned AUSA.

1    Further, to the extent defendant seeks to elicit testimony on

2    matters related to investigative decisions made by AUSA Mitchell, and

3    the rationale or propriety thereof, such testimony would be

4    inadmissible.  Defendant cannot subpoena AUSA Mithcell to elicit this

5    testimony as it is protected work product.  See United Kingdom v.

6    United States, 238 F.3d 1312, 1321 (11th Cir. 2001) ("The privilege

7    applies in criminal matters as it does in civil cases." (citing

8    United States v. Nobles, 422 U.S. 225, 238 (1975); see also United

9    States v. Malady, 209 F. App'x 848, 850 (10th Cir. 2006) ("[a]t its

10   core, the work-product doctrine shelters the mental processes of the

11   attorney, providing a privileged area within which he can analyze and

12   prepare his client's case.").

13   This material is further protected by Federal Rule of Criminal

14   Procedure 16(a)(2), which governs information that is not subject to

15   disclosure.  The Rule "does not authorize the discovery or inspection

16   of reports, memoranda, or other internal government documents made by

17   an attorney for the government or other government agent in

18   connection with investigating and prosecuting the case." Fed. R.

19   Crim. P. 16(a)(2); see United States v. Armstrong, 517 U.S. 456, 463

20   (1996) ("[U]nder Rule 16(a)(2), [a criminal defendant] may not

21   examine [g]overnment work product in connection with his case."); see

22   also United Kingdom, 238 F.3d at 1322 n.11 ("Rule 16(a)(2), unlike

23   its civil counterpart [], does not contain any express exception or

24   state any circumstances under which work product may be discovered,

25   although the Rule does not necessarily preclude the possibility that

26   other laws may nevertheless require production of work product.")

27

28

To be clear, the defendant will have the opportunity to vigorously cross examine the federal agents in this case who actually conducted the investigation.  The government will call two federal agents who were present during the defendant's interview.  Though federal prosecutors often collaborate with federal law enforcement officers regarding investigative decisions, it is the federal law enforcement officers themselves who investigate.  Throughout the investigation and prosecution of this case, the United States has ensured that law enforcement agents were present at witness interviews, and those agents completed summary reports that captured the substance of those interviews.  These reports were bates-stamped and produced to the defendant in discovery.  The authors of those reports, who were also the ultimate drivers of the investigation, are federal law enforcement agents.  Their testimony alone is relevant at trial to the investigative decisions made in this case.

**IV.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court quash defendant's trial subpoena for the testimony of AUSA Mitchell and preclude any argument that the government failed to call AUSA or any argument that the government or Court prohibited the defense from calling AUSA Mitchell.

# EXHIBIT 1



Brian Klein                                                                By U.S. Mail and Email
T: +1 213 720 2286
bklein@cooley.com

January 15, 2026

Juan M. Rodriguez
Michael J. Morse
Laura A. Alexander
United States Attorney's Office
Central District of California
312 North Spring Street, Suite 1200
Los Angeles, California 90012

**Re:     USA v. Puig Valdes, 22-cr-394-DMG**
**Touhy Demand re Testimony of Jeffrey P. Mitchell**

Dear Counsel:

As you know, we represent defendant Yasiel Puig Valdes in the above-referenced matter.  This letter constitutes a request made pursuant to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), for the testimony of Jeffrey P. Mitchell at trial in this matter, which is set to begin on January 20, 2026 at 9:00 A.M., before the Honorable Dolly M. Gee, United States District Judge.

In accordance with 28 C.F.R. § 16.23(c), we make the following statement setting forth a summary of the testimony we seek from Mr. Mitchell and its relevance to the case:

On January 27, 2022, the government conducted an interview of Mr. Puig.  Statements supposedly made by Mr. Puig during that interview form the basis for the government's First Superseding Indictment. Mr. Mitchell, then an Assistant United States Attorney in this District, was a percipient witness to that interview.  Mr. Mitchell also communicated with Mr. Puig's then-attorneys before and after the interview of Mr. Puig.  His testimony regarding those communications and the interview, including his recollection of statements allegedly made by Mr. Puig and others, is directly relevant to the merits of this case, including whether Mr. Puig made the charged false statements and intended to and did, in fact, obstruct justice.

The government has indicated that it intends to call three other percipient witnesses to that interview, so it clearly believes the testimony of those present is relevant.  If for some reason the government no longer intends to call those witnesses and now disagrees with the relevance of their testimony about the interview, please advise us as soon as possible.

We are available to discuss any questions that you may have regarding the above.

# Cooley

Juan M. Rodriguez
Michael J. Morse
Laura A. Alexander
January 14, 2026
Page Two

Sincerely

Brian Klein
Chip Harrison
Cooley LLP

-and-

Keri Curtis Axel
Jose Nuño
Viviana Andazola Marquez
Waymaker LLP

*Attorneys for Yasiel Puig Valdes*

# EXHIBIT 2

**Rodriguez, Juan (USACAC)**

| | |
|---|---|
| **From:** | Jeff Mitchell <████████@yahoo.com> |
| **Sent:** | Friday, January 16, 2026 4:05 PM |
| **To:** | Rodriguez, Juan (USACAC) |
| **Subject:** | [EXTERNAL] Fw: United States v. Puig - Trial Subpoena |

----- Forwarded Message -----
**From:** Jeff Mitchell ████████@yahoo.com>
**To:** Viviana Andazola Marquez <████████@waymakerlaw.com>
**Cc:** Keri Axel <████@waymakerlaw.com>; ████@cooley.com <████@cooley.com>; Jose Nuño <████@waymakerlaw.com>; ████@cooley.com <████@cooley.com>
**Sent:** Friday, January 16, 2026 at 04:04:17 PM PST
**Subject:** Re: United States v. Puig - Trial Subpoena

Viviana, Keri.  I emailed you a couple of days ago and i haven't heard back from you.  Please let me know if Mr. Puig intends to pay for my airfare, hotel, transportation, meals, and other expenses.


On Wednesday, January 14, 2026 at 06:02:06 PM PST, Jeff Mitchell ████████@yahoo.com> wrote:


Viviana, Keri.  As i mentioned in my prior email, I no longer live in LA.  Does Mr. Puig intend to pay for my airfare, hotel, transportation, meals, and other expenses?


On Monday, January 12, 2026 at 04:00:57 PM PST, Viviana Andazola Marquez <████████@waymakerlaw.com> wrote:


Jeff,


Thank you for your response. Attached is a copy of your trial subpoena for the upcoming Puig trial. We don't believe we need to go through the Touhy process, but we will if necessary. Regardless, you should be prepared to be in LA and ready to take the stand in the defense case-in-chief. We expect that to begin on Monday or Tuesday, 1/26 or 1/27.


Best,

Viviana


**Viviana Andazola Marquez**

Associate, Waymaker LLP
Direct: ████████

1

**From:** Jeff Mitchell [REDACTED]com>
**Sent:** Sunday, January 11, 2026 10:38 AM
**To:** Viviana Andazola Marquez <[REDACTED]@waymakerlaw.com>
**Cc:** Keri Axel <[REDACTED]@waymakerlaw.com>
**Subject:** Re: United States v. Puig - Trial Subpoena

Hi Keri.  Sorry for the delay.  I moved to San Francisco on Thursday.  I'm not sure if you've heard but I've returned to
government service.  I'm the new Crim Chief for NDCA.  I'll put you in touch with our Touhy coordinator tomorrow, and
they can guide you through the Touhy process for NDCA.

On Thursday, January 8, 2026 at 09:21:06 AM PST, Viviana Andazola Marquez
<[REDACTED]@waymakerlaw.com> wrote:

Dear Mr. Mitchell,

As you know, we represent Yasiel Puig Valdes and are writing regarding the upcoming *United States v. Puig Valdes* trial,
which is set to begin on January 20, 2026.  Please let us know if you would accept email service of a subpoena for you to
appear at trial.  You should reserve January 23 and 26-28 for possible testimony.

Best,

Viviana

**Viviana Andazola Marquez**
Associate

**Waymaker LLP**
Direct: [REDACTED]  |  Reception: (424) 652-7800
515 S. Flower Street, Suite 3500  |  Los Angeles, CA 90071
[REDACTED]@waymakerlaw.com  |  waymakerlaw.com  |  Bio

This message was sent from Waymaker LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank yo

EXHIBIT 3



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

**CASE NUMBER**

███████████

**CASE OPENED**
9/12/2017

**CURRENT CASE TITLE**
Matthew Funke, et. al.

**REPORT TITLE**
Yasiel PUIG Valdes Interview

January 27, 2022

**REPORTED BY**
Jason Canty
SPECIAL AGENT

**APPROVED BY**
Matthew Stocks
SPECIAL AGENT

**DATE APPROVED**
1/31/2022

## SYNOPSIS

On September 6, 2017, the United States Attorney's Office, Central District of California, contacted Homeland Security Investigations (HSI) Los Angeles regarding the existence of an illegal online sports gambling website, "Sandislandsports.com." At least some staff of the website, including Matthew FUNKE, work in the Los Angeles, CA area to sign up users to the website and to collect debts and pay out winnings to the site's users. As a result, HSI Los Angeles opened an investigation into FUNKE's potential violations of 18 United States Code, Section 1084 (Transmission of Wagering Information).

This report details the interview of Yasiel PUIG Valdes on January 27, 2022.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Matthew Funke, et. al. | ████████████ | 1/31/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION




OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



12/16/2022 18:34 EST                                                                                    Page 2 of 5

## DETAILS OF INVESTIGATION

DETAILS OF INVESTIGATION

On September 6, 2017, the United States Attorney's Office, Central District of California, contacted Homeland Security Investigations (HSI) Los Angeles regarding the existence of an illegal online sports gambling website, "Sandislandsports.com." At least some staff of the website, including Matthew FUNKE, work in the Los Angeles, CA area to sign up users to the website and to collect debts and pay out winnings to the site's users. As a result, HSI Los Angeles opened an investigation into FUNKE's potential violations of 18 United States Code, Section 1084 (Transmission of Wagering Information).

On January 27, 2022, at approximately 2:11 PM using WebEx, Homeland Security Investigations (HSI) Los Angeles Special Agent (SA) Jason Canty assigned to the El Camino Real Task Force (ECR), Chris Seymour of the Internal Revenue Service Criminal Investigations (IRS CI), Assistant United States Attorneys (AUSA) Jeff Mitchell, and Daniel Boyle conducted a virtual interview of Yasiel PUIG, associate of Wayne NIX, represented by Steven Gebelin and Scott Lesowitz and interpreted by Esther Hermida. The subject of this interview was PUIG's knowledge and relationship with Donny KADOKAWA and Wayne NIX. Pursuant to request by PUIG's attorneys, this interview was not recorded.

AUSA Mitchell began the interview with introductions of all parties present. AUSA Mitchell also addressed the proffer letter present to PUIG and his (PUIG) attorneys and informed PUIG that an agent would be taking notes and writing a report which would remain confidential unless the information was needed for prosecution purposes at which time PUIG and his (PUIG) legal representation would be notified. AUSA Mitchell then informed PUIG that lying was a crime and could be prosecuted. AUSA Mitchell then instructed SA Canty to admonish PUIG and to read 18 USC 1001 informing PUIG not to provide false information during this interview. During the reading of 18 USC 1001, PUIG interrupted SA Canty and stated that we (government) were wasting his (PUIG) time and asked that we do not continue reading, but AUSA Mitchell informed PUIG that we were following protocol. Following AUSA Mitchell's instructions, SA Canty continued reading 18 USC 1001. AUSA Mitchell then informed PUIG that the reason for this interview was regarding a sports gambling case with which PUIG may have knowledge.

PUIG was asked if he (PUIG) knew Wayne NIX which was initially translated incorrectly as Dwayne NIX by Hermida, but this error was immediately corrected to reflect the name Wayne NIX. PUIG indicated that he did not know either name. AUSA Mitchell then showed PUIG a series of six-pack photo arrays containing individuals of interest within this investigation which included Wayne NIX, Michael ROSENFELD, Viet Dinh "Victor" NGUYEN, Matthew SOTO, Daniel SOTO, Michael OROZCO, Kenneth ARSENIAN, Joseph SCHOTTENSTEIN, Joseph CASTELAO, and Donny KADOKAWA. PUIG states that

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Matthew Funke, et. al. |  | 1/31/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



he did not recognize any of the individuals with the exception of Donny KADOKAWA who PUIG stated that he knew from baseball. At this time in the interview PUIG asked if he (PUIG) needed to provide the information that was being requested of him (PUIG); to which, AUSA Mitchell responded that the interview was strictly voluntary and if he (PUIG) did not want to provide the information being requested that questioning could be reconvened before a Grand Jury. PUIG then asked if he would have to answer the same questions before the Grand Jury; to which, AUSA Mitchell stated that he could not provide legal guidance and referred PUIG to his legal representation. Following this information, the interview was halted, and PUIG spoke to his (PUIG) attorneys in private.

The interview was reconvened at 2:41PM. PUIG indicated that he (PUIG) only knew KADOKAWA as "Donny," who PUIG knew from baseball, and wasn't sure if that was KADOKAWA's real name. When asked about PUIG's and KADOKAWA's involvement with sports betting, PUIG indicated that the two had not spoken about sports betting. When asked about the Sand Island Sports (SIS) and Bet Prestige websites, PUIG indicated that he (PUIG) was not familiar with them but needed to see the sites to be sure. AUSA Mitchell then provided various screenshots of both the desktop and mobile website platforms of both SIS and Bet Prestige to include an image that was contained within a message exchanged between PUIG and NIX, but PUIG stated that he (PUIG) did not recognize the sites. When asked if he (PUIG) had used websites to place sports bets, PUIG asked to speak to his (PUIG) attorneys and halted the interview for a few minutes. Upon returning, Lesowitz asked that the following questions not involve where the various bets were placed as those questions may have potential legal ramifications with local prosecutors of those jurisdictions; to which, AUSA Mitchell agreed. PUIG continued stating that he (PUIG) did not recognize the websites or names of SIS and Bet Prestige but had used other sites for sports betting about which he (PUIG) learned through various friends and people that he (PUIG) knew would bet in Las Vegas. When asked if KADOKAWA talked with PUIG about online sports betting and the use of Bet Prestige and NIX, PUIG stated that he (PUIG) did not remember.

When asked, PUIG stated that he (PUIG) did not recall the name Joey (Joseph) SCHOTTENSTEIN. AUSA Mitchell then showed PUIG two Cashier's Checks from Bank of America's Glendale Main office dated June 25, 2019, for $100,000 USD each with Yasiel PUIG VALDES printed on the check as the "remitter" and the name Joey SCHOTTENSTEIN following "pay to the order of." PUIG stated that he (PUIG) still did not remember the name SCHOTTENSTEIN and that these checks that the government had with SCHOTTENSTEIN's name on them must have been because that was the name to which PUIG was directed to send the checks. PUIG continued asking where his (PUIG) signature was on the check, that he (PUIG) did not see his (PUIG) signature on the check, and that he (PUIG) didn't remember those checks.

Pursuant to this conversation, AUSA Mitchell paused the interview and as to speak with PUIG's attorneys on the side.

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Matthew Funke, et. al. |  | 1/31/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.



# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION



**OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE**



12/16/2022 18:34 EST                                                                   Page 4 of 5

Upon the continuance of the interview, PUIG indicated that he (PUIG) had placed a bet or bets online, had lost, and had sent the checks to the person listed (SCHOTTENSTEIN) based on direction from an unknown person that had called PUIG in association to the loss and resulting payment. PUIG insisted that it was a phone call with this person who directed him (PUIG) to whom to send the checks and stated that he (PUIG) never used text messages to communicate with this unknown person.

At this time during the interview, PUIG indicated that KADOKAWA had texted PUIG, and as PUIG read through the text messages that were present on his (PUIG) phone, PUIG had information pertaining to a basketball bet for $40,000. PUIG asked KADOKAWA to place the bet for him (PUIG) while KADOKAWA was in Las Vegas NV on May 8, 2019. PUIG recalled that when the bet was placed, KADOKAWA asked PUIG what time the game started, and then KADOKAWA stated that he would place the bet. Upon losing this bet, PUIG recalled that he (PUIG) sent the money to KADOKAWA. While he (KADOKAWA) was in VEGAS, PUIG said KADOKAWA told him (PUIG) that he (PUIG) should bet on some more games. While he (PUIG) was reviewing his texts with his attorney present, PUIG stated that he (PUIG) did not see any information about betting on a website. PUIG insisted that he (PUIG) did not remember having any conversations with KADOKAWA about betting on websites. PUIG also stated that he did not recall if the checks to SCHOTTENSTEIN were associated to KADOKAWA.

AUSA Mitchell, then asked PUIG to confirm his (PUIG) cell phone number as ███-5656; to which, PUIG responded that the phone number was his (PUIG) and denied having any other cell phones. When asked if other individuals had access to his (PUIG) phone to send texts and make calls, PUIG indicated that others did and explained that angry women might have used his phone. The question was never fully addressed within the context of the interview.

This interview was terminated at 3:41 PM.

This investigation continues.

Please refer to the following list of exhibits associated to this report that are contained as Media in the ICM electronic case file:

- 100K Puig to Schottenstein used during PUIG interview on Jan 27, 22

- 100K Puig to Schottenstein-2 used during PUIG interview on Jan 27, 22

- IMG_0384 used during PUIG interview on Jan 27, 22

- Puig Interview Final 6-pack used during PUIG interview on Jan 27, 22

- Puig subscriber info used during PUIG interview on Jan 27, 22

| **Current Case Title** | **ROI Number** | **Date Approved** |
|---|---|---|
| Matthew Funke, et. al. | ███████ | 1/31/2022 |

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.





# DEPARTMENT OF HOMELAND SECURITY

## HOMELAND SECURITY INVESTIGATIONS

### REPORT OF INVESTIGATION

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE



- SIS Examples used during PUIG interview on Jan 27, 22

- Welcome to Bet Prestige used during PUIG interview on Jan 27, 22

- Welcome to Sand Island Sports used during PUIG interview on Jan 27, 22

| Current Case Title | ROI Number | Date Approved |
|---|---|---|
| Matthew Funke, et. al. |  | 1/31/2022 |

OFFICIAL USE ONLY | LAW ENFORCEMENT SENSITIVE

This document is loaned to you for official use only and remains the property of the Department of Homeland Security. Any further request for disclosure of this document or information contained herein should be referred to HSI Headquarters together with a copy of the document.

# EXHIBIT 4

## DECLARATION OF JEFF MITCHELL

I, Jeff Mitchell, declare as follows:

1.    I am an Assistant United States Attorney with the United States Attorney's Office for the Central District of California.  I represent the government in this matter.

2.    Since 2017, the Department of Homeland Security – Homeland Security investigations ("HSI"), and the Internal Revenue Service – Criminal Investigations ("IRS-CI") have been investigating an illegal sports gambling business operated by Wayne Nix (the "Nix Gambling Business").

3.    I am currently the lead prosecutor on the Nix Gambling Business investigation, and have overseen this investigation since at least 2019. Through court-authorized wiretaps and search warrants, the government identified a network of thousands of individuals who participated in the Nix Gambling Business in some form, whether as principles, agents, sub-agents, bettors, or agents of bettors.

4.    On February 7, 2020, law enforcement executed search warrants at residences of five targets. The prosecution team subsequently identified two additional targets.  Some of those targets retained attorneys and eventually agreed to proffers with the government.

5.    At the request of the targets' attorneys, the government provided proffer (immunity) letters.  At the beginning of each proffer, I went over the proffer letter which each target. My standard practice includes a discussion of the paragraph that advises the target that they can be prosecuted for providing false statements during the proffer.

6.   In the summer of 2021, the government began interviewing the non-target witnesses. The non-target witnesses included the sub-agents, bettors, and others.  In contrast to the targets, non-targets were typically interviewed by the agents without the AUSAs; however, some of the non-target witnesses retained counsel and also requested proffer letters.  When that occurred, the AUSAs typically attended the interviews in order to review the terms of the proffer letter, which is signed by the AUSA, not the agents.  Two non-target witness refused to talk to the agents even after obtaining counsel. Both of those witnesses were eventually compelled to testify, either by a court order or subpoena, and admonished by an AUSA. Neither of those witnesses were Black.

7.   During the investigation, the government identified two cashier's checks sent directly to a significant client of the Nix Gambling Business ("Individual 13"). These checks had been drawn upon the accounts of the defendant Yasiel Puig Valdes ("defendant").

8.   Defendant PUIG and Individual 13 are both residents of Florida.  The government submitted a collateral request to the local Florida IRS-CI office to interview both.  Individual 13 agreed to be interviewed; however, defendant declined and referred the agents to his attorney.

9.   On October 11, 2022, I was provided the name and phone number of defendant's attorney at the time, Scott Lesowitz.  I subsequently called and spoke to Mr. Lesowitz, and advised him that we wanted to interview defendant.  Mr. Lesowitz indicated that he would speak to his client and call me thereafter; however, I did not receive an answer from Mr. Lesowitz, despite sending several follow-up emails and voicemails.

2

10. I eventually issued a subpoena for defendant to testify before the grand jury on February 16, 2022. Shortly thereafter, Mr. Lesowitz called and advised me that defendant planned to depart the country on February 1, 2022, for the Republic of Korea, where he played professional baseball, and asked that any interview be conducted on a voluntary basis before that date. I ultimately agreed to this request and scheduled an interview by Webex, a remote teleconferencing platform, for January 27, 2022.

11. During these discussions, I informed Mr. Lesowitz that defendant was not a target of our investigation, and that our questions at an interview would be focused on an unlawful sports gambling organization. Mr. Lesowitz advised me that he was a former criminal AUSA from San Diego, and we discussed potential criminal exposure for defendant. As part of these discussions, I told Mr. Lesowitz that it was my understanding that placing personal bets with an unlawful sports gambling business is not a Federal crime under 18 U.S.C. § 1955, but that individual states may have state laws that prohibit betting with unlawful gambling businesses.

12. During these conversations, Mr. Lesowitz represented to me that defendant was unlikely to have any information relevant to the government's investigation, as I had described it to him. Mr. Lesowitz requested a proffer letter to provide defendant with immunity from statements made during an interview, and I agreed. On January 26, 2022, I sent a standard proffer letter to Mr. Lesowitz. I also included a summary of our conversations regarding the scheduled interview, and asked Mr. Lesowitz to correct and errors in that summary. Mr. Lesowitz did not respond identifying any inaccuracies with this summary.

3

13.  Attached as Exhibit E is a true and correct copy of the January 26, 2022, e-mail I sent to Mr. Lesowitz.

14.  During one of my conversations with Mr. Lesowitz, he advised me that even though defendant speaks and understands English, Mr. Lesowitz recommended that we retain a professional Spanish-language interpreter of Cuban descent to avoid any misunderstandings due to the dialect. I agreed, and instructed my assistant to hire an interpreter of Cuban descent from the list of court-certified Spanish language interpreters. The government retained Esther Hermida. Shortly before the interview, I spoke to Ms. Hermida and she confirmed that she was of Cuban descent.

15.  Other than this request for an interpreter of Cuban descent, during these discussions, Mr. Lesowitz did not indicate that defendant had any learning or cognitive disability, or identify any other issue that might affect defendant's comprehension during an interview.

16.  On January 27, 2022, I hosted the Webex interview, which began as scheduled at 1:30 p.m.

17.  Defendant's two defense attorneys and Ms. Hermida joined the interview, and the government was represented by the assigned prosecutors and two special agents ("SAs") assigned to the Nix Gambling Business investigation.

18.  While the Webex conference began on time at 1:30 p.m., defendant was not initially present. Defendant eventually arrived at approximately 2:00 p.m. After he arrived, defendant, both of his attorneys, and the interpreter conferred outside the presence of the government.

4

19.   Defendant's attorneys then requested that the interview not be recorded. I agreed to this request.

20.   I began the interview by reviewing the terms of the proffer letter with defendant, including that any false statements could result in a criminal prosecution. I then asked HSI SA Jason Canty to read the text of § 1001 to defendant, but when SA Canty began, defendant interrupted and said the agent was wasting defendant's time. SA Canty nonetheless finished reading the text of the statute to defendant.

21.   Multiple times during the interview, defendant requested to speak to his attorneys, and the interpreter, outside the presence of the government. I agreed to these requests.

22.   Towards the end of the interview, I requested to speak to Mr. Lesowitz directly, separate from his client or the case agents. I then spoke to Mr. Lesowitz over the telephone and advised him that I believed defendant had made multiple statements during the interview which had been contrary to the evidence obtained during the investigation. Mr. Lesowitz then conferred with his client outside the presence of the government and the interview then resumed, but defendant did not recant any of his prior false statements.

23.   The interview terminated shortly thereafter, and I spoke again to Mr. Lesowitz by telephone, and again advised him that I believed defendant had lied during the interview. I also advised him the government would discuss internally whether to seek an indictment based on this conduct.

24.   Subsequent to defendant's interview, the agents attempted to contact Agent 1.  On or about February 3, 2022, I was contacted by counsel to Agent 1. Agent 1's counsel indicated to me that his client

1  wanted to cooperate with the government, and was prepared to disclose

2  his role in placing bets for defendant with the Nix Gambling

3  Business.  Counsel also advised that Agent 1 was very nervous, but

4  that he expected Agent 1 to identify another potential witness.  A

5  true and correct copy of an email I sent reflecting this disclosure

6  is attached as Exhibit H.

7       25.  The report of Agent 1's interview indicates that Agent 1

8  did not retain his text messages (Mot., Nuño Exh. D), but defendant's

9  motion claims that Agent 1 intentionally deleted his text messages to

10  obstruct the government's investigation.  After reading defendant's

11  motion, the government re-interviewed Agent 1.  Agent 1 stated that

12  he deleted his text messages before learning of the government's

13  investigation. Agent 1 explained that he deleted the messages due to

14  his frustration with defendant not paying his gambling debts to the

15  Nix Gambling Organization.

16       26.  After the first interview, Agent 1 provided consent for the

17  government to obtain his archived iCloud account data to allow

18  investigators to review his old text messages.

19       27.  As described in the Government's Opposition to Defendant's

20  Motion to Compel Discovery, the government interviewed another

21  witness in 2021 who also lied to investigators.  That witness is

22  identified in Exhibit F as Individual 6.  After obtaining a Court

23  Order compelling a witness to testify in the grand jury against

24  Individual 6, and obtaining permission to provide Use Immunity to a

25  second witness, I subsequently advised Individual 6's counsel that he

26  had been elevated to a target.  On August 24, 2022, I conducted a

27  reverse proffer and advised Individual 6 and his counsel that the

28  government intends to seek an indictment charging a violation of 18

U.S.C. § 1001, as well as money laundering offenses.  Exhibit J to this Declaration contains two PowerPoint slides from the reverse proffer which I presented to Individual 6 and his counsel. This investigation remains ongoing.

28.  On October 27, 2022, defense counsel Keri Curtis Axel contacted me by letter requesting pretrial diversion for defendant, raising issues including defendant's purported financial status, cognitive disabilities, and charity work.[1]  While this request discussed defendant's purported limited communication abilities, it did not allege any race-based issues. A true and correct copy of this letter is attached as Exhibit A.

29.  I forwarded defendant's request for diversion to my supervisor, who subsequently met with Ms. Axel to discuss diversion. Ultimately, the USAO declined defendant's request for diversion.

30.  After defendant's request for diversion was declined, on November 17, Ms. Axel contacted me by phone and advised that she now believed that Agent 1 had entrapped her client.  I agreed to provide Ms. Axel with additional discovery and invited her to the USAO to review the discovery on November 22, 2022, to show that neither Agent 1 nor Individual B (as identified in defendant's plea agreement) could have legally or factually entrapped defendant. A true and

---

[1] While the government would not ordinarily put a defendant's request for diversion before the Court, in this case defendant has affirmatively raised these letters in his Motion and suggested that the government's failure to respond to his satisfaction may itself be evidence of selective prosecution. See ECF 59-1 (Axel Decl. ¶ 4-5; Mot. at i.) Accordingly, the government is obligated to provide a complete record of these communications to avoid mischaracterization. The government is requesting sealing of these letters because they detail sensitive or non-public medical information or diagnoses.

correct copy of my responsive correspondence with defense counsel, dated November 19, 2022, is attached as Exhibit B.

31. On November 22, 2022, defense counsel delivered a letter written directly to the U.S. Attorney and Criminal Chief, again requesting diversion, but now asserting that defendant had "a potential entrapment defense" based on purported conduct of Agent 1 and Individual B. Counsel again did not allege any race-based selective prosecution, and instead, stated that defendant had been targeted due to his "celebrity status." A true and correct copy of this letter is attached as Exhibit C.

32. On November 28, 2022, defense counsel sent a "private personal appeal" to the U.S. Attorney again requesting diversion, and for the first time, alleged "selective prosecution issues and the implicit biases of government agents." Counsel also requested that her letter with the allegations of selective prosecution not be shared with the assigned prosecutors and instead "implore[ed] [the US Attorney] to take a meeting, as there are things I can only say privately." A true and correct copy of this letter is attached as Exhibit D. This direct appeal was denied by letter from the Chief of the Criminal Division on December 8, 2022.

33. At defendant's request, beginning in December 2022, the government began producing discovery from the larger Nix Gambling Business investigation, beginning with approximately 54,271 pages of documents that included reports of investigation related to targets from the larger investigation.

34. On January 23, 2023, the government produced an additional 10,000 pages of discovery from the larger investigation.

35.  On February 3, 2023, while the government's productions were ongoing, defense counsel contacted the government by email, stating defendant's intention to bring a motion to dismiss the indictment based on selective prosecution grounds, as well as to seek associated discovery.

36.  On February 7, 2023, the government produced an additional 223,329 pages of discovery from the larger investigation.

37.  On February 8, 2023, the government produced an additional 2,048 pages of discovery from the larger investigation.

38.  On February 10, 2023, I advised defense counsel via email that there was still a significant amount of discovery from the broader Nix Gambling Business investigation that the government was in processing of producing, and described these categories of evidence, including interview reports of several targets and witnesses.  Later that evening, defendant filed the instant motion.

39.  At present, the government has produced just under 300,000 pages of discovery to defendant, as well as recordings and native files, and discovery remains ongoing.  The government expects the discovery production to be complete by mid-March.

40.  Attached as Exhibit F is a chart of all interviews conducted as part of the Nix Gambling Investigation. Attached as Exhibit K is an unredacted chart reflecting the same information, with all interviewees identified by name.

41.  Attached as Exhibit I is a compilation of all reports for the interviews reflected in Exhibit F.

42.  At least four of the witness interviews were recorded with audio and/or video and a report has not yet been created.  I have listened to the audio recordings and learned the following:

9

a.   At the 2:00 minute mark of the interview of Individual 9, the agent read 18 U.S.C. § 1001 to the witness.

b.   At the 8:59 minute mark of the interview of Individual 13, the agent read 18 U.S.C. § 1001 to the witness.

c.   At the 17:15 minute mark of the interview of Individual 26, I advised Individual 26 and his attorney that the witness could be prosecuted for false statements and at the 27:15 minute mark the agent read 18 U.S.C. § 1001 to the witness.

d.   At the 3:00 minute mark of the interview of Individual 27, the agent read 18 U.S.C. § 1001 to the witness.

43.   Some of the identified individuals were interviewed more than once.  Because defendant's motion alleges that the government did not read the § 1001 statute, I have included only reports to substantiate or contradict that claim.

44.   Attached as Exhibit G is a chart of all individuals who have pled guilty in the Nix Gambling Business investigation.  In addition, one corporate defendant has also pled guilty.  See United States v. Celebrity Financial LLC, Case No. 22-cr-81-DMG.

45.   In defendant's motion, he again alleges that the government threatened him with arrest.  The government, however, did not have any conversations with defendant himself.  I did, however, have conversations with counsel, Ms. Axel.  Ms. Axel was concerned about interfering with defendant's baseball season in Korea.  I recall several conversations in which she raised concerns about Korean authorities arresting defendant if the case was made public.  During the first conversation, Ms. Axel indicated that an indictment could result in defendant being arrested in Korea, which would result in an extradition.  At that time, I had not considered a foreign arrest or

10

extradition, and had not contacted anyone from the Department of Justice, Office of International Affairs, which is responsible for extraditions. Even though I had not considered a foreign arrest or extradition at that time, I am generally aware of the process from a prior case in 2009. I also recall conversations in the past with agents from Homeland Security Investigations in which they have advised me that they are required to enter arrest warrants into a central database shortly after they receive a warrant. Based on this knowledge, I confirmed Ms. Axel's concerns that an indictment could result in a foreign arrest and extradition.

46. I am aware that defense attorneys will often request that their clients be permitted to self-surrender at the courthouse before any warrants are submitted. Ms. Axel never requested that defendant be allowed to self-surrender if the government obtained an indictment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on February 22, 2023.

AUSA JEFF MITCHELL

11

EXHIBIT A

[FILED UNDER SEAL]

EXHIBIT B

[FILED UNDER SEAL]

EXHIBIT C

[FILED UNDER SEAL]

EXHIBIT D

[FILED UNDER SEAL]

EXHIBIT E

**Mitchell, Jeff (USACAC) 5**

| | |
|---|---|
| **From:** | Mitchell, Jeff (USACAC) 5 <jmitchell5@usa.doj.gov> |
| **Sent:** | Wednesday, January 26, 2022 12:54 PM |
| **To:** | scott@lawbylg.com |
| **Subject:** | Yasiel Puig |
| **Attachments:** | Proffer Letter_Puig.pdf |

Scott.  As requested, please find attached a proffer letter for your client.

To recap our conversations over the last couple of weeks, we issued a subpoena to Yasiel Puig to have him appear and testify before the grand jury on February 16, 2022.  You indicated that your client intends to depart the United States at the beginning of February to begin his preparation for the Korean baseball season.  A couple of weeks ago we discussed advancing his grand jury appearance, but you were unable to give me an answer on a specific date until this past Monday.  Unfortunately, that did not leave enough time to arrange for a grand jury appearance this week.  You indicated that Mr. Puig is unlikely to have information relevant to our investigation, and requested that we conduct a voluntarily interview instead.  As a courtesy to you and your client, we're willing to participate in the video interview with your client tomorrow.  I will send a Webex invitation separately.

Please let me know if you have any questions or if my summary was not accurate.

Thank you.

**Jeff Mitchell**
**Assistant United States Attorney**
**Major Frauds Section**
U.S. Attorney's Office
312 North Spring St., Los Angeles, CA  90012
Work: 213-894-0698 | jeff.mitchell@usdoj.gov
Cell: 213-393-5765

1

# EXHIBIT F

| Name | Redacted ID | African American | Admonished by AUSA | Admonished by Agent | Date of Interview |
|---|---|---|---|---|---|
| **Target Proffers in the Internet Gambling Investigation (in chronological order)** | | | | | |
| ▓ | Target 1 | | X | | 2/11/2020 |
| ▓ | Target 2 | | X | | 2020 |
| ▓ | Target 3 | | X | | 2020 |
| ▓ | Target 4 | | X | | 2020 |
| ▓ | Target 5 | | X | | 2021 |
| ▓ | Target 6 | | X | | 6/2/2021 |
| **Non-Targets Interviews in the Internet Gambling Investigation (in chronological order)** | | | | | |
| ▓ | Individual 1 | | X | | 9/9/2021 |
| ▓ | *Individual 2[1]* | | | | *9/20/2021* |
| ▓ | *Individual 3[2]* | *X* | | | *9/27/2021* |
| ▓ | Individual 4 | | | X | 10/7/2021 |
| ▓ | Individual 5 | | | X | 10/7/2021 |
| ▓ | Individual 6 | | | X | 10/8/2021 |
| ▓ | Individual 7[3] | X | | X | 10/28/2021 |
| ▓ | Individual 8[4] | X | | X | 11/9/2021 |
| ▓ | Individual 9 | | | X | 1/10/2022 |
| ▓ | Individual 10 | | X | X | 1/13/2022 |
| ▓ | Individual 11 | | X | | 1/14/2022 |
| Yasiel Puig | Individual 12 | X | X | X | 1/27/2022 |
| ▓ | Individual 13 | X | | X | 2/8/2022 |
| ▓ | Individual 14 | | | X | 2/23/2022 |
| ▓ | Individual 15[5] | | | X | 2/22/2022 |
| ▓ | Individual 16 | | | X | 2/28/2022 |
| ▓ | Individual 17 | | | X | 2/28/2022 |
| ▓ | Individual 18[6] | | X | | 3/2/2022 |
| ▓ | Individual 19 | | X | | 5/26/2022 |
| ▓ | Individual 20 | | X | | 6/6/2022 |
| ▓ | Individual 21 | | | X | 7/1/2022 |
| ▓ | Individual 22 | | | X | 7/12/2022 |
| ▓ | Individual 23 | | | X | 7/27/2022 |
| ▓ | Individual 24 | | X | X | 7/28/2022 |
| ▓ | Individual 25 | | X | X | 8/2/2022 |
| ▓ | Individual 26 | | X | X | 10/21/2022 |
| ▓ | Individual 27 | | X | X | 11/15/2022 |

[1] Interview was conducted by a different field office pursuant to an agency collateral request.
[2] Interview was conducted by a different field office pursuant to an agency collateral request.
[3] Individual 7 is referred to as the prominent Black athlete in defendant's motion to compel.
[4] Individual 8 is referred to as the prominent Black manager in defendant's motion to compel.
[5] Individual 15 is referred to as Player R in defendant's motion to compel.
[6] Individual 18 is referred to as Agent 1 in the indictment.

EXHIBIT G

| Defendant | Offense(s) Pled | Base Offense Level[1] |
|---|---|---|
| Wayne Nix | 18 U.S.C. § 371;<br>26 U.S.C. § 7201(1) | 22 |
| Edon Kagasoff | 18 U.S.C. § 371 | 12 |
| Matthew Funke | 18 U.S.C. § 1955;<br>31 U.S.C. §§ 5363, 5366 | 12 |
| Howard Miller | 18 U.S.C. §§ 1955 | 10 |
| ██████████ | 18 U.S.C. § 1955;<br>18 U.S.C. § 1957;<br>26 U.S.C. § 7201(1);<br>31 U.S.C. §§ 5363, 5366 | 24 |
| ███████ | 18 U.S.C. §§ 1955 | 12 |
| Erik Hiljus | 26 U.S.C. § 7206(1) | 16 |
| ██████████ | 26 U.S.C. § 7206(1) | 16 |
| Yasiel Puig | 18 U.S.C. § 1001 | 6 |

---

[1] Where a defendant pled to multiple counts, this column reflects the highest base offense level prior to any grouping pursuant to U.S.S.G. § 3D1.1.

[2] This matter is currently under seal.

EXHIBIT H

[FILED UNDER SEAL]

EXHIBIT I

[FILED UNDER SEAL]

EXHIBIT J

[FILED UNDER SEAL]

EXHIBIT K

[FILED UNDER SEAL]