Keri Curtis Axel (Bar No. 186847)
  kaxel@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
Viviana Andazola Marquez (Bar No. 354307)
  vandazolamarquez@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Brian Klein (Bar No. 258486)
  bklein@cooley.com
Chip Harrison (Bar No. 313028)
  charrison@cooley.com
COOLEY
355 S. Grand Avenue
Suite 900
Los Angeles, CA 90071-1560
Telephone: (213) 561-3250
Facsimile: (213) 561-3244

*Attorneys for Defendant*
*Yasiel Puig Valdes*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YASIEL PUIG VALDES,<br><br>Defendant. | Case No. CR 22-394-DMG<br><br>**DEFENDANT YASIEL PUIG'S RESPONSE TO NON-PARTY HORWITS' FILING ON ORDER TO SHOW CAUSE RE CONTEMPT** |

YASIEL PUIG'S RESPONSE TO HORWITS' FILING ON ORDER TO SHOW CAUSE RE CONTEMPT

## I. INTRODUCTION

Daniel Horwits and Horwits alone is responsible for the pending Order to Show Cause ("OSC") re Contempt. Defendant Yasiel Puig issued two narrowly tailored subpoenas to Horwits and his business, Beverly Hills Sports Council ("BHSC") seeking brief testimony and a very limited set of text messages between Horwits and Puig. The text messages between Puig and his former agent were relevant to Puig's defense, bearing on the falsity and willfulness of the alleged statements Puig made. Seeking to limit any burden on Horwits, defense counsel asked Horwits, through counsel, to accept service of the subpoena nearly two weeks prior to trial. Horwits refused to accept service and, as CEO of BHSC, was responsible for BHSC's failure to comply with California law regarding updating its filings with the Secretary of State and designating a registered agent to accept service.

Horwits' own conduct therefore culminated in a motion for substitute service, the properly issued subpoenas requiring him to appear at 8:30 am on February 3, and the Court's OSC set for 8:30 am on February 4. Ultimately, it was Horwits who decided to evade service for two weeks before trial, Horwits who decided not to get on a plane to appear to testify on February 3 as required, and Horwits who decided not to get on a plane and appear at his OSC on February 4 at 8:30 am as ordered by this Court. Those facts are clear and indisputable, and prejudiced Mr. Puig. As a result of his actions, Horwits should be forced to pay his own fees and costs related to the subpoenas and OSC, plus any sanction set by the Court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Horwits' and BHSC Possess Information Relevant to the Nix Investigation and the Charges Against Puig

Daniel Horwits, through his company, BHSC, is Puig's former sports agent. After Puig was charged in this case, Puig met with government officials in Korea

and provided the government agents with information about Puig's betting with other organizations. (*See* Declaration of Keri Curtis Axel ("KCA Decl.") ¶ 2.) One of those gambling organizations was Tradewinds, which was not part of the Nix Gambling organization network. (*Id.* ¶ 4.) As part of Puig's meeting with government officials related to Horwits, Puig provided government agents with access to his phone, and the agents took video of Puig's cellphone text conversations with Horwits. (*Id.* ¶ 2.) Those videos were later distilled into screenshots and produced by the government back to Puig as part of discovery in this action. (*Id.* ¶ 2.) The government further obtained certified translations of those text messages between Puig and Horwits, to which the parties stipulated to for accuracy for purposes of trial. (*Id.* ¶ 3.) As relevant to the trial, several of those text messages pertained to Tradewinds, another website Puig placed bets on during 2019. (*Id.* ¶¶ 4, 10.) The text messages also showed Puig incurring sizeable debts to Tradewinds, in comparable size and timing to the debts owed to the Nix organization. (*Id.* ¶ 4.)

As the government began investigating Puig, the government interviewed and obtained information from a number of individuals and entities related to Puig. As part of that investigation, the government interviewed Horwits. (KCA Decl. ¶ 5.) Moreover, Horwits and BHCS produced thousands of pages of documents to the government. (*Id.* ¶ 6.) In particular, on or around September 28, 2022, BHSC produced documents pursuant to a Federal Evidence Rule 803(6) custodian of records declaration from Margaret Lee, who certified that the records concurrently produced were business records of BHSC. (*Id.* ¶ 6, Ex. A.) Those business records included text messages between Puig and Horwits that came from Horwits' phone. (*Id.*) The text messages between Puig and Horwits that were produced by BHSC were less fulsome than the text messages provided to the government by Puig, in that they covered only a limited time period.

B.  **Horwits Evades Service of Subpoenas**

As part of the defense's trial preparation, and if the government did not seek to put the messages in evidence (as Mr. Mitchell said that he would), defense counsel intended to subpoena Horwits and BHSC to introduce the 2019 text messages between Horwits and Puig showing Puig's use of other websites and accumulation of other comparable debts during this time period. On Thursday, January 8, 2026, Puig through counsel reached out to Mr. Horwits' counsel, Ben Levine, to see if he would accept service of a subpoena for Mr. Horwits in advance of the January 20 trial. (*See* KCA Decl. ¶¶ 5, 7.) Later that day, Mr. Levine responded that Horwits' father had passed away two days' before, and asked that we try again on Monday or Tuesday of the following week. (*Id.* ¶ 7.) On January 12, defense counsel followed up by email requesting available times to speak. (*Id.* ¶ 8.) Mr. Levine responded that we could speak Tuesday. (*Id.*) After requesting a time but not hearing back, on Wednesday, January 14, the defense followed up again by email, explaining that trial was beginning the following Tuesday and again asking whether Mr. Levine was authorized to accept service of a subpoena to Horwits. (*Id.* ¶ 9.) Mr. Levine agreed to schedule a call. (*Id.*)

On January 15, defense counsel spoke with Mr. Levine via Zoom and Mr. Levine indicated that he was not authorized to accept service at that time. (KCA Decl. ¶ 10.) Regarding the nature of the testimony, defense counsel explained that there were various text messages between Puig and Horwits that were relevant to Puig's defense regarding gambling on other websites, particularly Tradewinds, and wished to get them into evidence. (*Id.*) Defense counsel also iterated that if Horwits did not agree to accept service, the defense would be forced to serve him and could do so given that Horwits purportedly worked in Beverly Hills. (*Id.* ¶ 11.) Mr. Levine, responded by stating "are you sure about that?" and suggested Horwits lived out of state. (*Id.*) On January 17, 2025, defense counsel emailed Levine again and

3
YASIEL PUIG'S RESPONSE TO HORWITS' FILING ON ORDER TO SHOW CAUSE RE CONTEMPT

offered to share the text messages via screenshare so Levine could see the messages in question. (*Id.* ¶¶ 11-12.) The defense did not receive a response. (*Id.* ¶ 12.)

In the meantime, given that Horwits clearly did not intend to cooperate voluntarily, the defense began service attempts on BHSC to get the text messages from the company since BHSC had already produced to the government some of the same text chain between Puig and Horwits as business records. (KCA Decl. ¶ 13.) The defense learned that BHSC was out of compliance with its corporate filing obligations with the Secretary of State ("SoS"), having not filed a statement of information since 2018. (*Id.* ¶ 14.) The address listed on the last SoS filing was vacant and for rent and thus the defense tried to serve an address listed on BHSC's website; it was a common office space, the receptionist not authorized to accept service, and she reported that BHSC was a virtual client that was never in office. (*Id.* ¶ 15.) Due to lack of a response, the defense attempted to locate and serve Mr. Horwits, personally. (*Id.* ¶ 16.) Using the services of a private investigator, the defense learned Horwits resided in Texas. On January 21, service was attempted at his home in Texas with no answer. On January 23, another attempt was made; Horwits' son answered and told the process server that Horwits was not home. (*Id.*)

Also on January 21, the defense tried to serve BHSC's custodian Margaret Lee at an El Segundo address provided by the investigator that turned out to be a mailbox and could not be served. (KCA Decl. ¶ 17.) Then, on four successive days, January 22, 23, 24, and 25, a process server tried again at a residential address we found on Westlaw, and which a former colleague understood was Ms. Lee's home. (*Id.*) Mr. Puig was charged for each of these attempts by the service provider, but the attempts were unsuccessful. (*Id.*) On January 21 and 22, the defense also diligently tried to serve another BHSC employee in Del Mar, California, Alinna Elysia, as a potential custodian; both attempts were unsuccessful. (*Id.* ¶ 18.)

On January 25, defense counsel again followed up with attorney Levine and notified him that BHSC was not in compliance with California law regarding its

corporate filings, that we had nevertheless had tried to serve it a number of times, and that if he could not accept a subpoena on behalf of BHSC and Horwits, the defense would move the Court for an order for substitute service. (KCA Decl. ¶ 19.) The defense notified Mr. Levine that it would move for substitute service absent a response by 1:00 p.m. ET on January 26. (*Id.*) No response was received. (*Id.*)

### C. The Court Allows Alternative Service on Horwits and BHSC

On the evening of January 26, 2026, Puig filed a motion to serve Horwits and BHSC via substitute or alternative service. (*See* KCA Decl. ¶ 20.) A copy of the motion was sent to Mr. Levine the morning of January 27. (*Id.*) On January 29, the Court issued an order indicating it was inclined to grant the motion but seeking further evidence from defense counsel to ensure the subpoenas would be received by Horwits and BHSC if served via electronic means. (*See* Dkt. 349; KCA Decl. ¶ 21.) On January 30, Puig filed a further declaration in support of alternative service. (*See* Dkt. 355; KCA Decl. ¶ 22.) That same day, the Court granted Puig's motion to serve Horwits via alternative (email) service. (*Id.* ¶ 22.) The written order was issued on January 30, but filed on the docket on February 3. (Dkt. 361.)

On January 31, 2026, defense counsel served Horwits with subpoenas for his personal appearance and that of BHSC via email pursuant to court order. (KCA Decl. ¶ 23.) The subpoenas compelled Horwits and BHSC to appear in court at 8:30 a.m. on Tuesday, February 3, 2026. (*See* Dkt. 379; KCA Decl. ¶ 23.)

### D. Horwits Openly Disregards the Subpoenas and the Court's Order to Show Cause

On Sunday, February 1, the defense reached out again to Mr. Levine, indicating that Horwits had now been served pursuant to the Court's order and that Horwits was due "*in court in Los Angeles with the subpoenaed documents in hand by Tuesday*" and asked if he would like to speak. (KCA Decl. ¶ 24, Ex. B.) Having received the subpoenas a day earlier, Horwits should already have made plans to be in Court as ordered, with the subpoenaed documents. However, the defense did not

hear back from Mr. Levine until the afternoon of Monday, February 2, 2026. (KCA Decl. ¶ 25.) Counsel understood from the conversation that Horwits did not intend to be in court as ordered on February 3. (*Id.*) The defense indicated its openness to a stipulation in lieu of testimony, if the government would agree to it and the Court would accept it, but could make no guarantees on either. (*Id.*) The defense never told Mr. Levine or anyone that any negotiations toward a potential declaration or stipulation excused Mr. Horwits' need to get on a plane to comply with the subpoena. In fact, the defense told Mr. Levine (at 9:47 am on February 3), "Mr. Horwits should plan to get on a plane. In the short term, you should send Margaret [Lee] down to be the BHSC records custodian." (*See* KCA Decl. ¶ 26, Ex. B.)

Horwits did not appear on the morning of February 3, 2026 as ordered. On or about 10:30 am, Mr. Levine added Ms. Garofalo to the chain, indicating she was acting as California counsel. (KCA Decl. ¶ 27, Ex. B.) The defense in good faith continued to pursue a potential declaration which might mitigate potential contempt, but never suggested that Horwits was excused from following the Court's order and getting on a plane to appear before the Court as ordered. (*Id.* ¶ 27.) Nevertheless, when counsel spoke with Ms. Garofalo at lunch on February 3, Ms. Garofalo stated Horwits was not planning to travel February 3; and indicated that the earliest Horwits would show up in Los Angeles, if they did not decide to move to quash the subpoena instead, was the following day (February 4), mid-late morning. (*Id.* ¶ 28.) This is despite the fact that there are many daily flights between Dallas and Los Angeles. (*Id.*, Ex. C.)

At 1:17 p.m., defense counsel informed Ms. Garofalo that the Court was issuing an order that Horwits be there at 8:30 a.m. in the morning for an order to show cause why he should not be held in contempt. (KCA Decl. ¶ 29, Ex. B.) The Court's order was emailed to Mr. Horwits and his counsel shortly after. (*Id.* ¶ 29.) Given that Horwits did not appear on February 3, indicated he had no intention of being in Court at 8:30 am on February 4, and that counsel conveyed that Horwits

might simply move to quash the subpoena or oppose the OSC rather than appearing at all, defense counsel made every effort to try to obtain the relevant evidence. (*Id.*)

Accordingly, after Horwits' counsel provided a signed declaration, the defense attempted to use that to get the text messages into evidence. Ms. Garofalo indicated that she intended to file a response to the OSC by 8:30 am unless she was informed it was unnecessary. (*See* KCA Decl. ¶ 30, Ex. D.) In other words, she understood the Court's order stood regardless of the declaration she provided unless it was accepted. After the Court denied admission of the declaration, in the evening of February 3, 2026, I emailed Ms. Garofalo the Court's instruction on the record that "There will be serious consequences if he doesn't appear." "The Court will be displeased by his failure to appear, and he will be held in contempt." (*Id.*) The evening of February 3, 2026, defense counsel spoke again with Ms. Garofalo and understood that Horwits was planning to fly to Los Angeles on the morning of February 4, but would not arrive until mid-late morning, perhaps around 11 am. (*Id.* ¶ 31.) Defense counsel continued to suggest that a different custodian be provided for BHSC at 8:30 am, which might permit the text messages to be entered through the custodian, and could possible mitigate contempt, at least as to BHSC. (*Id.*) Defense counsel made no guarantee of either. (*Id., id.* ¶ 32.)

On February 4, 2026, Horwits failed to appear at 8:30 a.m. Ms. Garofalo provided to counsel Horwits' version of some of the text messages that Mr. Puig had provided the government. (KCA Decl. ¶ 33.) A custodian of BHSC was present and available to authenticate and introduce these messages, as it had authenticated them in producing them to the government. The Court denied the request to enter the messages into evidence via the BHSC custodian. (*Id.*)[1]

---

[1] Although the content of the Horwits' messages was the same as the messages previously produced by Mr. Puig: the screenshots were from a different phone and cut differently, so that each screen cut off the messages at a different point than Puig's screenshots. (KCA Decl. ¶ 34.) Government counsel told defense counsel

III. ARGUMENT

    A.    The Subpoenas to Horwits and Beverly Hills Sports Counsel Were Relevant and Proper

As an initial matter, the trial subpoenas served by Puig were narrow, relevant, and proper. In this trial for false statements, the government was required to prove that Puig's purportedly false statements were made knowingly and willfully. That is, that Puig acted deliberately with knowledge the statements were untrue and his conduct was unlawful. (*See* Ninth Circuit Model Criminal Jury Instructions § 24.10.) In particular, the government argued that Puig should have remembered that he was gambling with the Wayne Nix organization and through Donny Kadokawa in 2019, rather than through other organizations, and should have provided that information to the government. Puig's former agent, Horwits, however, had relevant communications regarding Puig's 2019 gambling on websites that were not part of the Nix Gambling organization network. (KCA Decl. ¶ 4) Indeed, several of those text messages pertained to Tradewinds, another website Puig placed bets on during 2019, and the messages showed Puig incurring sizeable debts to Tradewinds, in comparable size and timing to the debts owed to the Nix organization in the summer of 2019. (*Id.*) Such evidence is directly relevant to the claims and defenses, falsity, and willfulness of Puig's alleged statements.

Moreover, Horwits' contention that the subpoenas were a "fishing expedition" is wholly erroneous. The subpoenas were narrowly tailored, seeking only text communications between Puig and Horwits, from a specific phone number, from February 1, 2019 to September 1, 2019. (*See* Dkt. 379.) To that end, neither the timing of the subpoena, nor the scope, was oppressive. Horwits was aware of the subpoenas nearly two weeks before trial and instructed his attorney to

---

that, under such circumstances, they could not match up the translations to the screenshots and the screenshots were inadmissible without such translations. (*Id.*)

8

YASIEL PUIG'S RESPONSE TO HORWITS' FILING ON ORDER TO SHOW CAUSE RE CONTEMPT

1  refuse to accept service. Moreover, BHSC could not be served because they did not
2  file the requisite information statements with the California SoS. Any
3  characterization of untimely, overbroad, or oppressive subpoenas is simply belied by
4  the record.

5  **B.  Horwits Willfully Acted in Contempt of the Court's Substitute**
6  **Service Order and the Order to Show Cause**

7  As discussed at length above, Horwits evaded service, and then ignored the
8  defense emails/text messages serving him once the Court permitted substituted
9  service. Among other things, Horwits instructed his counsel not to accept service,
10 failed to maintain accurate and current information on the California SoS website
11 for service on his entity, and evaded personal service at his home. (*See* KCA Decl.
12 ¶¶ 7-25.) Thus, the defense was forced to file a motion for substitute service which
13 was granted by the Court on January 30. (Dkt. 361.) Horwits and BHSC were
14 promptly served on January 31 – requiring him to appear on February 3. Thus, in
15 addition to knowing about the trial for weeks, Horwits had three days to arrange his
16 airfare and fly to Los Angeles – a city he used to live in and, on information and
17 belief, regularly visits for business. He made an express decision not to do so.

18 Moreover, when defense counsel spoke to Horwits' counsel on February 2
19 and February 3, they indicated he was not going to appear in Court on February 3 to
20 comply with the subpoena, or on February 4 to comply with the OSC, opting to
21 move to quash or oppose an OSC. (*See* KCA Decl. ¶¶ 25-30.) Only at mid-day on
22 February 3 – after he already was in contempt of the court order – did they indicate
23 he would fly out on February 4, but would not arrive until around 11 a.m.; again a
24 unilateral decision to be in clear violation of the subpoena and this Court's order.

25 The argument by Horwits' counsel that defense counsel decided to call a
26 BHSC custodian instead of Horwits and then at 9:00 p.m. on February 3, "reversed
27 course," is unsupported by the facts or the law. First, as noted, at the time this
28 purported reversal happened, the Court had already set an OSC re contempt for

Horwits failure to comply with the subpoena. With respect to the February 4 contempt hearing, Ms. Garofalo had already told counsel on February 3 that Horwits would not be getting on a plane to Los Angeles that day and would not arrive until "mid-morning" on the fourth if they did not move to quash. (*See* KCA Decl. ¶ 27.) Given that Horwits refused simply to get on a plane and comply with the subpoena and OSC in a timely fashion, defense counsel attempted to work with Horwits to try to get the evidence in through a declaration or Ms. Lee as an alternative BHSC custodian. This was done in an effort both to streamline the issues for the defense which could be mutually beneficial to Horwits by perhaps helping him avoid a contempt sanction. However, under no circumstances did the defense suggest that Horwits or a BHSC custodian that they were not required in court as ordered. Nor could it: a federal court order is a federal court order.

Given Horwits' evasion of service and defiance of two court orders, the defense should not be required to pay the attorneys' fees for Horwits' counsel to appear at the OSC re Contempt, even if the defense ultimately decided not to call Horwits as a witness. This is especially so given that Horwits made the decision not to fly to Los Angeles on February 2 to comply with the subpoena, nor on February 3 to appear at the OSC. This necessarily required Horwits' counsel to appear at the February 4 OSC in his stead. This was Horwits' choice, not defendant's.

### C. Puig's Defense Was Prejudiced By Mr. Horwits' and BHSC's Failure to Appear in Court As Ordered on February 3

Finally, the defense was prejudiced by Horwits' and BHSC's evasion of service and failure to appear to testify as required on February 3. Puig was forced to incur numerous fees and costs in an attempt to serve Horwits, including numerous emails and phone calls to Horwits' counsel, hiring a private investigator, making over eight combined attempts at serving Horwits and BHSC, and finally being required to prepare and file a motion for substitute service. As set forth in the Axel declaration, Puig's out-of-pocket costs amount to $2,688.46, which does not include

attorneys fees. (KCA Decl. ¶ 35). These expenses vastly overshadow any expenses Horwits was forced to incur.

Moreover, even after service was successfully completed, Horwits failed to appear on February 3 as required. Had Horwits appeared to testify as required, the defense could have finished its case-in-chief on February 3 with narrow testimony, and prepared for closing arguments with a full record. Instead, the defense was left in the proverbial no-man's land, unsure whether Horwits would appear, whether the requested information would even be received into evidence, or whether to prepare its closing arguments absent that information. Horwits' untimely appearance at 11:00 a.m. on February 4, more than a day after his scheduled testimony and 2.5 hours after his OSC, did not cure the prejudice to defendant, who made the difficult decision to begin closing arguments rather than put up a belated and disgruntled witness, particularly when the relevant text messages might not be admitted at all given the government's translation objections. This prejudice could have been avoided however, had Horwits simply complied with either of the two Court orders he defied.

## IV.  CONCLUSION

Based on the foregoing, Yasiel Puig respectfully requests this Court require Horwits and BHSC pay their own fees and costs related to the trial subpoenas and OSC re contempt.

DATED: March 3, 2026                    WAYMAKER LLP

By:  ___/s/ Keri Curtis Axel___
KERI CURTIS AXEL
*Attorneys for Defendant Yasiel Puig Valdes*