Keri Curtis Axel (Bar No. 186847)
  kaxel@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
  jnuno@waymakerlaw.com
Viviana Andazola Marquez (Bar No. 354307)
  vandazolamarquez@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Brian Klein (Bar No. 258486)
  bklein@cooley.com
Chip Harrison (Bar No. 313028)
  charrison@cooley.com
COOLEY LLP
355 S. Grand Avenue
Suite 900
Los Angeles, CA 90071-1560
Telephone: (213) 561-3250
Facsimile: (213) 561-3244

*Attorneys for Defendant*
*Yasiel Puig Valdes*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>        v.<br><br>YASIEL PUIG VALDES,<br><br>             Defendant. | Case No. CR 22-394-DMG<br><br>**DECLARATION OF KERI CURTIS AXEL IN SUPPORT OF DEFENDANT YASIEL PUIG'S RESPONSE TO NON-PARTY DANIEL HORWITS' FILING ON ORDER TO SHOW CAUSE RE CONTEMPT** |

DECLARATION OF KERI CURTIS AXEL

<u>DECLARATION OF KERI CURTIS AXEL</u>

I, Keri Curtis Axel, declare as follows:

1.      I am an attorney licensed to practice in the State of California.  I am a partner with Waymaker LLP, counsel to Defendant Yasiel Puig Valdes this action.  I make this Declaration in support of Yasiel Puig's Response to Non-Party Daniel Horwits' Filing on Order to Show Cause Re Contempt in the above-captioned matter.  I have personal knowledge of the facts set forth herein and if called as a witness I could and would testify competently thereto.

2.      Prior to trial, we recognized that Daniel Horwits possessed information relevant to the defense of the defendant, my client, Yasiel Puig.  In the summer of 2022, my client voluntarily appeared at the U.S. Embassy in the Republic of Korea and permitted agents from the Department of Homeland Security to extract images of correspondence between Puig and Horwits from on or about February 2019 to August 2022 via a moving video shot by the agent using his phone.  The video taken of Puig's phone was later produced to the defense in discovery, both in video format and in screenshots, and the government, through AUSA Mitchell, indicated that it intended to put some of the screenshots into evidence.

3.      The government also provided a detailed translation of these messages, with a translator's certification.  The parties' stipulated to the translation, thus paving the way for the messages to be admitted in evidence, should they be authenticated in a manner the Court would accept.

4.      These text communications between Horwits and Puig included messages related to Puig's use of the website Tradewinds, which Puig received from Horwits.  Puig placed bets on the Tradewinds website in the summer of 2019. The text messages also showed Puig incurring sizeable debts to Tradewinds, in comparable size and timing to the debts owed to the Nix organization in 2019.

DECLARATION OF KERI CURTIS AXEL

5. From the discovery in this case, we learned that, also in 2022, Daniel Horwits was interviewed by the government, and, at the time, Mr. Horwits was represented by Benjamin Levine of Gordon Rees Scully Mansukhani, LLP.

6. Further, we learned that Beverly Hills Sports Council ("BHSC") provided thousands of pages of various documents to the government. The custodian of records for BHSC was Margaret Lee. Those documents included screenshots of various text messages between Danny Horwits and Puig. These were produced as BHSC records despite apparently having come from Horwits' phone. **Exhibit A** is a true and correct copy of Ms. Lee's declaration and accompanying messages that she produced and authenticated, which will be lodged with the Court under seal since they are designated as under the protective order.

7. On Thursday, January 8, 2026, my associate Viviana Andazola-Marquez reached out to attorney Levine, counsel for Horwits, to ask whether he would accept service of a subpoena from the defense for the upcoming trial. Later that day, Mr. Levine responded that Horwits' father had passed away two days before, and asked that we try again on Monday or Tuesday of the following week.

8. On January 12, Ms. Andazola Marquez followed up by email requesting available times to speak. Mr. Levine responded that we could speak Tuesday. We requested a time but did not receive a response.

9. On Wednesday, January 14, I followed up again by email, explaining that trial was beginning the following Tuesday and again asking whether Mr. Levine was authorized to accept service of a subpoena to Horwits. Mr. Levine agreed to schedule a call.

10. On January 15, Ms. Andazola Marquez and I spoke with Mr. Levine via Zoom. He indicated that he was not authorized to accept service at that time. He indicated that Mr. Horwits would not likely be a positive witness for Mr. Puig, and asked what we wanted him to testify about. I explained that the issue was that there were various text messages between them that were relevant to Puig's defense

DECLARATION OF KERI CURTIS AXEL

regarding gambling on other websites, particularly Tradewinds, and that we wished to get them into evidence. He asked if he could receive and review the text messages. I indicated that we would get back to him on the question.

11. Also on the call, I indicated that, if Horwits did not agree to accept service, we would have no alternative but to serve him. I referenced the fact that it should not be too burdensome given that Horwits worked in Beverly Hills and Mr. Levine, said "are you sure about that?" and then suggested he lived out of state. I said that, regardless whether he remained in Beverly Hills, we would do the necessary work using a private investigator to track Horwits down and serve him.

12. On January 17, 2026, I sent Mr. Levine a follow up email indicating that I was not comfortable sending all the text messages to him by email, but we could schedule a Zoom meeting to share them with him on screen. We never received a response.

13. In the meantime, and given that Horwits clearly did not intend to cooperate voluntarily, we realized that it might be easier to get the text messages from BHSC, since they had already produced to the government, as their own business records, some of the same text chain between Puig and Horwits. We assumed that, as a California corporation, BHSC would have a registered agent for service of process designed with the California Secretary of State, and therefore it would be straightforward to effect service on such registered agent.

14. We learned, however, that this was not the case. In fact, while California law requires corporations to file annually a Statement of Information containing the name and address of a natural person or corporation "residing in the state" for service of process (Cal. Corp. Code Sect. 1502(b)), its filings had been out of date since 2022. Its last substantive filing was in 2018 and listed as its agent Horwits, whom we understood resides out of state, at a business address that was defunct.

DECLARATION OF KERI CURTIS AXEL

15.     We nevertheless made multiple attempts to find and serve an appropriate BHSC custodian of records.  The address listed on the Secretary of State filing was vacant and for rent. On January 16, we then tried the address on BHSC's website; it was a common office space and the receptionist was not authorized to accept service. We were told BHSC is a virtual client and never in the office.

16.     At the same time, we made substantial efforts to find and personally serve Horwits.  Using the services of a private investigator, we learned he resided in Texas. On January 21, service was attempted at his home in Texas with no answer. On January 23, another attempt was made; Horwits' son answered and told the process server that Horwits was not home.

17.     Also on January 21, we attempted to serve BHSC custodian Margaret Lee at an El Segundo address provided by the investigator that turned out to be a mailbox and could not be served. Then, on four successive days, January 22, 23, 24, and 25, a process server tried again at a residential address we found on Westlaw, which a former colleague also confirmed was (or had been) Ms. Lee's home.  Mr. Puig was charged for each of these attempts by the service provider, but the attempts were unsuccessful.

18.     On January 21 and 22, we also tried to serve another BHSC employee in Del Mar, Alinna Elysia, as a potential custodian; both attempts were unsuccessful.

19.     On January 25, I again followed up with attorney Levine.  I notified him that BHSC was not in compliance with California law regarding its corporate filings and designation of service of process and that we had nevertheless had tried to serve it a number of times, but, if he could not accept a subpoena on behalf of BHSC, we would move the Court for an order for substitute service.  I asked again if he was authorized to accept service for Horwits, and also asked whether he could accept service for BHSC.  I notified him that we would move for substitute service absent a response by 1:00 p.m. ET on January 26. We received no response.

4

DECLARATION OF KERI CURTIS AXEL

20.     On January 26, in the late evening, we filed a motion for substitute service on Horwits and BHSC.  On the morning of January 27, we sent the motion to Levine.  Again, we received no response.

21.     Three days later, on January 29, the court issued an order requesting a further declaration to ensure subpoenas would be received if served via electronic means.

22.     On January 30, 2026, the defense filed a further declaration in support of alternative service. That same day, the court orally granted the motion for substitute service.

23.     On January 31, 2026, pursuant to the court order, Mr. Nuño served Horwits with the two subpoenas, compelling his attendance in Court on February 3, 2026. We received no response.

24.     On Sunday, February 1, I reached out again to Mr. Levine, indicating that Horwits had now been served pursuant to the Court's order and that Horwits was due "*in court in Los Angeles with the subpoenaed documents in hand by Tuesday*" and asked if he would like to speak.  Attached hereto is as **Exhibit B** is a true and correct copy of an email chain showing this email sent as of 3:44 on February 1.  By that time, having received the subpoenas a day earlier, Horwits should already have made plans to be in Court as ordered, with the subpoenaed documents.

25.     But I did not hear back from Mr. Levine until the afternoon of Monday, February 2, 2026, although his client was supposed to be present in Court on Tuesday morning.  Mr. Levine again reiterated Mr. Horwits would not be a good witness for Puig, and we again discussed the text messages that he was required to produce that wished to admit.  Despite the Court's order, it was clear that Horwits had no intention of being in Court as ordered on February 3, and might simply move to quash the subpoena.  Against that backdrop, and without excusing or condoning his decision to defy Court's order to appear, I indicated that we were open to

5

DECLARATION OF KERI CURTIS AXEL

negotiating a stipulation for his testimony, if the government would agree to it and the Court would accept it, but I could guarantee neither.

26.     I never told Mr. Levine or anyone that any negotiations toward a potential declaration or stipulation excused Mr. Horwits' need to get on a plane to comply with the subpoena.  At the same time that I was attempting to draft a declaration to cover Mr. Horwits' proposed testimony, I told Mr. Levine (at 9:47 am on February 3), "Mr. Horwits should plan to get on a plane.  In the short term, you should send Margaret [Lee] down to be the BHSC records custodian." (*See* Exhibit B.)

27.     As the Court knows, Horwits did not appear on the morning of February 3, 2026 as ordered.  On or about 10:30 am, Mr. Levine added Ms. Garofalo to the chain, indicating she was acting as California counsel.  I continued to pursue a potential declaration, and said I would try to get that declaration in evidence, should he sign it, which might mitigate a potential contempt sanction against him for his willful noncompliance, but I never suggested that Horwits was excused from following the Court's order and getting on a plane to appear before the Court as ordered.

28.     Nevertheless, Horwits continued to refuse to cooperate.  When I spoke to Ms. Garofalo at lunch on February 3, she said Horwits was not planning to travel February 3 at all; she indicated that the earliest he would show up in Los Angeles, if they did not decide to move to quash the subpoena instead, was the following day (February 4), mid-late morning.  This is despite the fact that there are many daily flights between Dallas and Los Angeles.  Attached as **Exhibit C** are true and correct screenshots I pulled from the web showing a sample of daily flights between Dallas and Los Angeles.

29.     At 1:17 pm on February 3, I informed Ms. Garofalo that the Court had ordered Horwits be there at 8:30 am on February 4 for an order to show cause why he should not be held in contempt. (Mr. Nuño later emailed Horwits and his counsel

DECLARATION OF KERI CURTIS AXEL

the Court's written order, after it issued.)  Again, I never excused Mr. Horwits from traveling to Los Angeles; nor could I given that the Court had issued written orders. However, after openly defying the  Court's order to appear on February 3, I had been expressly told by his counsel that Horwits had no intention of being there at 8:30 am on February 4.  I was further told that he might just file something to oppose the OSC rather than appearing at all.  I was therefore acting in what I believed to be my client's interest by making every effort to try to obtain the relevant evidence:  If I could appeal to Horwits' counsel's desire to avoid her client receiving a contempt sanction by working together, that seemed to me the prudent course of action.

30.    Accordingly, in the afternoon, Ms. Garofalo emailed me the signed declaration, which I said we would make every effort to get into evidence, and members of the defense team did so.  Ms. Garofalo's email further indicated that she intended to file a response to the OSC by 8:30 am unless she was informed it was unnecessary.  (*See* **Exhibit D** a true and correct copy of a February 3, 2026 email, reflecting a 4:43 pm email from Ms. Garofalo.)  After the Court denied admission of the declaration, in the evening of February 3, 2026, I emailed Ms. Garofalo the Court's instruction on the record that "There will be serious consequences if he doesn't appear."  "The Court will be displeased by his failure to appear, and he will be held in contempt."  (*Id.* at 5:49 pm)

31.    After the Court denied admission of the declaration, in the evening of February 3, 2026, I emailed Ms. Garofalo the Court's clear instruction and spoke again with Ms. Garofalo. At this point, from our communications, I understood that Horwits was planning to fly to Los Angeles on the morning of February 4, but would not arrive until mid-late morning, perhaps around 11 am.  I continued to suggest that a different custodian be provided for BHSC at 8:30 am, and that such custodian provide the text messages, as it had in the production to the government.  This could potentially facilitate the text messages being entered in evidence through

DECLARATION OF KERI CURTIS AXEL

the custodian, and potentially could mitigate contempt, at least as to BHSC. But I made no guarantee of either.

32.    Contrary to the suggestion that the defense "reversed course," again I simply tried to problem-solve an option to facilitate the orderly and timely admission of the messages, which equally appealed to Horwits' counsel, who sought did not want her clients to be held in contempt.  Our joint efforts were made despite the fact that Horwits was already in contempt in that he had willfully chosen not to appear with the messages on February 3, and that he was continuing to choose to defy the Court's order, in that he had no intention of appearing at 8:30 am with the subpoenaed messages.  Neither I nor Horwits' counsel of course was in any position to tell anyone that they did not need to comply with this Court's written orders, and I did not do so.

33.    On February 4, 2026, Horwits failed to appear at 8:30 a.m.  For the first time, and in court, Horwits' counsel provided to defense counsel Horwits' version of some of the same text messages that Mr. Puig had provided the government, that Puig sought to get into evidence.  A custodian of BHSC was present and available to authenticate and introduce these messages, as it had authenticated them in producing them to the government.  The Court denied the request to enter the messages into evidence via the BHSC custodian.

34.    Further, although the content of the Horwits' messages was the same as the messages previously produced by Mr. Puig, the screenshots were from a different phone (Horwits' phone) and cut differently, so that each screen cut off the messages at a different point than Puig's screenshots.  The government's counsel told defense counsel that, under such circumstances, they could not match up the translations they had provided to the screenshots and, thus, the government's view was that Horwits' screenshots were inadmissible.

35.    Mr. Puig incurred $2,688.46 in costs due to the attempts to serve Horwits.  This includes $2,128.46 to FirstLegal for service of process, and $560 to

8

DECLARATION OF KERI CURTIS AXEL

an investigator to try to find Horwits. This number does not of course include the substantial amount of defense attorney time expended in these efforts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 3rd day of March 2026 at Los Angeles, California.

Keri Curtis Axel

DECLARATION OF KERI CURTIS AXEL