TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
MICHAEL J. MORSE (Cal. Bar No. 291763)
LAURA A. ALEXANDER (Cal. Bar No. 313212)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0304/7367/1019
     Facsimile: (213) 894-0141
     Email:    juan.rodriguez@usdoj.gov
               michael.morse@usdoj.gov
               laura.alexander@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>YASIEL PUIG VALDES,<br><br>        Defendant. | No. CR 22-00394-DMG<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S RENEWED RULE 29 MOTION |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorneys Juan M. Rodriguez, Michael J. Morse, and Laura A. Alexander, hereby files its Opposition to defendant YASIEL PUIG VALDES's ("defendant") Renewed Motion for Judgment of Acquittal on Counts One and Two pursuant to Federal Rule of Criminal Procedure 29.

This Opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.


Dated: March 25, 2026                    Respectfully submitted,

                                         TODD BLANCHE
                                         Deputy Attorney General

                                         BILAL A. ESSAYLI
                                         First Assistant United States
                                         Attorney

                                         ALEXANDER B. SCHWAB
                                         Assistant United States Attorney
                                         Acting Chief, Criminal Division


                                         _____/s/_____
                                         JUAN M. RODRIGUEZ
                                         MICHAEL J. MORSE
                                         LAURA A. ALEXANDER
                                         Assistant United States Attorneys

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................1

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   LEGAL STANDARD.................................................1

III.  ARGUMENT.......................................................3

     A.    The Government Presented Sufficient Evidence to Support Each Element of Obstruction of Justice (18 U.S.C. § 1503)...........................................4

        1.    The Government Presented Sufficient Evidence of a Pending Grand Jury Investigation....................5

        2.    The Government Presented Sufficient Evidence that Defendant Knew His Actions were Likely to Affect a Pending Grand Jury Proceeding....................14

        3.    The Government Presented Sufficient Evidence Demonstrating That Defendant's False Statements and Omissions Were Material.........................24

     B.    The Government Presented Sufficient Evidence to Support Each Element of False Statements (18 U.S.C. § 1001(a)(2)).............................................31

        1.    The Government Presented Sufficient Evidence that Defendant's Statement That He Never Discussed Sports Betting With Donny Kadokawa Was False........32

        2.    The Government Presented Sufficient Evidence that Defendant's False Statement That He Did Not Know Who Instructed Him to Send the Schottenstein Was False As Opposed to Misleading.......................37

        3.    The Government Presented Sufficient Evidence that Defendant Acted with the Requisite Intent...........41

        4.    The Government Presented Sufficient Evidence that Defendant's False Statements Were Material..........45

        5.    Even If Investigators Subjectively Believed Defendant Was Lying At Times, His Lies Were Nevertheless Material................................46

IV.   CONCLUSION.....................................................54

i

**TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

Brogan v. United States,
  522 U.S. 398 (1998) ......................................24, 45, 47

Jackson v. Virginia,
  443 U.S. 307 (1979) ............................................. 2

United States v. Aguilar,
  515 U.S. 593 (1995) ......................................... 5, 6, 17

United States v. Alarcon-Simi,
  300 F.3d 1172 (9th Cir. 2002) ................................ 3, 33

United States v. Bedoy,
  827 F.3d 495 (5th Cir. 2016) ................................. 6, 21

United States v. Boone,
  951 F.2d 1526 (9th Cir. 1991) ................................... 24

United States v. Corona-Verbera,
  509 F.3d 1105 (9th Cir. 2007) ................................... 2

United States v. Dwyer,
  238 F. App'x 631 (1st Cir. 2007) ............................ passim

United States v. Fassnacht,
  332 F.3d 440 (7th Cir. 2003) ............................. 16, 17, 18

United States v. Fortenberry,
  89 F.4th 702 (9th Cir. 2023) ................................... 41

United States v. Gaudin,
  515 U.S. 506 (1995) ...................................... 24, 29, 45

United States v. H.B.,
  695 F.3d 931 (9th Cir. 2012) ................................ passim

United States v. Henderson,
  318 F. Supp. 3d 1221 (E.D. Wash. 2018) .......................... 44

United States v. Hinton,
  222 F.3d 664 (9th Cir. 2000) ................................... 2

i

United States v. Hopper,
  177 F.3d 824 (9th. 1999) ......................................... 6

United States v. Jiang,
  476 F.3d 1026 (9th Cir. 2007) ................................ 35, 36

United States v. King,
  735 F.3d 1098 (9th Cir. 2013) ..................................... 47

United States v. Lombera-Valdovinas,
  429 F.3d 927 (9th Cir. 2005) ...................................... 2

United States v. Macari,
  453 F.3d 926 (7th Cir. 2006) ................................. passim

United States v. Mangano,
  No. 16-CR-540 (JMA), 2022 WL 2872670 (E.D.N.Y. July 20, 2022) .... 20

United States v. McComb,
  744 F.2d 555 (7th Cir. 1984) ...................................... 7

United States v. Nevils,
  598 F.3d 1158 (9th Cir. 2010) .................................. 2, 3

United States v. Rocha,
  598 F.3d 1144 (9th Cir. 2010) ..................................... 1

United States v. Rodriguez-Rodriguez,
  840 F.2d 697 (9th Cir. 1988) ..................................... 24

United States v. Rojas,
  554 F.2d 938 (9th Cir. 1977) ...................................... 3

United States v. Ryan,
  455 F.2d 728 (9th Cir. 1972) ...................................... 6

United States v. Salinas-Ceron,
  731 F.2d 1375 (9th Cir. 1984) .................................... 24

United States v. Serv. Deli Inc.,
  151 F.3d 938 (9th Cir. 1998) .................................. 47, 48

United States v. Simmons,
  591 F.2d 206 (3d Cir. 1979) ...................................... 12

United States v. Smith,
  659 F. App'x 908 (9th Cir. 2016) ................................. 24

ii

United States v. Smith,
  831 F.3d 1207 (9th Cir. 2016) ...................................... 7

United States v. Talkington,
  589 F.2d 415 (9th Cir. 1978) ...................................... 48

United States v. Terry,
  911 F.2d 272 (9th Cir. 1990) ....................................... 2

United States v. Thomas,
  612 F.3d 1107 (9th Cir. 2010) ................................. 24, 28

United States v. Vaughn,
  797 F.2d 1485 (9th Cir. 1986) .................................... 24

**Federal Statutes**

18 U.S.C. § 1001(a)(2) ......................................... passim

18 U.S.C. § 1503 .............................................. 4, 12

18 U.S.C. § 1503(a) ................................... 5, 14, 15, 16

**Federal Rules**

Federal Rule of Criminal Procedure 29 .......................... passim

iii

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

After an 11-day trial, a jury found defendant Yasiel Puig Valdes ("defendant") guilty of Obstruction of Justice and False Statements to a Federal Officer.  (Dkt. 403.)  At trial, the evidence established that on January 27, 2022, during an interview with federal agents and prosecutors, defendant lied about his involvement in an illegal sports gambling operation, and withheld material information related to that same operation.  After the government rested, but before the jury's verdict, defendant moved for a judgment of acquittal on Count One (Obstruction of Justice) and Count Two (False Statements to a Federal Officer) of the First Superseding Indictment, under Federal Rule of Criminal Procedure 29, which this Court denied.  (Dkt. 378.)  Now, defendant renews his Rule 29 Motion. Defendant's motion is nothing more than a rehashing of the arguments he made at trial, which the jury rejected, and the arguments he made in his initial Rule 29 motion, which this Court rejected.  For the reasons the Court previously stated on the record when denying defendant's initial Rule 29 Motion, and the reasons described herein, the Court should deny defendant's renewed Rule 29 Motion.

**II.   LEGAL STANDARD**

"The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  <u>United States v. Rocha</u>, 598 F.3d 1144, 1153 (9th Cir. 2010) (explaining that the test to be applied for a Rule 29 motion is the same as for a sufficiency challenge).  "The test is whether the evidence and all reasonable inferences which may be drawn from it, when viewed in the light most

1

favorable to the government, sustain the verdict." United States v. Terry, 911 F.2d 272, 278 (9th Cir. 1990).

Under Rule 29, a court must "review the evidence presented against the defendant in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See United States v. Lombera-Valdovinas, 429 F.3d 927, 920 (9th Cir. 2005) (internal quotation marks omitted and emphasis added); United States v. Hinton, 222 F.3d 664, 669 (9th Cir. 2000) ("There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses charged beyond a reasonable doubt"). Any "[c]onflicting evidence is to be resolved in favor of the jury verdict[.]" See United States v. Corona-Verbera, 509 F.3d 1105, 1117 (9th Cir. 2007). Accordingly, the Court "may not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). The question is only whether "all rational fact finders" would have voted to acquit. Id. at 1165. As such, the Court considers whether the defendant has "pointed to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 1169. A jury's determination should be upset only on those "rare occasions in which a properly instructed jury may convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Id. at 1164 (cleaned up).

In ruling on a Rule 29 motion, the Court "must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977) (internal quotation marks omitted).  "Therefore, in a case involving factual disputes and credibility determinations," the Court "must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  United States v. H.B., 695 F.3d 931, 935 (9th Cir. 2012) (internal quotation marks omitted); see also United States v. Alarcon-Simi, 300 F.3d 1172, 1176 (9th Cir. 2002) ("[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion.").

**III.  ARGUMENT**

Here, when viewing all evidence in the light most favorable to the government, any rational juror could conclude, and in fact 12 jurors did conclude, that defendant obstructed justice and made false statements to a federal officer.  Defendant does not dispute that the jury was properly instructed.  While the parties disputed the weight and credibility of the evidence presented at trial (which naturally occurs in every trial), the resolution of such disputes is the exclusive function of the jury, and the jury resolved those disputes in favor of the government.  Defendant has not "pointed to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt."  Nevils, 598 F.3d at 1169. Accordingly, his motion should be denied.

**A.** **The Government Presented Sufficient Evidence to Support Each Element of Obstruction of Justice (18 U.S.C. § 1503)**

The jury's charge required it to find that defendant: (1) influenced, obstructed, or impeded, or tried to influence, obstruct, or impede a grand jury investigation; and (2) that defendant acted corruptly, meaning that he had knowledge of the grand jury investigation and acted with an intent to obstruct it. The jury was also instructed that a defendant acts with an intent to obstruct a grand jury investigation if his actions have the natural and probable effect of interfering with that proceeding, that the government needed to prove defendant's actions were material, "[t]hat is, they must bear some reasonable relationship to the subject matter of the investigation and not be immaterial to the investigation," and that defendant's intent to obstruct justice must be substantial. Additionally, at defendant's request, this Court deviated from the Ninth Circuit's Model Criminal Jury Instruction 19.1., which applies to 18 U.S.C. § 1503, and instructed the jury that "[a]n investigation conducted by [HSI], the [IRS], or some other governmental agency is not necessarily part of a grand jury investigation. But if you find that the HSI, IRS, or some other governmental agency was effectively acting as an arm of a grand jury investigation, then you should consider the agency investigation as part of a grand jury investigation." (Dkt. 388 at 23-24.)

Defendant now argues, in his renewed Rule 29 Motion, that the government failed to prove: (1) that there was a pending grand jury investigation, (2) that defendant acted corruptly, and (3) that defendant's statements and omissions were material. Defendant made

4

these exact same arguments to the jury through jury addresses, cross-examination, and his affirmative case.  The jury rejected them.  For the reasons outlined below, this Court should similarly reject defendant's meritless arguments.

> 1.    The Government Presented Sufficient Evidence of a Pending Grand Jury Investigation

Defendant seeks to convince this Court, much like it tried to convince the jury, that "[t]here is no evidence that there was a grand jury proceeding[.]"  The jury squarely rejected this argument, just like it rejected defendant's contention that the agents' investigation was an "IRS investigation," and not a grand jury investigation.  (Dkt. 423, Tr. Feb. 4, 2026, at p. 158.)  The evidence presented at trial established that there was an active grand jury investigation, and that Homeland Security Investigations ("HSI") and Internal Revenue Service – Criminal Investigations ("IRS-CI") were running a joint investigation and "acting as an arm of the grand jury[.]" The jury was properly instructed that an investigation conducted by a governmental agency is not _necessarily_ part of a grand jury investigation, but nevertheless convicted defendant –– demonstrating that it was convinced, by the evidence presented, that HSI and IRS-CI were acting as "an arm of the grand jury."

To violate 18 U.S.C. § 1503(a), a defendant must have acted "with an intent to influence . . . grand jury proceedings," not to influence "an investigation independent of the ... grand jury's authority."  United States v. Aguilar, 515 U.S. 593, 599 (1995).  In Aguilar, the defendant was charged with violating § 1503(a) for obstructing a judicial proceeding.  The indictment

alleged that Aguilar had intentionally given false information to federal investigators who were potentially going to be called to testify before a grand jury.  The Supreme Court held that lying to an investigating agent who "might or might not testify before a grand jury" did not constitute obstruction of a federal proceeding.  Id. at 600.  "The Court noted, however, that had the investigators been subpoenaed or summoned by the grand jury, or had there been proof that they were acting as an arm of the grand jury, there would have been enough to support a conviction for obstructing a judicial proceeding."  See United States v. Hopper, 177 F.3d 824, 830 (9th. 1999) (overruled on other grounds)(discussing Aguilar)(emphasis added).

Additionally, the Aguilar court "did not expressly hold that [defendant's] actual knowledge [of a grand jury proceeding] is a necessary element of the nexus requirement."  See United States v. Bedoy, 827 F.3d 495, 505 (5th Cir. 2016) (citing Aguilar, 515 U.S. at 600-602).  Rather, "the [Aguilar] Court held that the nexus requirement only demands that the defendant believe his statements 'are likely to affect the judicial proceeding.'"  Id. (quoting Aguilar, 515 U.S. at 599); see also United States v. Ryan, 455 F.2d 728, 734 (9th Cir. 1972) ("The acts complained of must bear a reasonable relationship to the subject of the grand jury inquiry.").

To prove that an agency acted as an "arm of the grand jury" and not "separate and apart" from it, the government must prove that the agency "undertook the investigation to supply information to the grand jury on this issue in direct support of a grand jury investigation."  United States v. Macari, 453 F.3d 926, 936-937 (7th

6

Cir. 2006); see also United States v. Smith, 831 F.3d 1207, 1215-17 (9th Cir. 2016) (citing Macari and observing that "[t]o the extent that the FBI was operating as an arm of the grand jury, the trial jury was entitled to consider the [defendants'] obstructive acts as they related to the FBI" in a false statements § 1503 prosecution). In other words, the government must demonstrate that the agents were "integrally involved" in the grand jury investigation and that the agencies activities were "undertaken with the intention of presenting evidence before the grand jury." Macari, 831 F.3d at 937 (cleaned up). Importantly, courts have refrained from "establish[ing] a rigid rule denominating some act of the grand jury that would be required to establish pendency, [and instead] courts have asked whether [a] subpoena is issued in furtherance of an actual grand jury investigation, i.e., to secure a presently contemplated presentation of evidence before the grand jury." United States v. McComb, 744 F.2d 555, 561 (7th Cir. 1984) (internal quotation marks omitted).

Here, the evidence showed that HSI Special Agent ("SA") Jason Canty and IRS-CI SA Christen Seymour testified at length regarding the grand jury investigation of the WNGB[1], grand jury subpoenas they served, documents they reviewed pursuant to those subpoenas, and witness interviews they and other federal investigators conducted in furtherance of the grand jury investigation before defendant's interview.

---

[1] The First Superseding Indictment charged that the grand jury investigation was "into federal crimes, including illegal sports gambling and money laundering," which the government characterized as the investigation into the Wayne Nix Gambling Business ("WNGB"). (Dkt. 54 at 2.) Defendant became involved in the investigation for the reasons described at trial. Defendant's contention that "the government made contrary arguments at trial" is unfounded. (Mot. at 5.)

7

SAs Seymour and Canty testified about the following steps, indicating that the IRS-CI and HSI were gathering evidence for the grand jury:

- After the source tipped off the IRS-CI to WNGB in 2017, both agents testified the investigative team used grand jury subpoenas to obtain bank and phone records to verify information provided by the source.  (Trial. Tr., Day 6 at p. 221, line 20 – p. 222, line 21; Day 7 at p. 33, lines 1-4.; Day 8 at p. 194, lines 3-14.)

- SAs Seymour and Canty testified that he obtained and served a grand jury subpoena for the bank records of Joseph Schottenstein, which resulted in the discovery of the two $100,000 checks defendant was eventually confronted with during his 2022 interview.  (See Govt. Exhibit 503 (exhibits shown to defendant during his interview) at 1-2); Trial. Tr., Day 7 at p. 33, lines 3-23); Day 8 at p. 29, lines 11-13); Day 8 at p. 30, lines 1-18); Day 8 at p. 217, lines 4-21; and Day 9 at p. 71, lines 9-21.)

- SA Canty testified that agents obtained defendant's phone records before interviewing defendant.  (See Govt. Exhibit 503 at 4 (defendant's AT&T subscriber records); Trial. Tr., Day 8 at p. 214, line 22 - p. 215, line 11.)

- SAs Seymour and Canty testified regarding how they analyzed subpoenaed bank records to follow the money and understand the nature and extent of relationships within the WNBG, including the relationship between defendant and

8

Schottenstein. (Trial. Tr., Day 7 at p. 69, line 22 – p.72, line 1.) (defendant's bank records reviewed to see if wire sent at time payment discussed in text messages); Day 8 at p. 28, lines 1-9.) (investigators learned of Schottenstein through review of Nix's bank records); Day 8 at p. 29, lines 11-13) (same); Day 8 at p. 217, lines 4-21) (reviewed Schottenstein's bank records to find cashier's checks from defendant); Day 9 at p. 71, lines 16-24.)

- SA Seymour testified regarding how and why grand jury subpoenas for records are obtained generally. (Trial. Tr., Day 7 at p. 33, lines 1-8) (process of obtaining grand jury subpoenas); Day 8 at p. 32, lines 20-22); Day 8 at p. 33, lines 1-9) (process for requesting a grand jury subpoena.)

- SAs Seymour and Canty testified regarding how they used the grand jury to further their investigation after defendant's January 2022 interview. (Trial. Tr., Day 7 at p. 43, lines 3-23) (MLB records obtained); Day 7 at p. 69, line 22 – p.72, line 1) (defendant's bank records analyzed); Day 7 at p. 178, lines 19-23) (Bonilla called to testify before the grand jury); Day 8 at p. 217, lines 4-21) (both Joseph Schottenstein's and defendant's bank records analyzed.)

Further, defendant's receipt of a grand jury subpoena and his discussion of his obligations to answer questions before a grand jury in his January 2022 interview underscore the active and pending

9

nature of the grand jury investigation at the time of defendant's crimes.  Months before his interview, in October 2021, federal agents approached defendant at his home in Miami, Florida, and relayed their desire to talk to him about an illegal sports gambling operation. (Trial Tr., Day 7 at p. 190, line 22 - p. 191, line 1.)  He refused. (Id. at p. 192, lines 8-17.)  A few months later, in December 2021, federal agents served defendant with a federal grand jury subpoena. (Trial Tr., Day 7, p. 203, line 22 - p. 204, line 13).  Defendant then hired counsel, who asked the government to accommodate defendant by permitting him to submit to a voluntary interview in lieu of grand jury testimony, given his international baseball schedule.  The government accommodated this request.  (Trial Tr., Day 9, at p. 136, lines 11-18.)  During the voluntary interview -- the defendant *discussed* the nature of his options, including grand jury testimony, with the prosecutor and his counsel.  After defendant identified Donny Kadokawa as someone he knew "from baseball," he asked federal agents and prosecutors whether he was required to answer further questions regarding Kadokawa.  (Trial Tr., Day 9, at p. 31, lines 19-22.)  Assistant United States Attorney ("AUSA") Mitchell told defendant that although the interview in which he was participating was voluntary, the conversation could be reconvened before the grand jury.  (Id. at p. 32, lines 3-5.)  Defendant then asked whether he would be required to answer the same questions before the grand jury (i.e., questions related to Kadokawa and illegal sports gambling). (Id. at p. 32, lines 13-16.)  AUSA Mitchell referred him to his attorney.  (Id. at p. 33, lines 2-7.)

In short, given defendant's receipt of a grand jury subpoena, his interview inquiry related to whether he would need to testify before a grand jury if he refused to answer questions in the voluntary interview, and the agents' extensive testimony concerning their efforts to gather information for the grand jury investigation, any rational factfinder could conclude, just as 12 jurors did, that at the time of the defendant's interview, there was a pending grand jury investigation, and HSI and IRS-CI were acting as an "arm of the grand jury."  (Mot. at 5.)  See United States v. Dwyer, 238 F. App'x 631, 651 (1st Cir. 2007) (finding that FBI was working as arm of the grand jury where the agents were "gathering information, conducting interviews, and reviewing documents," some of which was eventually presented to a grand jury); Macari, 831 F.3d at 938-39 (rejecting argument that the grand jury investigation was not pending because grand jury subpoenas were served on him and his co-defendant after his obstruction conduct; according to the court, "the jury could have rationally concluded, given [earlier grand jury work], that the original grand jury's term had been extended or that a subsequent grand jury had been impaneled to continue the ongoing investigation[.]").

Indeed, this grand jury investigation resulted in the collection of voluminous documents via grand jury subpoenas, interviews of dozens of witnesses, criminal Informations being filed, and cooperation agreements being reached with Nix and his co-conspirators.  The testimony and evidence presented made clear -- at least through reasonable inferences -- that the agents were not engaged in investigative acts that were "separate and apart" from the

11

grand jury investigation.  (See Mot. at 6.)  Indeed,  there is no evidence to support that theory.  Nor was there any testimony showing that this investigation was "some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." Dwyer, 238 F. App'x at 631 (1st Cir. 2007).  Rather, the government presented overwhelming evidence to the jury showing both SA Canty and Seymour were "integrally involved" in the grand jury investigation, and that the agencies' activities were "undertaken with the intention of presenting evidence before [the] grand jury."  Macari, 453 F.3d, at 936-937.

Defendant harps on the fact that "neither agent spoke of amassing [] evidence on behalf of the grand jury or of presenting it to the grand jury."  But the government need not demonstrate that the grand jury "has actually heard testimony or has in some way taken a role in the decision to issue the subpoena" to establish a pending judicial proceeding (in this case an active grand jury investigation).  United States v. Simmons, 591 F.2d 206, 208 (3d Cir. 1979).  Simply put, the law does not require, as defendant argues, that SAs Seymour and Canty testify that they were "amassing evidence on behalf of the grand jury."[2]  As cited in detail above, SAs Seymour and Canty made repeated references to using grand jury subpoenas to obtain evidence to further their investigation, and SA Seymour testified that defendant's coach, Benjamin Bonilla, testified before

---

[2] Defendant similarly contends that the agents never mentioned a grand jury investigation or used the specific phrase "grand jury subpoena."  This argument is meritless.  (Dkt. 10 at n.5.)  Defendant does not cite a single case requiring the government to elicit specific words or phrases to support a § 1503 conviction because a jury only needs to be able to draw reasonable inferences from the evidence presented.

the grand jury.  (Trial Tr., Day 7 at p. 178, lines 19-23.)  Such evidence is sufficient to sustain an obstruction-of-justice conviction.  Macari, 453 F.3d, at 936-937.

Finally, defendant argues that the fact that defendant "was served with a grand jury subpoena does not change the analysis" of whether there was a pending grand jury investigation.  (Mot. at 7.) A subpoena to the defendant, however, is, at a minimum, indicia that there was an active grand jury investigation[3] into the WNGB and that the agents were acting as arm of the grand jury.  The government did not argue to the jury that the grand jury was investigating the defendant for criminal liability.  The government did not dispute that defendant was not the target of the WNGB investigation; he was told as much at the beginning of his interview.  (Trial Tr., Day 8 at p. 43, lines 22-24; Trial Tr., Day 9 at p. 20, lines 8-14.)  The active grand jury investigation was, as explained in detail above, into the WNGB.  Even if defendant had not been served with a grand jury subpoena, the current record would suffice to establish an active grand jury investigation; that defendant himself was served with a grand jury subpoena approximately one month before his interview simply lends credence to the pending nature of the grand jury investigation.  Indeed, trial testimony shows that defendant's subpoena was "issued in furtherance of an actual grand jury investigation," i.e., to secure testimony from defendant regarding

---

[3] Defendant creates a strawman argument by suggesting that "[t]he government suggests that Macari permits a rational juror, and this Court, to simply infer that a future grand jury could potentially have existed and the agents might have presented evidence to it."  Defendant does not cite to where the government made any of those arguments because the government did not.

13

illegal sports gambling.  (Trial. Tr., Day 6 at p. 202, line 23 – p. 204, line 21.)

Moreover, even if defendant's subpoena to testify before the grand jury about illegal sports gambling was "withdrawn" or "canceled" (Mot. at 8), the government presented testimony establishing that the grand jury investigation itself continued to exist both at the time of defendant's interview and afterwards.  See, e.g., (Trial. Tr., Day 7 at p. 43, lines 3-23; Day 7 at p. 69, line 22 – p.72, line 1; Day 7 at p. 178, lines 19-23; Day 8 at p. 217, lines 4-21.  Regardless, any dispute between the parties regarding the impact of the alleged withdrawal or cancellation of defendant's subpoena on the overall status of the grand jury investigation is an evidentiary dispute that is within the purview of the jury, and the jury decided it in the government's favor.

### 2.    The Government Presented Sufficient Evidence that Defendant Knew His Actions were Likely to Affect a Pending Grand Jury Proceeding

The government also presented sufficient evidence that, when viewed in the light most favorable to its case, any rational juror could conclude, as 12 jurors did, that defendant became aware of the WNGB grand jury investigation no later than the time of his interview on January 27, 2022.  Indeed, unlike some of the cases discussed below, the government presented direct evidence of defendant's knowledge of the grand jury investigation.

Federal circuit courts have held that a defendant is aware of a grand jury investigation for purposes of 18 U.S.C. § 1503(a) where: (1) a defendant was likely aware of the existence of a grand jury subpoena prior to his or her obstruction conduct, and (2) could infer

14

through circumstantial evidence that the agency's inquiry was related to the grand jury investigation.

Dwyer, 238 F. App'x at 631 is instructive.  There, the FBI was investigating the defendant's employer for fraud and served a grand jury subpoena for documents on the company.  The FBI interviewed defendant, an administrative assistant at the company, after the company received this subpoena.  During the interview, the FBI agents "did not ask any follow-up questions and did not seek more complete answers than the ones [the defendant] gave [and] . . . the interview was not recorded and [] no written statement was taken."  Id. at 649.  Further, FBI agents did not inform Dwyer of the nature of the FBI's investigation, beyond telling Dwyer that it involved Dwyer's job and her role.

Defendant made several false statements in that interview pertaining to the payment of employees at the company where she worked.  For that obstructive conduct, she was charged with obstructing justice, in violation of 18 U.S.C. § 1503(a), and convicted of that and other crimes.  On appeal, she argued that the government failed to establish that she knew her statements would be submitted to a grand jury.

The First Circuit rejected her argument.  The First Circuit reasoned that defendant's employer received a grand jury subpoena for documents, and according to testimony at trial, the defendant was one of the employees responsible for gathering documents responsive to the subpoena.  Accordingly, she "would be told of, and would know about, the existence of the subpoena."  Id. at 650.  There was also evidence that defendant had conversations with two individuals "would

15

also have been aware of the existence of a grand jury subpoena," although there was no evidence of what was said during those conversations.  Id.  The court further observed that the defendant "would have known from the character of the questions the FBI subsequently put to her in her interview that matters relevant to the grand jury's investigation were the subject of the FBI's inquiry."  Id.  The First Circuit ultimately concluded that a reasonable jury could find that the defendant connected these dots and knew that a grand jury investigation existed at the time of her interview.  Id. at 650-51.

United States v. Fassnacht, 332 F.3d 440, 449-51 (7th Cir. 2003) and United States v. Macari, 453 F.3d 926, 936-937 (7th Cir. 2006) are also on point.  In Fassnacht, the Seventh Circuit affirmed the district court's denial of the Rule 29 motion and found that there was sufficient evidence for a jury to conclude that defendants Fassnacht and Malanga "were aware of the grand jury investigation into their tax returns and that they understood that the IRS agents were 'integrally involved' in that grand jury investigation or, at the least, that the IRS agents would provide to the grand jury the information they garnered from the defendants."  332 F.3d at 449.

In reaching that conclusion, the Fassnacht court relied on, the following two categories of evidence to demonstrate that defendants were aware that a federal grand jury was involved in the investigation: (1) defendant Fassnacht was served with a grand jury subpoena and the other defendants became aware of this fact through conversations; and (2) other circumstantial evidence -- including testimony, documents, and government-directed, tape-recorded

16

conversations.  Id. at 449-50.  The Seventh Circuit stated that even if the testimony were not reliable because it was "given under a grant of immunity," and even if the recorded conversations were unreliable because the cooperator on the calls "was in a position . . . to advantage himself with the Government," such arguments "go to the weight the jury should have given the evidence[.]"  Id. at 451.  The court there  concluded that "even if [the jury] believed that the defendants' obstructive efforts were primarily aimed at the IRS agents, the jury was entitled to make the rational inference that [defendants] understood that the IRS agents were acting as the 'arm of the grand jury,' and that impeding the agents' efforts necessarily meant obstructing the grand jury."  Fassnacht, 332 F.3d at 451 (citing Aguilar, 515 U.S. at 600) (emphasis added).

In Macari,  defendant argued that the government "failed to establish that [the defendant] corruptly intended to influence the grand jury."  453 F.3d at 936.  The Seventh Circuit rejected his argument.  In doing so, the court observed there was trial testimony that: (1) defendant had been provided with a grand jury subpoena issued to the union where he served as secretary-treasurer, and (2) at some point after receiving this grand jury subpoena, the defendant discussed its contents with co-conspirators, and further discussed, with these co-conspirators, the cessation of their criminal conduct due to "increased investigatory heat."  Id. at 937 (internal quotation marks omitted).  The Seventh Circuit emphasized the importance of the temporal proximity between the grand jury subpoena issued to the defendant (after his obstruction conduct) and this circumstantial evidence of his knowledge of the investigation.

Id. at 938.  The court then concluded that there was sufficient "evidence from which the jury could find that a grand jury investigation . . . existed [prior to defendant's conduct] and continued for some period of time and, additionally, that [the defendant] had knowledge of the inquiry."  Id. at 937.

Here, the government has presented more evidence of defendant's knowledge of the pending grand jury investigation than was present in Dwyer.  And like Fassnacht and Macari, the temporal proximity between defendant's receipt of his grand jury subpoena and the circumstantial evidence of his knowledge –- e.g., his interview colloquy with AUSA Jeff Mitchell regarding the grand jury process –- underscores this point.  When viewed in the light most favorable to the government, this evidence far exceeds that needed for a rational juror to conclude –- through reasonable inferences –- that defendant knew his statements were "likely to affect the judicial proceeding," in this case, the grand jury investigation into illegal sports gambling (i.e., the WNGB grand jury investigation), about which defendant was being questioned, in the presence of federal agents who were "integrally involved."  Indeed, both agents testified that they were the lead agents for their respective agencies.

First, by the time of defendant's January 2022 interview, defendant had been contacted in-person by federal agents in Miami who told defendant the IRS was investigating illegal sports gambling and wanted to question him.  (Trial Tr., Day 7 at p. 190, line 22 to 191 line 1.)  IRS-CI SA Zaya-Hernandez's testimony showed as much.  Defendant declined to be interviewed.  (Id. at p. 192, lines 8-17.)  SA Zaya-Hernandez provided defendant with SA Seymour's business card

18

and instructed defendant to contact SA Seymour for any further questions.  (Id.)  Accordingly, as of October 2021, defendant knew the federal government was attempting to question him regarding illegal sports gambling, one of the specific agencies that was conducting the investigation, and the identity of the specific agent who was leading the investigation at IRS-CI.

Second, a second IRS-CI agent visited defendant just over two months later in December 2021 and served him with a grand jury subpoena.  SA Donies personally served him to appear and testify in Los Angeles.  (Trial Tr., Day 7 at p. 203, line 22 - p. 204, line 13).  SA Donies explained to the defendant that he would have to testify before grand jury.  (Id.)  Thus, as of December 2021, defendant knew that the IRS-CI was conducting an illegal sports gambling investigation and that they wanted to talk to him.  And then after he declined their request for a voluntary interview, an IRS-CI agent (an agent from the same agency who initially approached him) personally served him with a grand jury subpoena to testify in Los Angeles.  Given the proximity in time between defendant's 2021 encounters with IRS agents, a reasonable jury could conclude, with this evidence alone, that defendant knew: (1) that a grand jury investigation existed; (2) that the investigation pertained to illegal sports gambling; and (3) that the IRS was acting as an arm of the grand jury.  See Macari, 453 F.3d at 938 (observing the importance of the temporal proximity between the grand jury subpoena issued to the defendant and evidence of his knowledge of the investigation).

Third, trial testimony also showed that after defendant's

19

attorney contacted the then-lead AUSA, Jeff Mitchell, the government accommodated defendant's request to sit for a voluntary interview instead of testifying before a grand jury.  (Trial Tr., Day 9 at p. 136, lines 11-18.)  That interview occurred on January 27, 2022. During the interview, defendant was again put on notice of the existence of the grand jury investigation, the agents and prosecutors who were involved, and the fact that a grand jury had been convened. See United States v. Mangano, No. 16-CR-540 (JMA), 2022 WL 2872670, at *11 (E.D.N.Y. July 20, 2022) (finding the "presence of prosecutors at the [] proffer sessions was further proof that the[] proffer sessions were connected to [an] ongoing grand jury proceedings and w[as] not an independent FBI investigation.").

At the outset of defendant's interview, defendant was introduced to the prosecutors and federal agents (including the IRS-CI agent whose business card he was provided by SA Zaya-Hernandez) who were investigating illegal sports gambling.  Unlike the Dwyer defendant, who was not informed of the nature of the investigation in her interview, AUSA Mitchell told defendant that the government was conducting an illegal sports gambling investigation.  (Trial Tr., Day 9, p. 20 at 14-18.)

After defendant identified Donny Kadokawa as someone he knew "from baseball," he asked federal agents and prosecutors whether he was required to answer further questions regarding Kadokawa.  (Trial Tr., Day 9 at p. 31, lines 19-22.)  AUSA Mitchell told defendant that although the interview in which he was participating was voluntary, the conversation could be reconvened before the grand jury.  (Id. at p. 32, lines 3-5.)  Defendant then asked whether he would be required

20

to answer the same questions before the grand jury (i.e., questions related to Kadokawa and illegal sports gambling).  (Id. at p. 32, lines 13-16.)  AUSA Mitchell referred him to his attorney.  At that time, the interview was paused to allow defendant to speak with his attorney.  (Id. at p. 33, lines 2-7.)  After a short break, the interview was reconvened, and defendant continued to lie and obstruct through false statements, material omissions, and purported claims of memory loss. (Id. at p. 33, lines 14-15.)

On this record, a rational juror could conclude that defendant knew of the existence of the grand jury investigation into illegal sports gambling.  Indeed, the Dwyer court held that the defendant could infer the existence of a grand jury subpoena at the time of her false statements because was asked questions in her interview similar in nature to the records requested in her employer's grand jury subpoena; here, a fortiori, defendant directly discussed the possibility of being called to testify before the grand jury in his interview.  For all intents and purposes, AUSA Mitchell confirmed through this explanation to defendant that the investigative team was acting as an arm of the grand jury.  At a minimum, a rational juror could draw this inference based on the evidence and testimony presented, especially where testimony was also presented that defendant was (1) approached in October 2021 by the government about illegal sports gambling; and (2) served a grand jury subpoena after he declined to be interviewed.  See Bedoy, 827 F.3d at 505.

Despite this overwhelming evidence and chronology, defendant argues he's entitled to a judgment in favor of acquittal.  First, defendant claims that because SAs Canty and Seymour did not believe

21

him "before he allegedly lied or withheld information," his statements would be of "absolutely no use" and there was thus "no basis" for defendant to think his statements would be provided to the grand jury.  (Mot. at 13.)  There is no evidence in the record to suggest that the agents or the prosecutors walked into defendant's January 2022 interview believing he would intentionally lie.  And even if the agents suspected that defendant was lying at any point in the interview, or knew that some of his statements were inconsistent with documents gathered to date through grand jury process, defendant's statements could still be presented to a grand jury and attributed to him as a witness.

Further, even if the agents and prosecutors knew defendant was lying, then-AUSA Mitchell's admonishment to defendant that he would be subpoena'ed to testify before grand jury, coupled with SA Donies and SA Zaya-Hernandez's testimony, demonstrates that defendant was (1) likely aware of the existence of a grand jury subpoena prior to his or her obstruction conduct, or (2) could infer through circumstantial evidence (discussed in detail infra) that the agency's inquiry was related to the grand jury investigation.

Second, defendant's arguments that his grand jury subpoena may have been withdrawn or cancelled misses the point.  Again, the issue is not the status of defendant's particular grand jury subpoena; the issue is whether any rational juror could conclude, when viewing the evidence in light most favorable to the government, that defendant knew (1) a grand jury investigation into illegal sports gambling existed, and (2) his statements during his January 2022 interview were "likely to affect" that investigation.  The evidence shows that

22

a rational juror could reasonably conclude that defendant did in fact know his statements about illegal sports gambling would affect the grand jury's investigation, since he was told that if he did not want to continue answering questions (about illegal sports gambling), the interview could be reconvened (i.e., the topic of discussion could be resumed) before a grand jury.  Defendant further sought advice from his attorney on the matter, which a reasonable jury could also consider.

Finally, a rational juror could conclude that defendant's actions showed he was reluctant to testify at grand jury because he knew the topic of his testimony would be illegal sports gambling because: (1) defendant declined to be interviewed regarding illegal sports gambling in October 2021; (2) after receiving a grand jury subpoena from the same agency mere months later, he requested to sit for a voluntary interview instead of testifying at grand jury after being subpoenaed; and (3) during that voluntary interview, he asked whether he would have to answer the same questions concerning gambling at grand jury should he decline to answer further questions. Put differently, defendant's attempts to avoid grand jury testimony are circumstantial evidence that he knew a grand jury investigation into sports gambling existed, and that any statements he made (at grand jury or otherwise) directly related to the grand jury's investigation (i.e., his statements were likely to affect it).  See Dwyer, 238 F. App'x at 650-51.

23

3.    The Government Presented Sufficient Evidence Demonstrating That Defendant's False Statements and Omissions Were Material

A false statement is material if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Gaudin, 515 U.S. 506, 509 (1995) (cleaned up).  There is no exception for lying to investigators, even when the investigators "disbelieve[] [the] falsehood."  Brogan v. United States, 522 U.S. 398, 402 (1998).

The false statement need not have actually influenced the agency, see, e.g., United States v. Boone, 951 F.2d 1526, 1545 (9th Cir. 1991); United States v. Vaughn, 797 F.2d 1485, 1490 (9th Cir. 1986), and the agency need not rely on the information in fact for it to be material.  See, e.g., United States v. Rodriguez-Rodriguez, 840 F.2d 697, 700 (9th Cir. 1988).  In other words, "the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances."  United States v. Salinas-Ceron, 731 F.2d 1375, 1377 (9th Cir. 1984) (internal citations omitted), vacated on other grounds by 755 F.2d 726 (9th Cir. 1985).

For an obstruction charge, the obstructive conduct (whether it be a false statement or omission) "must bear a reasonable relationship to the subject of the grand jury inquiry."  United States v. Thomas, 612 F.3d 1107, 1128 (9th Cir. 2010).  Materiality is established if defendant's obstructive conduct would "have the natural and probable effect of interfering" with the grand jury investigation.  United States v. Smith, 659 F. App'x 908, 915 (9th Cir. 2016).

24

Given the chronology of events preceding and following defendant's voluntary interview on January 27, 2022, any rational juror could find that defendant's answers to the agents' questions had the "natural and probable effect" of interfering with their grand jury investigation into the WNGB.  Here, 12 jurors applied their common sense and found that the defendant's false statement that he had never discussed sports gambling with Donny Kadokawa –– his gambling agent --- and his withholding of information regarding Donny Kadokawa's involvement with the WNGB both had the "intrinsic capability" of interfering with the investigation.  Moreover, while the law does not require attainment of such interference, testimony related to the trajectory of the investigation demonstrated that defendant's answers did in fact interfere with the WNGB investigation.

> a.    *The Evidence Showed That Defendant's False Statement That He Had Never Discussed or Talked About Sports Gambling with Kadokawa Was Material*

Trial testimony showed that before defendant's January 2022 interview, the government strongly suspected that Kadokawa was the middleman between Nix and defendant.  (See Trial Tr., Day 7 at p. 39, lines 12-19.)  The government had also searched Nix's phone, where they found evidence of direct communications between the defendant and Nix (See Ex. 127), between Nix and Kadokawa that suggested Kadokawa was seeking to place bets on defendant's behalf (see, i.e., Ex. 110), and a four-page group chat, found in Nix's phone between the three men, which appeared to show Kadokawa initiating the thread and defendant seeking to place bets directly through Nix via that chat (Ex. 137).  Critically, the government did not yet have or know

about the group chat between defendant, Kadokawa, and Bonilla (Exs. 54-79), where all of the direct communications about betting between defendant and Kadokawa would eventually be found.  The investigative team suspected that defendant was lying in his interview, which caused the team to soon thereafter reach out to Kadokawa.  Kadokawa's cooperation then revealed Benny Bonilla's involvement, which allowed the government to obtain a search warrant (based in part on information provided by Kadokawa) for Bonilla's cellphone.  The government subsequently seized Bonilla's cellphone pursuant to this warrant and analyzed its contents.

SA Seymour testified that, given the investigative team's suspicions regarding the relationship between defendant and Kadokawa, the government sought to learn more about the nature and extent of the relationship between Kadokawa and the defendant regarding sports bets.  SA Seymour also testified that investigators were not targeting bettors but were instead targeting co-conspirators and accomplices of the WNGB.  (Trial Tr., Day 7 at p. 30, line 25 - p. 31, line 1.)  SA Seymor further said that while Nix provided some information related to Kadokawa and defendant, they did not simply take the word of Nix when investigating the WNGB at face value. (Trial Tr., Day 8 at p. 149, lines 2-8.)  As SA Seymour stated, investigators needed to find "anchors to the truth."  (Trial Tr., Day 8 at p. 149, lines 10-17.)

Nor did the Nix phone evidence reveal any direct communications between Kadokawa and defendant about sports betting.  Direct communications between Nix and Kadokawa showed that Kadokawa was likely speaking with the defendant, and ferrying messages "from YP"

26

to Nix. (See Ex. 110 at 10 (Kadokawa: "[a]s soon as I talk to yp this morning I will let you know[;]"); see also id. at 16 (Kadokawa: "[n]ext week I sent to him Monday[.] From YP.") Additionally, the government had a picture of a shipping label that appeared to show a package from defendant addressed to Joseph Schottenstein, sent via text message to Nix from Kadokawa. (See id. at 28; see also Govt. Ex. 76 (photo of shipping label found in Nix's phone).

Trial testimony showed that, although the government had a strong suspicion regarding Kadokawa's role at the time of defendant's interview, it did not have conclusive evidence that Kadokawa was acting as a subagent for Nix. (Trial. Tr., Day 7 at p. 39, lines 12-19.) Kadokawa and Nix rarely referenced the defendant by name in their direct communications. (Ex. 110.) Thus, at the time of defendant's interview, the strongest evidence the government had that Kadokawa was an agent of the WNGB was the picture of the shipping label addressed to Joseph Schottenstein to defendant, and what the government believed were the two checks that were likely inside of the package. (Trial. Tr., Day 7 at p. 42, lines 1-5.) That's why the government asked the defendant about the Schottenstein checks and whether Kadokawa was associated with them in any way, which defendant falsely claimed to not remember. (Trial. Tr., Day 7 at p. 39, line 20 - p. 40, line 15; Day 7 at p. 41, lines 2-23.)

Testimony of SA Seymour revealed that, after defendant lied about having conversations with Kadokawa about sports betting, the government contacted Kadokawa, but Kadokawa did not have his communications with defendant. (Trial. Tr., Day 7 at p. 162, line 21- 163, line 14; Day 7 at p. 177, lines 7-12.) Kadokawa, however,

27

was able to lead investigators to Bonilla, which resulted in the government obtaining a search warrant for Bonilla's phone. (Trial. Tr., Day 7 at p. 165, line 23 – p. 166, line 7; Day 7 at p. 176, line 15- p. 177, line 5.) That search revealed a treasure trove of text messages where defendant discusses sports betting with Kadokawa in a group text, and Kadokawa facilitates sports bets from defendant to Nix on defendant's behalf, to the tune of hundreds of thousands of dollars. (Trial. Tr., Day 7 at p. 182, lines 5-7.) Because the government was targeting subagents of the WNGB, that evidence led to Kadokawa admitting to acting as Nix's subagent in his plea agreement by placing hundreds of bets for the defendant through the WNGB. (Trial. Tr., Day 4 at p. 40, lines 14-16; Trial. Tr., Day 4 at p. 71, lines 4-21; Ex. 2115.)

Defendant's lies and material omissions about his discussions of sports betting with Kadokawa bore "some reasonable relationship to the subject matter of the investigation," since the investigation was about illegal sports gambling, and defendant lied about having discussions with Kadokawa about sports betting. Thomas, 612 F.3d at 1128. Indeed, had defendant fully disclosed the nature and scope of his discussions with Kadokawa about sports betting, the government may have obtained more conclusive evidence against Kadokawa for being a subagent of Nix without Kadokawa's assistance, which the government eventually needed.

Defendant's argument that he eventually disclosed during the interview that Kadokawa assisted him in placing a single bet in May 2019 is beside the point. Defendant initially lied about his involvement with Kadokawa, saying he knew Kadokawa "only from

baseball." (Ex. 502.) That lie was material. He then asked if he had to answer any further questions about Kadokawa. (Trial Tr., Day 9 at p. 31, lines 19-22.) SA Seymour and Canty testified that defendant eventually volunteered more information, claiming that Kadokawa had texted messaged him, and that he had "found" a text message from May 2019 showing a bet Kadokawa placed for defendant. (Id. at p. 46, line 23 - p. 47, line 21.) But that does not erase his initial lie, or the selective nature of his memory regarding a single bet Kadokawa placed for him while Kadokawa was in Las Vegas. Both defendant's initial lie regarding Kadokawa, as well as his eventual selective disclosure of a single bet, were both false and material to the grand jury investigation. His lies deprived investigators of information and caused investigators to pursue other investigative avenues to get the truth, and to obtain sufficient evidence to approach and convince other co-conspirators, such as Kadokawa, to cooperate. Thus, his false statements not only had "a natural tendency to influence[ . . . ] [and were] capable of influencing, the decision[s] of the decisionmaking body to which it was addressed," but they actually did. Gaudin, 515 U.S. at 509. This evidence far surpasses that required to survive a Rule 29 motion.

> b. *The Government Presented Sufficient Evidence Showing That Defendant's Omissions Regarding Kadokawa's Involvement with Placing and Making Payments for Defendant's Bets Were Material*

With respect to defendant's omissions, the government had limited information regarding the scope of Kadokawa's involvement in the WNGB. The government did not know the volume of bets facilitated

29

by Kadokawa, and was not privy to the hundreds of thousands of dollars defendant paid in gambling payments, including through illicit money drops, as well as disguised check and wire payments funneled through banks to third parties and business entities, in which Kadokawa assisted.  (See Exs. 252-258 (various wires sent by defendant to, inter alia, business entities believed to be associated with the WNGB).)  Defendant's honest answers would have revealed who, where, and when money drops and sham payments were made, and to whom – precisely the information investigators sought, and to this day, lack.

Indeed, defense counsel cross-examined SA Seymour at length, pointing out that the government was left to "speculate" about wires sent from defendant's account, that appear to match recipients provided by Nix to Kadokawa, and by Kadokawa to defendant in the group chat between Kadokawa, defendant, and Bonilla.  (See Trial Tr., Day 7 at p. 257, line 1 - p. 259, line 9.)  As noted infra, the government was not aware of this group chat until it seized Bonilla's phone, well *after* defendant's interview.  Defense counsel also elicited testimony that, in 2026, the government could not conclusively state that defendant's wire transfers to John Stern and Studio Palace LLC were payments to the WNGB.  (See, e.g., Trial Tr. at Day 8, p. 10, lines 11-19.)

Defense counsel's elicitation of such testimony underscores the government's point here, which the government argued to the jury. (Trial Tr. at Day 11, p. 68, lines 17-20; p. 94, lines 13-19.)  By withholding information related to Donny Kadokawa and the extent of his involvement with the WNGB, the government was left to

"speculate," and piece together circumstantial evidence, including by comparing the timing of several text message strings with the timing of suspicious payments, to determine whether in fact hundreds of thousands of dollars were funneled to third parties to pay gambling debts.  Such conduct was exactly what investigators were probing -- conduct that could constitute money laundering and tax evasion. That's why investigators asked defendant about the two Schottenstein checks; those checks were the most concrete evidence showing a disguised payment facilitated by Kadokawa.  At bottom, defendant's omission of material information about payments Kadokawa helped facilitate -- which investigators then had to seek directly through Kadokawa -- not only had the natural tendency to, but did in fact interfere with, the WNGB investigation.

**B.    The Government Presented Sufficient Evidence to Support Each Element of False Statements (18 U.S.C. § 1001(a)(2))**

The jury's charge required it to find that: (1) defendant made a false statement; (2) the statement was made in a matter within the jurisdiction of the HSI, IRS-CI, and the USAO; (3) defendant acted willfully; that is, he acted deliberately and with knowledge both that the statement was untrue and that his conduct was unlawful; and (4) the statement was material to the activities or decisions of the HSI, IRS-CI and/or the USAO; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities. A statement may be relevant but not necessarily material. (Dkt. 388 at 25.)  Although three false statements served as the predicates for this charge, the jury only convicted defendant based on two of those statements, demonstrating the jury's thoughtful deliberation process.  Those two false statements include: (1)

31

defendant's statement that he never discussed or talked about sports gambling with Kadokawa, and (2) defendant's statement that he did not know who instructed him to send the two $200,000 cashier's checks to Schottenstein.

Defendant now renews his argument that the government failed to prove that there was a false statement (as opposed to a merely misleading statement), that defendant acted willfully, and that defendant's false statements were material.  Again, just like the jury did, for the reasons outlined below, this Court should reject defendant's meritless arguments.

> 1.    The Government Presented Sufficient Evidence that Defendant's Statement That He Never Discussed Sports Betting With Donny Kadokawa Was False

Defendant claims that the government failed to demonstrate that his statement that he never discussed or talked about sports gambling with Kadokawa was false because "the record did not reflect the question asked, the answer was context-dependent, and law enforcement failed to document other statements made during the interview in which Puig did admit discussing sports betting with Kadokawa."  (Mot. at 16.)  This argument is simply not rooted in fact or law.

First, the record did reflect the question asked.  Defense counsel conceded as much during her cross-examination of SA Seymour. She asked "you testified that when asked about talking with Donny, about sports betting Mr. Puig said never, right?" to which SA Seymour responded "yes" and counsel continued by asking "and he used the word never" to which SA Seymour responded "I believe so, that he'd never talked to him or did not talk to him at all or something to that effect, yes."  (Trial. Tr., Day 8 at p. 62, lines 6-16.)  Credibility

determinations are for the jury, and the jury clearly found the agents' testimony credible, as evidenced by their conviction. Alarcon-Simi, 300 F.3d 1172 at 1176 (stating that "it is not the district court's function to determine witness credibility when ruling on a Rule 29 motion.")  Even if the record did not reflect the question asked, which is not true, the law does not require that the government establish the exact question asked to sustain a 1001 conviction, which is why defendant does not cite a single case holding otherwise.

Second, as in trial, defendant claims his statement wasn't false due to a lack of understanding regarding the question; here, he attempts to create "ambiguity" in the interview by arguing that his interview was conducted via an interpreter, questions were "asked in English, translated to Spanish, responded to in Spanish, and translated to English," and he was not provided with information to "refresh his recollection" ahead of his January 2022 interview.  The jury heard all of these arguments by defendant at trial, and did not find them credible.

Further, the translation of words from Spanish to English and vice-versa is exactly how live interpretation works.  Live interpretation of questions and answers does not indicate a lack of understanding by defendant.  In fact, it demonstrates the exact opposite.  Trial testimony established that defendant is conversational in Spanish, but the government hired a Cuban-dialect Spanish interpreter, Esther Hermida, to ensure that nothing was lost in translation.  (Trial Tr., Day 7 at p. 122, lines 22-25.)  Ms. Hermida testified that she had no difficulty understanding defendant,

33

and he did not express any difficulty understanding her.  (Trial Tr., Day 9 at p. 155, line 25 – p. 156, line 11.)  Trial testimony even established that defendant spoke in English during the interview, when he told SA Canty, during defendant's § 1001 admonition, "to stop reading [the] statute because [SA Canty] [was] wasting [defendant's] time."  (Id. at p. 28, lines 7-15.)  There is no language issue, and whether defendant was asked if he "talked" or "discussed" sports betting with Kadokawa is irrelevant to the "falsity" issue.  Common sense -- which this Court instructed the jury to use -- demands that these two words carry the same meaning, in English or Spanish. Finally, testimony at trial established that defendant was not sandbagged in the interview by the government.  Defendant was approached in October 2021 by agents and asked to answer questions related to illegal sports gambling.  He declined, and a couple of months later, was served with a grand jury subpoena, and retained counsel.  His counsel testified at trial that he was aware that the nature of the agents' investigation was illegal sports gambling, and that it is his common practice to discuss such information with his clients before any voluntary interviews with the government.  (Trial. Tr., Day 10 at p. 65, lines 15-17, p. 158, line 7 – p. 164, line 7.) The government is not required to spoon-feed interviewees with documents and a list of interview questions before charging them with false statements in violation of § 1001.  Indeed, defendant had two lawyers present during his interview, was read the exact text of the statute by SA Canty, and was informed by then-prosecutor Mitchell that the interview was strictly voluntary.  (Trial. Tr., Day 7 at p. 135, line 6 - p. 136, line 21.)  Whether he knew the nature of the

34

interview or not before it proceeded, he knew he was required to tell the truth and he knew he was voluntarily electing to participate in the interview.  Defendant chose not to tell the truth, and the jury convicted him for that choice.

This case stands in stark contrast to United States v. Jiang, 476 F.3d 1026 (9th Cir. 2007) despite defendant's best efforts to drum up non-existent "context" and "ambiguity."  In Jiang, the government charged defendant with falsely stating that he had returned amplifiers (referred to simply as "the product") to the manufacturer, Narda, when he had in fact exported some of the amplifiers.  Id. at 1028.  The Jiang Court found that there was insufficient evidence to sustain a § 1001 conviction, because: (1) "the *only* proof offered by the government that Jiang uttered a false statement is [one agent's] testimony, based largely on [that agent's] notes, which were recorded some time after the day of the interview," (2) the testifying agent could not recall whether he asked the defendant whether he returned one or multiple amplifiers, a "significant" distinction given the descriptor "the product"; and (3) the testifying agent's notes did not reflect his understanding that there were multiple amplifiers; and (4) the defendant had broken English, and no interpreter was present.  Id. at 1029-30.

Unlike Jiang, defendant's false statement -- that he "never"[4] discussed sports gambling with Kadokawa -- cannot possibly be

_____

[4] SA Seymour also said defendant may have said he "did not talk to [Kadokawa] at all [about sports gambling] or something to that effect."  (Trial. Tr., Day 8 at p. 62, lines 6-16.)  The upshot is the same.  Defendant spoke in absolute terms asserting that the topic of sports gambling had never come up between him and Kadokawa, unlike in Jiang where there was ambiguity in the term "the product" because it could refer to a single or multiple products, which underpins the Jiang Court's rationale.

construed as true.  (Trial. Tr., Day 8 at p. 62, lines 6-16.) Evidence at trial established that defendant discussed sports gambling with Kadokawa by text, by phone, and in person for months on end in 2019.  This Court and the jury reviewed numerous text exchanges (indeed, through multiple days of trial) wherein defendant and Kadokawa discussed sports gambling.  Defendant's claim that he "never" had these types of conversations with Kadokawa is very different from the Jiang defendant's claim that he "returned the product," when he did, in fact, return some of the product.  Further, unlike the Jiang agent's notes, SA Canty's notes were recorded contemporaneously with the interview, and unlike the Jiang defendant, who did not have a live interpreter present, defendant had Esther Hermida present, who not only interpreted Spanish, but was familiar and experienced with the Cuban dialect and testified that there were no translation issues.  Finally, SA Canty's notes are consistent with SA Canty's testimony, SA Seymour's testimony, and Esther Hermida's testimony: all establish that defendant understood the questions posed to him in the interview, that he was asked if he had ever discussed or talked about sports gambling with Kadokawa, and that he responded in the absolute – asserting that that topic "never" came up.

When viewing all of the evidence in the light most favorable to defendant, a reasonable juror could find, as 12 jurors did, that defendant understood the question posed to him, and that his answer in response was unequivocally false.

36

2.    <u>The Government Presented Sufficient Evidence that Defendant's False Statement That He Did Not Know Who Instructed Him to Send the Schottenstein Was False As Opposed to Misleading</u>

The jury convicted defendant of violating 18 U.S.C. § 1001 based, in part, on the following false statement: "[Defendant] falsely stated he did not know the individual who instructed him to send $200,000 in cashiers' checks to Joey Schottenstein and that [defendant] had never communicated with that individual via text message."  (Dkt. 403 at 2.)  Defendant now claims that there is insufficient evidence, when viewing all evidence in the light most favorable to the government, to establish that this statement was false, as opposed to misleading.  (Mot. at 19.)  To make this argument, defendant re-words the charged false statement itself, by claiming that the government failed to prove that defendant's statement "that a person, whose name he did not know, directed him over the phone to send the checks to Schottenstein" was false. Moreover, defendant's factual narrative with respect to this point is unsupported by the evidence, and the jury's § 1001 conviction demonstrates that it weighed the evidence presented (including the testimony of the agents) and resolved conflicts in favor of the government.

First, SA Seymour testified at trial that defendant told the agents and prosecutors in his January 2022 interview that:

> [H]e had made some online bets, a bet or bets, that he had lost those bets and that he was instructed by some unknown person to write the checks and to pay for the bets that he had lost.  He stated that he had only talked to him over the phone, they never texted, and that's all he knew about it.

37

(See Trial Tr., Day 7 at p. 148, line 25 - p. 149, line 5.)  This statement was supported both by SA Canty's testimony, as well as SA Canty's contemporaneous notes, which defendant went to great efforts, unsuccessfully, to hide from the jury's purview.  And the testimony and evidence presented to the jury for 11 days demonstrated the falsity of this statement --Bonilla and Kadokawa instructed defendant to send $200,000 in cashier's checks to Joey Schottenstein.  (Exs. 71, p.37; 92.)  Given defendant's long-standing relationships and extensive communications with Kadokawa and Bonilla, the fact that defendant personally went to a bank in Glendale, California for these checks five minutes after receiving the name Joey Schottenstein from Bonilla (Exs. 92, p.1; 202), and that defendant and Kadokawa argued about "Wayne" before defendant gave Kadokawa one of the two cashiers' checks (Trial. Tr., Day 6 at p. 94, line 16 – p. 95, line 23.), defendant could not have forgotten who instructed him to send these two checks to Joey Schottenstein, and rather intentionally lied when he stated that he did not know, and never texted with, the person who provided these instructions to him.  Trial. Tr., Day 7 at p. 148, line 21 – p. 149, line 5.)  Indeed, the evidence established (ad nauseum) that defendant texted Kadokawa, Bonilla, and Nix frequently and for several months in 2019, to place bets with the WNGB.  (Exs. 54-71, 109-115, 124-127, 137.)

Defendant now creatively claims that what he really "meant" when he relayed to agents that he did not know the person who provided him with these instructions was that he did not know Nix, who provided him with these instructions, on July 3, 2019.  Defendant then claims that the government can't prove that defendant lied when he said he

38

never texted the person who instructed him to send the Schottenstein checks because although defendant texted Nix (directly and through a group chat), he did not text Nix before July 3, 2019.  This spin, however, is not supported by any of the evidence that was presented to the jury.  Defendant's claim that he did not know Nix by July 3, 2019 is factually inaccurate, and a common-sense interpretation of all of defendant's interview statements -- including this one -- is that defendant was speaking regarding what he knew at the time of the interview in 2022, unless he specified otherwise.

By July 3, 2019, defendant knew who Wayne Nix was.  Bonilla testified that in the summer of 2019, he had heard "Wayne" referenced in conversation, knew that Wayne was a bookie, heard Wayne referenced 20 to 30 times, heard the name Wayne by mid-to-late June 2019, and unequivocally stated that on "June 26, 2019," he and Kadokawa went to defendant's hotel in Anaheim where he heard "defendant and Mr. Kadokawa discussing gambling in [the] lobby" and "overheard the name Wayne in that discussion . . . about four to five times"; simply put, on that date, he "heard the word Wayne being used between the defendant and Mr. Kadokawa in conversation."  (Trial. Tr., Day 6 at p. 35, lines 2-19; p. 37, lines 1-8; p. 92, line 25 – p. 93, line 15; p. 94, line 16 – p. 95, line 20.)  Thus, even accepting defendant's theory that he was speaking regarding his knowledge as of July 3, 2019 (which is not supported by the record), the jury had sufficient evidence to infer that defendant made a false statement to law enforcement when he said he did not know the individual who instructed him to send $200,000 in cashiers' checks to Joey

Schottenstein because by July 3, 2019, he knew who Nix, Kadokawa, and Bonilla were.

In sum, with respect to this statement, when viewing all evidence in the light most favorable to the government, and accepting that the 12 jurors who convicted defendant weighed the credibility of the agents, defendant meant exactly what he said -- that he did not know who instructed him to send the Schottenstein checks, and that he only communicated with that person by phone. That the interview "went back and forth translated from English to Spanish, and then . . . from Spanish to English," i.e., a standard live interpretation, does nothing to undermine this trial testimony, and the jury's ability to draw reasonable inferences from it.

Further, defendant asserts, without any citations to the record, that "the government's theory is that [defendant] failed to affirmatively state that Kadokawa and/or Bonilla instructed him via text message to send the checks." This argument is not rooted in the evidence because it's simply not true. The government's theory at trial was exactly what it charged, and exactly what the verdict form reflected -- that defendant "falsely stated he did not know the individual who instructed him to send $200,000 in cashiers' checks to Joey Schottenstein and that [defendant] had never communicated with that individual via text message." (Dkt. 403 at 2.) After putting forth this nonexistent government "theory," defendant then claims that the theory fails because defendant's failure to reveal that Kadokawa and/or Bonilla instructed him via text message to send the checks is, at best, a misleading statement, which is insufficient to prove falsity for a § 1001 violation. At bottom, this is a red

herring; the government never put forth such a "theory," so any attacks on that "theory" are irrelevant and simply a distraction from the facts and law at issue in this case.

The jury thoughtfully considered each false statement alleged with respect to his § 1001 charge, and determined that the government proved beyond a reasonable doubt that he intentionally made two of the three false statements, including the statement that he did not know and never texted the person who instructed him to write the Schottenstein checks.  Here, when viewing all evidence in the light most favorable to the government, sufficient evidence established the falsity of that statement.

        3.    <u>The Government Presented Sufficient Evidence that Defendant Acted with the Requisite Intent</u>

The evidence demonstrates, when viewed in the light most favorable to the government, that defendant knowingly and willfully made both of the false statements that served as the basis for his § 1001 conviction.  First, there were numerous texts between defendant and Kadokawa related to sports gambling; Kadokawa testified that there were approximately 875 text messages in the group chat with Bonilla and defendant relating to sports gambling.  (Trial. Tr., Day 3 at p. 40, line 24 – p. 41, line 10.)  Defendant regularly texted in that group chat.  (<u>See generally</u> Exs. 54-71.)

Second, defendant's argument that he "later in the interview" told the agents about discussing sports betting with Kadokawa is irrelevant.  <u>United States v. Fortenberry</u>, 89 F.4th 702, 712 (9th Cir. 2023) (holding that "a Section 1001 offense is complete at the time the false statement is uttered.")

While he seeks to convince this Court, much like the jury, that defendant "inadvertently" responded that he had never discussed or talked about sports gambling with Kadokawa such that the statement was "not willful," he lost that battle before the jury, who were instructed to convict defendant only if they believed the government proved this count beyond a reasonable doubt.  (Trial. Tr., Day 11 at p. 125, lines 14-25.)  The simple fact that defendant may have ultimately admitted some of his conduct and provided information from his text messages (Mot. at 24) does not nullify the falsity of his initial statement nor does it render it not willful.  There are two factual narratives that the jury, after weighing the evidence and making credibility determinations with respect to the witnesses, could have accepted: (1) the government's view that defendant's false statement relating to never discussing sports gambling with Kadokawa was knowingly and willfully made; and (2) the defendant's view that he "inadvertently" made this false statement because of his "ADHD," "interpretation issues," and "slang."  (Trial. Tr., Day 11 at p. 126, lines 1-15.)  Faced with both narratives, the jury drew reasonable inferences, adopted the government's view, and convicted defendant. As the Ninth Circuit succinctly put it, on a Rule 29, "in a case involving factual disputes and credibility determinations," the Court "must presume ... that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." H.B., 695 F.3d at 935.

Similarly, defendant's argument that the false statement that he did not know and never texted the person who instructed him to send the Schottenstein checks was not knowing or willful is meritless.

42

Text messages showed that both Kadokawa and Bonilla relayed instructions from Nix to defendant, and told him to make the cashiers' checks payable to Joey Schottenstein.  (Exs. 71, p.37, 92.)  Defendant's statement that he did not know the individual who instructed him to send the checks is demonstrably false.  He knew Bonilla and Kadokawa (and even Nix), and had extensive communications -- including by text -- with each of them.  Defendant's argument that the government cannot prove willfulness because it did not rule out "another unknown individual with whom Puig had never spoken to at the time" is nonsensical.  (Mot. at 25.)  The government needs to prove its case beyond a reasonable doubt, not beyond all doubt.  Like with defendant's false statement that he never discussed sports gambling with Kadokawa, defendant effectively claims that the jury could have inferred from the facts that he was truthful or, at a minimum, confused (thereby negating willfulness) because there may have been some third person who was "unknown to him who provided him with these instructions.  To be clear, there was no evidence of a phantom "unknown" person, so there was nothing for the government to "rule out," and both text messages and trial testimony demonstrated that Kadokawa and Bonilla provided the Schottenstein check instructions to defendant.  (Exs. 71 p. 37, 92.)

Even if there were any semblance of evidence that someone other than Nix, Bonilla, and Kadokawa provided these instructions to defendant, as he claims, that would have created a "factual dispute" which the jury resolved in favor of the government and this Court must "defer to that resolution."  H.B., 695 F.3d at 935.

43

Defendant cites <u>United States v. Henderson</u>, 318 F. Supp. 3d 1221, 1243 (E.D. Wash. 2018) to support his argument there was insufficient evidence of defendant's intent with respect to his § 1001 conviction because the jury was forced to "speculate" to reach conclusions that would satisfy the intent element.  Evidence of defendant's intent, however, was overwhelming.  Indeed, beyond the numerous text messages between defendant, Nix, Kadokawa, and Bonilla related to illegal gambling in 2019, Bonilla's trial testimony and text messages with defendant in the months following defendant's January 2022 interview established that defendant warned Bonilla that federal investigators might seize his phone.  On March 10, 2022, defendant texted Bonilla, "Don't mention my name anymore of they might take away your cell to check it."  (Ex. 102 at 3.)  Further, in a March 14, 2022 voice note to Bonilla, defendant stated,

> Explain to Donny, stop texting me and asking me about that because later when people asking for the phone . . . the peoples will see that he's been texting me  about this and its asking me about that and its going to be more in trouble for him and for myself.  And I no want any trouble.  The people check the other guy's phone and see every text about . . . him and  . . . I don't know what's the other name of the guy but I don't know nothing about it bro.  I sit, sitting over there and listen what these people said and I no said nothing.  I no talking.  I said I  . . . that I only know him from baseball.  Call him and tell him that, no text him.

(Ex. 106).  The government also presented the testimony of United States Citizenship and Immigration Services Officer Jose Lopez, who made clear that defendant previously lied to law enforcement about his illegal gambling in August 2019, when he was <u>still</u> illegally gambling with the WNGB.  (Trial Tr., Day 6, p. 151, line 2 to p. 152, line 11.)  When viewing this evidence in the light most favorable to

44

the government, as required on a Rule 29 standard, defendant knowingly and willfully made the false statements that were the basis of his § 1001 conviction.

### 4. The Government Presented Sufficient Evidence that Defendant's False Statements Were Material

A false statement is material if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." United States v. Gaudin, 515 U.S. 506, 509 (1995) (cleaned up). There is no exception for lying to investigators, even when the investigators "disbelieve[] [the] falsehood." Brogan v. United States, 522 U.S. 398, 402 (1998).

> ### a. The Government Presented Sufficient Evidence that Defendant's False Statement That He Had Never Discussed or Talked About Sports Gambling with Kadokawa Was Material

For the reasons the government articulated in Section III.A.3, when viewing the evidence in the light most favorable to the government, any rational juror could conclude that defendant's false statement that he had never discussed or talked about sports gambling with Kadokawa was material.

> ### b. The Government Presented Sufficient Evidence Showing That Defendant's False Statement That He Did Not Know Who Instructed Him to Send Two $200,00 Cashiers' Checks to Schottenstein Was Material

The government did not have direct evidence that Kadokawa or Bonilla had instructed the defendant, via text, to send $200,000 in cashiers' checks to Schottenstein. The government had a text message from Nix to Kadokawa, providing Schottenstein's shipping address, but as defense counsel elicited from both agents Seymour and Canty, the investigative team could not conclusively state, in 2026, what was in

45

that package; defendant, on the other hand, knows.  The government also had evidence that Kadokawa sent a picture (to Nix) of a package with a shipping label that appeared to be from defendant to Joseph Schottenstein.  Defendant falsely stating that he did not know who instructed him to send $200,000 in cashier's checks to Schottenstein, and that he never communicated with that person via text, was material, since it is exactly the information investigators were seeking as they sought to "follow the money" and find "anchors to the truth."  The agents' attempts met a dead-end with defendant, leaving them to explore other routes that may have been unnecessary had defendant been honest.

After the government searched Bonilla's phone, it found clear text message evidence that Kadokawa had sent defendant instructions to pay Schottenstein.  The government also found evidence that Bonilla, too, had directly text messaged the defendant with instructions to pay Schottenstein.  This caused the government to want to speak to Bonilla, but he declined, which resulted in agents placing Bonilla in grand jury —- further evidence that they were acting as an arm of the grand jury and that the false statements were material.  When viewing all evidence in the light most favorable to the government, a rational juror could find, just as 12 jurors did, that such investigative measures may have been unnecessary if defendant had been truthful.

5.   Even If Investigators Subjectively Believed Defendant Was Lying At Times, His Lies Were Nevertheless Material

Defendant argument that investigators "knew the answers" to the questions they asked is without merit.  Trial testimony demonstrated

that the investigators only suspected as much, and the jury found this testimony credible.  However, even if defendant's factual assertion were true, a subjective belief by the investigators that defendant was certainly lying would not alter the analysis regarding the materiality of his false statements.

There is no exception for lying to investigators, even when the investigators "disbelieve[] [the] falsehood."  Brogan v., 522 U.S. at 402.  The Supreme Court has rejected the argument that a "*disbelieved* falsehood" cannot be material, explaining that what matters is the "the *possibility* (as opposed to the certainty) of perversion" of a "governmental function," such as "an investigation."  Brogan, 522 U.S. at 402; United States v. Serv. Deli Inc., 151 F.3d 938, 941 (9th Cir. 1998) ("The false statement need not have actually influenced the agency . . . and the agency need not rely on the information in fact for it to be material"); see also United States v. King, 735 F.3d 1098, 1108 (9th Cir. 2013).

Here, trial testimony made clear that SA Seymour and SA Canty only suspected that defendant was lying, based on information available to them at that time.  (Trial Tr., Day 7 at p. 136, line 13 – p. 137, line 23, p. 172, line 18 – p. 173, line 3; Trial Tr., Day 9 at p. 43, line 11-15 – p. 44, line 2.)  Indeed, the interview proceeded as most investigation interviews do – the agents suspected defendant's involvement in the WNGB, based on information collected to date in the investigation, and interviewed him to learn more.  If the agents already knew of the complete extent of defendant's involvement in the WNGB, an interview or Grand Jury testimony would not have been necessary.  Given their suspicions of defendant lying,

47

SA Seymour and SA Canty took a variety of investigative steps, following defendant's interview, to determine whether defendant was telling the truth of not.  For example, SA Seymour reached out to Kadokawa the same day as defendant's interview and ultimately convinced Kadokawa to assist the government in its investigation. (Trial. Tr., Day 7 at p. 162, line 22 – p. 167, line 12.)  SAs Seymour and Canty also attempted to interview Bonilla, who Kadokawa identified as a witness; they then sought and obtained a search warrant for Bonilla's phone and issued a subpoena for Bonilla to testify before a grand jury.  (Id. at p. 176, line 15 – p. 178, line 23.)

But even if the investigators believed defendant was lying at times during his interview, his false statements were nevertheless material.  The law gives no benefit to defendants who lie to investigators who know or believe they are lying.  United States v. Serv. Deli Inc., 151 F.3d 938, 941 (9th Cir. 1998) (holding that "the agency need not rely on the information in fact for it to be material"); United States v. Talkington, 589 F.2d 415, 417 (9th Cir. 1978) (holding that in a § 1001 conviction "[p]roof of actual reliance is not required").

That makes sense –- even a disbelieved falsehood carries with it a possibility that a less informed, or less savvy investigator may be misled, or lack sufficient corroboration to successfully bring charges.  For example, the government further investigated Kadokawa, and brought charges against him related to his involvement in the WNGB.  Had Kadokawa elected to proceed to trial, instead of cooperating with the government, defendant's false statements

48

distancing himself from Kadokawa and the WNGB would constitute exculpatory information that the government would have had to contend with at trial.  Indeed, there is little reason in law or common sense to absolve defendants who lie to investigators who subjectively disbelieve their falsehoods.  Put differently, the law does not reward defendants for being bad liars.  Their false statements are no less false, and no less material, just because investigators might disbelieve them, or a portion of them.

At bottom, the investigative team only <u>suspected</u>, and did not conclusively know, that defendant was lying in his interview.  The evidence and testimony reflected this reality, and the government argued as much to the jury.  The jury's conviction demonstrates that they accepted this view of the evidence.  And even if the agents disbelieved defendant's statements, or a portion of them, a reasonable jury could find, when viewing all evidence in the light most favorable to the government, that defendant's false statements were material to the grand jury investigation and the investigating agencies.  See <u>H.B.</u>, 695 F.3d at 935 ("Therefore, in a case involving factual disputes and credibility determinations," the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

**C.   The Jury Did Not Convict Defendant Under Two Different Definitions of "Federal Investigation"**

Defendant claims that the government attempted to cure a "charging error" by embracing two "distinct meanings to 'Federal Investigation'" at trial, which mandates a judgment of acquittal. This argument is flawed for several reasons.

49

First, there is no charging error.  The Ninth Circuit has held that the government need only allege the elements of a crime in the indictment, and that is exactly what the government did here, in the First Superseding Indictment ("FSI").  See United States v. ORS, Inc., 997 F.2d 628, 629 (9th Cir. 1993) ("The government need only allege the 'essential facts necessary to apprise a defendant of the crime charged' and not its theory of the case.")  Mirroring the text of § 1503, the FSI alleges that defendant "corruptly endeavored to  . . . impede the due administration of justice, namely, the Federal Investigation," which the FSI defined as "a federal criminal investigation into federal crimes, including illegal sports gambling and money laundering."  (Dkt. 54 at 2, 5-6.)  Defendant cites no legal authority to otherwise support his baseless contention that the government was required to specifically allege "a judicial or grand jury proceeding" in Count One of the FSI.

Second, the evidence established, and the government argued, that there was one federal investigation, with one meaning.  Despite this clarity, defendant seeks to muddy the waters in an effort to create "manifest error mandating a judgment of acquittal."  The FSI states that HSI, IRS-CI, and the United States Attorney's Office for the Central District of California "were conducting a federal criminal investigation into federal crimes, including illegal sports gambling and money laundering."  (Dkt. 54 at 2.)  This investigation, which utilized the grand jury, was referred to as the WNGB investigation.  The FSI defined the investigation and its parameters through Introductory Allegations in paragraphs 6-26.  These Introductory Allegations were incorporated into both counts.  At

trial, the government introduced evidence to demonstrate that the WNGB federal criminal investigation was conducted by HSI and IRS-CI and that those agencies were acting as an arm of the grand jury throughout the investigation and during defendant's interview; the jury's 1503 conviction shows that the jury necessarily credited this evidence.

Third, defendant's suggestion that a single event cannot give rise to both a § 1503 conviction and a § 1001 conviction is meritless.  This Court need look no further United States v. Dwyer, 238 F. App'x 631, 634 (1st Cir. 2007), a case both parties have cited throughout this case and with which this Court is undoubtedly familiar.  In Dwyer, the FBI, acting as an arm of the grand jury, interviewed the defendant.  In that interview, the defendant "falsely stat[ed] to a Special Agent of the Federal Bureau of Investigation that she assumed that Gretchen Ortiz worked her full shift, but could not verify the actual number of hours worked by Ortiz, and that the only preferential treatment received by Gretchen Ortiz from the administration about which the defendant had knowledge was that the defendant had heard employees complain that Ortiz got to work more hours than other employees."  Based on this exact statement, Dwyer was charged with two counts: Obstruction of Justice[5] (Count 15) and False Statement to a Federal Agent (Count 16).  United States v. Phillips et al., 3:03-CR-30018-MAP, Dkt. 156-3 at 29-30.

---

[5] Notably, as reflected the indictment, the government need not allege that a defendant obstructed and impeded a "grand jury investigation" so long as it alleges that defendant obstructed and impeded the "due administration of justice," which is the verbiage contained in 18 U.S.C. § 1503.

It logically follows that a single event, or statement, could give rise to criminal liability under two statutes that have different policy goals underlying each statute, such as § 1001 and § 1503.  § 1001 criminalizes false statements to a federal agency, which includes HSI and IRS-CI.  § 1503, however, reaches the integrity of the judicial system itself and criminalizes conduct that obstructs pending judicial proceedings (i.e., active grand jury investigation).  Thus, each statute has separate and distinct objectives consistent with their essential elements.[6]

Fourth, defendant's reliance on Deffenbaugh Industries and Butler is misplaced.  In Deffenbaugh Industries, the Department of Justice ("DOJ") brought a § 1001 prosecution against Deffenbaugh Industries for a false statement in an affidavit submitted to DOJ by Deffenbaugh Industries in response to a grand jury subpoena.  There, the Tenth Circuit held that the DOJ could not prosecute Deffenbaugh Industries unless there was a "either a statutory basis for an agency or department's request for information, or when the agency or department has the power to exercise authority in a particular situation."  Deffenbaugh Industries, Inc., 957 F.2d at 753 (citing United States v. Rodgers, 466 U.S. 475, 479-481 (1984)).  The Tenth Circuit held that the DOJ had no independent subpoena power to request the affidavit (i.e., no statutory authority) and similarly

---

[6] To the extent defendant is attempting to argue the counts are multiplicitous, that inquiry is controlled by Blockburger v. United States, 284 U.S. 299 (1932) ("The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not").  Because § 1001 contains an element — proof of a false statement material to a federal agency's jurisdiction — that is not contained in § 1503, the counts are not multiplicitous.

did not have "power to exercise authority" in the role of a "unique kind of aide to the grand jury." Deffenbaugh Industries, Inc., 957 F.2d at 753. Accordingly, it held that "the allegedly false statements in the affidavit of compliance are not within the jurisdiction of the Department of Justice for purposes of § 1001." Id. at 754.

Here, unlike in Deffenbaugh Industries, defendant uttered his false statements not only to DOJ, but also to HSI and IRS-CI. Accordingly, the pertinent inquiry, according to the Supreme Court in Rodgers, is whether either of those agencies have a statutory basis or the power to exercise authority in the particular situation. Rodgers, 466 U.S. at 479-481. The answer is unequivocally "yes." In Rogers the Supreme Court determined that the FBI has a "statutory basis . . . to detect and prosecute crimes against the United States." Id. at 481 (citing 28 U.S.C. § 533(1)). Like the FBI, both HSI and IRS-CI have a statutory basis to detect and prosecute crimes against the United States. Id. Because HSI and IRS-CI have independent statutory authority (unlike DOJ), on these facts, §§ 1503 and 1001 charges are proper. Defendant conveniently ignores that Deffenbaugh Industries involved no agency other than DOJ.

Defendant citation to Butler fares no better. Defendant cites Butler, a district court case, for the proposition that courts have noted that "false statements within the jurisdiction of grand juries are not covered" by § 1001. (Mot. at 32.) Reading Butler in context makes clear that the court reached that conclusion in reference to testimony before the grand jury. That makes sense. As the Butler court noted, "there is no basis to conclude that Congress intended §

53

1001 to penalize false grand jury testimony at all" because there is a statute that penalizes that precise conduct—§ 1623 (false declarations before grand jury or court).  Butler, 351 F. Supp. 2d at 132.  That is materially different that the situation here where defendant did not testify and lie before the grand jury, but to federal agents acting as an arm of the grand jury.  In fact, as the evidence made clear, defendant consciously avoided being placed in grand jury which is why he did not sit for a voluntary interview until he was served with a grand jury subpoena.

At bottom, there is no manifest error mandating a judgment of acquittal.

**IV.   CONCLUSION**

For the reasons discussed herein, the government respectfully requests that this Court deny defendant's renewed Rule 29 motion.