Keri Curtis Axel (Bar No. 186847)
 kaxel@waymakerlaw.com
Jose R. Nuño (Bar No. 312832)
 jnuno@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Brian Klein (Bar No. 258486)
 bklein@cooley.com
Chip Harrison (Bar No. 313028)
 charrison@cooley.com
Viviana Andazola Marquez (Bar No. 354307)
 vandazolamarquez@cooley.com
COOLEY LLP
350 S. Grand Avenue, Suite 3200
Los Angeles, California 90071
Telephone: (213) 561-3250
Facsimile: (213) 561-3244

*Attorneys for Defendant*
*Yasiel Puig Valdes*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YASIEL PUIG VALDES,<br><br>Defendant. | Case No. CR 22-394-DMG<br><br>**DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF HIS MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29**<br><br>Hearing Date: May 5, 2026<br>Time: 3:00 p.m.<br>Courtroom of Hon. Dolly M. Gee |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   COUNT ONE: THE GOVERNMENT FAILED TO PROVE OBSTRUCTION OF JUSTICE UNDER 18 U.S.C. § 1503 ......................... 3

    A.    The Government Failed to Prove a Pending Grand Jury Proceeding ........................................................................................ 3

    B.    The Government Failed to Show the Investigators "Acted as an Arm of" any Grand Jury ................................................................. 9

        1.    The government's evidence showed an investigation by independent agencies, not a grand jury. ...................................... 9

        2.    The case law confirms the government's evidence is insufficient for conviction .......................................................... 11

    C.    The Government Failed to Show a Required Nexus to a Grand Jury Proceeding .................................................................... 14

    D.    The Government Failed to Show that Puig's Alleged Acts Were Material to Grand Jury's Inquiry ......................................... 17

III.  COUNT TWO: THE GOVERNMENT FAILED TO PROVE FALSE STATEMENTS UNDER 18 U.S.C. § 1001 ..................................................... 18

    A.    The Government Failed to Prove Either of the Challenged Statements Were False ............................................................... 18

        1.    Statement 1 ("Never Discussed Sports Betting with Kadokawa"). ......................................................................... 18

        2.    Statement 2 ("Did Not Know Who Instructed the Schottenstein Checks"). ........................................................... 22

    B.    The Government Failed to Prove that Puig's Conduct Was Willful ....................................................................................... 24

    C.    The Government Failed to Prove Puig's Statements Were Material ..................................................................................... 26

IV.   THE DUAL CONVICTION IS IRRECONCILABLE AS A MATTER OF LAW ....................................................................................... 28

V.    CONCLUSION ......................................................................................... 32

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Blockburger v. United States*,
284 U.S. 299 (1932) ....................................................................................29

*Brogan v. United States*,
522 U.S. 398 (1998) ....................................................................................26

*Doe v. DiGenova*,
779 F.2d 74 (D.C. Cir. 1985) ........................................................................5

*First Nat'l Bank of Tulsa v. DOJ*,
865 F.2d 217 (10th Cir. 1989) .......................................................................5

*Juan H. v. Allen*,
408 F.3d 1262 (9th Cir. 2005) .......................................................................7

*Lopez v. DOJ*,
393 F.3d 1345 (D.C. Cir. 2005) .....................................................................5

*Masoner v. Thurman*,
996 F.2d 1003 (9th Cir. 1993) .....................................................................31

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) .......................................................................15

*Thompson v. United States*,
604 U.S. 408 (2025) .......................................................................18, 22, 23

*United States v. Aguilar*,
515 U.S. 593 (1995) ..............................................................................passim

*United States v. Butler*,
351 F. Supp. 2d 121 (S.D.N.Y. 2004) .....................................................29, 30

*United States v. Davis*,
183 F.3d 231 (3d Cir. 1999) ........................................................................10

*United States v. Deffenbaugh Industries, Inc.*,
957 F.2d 749 (10th Cir. 1992) .....................................................28, 29, 30, 31

*United States v. Duz-Mor Diagnostic Lab'y, Inc.*,
650 F.2d 223 (9th Cir. 1981) .......................................................................31

*United States v. Dwyer*,
238 F. App'x 631 (1st Cir. 2007) ....................................................................8

*United States v. Facchini*,
874 F.2d 638 (9th Cir. 1989) .......................................................................28

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

*United States v. Fassnacht,*
    332 F.3d 440 (7th Cir. 2003)............................................................................12, 13

*United States v. Fleming,*
    215 F.3d 930 (9th Cir. 2000)...................................................................................3

*United States v. Fortenberry,*
    89 F.4th 702 (9th Cir. 2023)....................................................................24, 25, 28

*United States v. Hopper,*
    177 F.3d 824 (9th Cir. 1999)...................................................................................3

*United States v. Jiang,*
    476 F.3d 1026 (9th Cir. 2007).......................................................................passim

*United States v. Macari,*
    453 F.3d 926 (7th Cir. 2006).........................................................................passim

*United States v. Nevils,*
    598 F.3d 1158 (9th Cir. 2010)...........................................................................1, 7

*United States v. Rodgers,*
    466 U.S. 475 (1984) ...............................................................................................28

*United States v. Salinas-Ceron,*
    731 F.2d 1375 (9th Cir.1984)................................................................................27

*United States v. Sanchez-Lopez,*
    879 F.2d 541 (9th Cir. 1989).................................................................................15

*United States v. Serv. Deli Inc.,*
    151 F.3d 938 (9th Cir. 1998)....................................................................26, 27, 28

*United States v. Steele,*
    241 F.3d 302 (3d Cir. 2001) ....................................................................................6

*United States v. Thomas,*
    612 F.3d 1107 (9th Cir. 2010)...........................................................................3, 17

**STATUTES**

18 U.S.C. § 1001..........................................................................................................passim

18 U.S.C. § 1503..........................................................................................................passim

18 U.S.C. § 1621..............................................................................................................29

18 U.S.C. § 1623..............................................................................................................29

**RULES**

Federal Rule of Evidence 801(c)(2) ...............................................................................15

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

## I.       INTRODUCTION

The government's opposition confirms what the trial record already made clear: the government cannot identify legally sufficient evidence to sustain either of the two counts of conviction. Rather than point to specific trial evidence establishing the required elements, the government asks this Court to assume what it did not prove, recharacterize what its own witnesses said, and treat speculation as reasonable inference. That is not enough. "Mere speculation" cannot sustain a conviction, and the government's "total failure of proof of the requisite elements" requires acquittal. *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (en banc) (cleaned up).

On Count One, the government's opposition only underscores the absence of proof required to prove obstruction of justice under *United States v. Aguilar*, 515 U.S. 593 (1995). The government never proved a pending grand jury proceeding: no agent testified to a "grand jury investigation" into the Wayne Nix Gambling Business ("WNGB"), no grand jury subpoena was introduced into evidence, and the only subpoena even mentioned in the record—separately issued to Puig—was cancelled before any appearance was made. The government also never proved the agents were acting as an arm of the grand jury. Instead, the agents described a joint IRS-HSI investigation, testified about agency investigative tools, and never once mentioned gathering or presenting evidence to a grand jury. Likewise, the government's opposition falls far short of establishing the required "nexus" between Puig's alleged statements and a grand jury proceeding, instead replaying its same arguments that suggest, at most, that Puig understood those statements would be used only as part of an executive-branch investigation. Finally, the government failed to introduce any evidence as to how Puig's statements were material to the grand jury's inquiry. The government's opposition does not remedy these deficiencies—it simply recharacterizes the testimony and asks this Court to speculate.

1

On Count Two, the government failed to prove falsity, intent, or materiality for the two statements at issue. The charge that Puig purportedly falsely stated he never discussed sports betting with Donny Kadokawa fails when the government cannot prove (as it cannot here) what question was actually asked and cannot get around the fact that Puig *did* disclose sports betting activity with Kadokawa during that interview and offered his text messages to corroborate it. This critical context renders a false statement charge unsupportable as a matter of law as the government must live with the ambiguity it created and failed to clarify. The alleged false statement that Puig did not know the person who directed him to send checks to Schottenstein also fails. The evidence at trial that Puig spoke by phone with Wayne Nix, a then-unknown person, just prior to sending the checks. The government failed to address this at trial and again in its opposition, charging full steam ahead with its omission or "misleading statements" theory. But, of course, the government charged *falsity*, not *omission*, and a misleading-but-true statement cannot sustain a conviction under a statute that criminalizes only "false" ones. And, even if Puig's purported statements were false and willful (they were not), neither statement was material to the investigation. The agents knew the information they were asking about and both agents confirmed at trial that Puig had no connection to any subsequent investigations.

Finally, the government has no answer to the fundamental inconsistency between its two counts. The case law is clear that when investigators act as an arm of the grand jury, their authority flows from the grand jury—not from their independent agency mandates—and false statements made within that umbrella are not actionable under 18 U.S.C. § 1001. The government cannot simultaneously maintain that the agents were acting as an arm of the grand jury for purposes of 18 U.S.C. § 1503 and that they were exercising independent agency authority for purposes of Section 1001. The dual conviction is irreconcilable as a matter of law.

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

For these reasons, and for the reasons set forth in the opening motion, this Court should enter a judgment of acquittal for Puig on both counts.

***

The government notes in its opposition that Puig "does not dispute that the jury was properly instructed." (Dkt. 436 ("Opp.") at 3.) This is not true.  Rather, Puig only moved for judgment of acquittal under Rule 29 and not for a new trial under Rule 33. Puig maintains and does not waive in any way the objections he made on the record, including to the jury instructions on which this Court already ruled.

## II.   COUNT ONE: THE GOVERNMENT FAILED TO PROVE OBSTRUCTION OF JUSTICE UNDER 18 U.S.C. § 1503

The government's opposition confirms it failed to prove *any* of the requirements of *Aguilar* and its progeny to sustain an obstruction conviction under 18 U.S.C. § 1503: (1) the existence of an official grand jury proceeding, (2) that the IRS and HSI investigators ("Federal Investigators") were acting "as an arm of the grand jury," (3) a nexus between Puig's conduct and the grand jury proceeding, and (4) that Puig's conduct was material to the grand jury's inquiry. *See Aguilar*, 515 U.S. 593; *United States v. Fleming*, 215 F.3d 930, 934 (9th Cir. 2000) (grand jury proceeding must be "pending"); *United States v. Hopper*, 177 F.3d 824, 830 (9th Cir. 1999) (investigators must be "acting as an arm of the grand jury"); *United States v. Thomas*, 612 F.3d 1107, 1129 (9th Cir. 2010) (alleged obstructive acts must be material to the subject of the grand jury's inquiry). Puig is entitled to a judgment of acquittal as to Count One.

### A.   The Government Failed to Prove a Pending Grand Jury Proceeding

The government's obstruction case fails from the start because it never proved the "existence of a pending [grand jury] proceeding." *Fleming*, 215 F.3d at 934 ("Although it is not mentioned in the statute, the [g]overnment must prove the

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

existence of a pending judicial proceeding in a prosecution for a violation of § 1503.") While a grand jury investigation can constitute a pending judicial proceeding for purposes of Section 1503, this is not a license to sweep in every federal investigation—a government agency's investigation that is "separate and apart from the court's or the grand jury's authority does not constitute a 'judicial proceeding.'" *United States v. Macari*, 453 F.3d 926, 936 (7th Cir. 2006) (citing *Aguilar*, 515 U.S. at 599).

The government's opposition cannot overcome this hurdle because the trial record is devoid of evidence that *any* grand jury proceeding was pending at the time of Puig's interview: no agent ever mentioned a grand jury investigation, no grand jury subpoena was introduced into evidence, and the only subpoena in the record—issued to Puig himself—was cancelled before any appearance was made. (*See* 01/29/2026 Tr. 36:4-13 (Seymour Cross) (grand jury subpoena was "canceled"); 01/30/2026 Tr. 136:11-18 (Canty Recross) ("the grand jury subpoena was called off").) What the record established, at most, was an agency investigation within the executive branch conducted by HSI and the IRS, precisely the type of agency investigation that falls outside the reach of Section 1503. For the reasons below, the government's opposition makes clear that it did not (and could not) prove the existence of a grand jury proceeding at trial, foreclosing the speculative inference the government now asks this Court to draw.

***First***, the government's opposition ignores that there is a total absence of evidence in the record showing a pending *grand jury* investigation into WNGB. Instead, the government effectively asks this Court to assume that there *must have been* a grand jury proceeding because the case agents "testified at length regarding the grand jury investigation of the WNGB, grand jury subpoenas they served, [and] documents they reviewed pursuant to those subpoenas." (*See* Opp. at 7.) But that characterization is simply false. No testifying agent or other government witness ever mentioned a "grand jury investigation" involving anything under investigation

4

here in their trial testimony. Let alone a pending one. None. Although the government points to indirect references to "subpoenas" in the trial record, any such references were devoid of context that would allow the jury to infer that those were subpoenas *issued by a grand jury*, instead of subpoenas issued by the executive branch. (*See, e.g.,* 01/27/2026 Tr. 221:25-222:1 (Seymour) ("In addition, we did interviews and phone calls and subpoenaed bank records…"); 01/28/2026 Tr. 33:1-2 (Seymour) ("So when we do an investigation is there subpoenas [sic], there's waiting for the records to come back…"); 01/29/2026 Tr. 194:7-8 (Canty) ("We were able to obtain bank records, also phone records for the individuals that were identified.").)

This is a particularly glaring omission considering the executive branch has the authority to issue subpoenas, even grand jury subpoenas, without the involvement of the grand jury. *See Lopez v. DOJ*, 393 F.3d 1345, 1349 (D.C. Cir. 2005) ("[T]he term 'grand jury subpoena' is in some respects a misnomer, because the grand jury itself does not decide whether to issue the subpoena; the prosecuting attorney does."); *First Nat'l Bank of Tulsa v. DOJ*, 865 F.2d 217, 220 (10th Cir. 1989) ("[A] United States Attorney has the authority to obtain a blank grand jury subpoena form, fill in the blanks, and serve the subpoena without the authorization (or even knowledge) of the grand jury."); *Doe v. DiGenova*, 779 F.2d 74, 80 (D.C. Cir. 1985) ("[G]rand jury subpoenas are issued at the request, and in the discretion of the prosecuting attorney involved in the case . . . ."). No reasonable jury could have inferred from this limited, vague testimony that there was a pending grand jury proceeding into the WNGB.

The government had the opportunity to introduce into the record grand jury subpoenas, but it chose not to do so. The reason, of course, is that this material does not exist. There was no pending grand jury investigation into the WNGB; at best, there was an executive branch investigation undertaken by the IRS and DHS. The

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

government cannot cure an evidentiary gap in its trial record by recharacterizing the evidence in its post-trial briefing.

*Second*, the government's failure to prove a pending grand jury proceeding with respect to the WNGB is not saved by the fact that Puig received an unrelated grand jury subpoena. The government argues that a subpoena to the defendant is "at a minimum, indicia that there was an active grand jury investigation," and that "even if defendant had not been served with a grand jury subpoena, the current record would suffice to establish an active grand jury investigation." (Opp. at 13.) Neither proposition holds water.

The first reference to any grand jury subpoena in the trial testimony—as explained by the case agents themselves—was the subpoena issued to Puig. (*See* Dkt. 429 ("Mot.") at 7.) And the agents explained that Puig's subpoena was issued *not* upon the request of an investigating grand jury, or to present evidence to a grand jury, but by AUSA Mitchell as a tool to compel Puig to provide information, given his refusal to do so voluntarily. (*See* 01/29/2026 Tr. 219:2-220:2 (Canty).) The case law is clear that the mere fact that a grand jury subpoena is issued does not mean that it "ripens into a pending grand jury investigation." *United States v. Steele*, 241 F.3d 302, 304 (3d Cir. 2001). In this case, the evidence is unequivocal that the Puig subpoena did not ripen into anything, because it was cancelled. (*See* 01/29/2026 Tr. 36:4-13 (Seymour Cross) (grand jury subpoena was "canceled"); 01/30/2026 Tr. 136:11-18 (Canty Recross) ("the grand jury subpoena was called off").) Not only was Puig not required to appear before a grand jury, but the agents, despite their lengthy testimony describing the interview, never indicated that they intended to subsequently testify in the grand jury or otherwise provide Puig's statements to a grand jury. Simply put, there is zero evidence in the record tying Puig's interview to a pending grand jury proceeding, either before or after the fact.

The government argues that the cancellation of Puig's subpoena is irrelevant because the grand jury investigation "continued to exist both at the time of

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

defendant's interview and afterwards," and that any dispute about the impact of the subpoena's withdrawal is "an evidentiary dispute that is within the purview of the jury." (Opp. at 14.) But this reasoning is circular: the only evidence of *any* grand jury proceeding in the record is testimony regarding the cancelled subpoena to Puig, which the agents themselves described as a coercive tool rather than a product of grand jury process. Pointing to the cancellation of that subpoena as evidence that a grand jury investigation persisted is not a resolution of a factual dispute—it is speculation, and "mere speculation" is precisely the type of "total failure of proof" that mandates a judgment of acquittal under *Nevils*, 598 F.3d at 1167.[1]

*Finally*, the case law the government relies upon simply confirms that the government did not actually prove the existence of a grand jury proceeding here. (*See* Opp. at 6-7, 11.) The government invokes *Macari* and *Dwyer* to argue that a pending grand jury proceeding can be inferred from the circumstances of the investigation. (*Id.*) But both cases rested on concrete, specific evidence of a pending proceeding that has no parallel here.

In *Macari*, a union (Local 110) received a grand jury subpoena in August 1999, issued under the name of the "SPECIAL JANUARY 1999-1 Grand Jury," requesting its records, lists of names, phone numbers, and rosters. *Macari*, 453 F.3d at 932. Copies of that subpoena were distributed internally within the union, including to the defendant, who then discussed with others how to respond. *Id.* at 932-33. The *Macari* court emphasized that, unlike cases where "no evidence"

[1] The government frames *Nevils* as though it places the burden on *the defendant* to show evidence "supportive of his innocence" to prevail on a Rule 29 motion. (*See* Opp. at 2.) But a long line of Ninth Circuit cases, including *Nevils*, makes clear that "evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case." *Nevils*, 598 F.3d at 1167 (citing *Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005)). Evidence "so supportive of innocence" is merely one of the circumstances in which judgment of acquittal is warranted, but not the only one.

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

existed "to establish that any grand jury had been impaneled prior to the date the defendants allegedly obstructed justice," the government there presented "evidence that in January of 1999, a grand jury had been impaneled to investigate into Local 110's activities." *Id.* at 938. The evidence at trial showed that the FBI had been "gathering and presenting evidence" to a grand jury investigating Local 110 from 1999 until the defendants' indictment in 2003, and the government's evidence included the testimony of witnesses who had been subpoenaed to testify before the grand jury and documentary evidence of the actual grand jury subpoenas issued relating to Local 110. *Id.* at 937.

Similarly, in *Dwyer*, trial testimony showed that the "grand jury proceeding . . . was underway before the government interviewed" the defendant, and the defendant's supervisor testified that when a grand jury subpoena came in, a group of employees responsible for gathering responsive documents—including the defendant—would be told of, and would know about, the existence of the subpoena. *United States v. Dwyer*, 238 F. App'x 631, 650 (1st Cir. 2007) (unpublished)[2] (cleaned up).

Both *Macari* and *Dwyer* underscore what the government did not prove at trial, even when drawing inferences in their favor. In this case, unlike in *Macari* and *Dwyer*, the government introduced no evidence to suggest that a grand jury proceeding regarding either the WNGB or Puig was pending at the time of his interview. Here, the government did not introduce the actual grand jury subpoenas into the record, and no agent testified about materials or testimony that were provided to the grand jury or about their plans to present such materials to a grand jury in the future. Indeed, unlike *Macari*, no one here even knows the name of the specific grand jury that was supposedly investigating the WNGB or Puig. The

---

[2] According to First Circuit L.R. 32.1.0, unpublished decisions may be cited and can be considered only "for their persuasive value but not as binding precedent."

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

government's opposition offers no meaningful response to this deficiency but instead relies on this Court to speculate that a grand jury was pending. But, again, speculation is insufficient to support conviction under *Nevils*, and judgment of acquittal on Count One is required.

**B.      The Government Failed to Show the Investigators "Acted as an Arm of" any Grand Jury**

Even if the government could show that there was a pending grand jury proceeding, it still failed to show that the investigators "acted as an arm of the grand jury," as required by *Aguilar*, 515 U.S. at 600. This requirement is not a trivial one. The government must show that it conducted its investigation "with the intention of presenting evidence before [the] grand jury" such that the investigating agency is "*integrally involved in the grand jury investigation*[.]" *Macari*, 453 F.3d at 937 (cleaned up and emphasis added). Where the "government agency's investigation" is "separate and apart from the court's or the grand jury's authority[,]" there is no judicial proceeding within the meaning of Section 1503. *Id.* at 936. Rather than shoring up this argument, the government's opposition serves only to confirm that the agents here were not acting as agents of a grand jury, but they were instead acting on their own volition on behalf of their respective executive agencies. This deficiency requires acquittal as a matter of law.

1.      The government's evidence showed an investigation by independent agencies, not a grand jury.

Chiefly, the government's opposition rests on a foundational factual claim that is directly contradicted by the trial testimony. In an attempt to show that the agents were working on behalf of a grand jury, the government asserts that "SA Jason Canty and IRS-CI SA Christen Seymour testified at length regarding the grand jury investigation of the WNGB, grand jury subpoenas they served, documents they reviewed pursuant to those subpoenas, and witness interviews they and other federal investigators conducted in furtherance of the grand jury

9

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

investigation before defendant's interview." (Opp. at 7.) These invented claims are unsupported by the trial record. Agent Canty, the lead HSI agent, in fact described the WNGB investigation as a "joint investigation" between IRS and HSI and "various other agencies, IRS being the primary"—not a grand jury investigation. (01/29/2026 Tr. 191:11-192:6.) Agent Seymour and Agent Canty spoke extensively about the interests their respective agencies had in the investigation, including the use of evidence collected to investigate potential money laundering, tax evasion, and illegal gambling. (*See, e.g.*, 1/29/2026 Tr. 140:14-16 (Seymour Redirect); *id*. 141:5-18; *id*. Tr. 210:8-214:21 (Canty).) Neither agent *at any point* testified to amassing this evidence on behalf of a grand jury, or of presenting it to a grand jury.

The only possible direct evidence and testimony about the investigative methods employed to investigate the WNGB concerned Title III wiretaps, search warrants, and witness interviews, all of which are methods employed by agents of the executive branch that fail to indicate a pending judicial proceeding within the meaning of Section 1503. *See United States v. Davis*, 183 F.3d 231, 239-40 (3d Cir.), *amended*, 197 F.3d 662 (3d Cir. 1999) (holding that wiretaps, like search warrants, are investigative methods employed by agents of the executive branch and "are insufficient to invoke § 1503"). And, as discussed above, in the very few cases where the agents mentioned "subpoenas" in their testimony, there is no reference to those being grand jury subpoenas or in any way associated with any official proceeding.

The government downplays the defense's position as somehow demanding magic words from the agents. (*See* Opp. at 12, n.2 ("Defendant does not cite a single case requiring the government to elicit specific words or phrases to support a § 1503 conviction.").) But this is a strawman. The issue is not whether the agents used the literal phrase "grand jury investigation." The issue is whether the government proved, through legally sufficient evidence, that the agents were conducting the investigation *as an arm of the grand jury*, as opposed to pursuant to their own

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

independent agency authority, which is what the testimony described. A jury cannot rely on mere speculation to supply evidence the government failed to introduce.

> 2. The case law confirms the government's evidence is insufficient for conviction.

Sensing that its evidence is insufficient to support conviction, the government spends much of its opposition trying to recast the relevant case law to support a narrow and less demanding reading of *Aguilar*'s requirements. (*See* Opp. at 5-6.) But a careful reading of these cases confirms how far the record in this case falls short of the standard required.

As the government correctly notes, to prove an agency acted as an "arm of the grand jury," the government must show that the agents were "integrally involved" in the grand jury investigation and that the agency's activities were "undertaken with the intention of presenting evidence before the grand jury." (*See id.* at 7 (citing *Macari*, 453 F.3d at 937 (cleaned up).) In *Macari*, the government's evidence tying the agents to the grand jury was extensive and specific: In August 1999, Local 110 received a subpoena from the FBI issued under the name of the Special January 1999-1 Grand Jury requesting Local 110's records; the office manager made copies and distributed them, including to the defendant, who then discussed with co-conspirators how to respond; a cooperating witness agreed to assist the FBI and proceeded to meet with FBI agents more than twenty times in connection with the grand jury investigation, and also met with AUSAs to discuss Local 110's activities; and just five days after the recorded conversation in which the defendant made his obstruction attempts, FBI agents served a key witness with a subpoena to appear before a grand jury, and the next day the defendant himself informed that witness that he too had received a grand jury subpoena. *Id.* at 932-933, 937.

The evidence in *Macari* showed that the FBI had been "gathering and presenting evidence" to a grand jury investigating Local 110 from 1999 until the defendants' indictment in 2003. *Id.* at 937. Not only was the grand jury investigation

11

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

lengthy, it was thorough, and the government's evidence at trial included the testimony of witnesses who had been subpoenaed to testify before the grand jury about Local 110, and documentary evidence of the actual grand jury subpoenas issued relating to Local 110. *Id.* The *Macari* court relied on the previous extensive investigation and presentation to the grand jury, the fact that the defendant's conduct sought to interfere with the investigation by instructing a witness to lie, and then the fact that subpoenas were actually issued after the obstruction, to find that, at the time of the obstruction, the agents "presently contemplated [a] presentation of evidence before the grand jury." *Id.* at 938-939.

Nothing close to the evidence in *Macari* is present here. Far from showing how specifically the agents interacted with the grand jury, the government did not even introduce a copy of a grand jury subpoena. Nor did the agents identify the specific grand jury the agents were purportedly acting on behalf of. Given the flimsy record presented, it is hard to conceive how the agents could be "integral" to such a grand jury, assuming one existed at all.

The government similarly argues that *United States v. Fassnacht*, 332 F.3d 440 (7th Cir. 2003), supports its position because the court there found the investigators there acted as an arm of the grand jury notwithstanding an absence of agent testimony specifically about presenting evidence to the grand jury. (*See* Opp. at 16). But the facts of that case dwarf what was proven here.[3]

---

[3] The government makes similar arguments based on *Dwyer*, an unpublished opinion from the First Circuit discussed above. (*See* Opp. at 11-12 (citing 238 F. App'x 631).) Like *Fassnacht* and *Macari*, the evidence of an actual grand jury proceeding in *Dwyer* was overwhelming: the defendant there was asked by the investigating agents about documents that were specific to the grand jury subpoena she received. *Dwyer*, 238 F. App'x at 651. And the evidence showed that the evidence collected by the FBI was in fact "eventually presented to the grand jury." *Id*. On these facts, the First Circuit understandably found there was a sufficient basis for a jury to conclude the FBI was working as an arm of the grand jury. *Id*. No such facts are present here.

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

In *Fassnacht*, the evidence supporting the agents' relationship with the grand jury was similarly extensive. The IRS opened a formal federal grand jury investigation—identified specifically as grand jury number 96 GJ 258—and the IRS Criminal Investigation Division special agent who testified at trial served as the case agent for that specific grand jury investigation from the outset. *Fassnacht*, 332 F.3d at 443. A grand jury subpoena was personally served on Fassnacht by an agent, and Fassnacht was recorded in a telephone conversation discussing "the subpoena [he] received." *Id.* at 449. A coconspirator was later tape-recorded discussing Fassnacht's "postponed grand jury testimony." *Id.* In light of this overwhelming evidence that Fassnacht knew of and was acting in response to a specific grand jury proceeding, the Seventh Circuit concluded that "even if [the jury] believed that the defendants' obstructive efforts were primarily aimed at the IRS agents, the jury was entitled to make the rational inference that [defendants] understood that the IRS agents were acting as the 'arm of the grand jury,' and that impeding the agents' efforts necessarily meant obstructing the grand jury." *Id.* at 451.

The government cites that proposition from *Fassnacht* as if it applies here. (*See* Opp. at 18.) It does not. In *Fassnacht*, the inference was warranted by an overwhelming evidentiary foundation, including a formally impaneled grand jury with an official identifying number, a personally served grand jury subpoena, recorded conversations explicitly referencing the grand jury, agents testifying as to their roles within the grand jury investigation, and false documents prepared specifically to obstruct the anticipated grand jury inquiry. In this case, none of those predicate facts exist. Where *Fassnacht* and *Macari* allow a rational inference on a robust record, the government here asks this Court to ratify speculation built on an evidentiary void. That is insufficient to support a conviction, and Puig is entitled to judgment of acquittal.

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

**C.      The Government Failed to Show a Required Nexus to a Grand Jury Proceeding**

Likewise, even if a pending grand jury proceeding existed and the agents were acting as its arm—neither of which was proven—the government failed to establish the requisite nexus. Under *Aguilar*, a defendant's obstructive conduct must have the "natural and probable effect of interfering with the due administration of justice." 515 U.S. at 599 (cleaned up). *Aguilar* demands, at a minimum, that the defendant have "knowledge that his actions are likely to affect the judicial proceeding." *Id.* The government did not prove that either, and its opposition does not change this analysis.

The three-part chronology laid out in the government's opposition does not establish the knowledge required to prove the nexus with a grand jury proceeding. (*See* Opp. at 16-20.) The government first points to the October 2021 home visit, in which federal agents told Puig that the IRS was investigating illegal sports gambling. (Opp. at 18-19.) But, of course, that disclosure established at most that Puig was aware of an IRS agency investigation, not a grand jury proceeding. It therefore cuts directly against the nexus element: the agents identified themselves as IRS agents conducting an agency investigation, and the natural and probable understanding of that disclosure is that Puig's statements would go to the IRS, not to any grand jury. The government cannot rely on a disclosure that signaled only that an executive agency was investigating sports gambling as evidence that Puig believed his statements would affect any judicial proceeding whatsoever.

The government next points to the December 2021 service of a grand jury subpoena requiring Puig to appear and testify in Los Angeles, with Agent Donies explaining that he would have to testify before the grand jury. (Opp. at 19.) But as discussed above, that subpoena was issued not upon the request of an investigating grand jury, but as a coercive tool to compel Puig to participate in a voluntary interview. And it worked: Puig appeared voluntarily, the subpoena was cancelled,

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

and no grand jury testimony was ever given. (*See* 01/29/2026 Tr. 36:4-13 (Seymour Cross) (grand jury subpoena was "canceled"); 01/30/2026 Tr. 136:11-18 (Canty Recross) ("the grand jury subpoena was called off").) Whatever awareness a subpoena might otherwise convey, a subpoena that is cancelled before any appearance has been made cannot fairly establish that he believed his voluntary interview statements would ever reach a grand jury.

The government's third category of evidence is AUSA Mitchell's out-of-court statement during the interview that, although the interview was voluntary, it could be reconvened before a grand jury if Puig declined to answer further questions about Kadokawa. (Opp. at 19-20.) As an initial matter, this statement was offered pursuant to Federal Rule of Evidence 801(c)(2) without cross-examination of AUSA Mitchell and not for the truth of the matter asserted, and the government cannot now argue that this Court should accept it for the factual proposition that a grand jury existed. *See United States v. Sanchez-Lopez*, 879 F.2d 541, 555 (9th Cir. 1989) (abuse of discretion to admit non-hearsay statement as competent evidence); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 779, n.26 (9th Cir. 2002) (out-of-court statement may not be relied on as operative fact to preclude summary judgment despite putative non-hearsay purpose for admission) ("When the proponent offers the statement for a nonhearsay purpose, we are primarily interested simply in the fact that the statement was made. The fact *of* the statement is relevant; the truth of the facts *in* the statement is irrelevant." (n. 26, citing Edward J. Imwinkelried, *Evidentiary Foundations* 312 (4th ed. 1998)).

In any event, the government's argument that Mitchell's statement proves Puig's knowledge that a grand jury existed and that his statements would affect it, (*see* Opp. at 20), inverts what was actually said. AUSA Mitchell's statement conveyed a conditional threat: *if* Puig stopped cooperating voluntarily, *then* he might be compelled to answer those same questions before the grand jury. The plain impact of that conditional is that his voluntary answers during the interview

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

were not going to the grand jury—only compelled testimony would. Far from establishing that Puig understood his interview statements to be "likely to affect" a grand jury proceeding, the AUSA's remark informed him that his voluntary statements occupied a different lane entirely. That is the opposite of what the nexus element requires.

As explained in the opening brief, the nexus requirement is further undercut by the agents' testimony that they did not believe Puig was truthful during the interview. (Mot. at 13.) If the agents did not believe his testimony was credible (and if Puig himself was not the target of the investigation), there would be no reason to present his statements to a grand jury investigating the WNGB. The government, however, argues in its opposition that even if the agents suspected Puig was lying during the interview, or knew that some of his statements were inconsistent with documents gathered, his statements could still be presented to a grand jury and attributed to him as a witness. (Opp. at 22.) This is precisely the kind of hypothetical the Supreme Court found insufficient in *Aguilar*, where the obstruction conviction was reversed because the agent to whom the defendant lied "ha[d] not been subpoenaed or otherwise directed to appear before the grand jury," meaning his false statements could not "be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Aguilar*, 515 U.S. at 601. The government's theory—that Puig's interview statements might have been presented to a grand jury if one existed and if the agents had been directed to testify is the speculative chain of "what-ifs" that *Aguilar* prohibits. There is no evidence in the record that either agent had been directed to appear or planned to appear before the grand jury. Therefore, as a matter of law, Puig could not have been aware that his statements would ever be presented to a grand jury.

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

**D.    The Government Failed to Show that Puig's Alleged Acts Were
Material to Grand Jury's Inquiry**

The government's opposition tellingly failed to address the key issue of whether Puig's alleged statements had "a reasonable relationship to the subject" of the *grand jury's* inquiry. *Thomas*, 612 F.3d at 1128. Instead, the government again conflates what is sufficient to satisfy materiality as to *agency* investigation to what is required to prove materiality as to a *grand jury* investigation. (*See* Opp. at 24.) But, as discussed above, the government cannot deny it failed to introduce any evidence about the scope of the grand jury's investigation, or that Puig's statements to the agents were going to be presented to the grand jury. The government merely points to gaps in the *government's* investigation that the agents sought to fill by interviewing Puig. (*See, e.g.,* Opp. at 26 ("[T]he government sought to learn more about the nature and extent of the relationship between Kadokawa and the defendant regarding sports bets.").) That cannot be stretched or treated as interchangeable with the grand jury's inquiry without evidence to support that the federal investigation was one and the same as the grand jury's inquiry, or that the agents were going to introduce Puig's statements to the grand jury. As such, the jury lacked *any* evidence to assess the scope of the grand jury's inquiry to assess whether Puig's statements to the Federal Investigators were material to it, and Puig's conviction under Count One cannot stand.[4]

***

In short, the government has failed to prove the fundamental elements of an obstruction charge under 18 U.S.C. § 1503: the existence of a pending grand jury proceeding, that the agents were "acting as an arm of" that grand jury, that there was a nexus between Puig's statements and the grand jury, and that his statements were

---

[4] The materiality analysis of the statements themselves is addressed *infra* at Section III.C.

17

material to the grand jury's inquiry. Those defects were obvious at trial, and the government's opposition does nothing to remedy them. For these reasons, Puig is entitled to judgment of acquittal as to Count One.

## III.   COUNT TWO: THE GOVERNMENT FAILED TO PROVE FALSE STATEMENTS UNDER 18 U.S.C. § 1001

The government also failed to prove that Puig made false statements within the meaning of 18 U.S.C. § 1001. As the government concedes, to sustain a conviction under Section 1001, it must show: "(1) a statement, (2) falsity, (3) specific intent, (4) materiality, and (5) agency jurisdiction." *United States v. Jiang*, 476 F.3d 1026, 1029 (9th Cir. 2007). The government's opposition confirms that it proved none of these, and Puig is therefore entitled to judgment of acquittal on Count Two.

### A.   The Government Failed to Prove Either of the Challenged Statements Were False

First, the government has failed to prove the threshold issue of whether the two challenged statements were, in fact, false. With respect to the first statement—that Puig never discussed sports betting with Donny Kadokawa—the government simply fails to grapple with the requirements of the Ninth Circuit's decision in *Jiang*, which demands a context-driven analysis, and which demonstrates that Puig's statements are non-actionable under Section 1001. As to the second statement—that Puig did not know the individual who instructed him to send the checks to Joey Schottenstein—the government's opposition confirms it is still relying on the same theory of omission the Supreme Court recently rejected in *Thompson v. United States*, 604 U.S. 408, 414-17 (2025).

#### 1.   Statement 1 ("Never Discussed Sports Betting with Kadokawa").

The first challenged statement, that Puig never discussed sports betting with Donny Kadokawa, is precisely the type of context-dependent assertion that the

Ninth Circuit held was non-actionable in *Jiang*, 476 F.3d at 1029. Indeed, rather than confronting this ambiguity head-on and explain why the statements were false in context, the government spends much of its opposition trying to downplay *Jiang*'s applicability altogether. Among other things, the government suggests Puig's statement that he "never" discussed sports betting with Kadokawa "cannot possibly be construed as true," given evidence presented at trial that defendant did in fact discuss sports gambling with Kadokawa in 2019. (*See* Opp. at 35-36.)

This argument misapprehends *Jiang*'s holding. The Ninth Circuit did not reverse Jiang's conviction because any single word was ambiguous (or unambiguous) in isolation. It reversed because the government failed to satisfy its burden, including for failing to show that Jiang's statements were false in context. 476 F.3d at 1029. *Jiang* held that, in evaluating whether there is sufficient evidence to satisfy the elements of 18 U.S.C. § 1001, a court "must begin with an appreciation of the context in which the statement was offered," to "determine whether the defendant and his questioner joined issue on a matter of material fact to which the defendant knowingly uttered a false declaration." *Id*. The context of the question and other extrinsic evidence must permit a reasonable juror to "conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false." *Id*. at 1030. Applied here, these guidelines compel a finding that Puig's statements were not false in context.

In *Jiang*, the Ninth Circuit first noted that "the only proof offered by the government that Jiang uttered a false statement is the agent's testimony, based largely on [the agent's] notes, which were recorded some time after the day of the interview." *Id*. at 1029. The same is true here. Neither agent recalled the precise question asked. When asked what his handwritten notes reflected, Agent Canty confirmed there were "no precise questions" in his notes, "no quotes in here . . . from Mr. Puig," and that they were "just [his] characterizations of what [Puig] said."

19

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

(1/30/2026 Tr. 137:17-25 (Canty Recross).) It was further unclear whether the question was whether Puig had "discussed" or "talked about" sports betting, critical context when determining whether Puig's responses were false. (*See* 1/30/2026 Tr. 166:1-168:14 (Herminda Cross).) And Agent Canty's Report of Interview raises more avenues for potential misunderstanding, in that it stated that "when asked about Puig's and Kadokawa's involvement with sports betting, Puig indicated that the two had not spoken about sports betting," suggesting that the question was whether Puig was "involved" in sports betting. (Ex. 501; *see* 1/30/2026 Tr. 109:17-110:11 (Canty Cross).) Finally, the government concedes the interview was not recorded and no written statement was signed by Puig, meaning that—just like *Jiang*—the only evidence we have is unclear and inconsistent memories from the agents about what was said.

Second, the *Jiang* court found it "particularly troubling" that the agent, who knew there were multiple amplifiers at issue, "never asked whether Jiang had shipped any of the amplifiers to China." 476 F.3d at 1029. Given that the defendant was being charged with lying about returning these amplifiers when he had in fact shipped three of them, the Ninth Circuit stated that asking "Jiang whether he returned *all* the amplifiers [] would have been the obvious and logical follow-up question" and was troubled by the charge given this failure to ask this question. *Id.* To that end, the court found it "notabl[e]" that when Jiang was later directly asked whether he had shipped amplifiers to China, "Jiang did not hesitate in saying that he had." *Id.* The same pattern played out here. As noted in the opposition, defense counsel on cross-examination asked Agent Seymour "you testified that when asked about talking with Donny, about sports betting Mr. Puig said never, right?" to which Agent Seymour responded "yes." (Opp. at 32 (citing 1/29/2026 Tr. 62:6-16 (Seymour Cross).) Agents Canty and Seymour knew they had contrary information, but as in *Jiang*, failed to ask the "obvious and logical follow-up question[s]"—*i.e.*, "In what context *did* you and Kadokawa communicate?," or "Have you *ever* placed

20

bets with Kadokawa?"—a failure that *Jiang* identifies as critical to the contextual analysis and bringing the false statements charge. 476 F.3d at 1029. And as in *Jiang*, when Puig came across information on his phone to answer the inquiry, Puig "did not hesitate" in relaying this information about sports betting between he and Kadokawa to the agents. The parallels between Puig's interview and Jiang's are difficult to overstate.

Third, the Ninth Circuit held that Jiang's provision of documents willingly at the interview "[was] yet another reason the context indicated that Jiang did not intend to mislead [the agent]." *Jiang*, 476 F.3d at 1030. Here, too, the alleged falsity of Statement 1 is undermined entirely by the fact that Puig later did tell the government that he discussed sports betting with Kadokawa, and offered his relevant text messages that would have shown further discussion of betting between them. (*See* 2/3/2026 Tr. 49:20-50:2 (Gebelin); *see also id.* Tr. 52:15-18; Ex. 502 p. 4.) As in *Jiang*, Puig willingly provided information from his text messages at the interview that would have contained the information that the government was asking about. (*Id.* Tr. 52:15-18.) The agents simply chose not to review the phone during the interview, nor did they question Puig about it. (*See, e.g.*, 1/29/2026 Tr. 101:19-102:23 (Seymour Cross); *id.* Tr. 105:8-19.)

Fourth, the Ninth Circuit found it significant the fact that Jiang communicated in "broken" and "poor" English, creating uncertainty about common understanding. *Jiang*, 476 F.3d at 1030. The government argues here that a Cuban-dialect Spanish interpreter was provided to ensure nothing was lost in translation. (Opp. at 33.) But the very existence of that translator is precisely the kind of extrinsic contextual factor that *Jiang* requires this Court to consider. The interpreter's testimony indicated there are various words in Spanish that can be used to mean "talking," as well as a word similar to "discuss" that could mean "argue," and a word for "involved" that can mean "implicated." (1/30/2026 Tr. 166:1-168:25 (Hermida Cross).) The government cannot simultaneously invoke the interpreter as proof of

21

perfect comprehension while ignoring the disputes about Spanish vocabulary that arose at trial.

Finally, *Jiang* held that "the consequences of imprecision in the language used to question a witness must be laid at the table of the questioner, not the questioned," and that "requiring agents to use a minimum 'level of clarity and specificity is the appropriate remedy for imprecise questioning, not a [criminal] prosecution.'" *Jiang*, 476 F.3d at 1030-31. After the entire trial, it is still unclear as to whether the agents in this case questioned Puig about whether he had "discussed," "talked about," or been "involved with" sports betting with Kadokawa. The agents also did not specify whether the question encompassed any conversation, or only conversations about bets placed on his behalf. As in *Jiang*, in light of the extrinsic evidence and the context in which the statements were made, there is insufficient basis upon which to conclude beyond a reasonable doubt that Puig intentionally made a false statement.

In short, the government's single response—that the word "never" could not possibly have been true—ignores the *Jiang* framework entirely. A finding of falsity requires more than proof that the government believes the statement was wrong. It requires contextual evidence sufficient to establish that the defendant and the questioner "joined issue" on the precise matter at hand, and that the defendant's statement, so understood, was knowingly and willfully false. *Id*. at 1029. The record does not support that finding here.

2.   Statement 2 ("Did Not Know Who Instructed the Schottenstein Checks").

The government's second charged false statement—that Puig did not know who instructed him to send the checks to Joey Schottenstein—is similarly non-actionable, as recent Supreme Court case law makes clear. Notably, the government's opposition outright refuses to address *Thompson*, which held that misleading statements and omissions are insufficient to prove falsity in a false

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

statements case. 604 U.S. at 414-17. Rather than dealing with this case and issue head on, the government casts it off as a "red herring," insisting its theory was never based on omission or misleading conduct, and that it "never put forth such a 'theory.'" (*See* Opp. at 40-41.)

The government's own closing argument defeats that claim. The government told the jury: "Like two sides of the same coin, this case is not only about what Defendant told Special Agents Canty and Seymour. *It's also about what he didn't tell them*." (2/4/2026 Tr. 61:7-9 (emphasis added).) A prosecution premised on "what he didn't tell them" is, by definition, a prosecution premised on omission. The government cannot disavow that theory on a post-trial motion when it expressly advanced it to the jury.

In *Thompson*, the Supreme Court unanimously held that a statute criminalizing "false" statements does not criminalize statements that are "misleading but not false." 604 U.S. at 417. The Supreme Court reasoned that the statute uses the word "false," not "misleading," and observed that other criminal statutes in Title 18 do criminalize "misleading" statements, such that interpreting "false" to include "misleading" would make the inclusion of "misleading" in those statutes superfluous. *See id*. at 415.

The same is true here. The government's claim is that Puig misleadingly failed to mention that Kadokawa and/or Bonilla (in addition to Wayne Nix) also told him to send the checks to Schottenstein. But that is, at most, misleading, and Section 1001 does not criminalize misleading statements, only false ones. Critically, the government charged Puig under 18 U.S.C. § 1001(a)(2)—the false statement provision—not under Section (a)(1), which criminalizes concealment. The government was therefore required to prove falsity beyond a reasonable doubt and cannot rely on a theory of concealment or omission to sustain the conviction.

Although the statement is plainly non-actionable under *Thompson*, the evidence of falsity for Statement 2 also fails on its own terms. Puig made a truthful

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

statement: the evidence demonstrates that immediately before sending Kadokawa the UPS label, Puig had spoken directly to Nix, who was an unknown person at the time, about Puig's debt that was then paid to Schottenstein. (*See, e.g.*, Ex. 1040 (Kadokawa cellphone records showing three-way call between Puig, Nix, and Kadokawa).) The government introduced a summary chart purporting to show that the first time Puig and Nix ever spoke was on July 4, (Ex. 10A), but Kadokawa's texts showed that on July 3 at 9:37 a.m., Kadokawa spoke with Puig for 16 minutes and added Nix to that call at 9:40 a.m., making it a three-way call (*see* Ex. 1040). At that time, Puig had never spoken with Nix before and never texted with Nix before. The statement that a person unknown to him, with whom he had never previously texted, instructed him was, on this evidence, literally true. The government cannot secure a Section 1001 conviction without proving actual falsity.

**B.      The Government Failed to Prove that Puig's Conduct Was Willful**

Even if the government could show that Puig's alleged statements were false—and they were not—it cannot show that Puig willfully intended to deceive. This is especially true in light of Puig's corrections and his offering of additional information later in his interview, which, as discussed above, is precisely the type of conduct the Ninth Circuit has found undercuts a false statement conviction. *See Jiang*, 476 F.3d at 1030.

The government argues that Puig's correction of Statement 1 later in the same interview is "irrelevant" because "a Section 1001 offense is complete at the time the false statement is uttered." (Opp. at 41 (citing *United States v. Fortenberry*, 89 F.4th 702, 712 (9th Cir. 2023).) This argument completely misunderstands *Fortenberry*'s holding. In *Fortenberry*, the defendant appealed his conviction on two grounds: improper venue and a declined jury instruction. 89 F.4th at 704. The Ninth Circuit concluded that an effects-based test for venue of a Section 1001 offense has no support in the Constitution, the text of the statute, or historical practice, and reversed the conviction on that basis alone. *Id*.

24

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

The statement that "a Section 1001 offense is complete at the time the false statement is uttered" thus appears in *Fortenberry* in the context of a venue analysis—specifically, to explain why the *locus delicti* for venue purposes is the place where the defendant makes the statement and not where investigators were later affected by it. *Id*. As such, that principle was articulated in the context of determining where venue lies, not for determining whether willfulness is satisfied.

Indeed, *Fortenberry* contains no analysis whatsoever of the willfulness element of Section 1001, and the government offers no authority for the proposition that the timing of when the charged offense is uttered for purposes of venue is relevant to the intent inquiry. It is not. Under *Jiang*, a court "must begin with an appreciation of the context in which the statement was offered," and "must look to the context of the defendant's statement to determine whether the defendant and his questioner joined issue on a matter of material fact to which the defendant knowingly uttered a false declaration." *Jiang*, 476 F.3d at 1029 (cleaned up). As discussed, above, the Ninth Circuit pointed to several contextual factors that weighed against intent, including the willingness of Jiang to provide documents at the interview that contained the accurate information that Jiang was being asked about, the failure of the agent to ask about those documents at the interview, and the possibility that Jiang and the agent were not in sync with respect to what specifically was being asked and answered. *Id*. at 1029-30.

Here, as in *Jiang*, the willfulness of Statement 1 is belied by the fact that Puig did tell the agents that he discussed sports betting with Kadokawa, even if that revelation came later in the interview. (*See* 2/3/2026 Tr. 49:20-50:2 (Gebelin); 1/29/2026 Tr. 107:4-16 (Seymour Cross); Ex. 502 p. 4.) Moreover, Puig willingly provided information from his text messages at the interview that would have contained the information the government was asking about, and the agents failed to review those messages during the interview. (*See* 2/3/2026 Tr. 52:15-18 (Gebelin); s*ee, e.g.*, 1/29/2026 Tr. 101:19-102:23 (Seymour Cross); *id*. Tr. 105:8-19.).)

25

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

The government also invokes Puig's post-interview text messages to Bonilla as circumstantial evidence of willful intent. (Opp. at 44-45.) The government points to a March 10, 2022 text from defendant to Bonilla stating, "Don't mention my name anymore or they might take away your cell to check it," and a March 14, 2022 voice note in which defendant stated he had told investigators he "only know him from baseball" and instructed Bonilla not to text about the matter. (Opp. at 44 (citing Ex. 102 at 3; Ex. 106.) But those messages, sent weeks after the interview, are equally consistent with Puig's awareness of his underlying gambling conduct more broadly—not specifically with an intent to mislead agents about the precise content of the January 2022 interview. Evidence of underlying gambling activity does not prove willful falsity as to the specific words exchanged in response to imprecise questions by agents who produced no recording and failed to follow up.

**C.    The Government Failed to Prove Puig's Statements Were Material**

Finally, the government has failed to prove Puig's statements were material to the agent's investigation. To be material, a statement must be "capable of influencing or affecting a federal agency." *United States v. Serv. Deli Inc.*, 151 F.3d 938, 941 (9th Cir. 1998).

In support of its argument that Puig's statements were material to the investigators, the government largely relies on *Brogan v. United States*, 522 U.S. 398 (1998), and *Service Deli Inc.*, 151 F.3d 938, for the propositions that (1) a "disbelieved falsehood" can be material, and (2) the test is the "possibility (as opposed to the certainty) of perversion" of a governmental function. (Opp. at 47.) These arguments are red herrings. The defense's argument is not that the agents disbelieved the statements. It is that the agents already knew the truth from independently gathered evidence before the interview began—and that a statement cannot have a "natural tendency to influence" agency action when the agency already possesses the precise information it purportedly needed. *See Service Deli Inc.*, 151 F.3d at 941 (internal citation omitted).

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

The government acknowledges that "trial testimony demonstrated that the investigators only suspected" defendant was lying, and argues that "even if defendant's factual assertion were true, a subjective belief by the investigators that defendant was certainly lying would not alter the analysis regarding the materiality of his false statements." (Opp. at 46-47.) But that framing also misstates the defense's point. The issue is not the agents' subjective belief—it is that the agents already possessed, independently, the very evidence they claim Puig withheld. Agents Canty and Seymour both testified at length about asking Puig questions they already knew the answers to, specifically to test the veracity of his responses. Agent Seymour explained: "we had some items that we knew to be true, and we wanted to be able to see that what he was telling us was legitimate with what we knew to be true." (1/28/2026 Tr. 123:21-124:8 (Seymour).)

The Ninth Circuit's decision in *Service Deli Inc.* confirms why this distinction matters. In that case, the Ninth Circuit held that "the test is the *intrinsic* capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances." 151 F.3d at 941 (quoting *United States v. Salinas-Ceron*, 731 F.2d 1375, 1377 (9th Cir.1984)) (emphasis in original). But a statement that the government already knew was false, from evidence already in its possession, has no intrinsic capability to influence agency action. A statement cannot "induce action or reliance by an agency" when the agency already knows the truth and will act on that knowledge regardless of what the defendant says.

Agent Seymour confirmed at trial that the information obtained from the investigation of Puig was only used to prosecute Puig himself and was not relevant to any of the other individuals charged. (1/29/2026 Tr. 123:10-24 (Seymour Cross).) Agent Canty similarly confirmed that Puig had no ties to any of the subsequent investigations. (*See* 1/30/2026 Tr. 108:16-109:8 (Canty Cross).) A statement that by the agents' own testimony produced no investigative yield beyond the prosecution of the person who made it cannot be said to have possessed the "intrinsic

27

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

capabilit[y]" to influence the broader governmental function the investigation was designed to serve. *Service Deli Inc.*, 151 F.3d at 941.

With respect to Statement 1 specifically, the allegedly false statement is also immaterial because the initial statement that Puig had not discussed sports betting with Kadokawa was corrected before the agents left the room, making it incapable of influencing the agency. The government's *Fortenberry* venue-timing argument—that the offense was "complete" when uttered—addresses when an offense occurs for venue purposes; it says nothing about whether a same-interview correction negates the intrinsic capability of the statement to influence agency action, which is what materiality requires.

***

For these reasons, the government has failed to show that Puig's statements were false, willful, or material, all requirements of a false statement charge under § 1001. Puig is therefore entitled to judgment of acquittal as to Count Two.

## IV. THE DUAL CONVICTION IS IRRECONCILABLE AS A MATTER OF LAW

Finally, the government's opposition gives short shrift to perhaps the most glaring issue of all: that Puig is entitled to judgment of acquittal because the government's two counts are mutually inconsistent as a matter of law.

As discussed in the opening brief, when an agency acts as an arm of the grand jury, it does not act "upon its own authority," but "under the umbrella of the grand jury." (Mot. at 32 (citing *United States v. Deffenbaugh Industries, Inc.*, 957 F.2d 749, 753 (10th Cir. 1992).) The power of government attorneys in the grand jury context necessarily "flows from the authority of the grand jury." *Deffenbaugh*, 957 at 753. This, however, is irreconcilable with the government's charge under Section 1001, which requires that the agency have "the power to exercise authority" in the relevant matter. *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir. 1989) (citing *United States v. Rodgers,* 466 U.S. 475, 479 (1984)). For this precise reason, courts

28

have held that statements made to investigators within the context of a grand jury investigation are not actionable under Section 1001 because it would be an improper delegation of authority to the investigating executive agencies. *See Deffenbaugh*, 957 F.2d at 753-754.

The court in *Deffenbaugh* summed up this tension neatly: "had the defendants chosen to satisfy the subpoena by presenting the documents directly to the grand jury, and made false statements directly to that body, the [statement] would not have been a matter within the jurisdiction of the Department of Justice for purposes of § 1001, but instead would have been a matter for prosecution under 18 U.S.C. § 1621, § 1503, or perhaps § 1623." *Id.* As a result, courts applying *Deffenbaugh* have recognized that "false statements within the jurisdiction of grand juries are not covered" by Section 1001. *United States v. Butler*, 351 F. Supp. 2d 121, 128 (S.D.N.Y. 2004). In short, the government's two counts here are plainly inconsistent and grounds for acquittal.

In its opposition, the government attempts to distinguish *Deffenbaugh* on the basis that, unlike the DOJ in that case, HSI and IRS possess a statutory basis to detect and prosecute crimes against the United States and therefore retain independent executive authority sufficient to sustain a Section 1001 conviction alongside a Section 1503 conviction. (*See* Opp. at 53.) The government further argues that the two statutes have "separate and distinct objectives consistent with their essential elements," with Section 1001 criminalizing false statements to a federal agency and Section 1503 reaching the integrity of the judicial system.[5] (*See id.* at 52.)

---

[5] The government also seems to misunderstand defendant's argument, suggesting the counts are not "multiplicitous" under *Blockburger v. United States*, 284 U.S. 299 (1932). (Opp. at 52, n.6.) But the defense does not argue that both counts require identical elements such that conviction on both violates the Double Jeopardy Clause in the multiplicity sense. Puig's argument is that the factual predicate required to

29

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

But, critically, *Deffenbaugh*'s holding does not turn on which specific agency is involved—it turns on whether the agency was acting under the umbrella of the grand jury at the time of the charged conduct. The key question is whether the role of the prosecutor as a "unique kind of aide to the grand jury" amounts to a grant of "power to exercise authority," and the Tenth Circuit held that it does not, because the power in the grand jury context flows from the authority of the grand jury itself. *Deffenbaugh*, 957 F.2d at 753. The same logic applies regardless of whether the agency is the DOJ, HSI, or IRS. Once the agents are found to have been acting as an arm of the grand jury, their authority in that context is derived from the grand jury, not from their independent statutory mandates. The government cannot point to the general investigative jurisdiction of HSI and IRS in the abstract to solve a problem that arises from the specific capacity in which those agencies were acting at the time of Puig's interview, which was (allegedly) on behalf of a grand jury. Put another way, had the agents insisted that Puig provide his testimony before a grand jury and had Puig made the exact same statements, there is no dispute that Puig could not be prosecuted for those statements under Section 1001. *Deffenbaugh* simply makes clear that this same logic applies when the statements are made to executive agencies acting under the umbrella of a grand jury.

The government similarly tries to distinguish *Butler*, a case reaffirming *Deffenbaugh*'s conclusion that "false statements within the jurisdiction of grand juries are not covered" by § 1001, by noting that the defendant in that case lied directly to a grand jury, rendering his statements clearly non-actionable. (*See* Opp. at 53 citing (*Butler*, 351 F. Supp. 2d at 128).) But the takeaway from *Deffenbaugh* is that this distinction is meaningless. It does not matter whether the statements are made directly to the grand jury or to an investigator working on its behalf. So long

sustain each count is logically incompatible with the factual predicate required to sustain the other.

30

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

as the statements are made within the "umbrella of the grand jury," they are non-actionable under § 1001. *Deffenbaugh*, 957 F.2d at 753-54.

The procedural history of this case makes the government's contradiction concrete. In its opening statement, the government described a multi-year investigation into a large-scale illegal gambling operation undertaken by HSI and the IRS, never once mentioning a pending grand jury proceeding.[6] Only after the defense sought acquittal for failing to introduce any evidence of a required element did the government begin calling the investigation a "grand jury investigation"—for the first time in closing argument. (*See* 2/4/2026 Tr. 61:10-12.) The agents were either acting as an arm of the grand jury—for which there is no evidence—or they were acting as federal investigators separate and apart from any grand jury, which is the theory the government advanced up until closing.

Given that both charges arise from the same conduct at the same interview, the investigators could not have been acting on behalf of both the grand jury and their respective agencies simultaneously, nor is it possible to do so under the law governing the charged offenses. The jury was asked to find, and did find, both things at once. Under *Deffenbaugh*, those two findings cannot coexist, and so the dual conviction must be set aside. *See Masoner v. Thurman*, 996 F.2d 1003, 1005 (9th Cir. 1993) (["A]lthough an inconsistent jury verdict on multiple counts is not ordinarily grounds for reversal, it may be considered where a defendant is convicted of mutually exclusive offenses, such that the defendant could have been guilty of one or the other, but not both."); *see also United States v. Duz-Mor Diagnostic Lab'y, Inc.*, 650 F.2d 223, 226 n.3 (9th Cir. 1981) (first recognizing the exception).

---

[6] The indictment itself alleges only that an investigation was conducted by HSI, the IRS, and the USAO, defining it as the "Federal Investigation", and never mentions any grand jury involvement. (*See* First Superseding Indictment ¶¶ 6, 27, 29.)

31

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION

## V. CONCLUSION

For all the foregoing reasons, and for the reasons stated in the opening motion, this Court should enter a judgment of acquittal for Puig on both Count One and Count Two.

Respectfully submitted,

DATED: April 3, 2026               WAYMAKER LLP

By: _____
KERI CURTIS AXEL
*Attorneys for Defendant Yasiel Puig Valdes*

DEFENDANT YASIEL PUIG VALDES'S REPLY IN SUPPORT OF RULE 29 MOTION