TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney &
Chief, Criminal Division
JUAN M. RODRIGUEZ (Cal. Bar No. 313284)
MICHAEL J. MORSE (Cal. Bar No. 291763)
LAURA A. ALEXANDER (Cal. Bar No. 313212)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0304/7367/1019
     Facsimile: (213) 894-0141
     Email:     juan.rodriguez@usdoj.gov
                michael.morse@usdoj.gov
                laura.alexander@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 22-00394-DMG |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENDANT YASIEL PUIG VALDES'S SENTENCING MEMORANDUM |
| v. | |
| YASIEL PUIG VALDES, | |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorneys Juan M. Rodriguez, Michael J. Morse, and Laura A. Alexander, hereby files its response to defendant YASIEL PUIG VALDES's sentencing memorandum.

//

The government timely filed its sentencing position on May 12, 2026.  Defendant Yasiel Puig Valdes ("defendant") filed his sentencing position three days later, which afforded him the opportunity to respond to the government's sentencing arguments. Accordingly, the government respectfully requests that this Court consider this supplemental sentencing position, which responds to defendant's sentencing position.  This response is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 20, 2026              Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Chief Assistant United States Attorney
& Chief, Criminal Division


                                        /s/
JUAN M. RODRIGUEZ
MICHAEL J. MORSE
LAURA A. ALEXANDER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

After filing objections to Probation's Presentence Report ("PSR"), wherein defendant again "asserted his innocence," "object[ed] in general" to the description of his offense conduct that was proven at trial, and generally repeated his trial team's closing arguments (also rejected by the jury) (see Def. Objections to PSR at 1-2), now on the doorstep of accountability, defendant feigns a change in tune.  He claims to have "[r]emorse" and to have accepted responsibility.  (See Dkt. 452 (defendant's sentencing position ("Def. Pos.") at 11.)  He says he now understands that he "could have conducted himself differently" during his January 2022 interview where he lied and obstructed justice, despite maintaining "that he did not intend to lie or obstruct."  (Id. at 1.)  That is not acceptance of responsibility.

Defendant also argues that the collateral consequences of a federal indictment and jury trial brought about by defendant's own crimes is punishment enough.  However, defendant could have avoided those collateral consequences and the expense of a likely multimillion-dollar defense team, with five lawyers across two firms, by accepting responsibility earlier, or by simply telling federal agents and prosecutors the truth in the first place, which is all they asked of him.  But he instead decided to lie and obstruct. Importantly, defendant's sentencing position is riddled with half-truths, material omissions, and misleading assertions about his professional career and prospects.  For example, he argues that he "has suffered financial ruin," "destruction of numerous professional opportunities," "years of public humiliation," and that he needs to

1

be free from prison to look after his mother.  (See id. at 12-13, 18.)  These arguments are unavailing.  Defendant is currently playing professional baseball in Canada, and signed a record-breaking contract, after the jury convicted him of both charges, and he played professional baseball in Venezuela while this case was pending.  He clearly still receives lucrative professional baseball opportunities.  And even if his career has been impacted, loss of some professional opportunities is a consequence experienced by *every defendant*, in *every* federal criminal case; defendant has not uniquely suffered in this regard.  To the contrary, he has received more lucrative career opportunities than the average defendant.

Any reputational harm defendant has suffered because of this prosecution is arguably minimal given that he is still playing baseball and pales in comparison to the other media coverage defendant has received because of other conduct on and off the baseball field.  Defendant seeks to blame everyone but himself for the situation he finds himself in.  For the reasons outlined in the government's sentencing position (Dkt. 450), as well as the reasons mentioned below, the government maintains that a low-end guideline sentence of 18 months' imprisonment, and a fine of $55,000, is sufficient, but not greater than necessary to meet the goals of sentencing.

**II.  DEFENDANT'S PROFESSIONAL REPUTATION AND OPPORTUNITIES**

Defendant argues that "as a result of the charges against him, [he] has faced years of severe public humiliation, reputational harm, financial setbacks, and the effective destruction of the vast majority of opportunities within the only career he has ever known, baseball."  (Def. Pos. at 1.)  The facts suggest otherwise.  The

2

charges in this case became public in November 2022; however, defendant last played in Major League Baseball in 2019.  Despite a career batting average of .277 and 132 homeruns,[1] no Major League team offered defendant a contract in 2020, 2021, or 2022.[2] It wasn't for lack of talent.  Rather, disciplinary issues[3] and negative publicity[4] have surrounded defendant for years.

Defendant further argues that "[t]he consequences of this case have been substantial even before sentencing[,]" because he "lost a professional contract in South Korea valued at approximately $2.3 million in 2023."  (Def. Pos. at 13.)  Public reporting contradicts defendant's claim.

First, defendant played with several foreign professional teams after the charges in this case were announced, including with the South Korean Kiwoom Heros in 2025, with the Navegantes de Magallanes in Venezuela in the months leading up to trial, and is now playing with the Toronto Maple Leafs in Canada.  Clearly, the federal charges in this case did not harm his reputation to a degree that offended all, if any, foreign professional baseball leagues.  Second, the

---

[1] https://www.baseball-reference.com/players/p/puigya01.shtml.

[2] Defendant initially signed a contract in 2020 with the Atlanta Braves but the Braves rescinded the offer after defendant tested positive for Covid shortly before the season began.  See https://www.mlb.com/news/yasiel-puig-tests-positive-for-covid-19.

[3] https://www.thescore.com/mlb/news/2081249; https://www.cbssports.com/mlb/news/yasiel-puig-lands-one-year-contract-with-korea-baseballs-kiwoom-heroes/.

[4] https://sports.yahoo.com/yasiel-puig-settles-sexual-assault-lawsuit-wants-to-return-to-mlb-in-2022-140438426.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmN vbS8&guce_referrer_sig=AQAAANicF6iYoy4PXpyQXHlxn9NzBaLN1IskKCTTQ7b1G7 yq8bJQi_AaRrL7Ajz8VUM9u1K_m-JZZVFTLeCmbv7zJVjxmAMWMMcp8QcT1kvWdqksrd5zOcCnUkgLxS-EdGvho8HLQ5med_yxWo9EVis09n4zhgG8mO39YWDIY5h5P7-c; https://www.espn.com/mlb/story/_/id/31044776/sexual-assault-allegations-cloud-yasiel-puig-future-mlb.

Kiwoom Heros released defendant not because of this case, as defendant claims, but because he injured his shoulder and returned to the United States for therapy.[5]

To the extent that defendant faces any difficulty in seeking employment (which appears minimal based on his career trajectory throughout these proceedings), such collateral consequences are experienced by *every single defendant* convicted of one or more felony charges.  If this Court were to accept defendant's argument that the collateral consequences of his convictions sufficiently punish him, then by that same logic, no defendant would ever receive a custodial sentence.  Any such consequences -- i.e., reputational harm and fewer employment opportunities --  are a result of defendant's decisions to intentionally commit federal crimes, not the government's decision to charge him, and the consequences that naturally flow from defendant's decisions.  The government provided defendant with opportunity after opportunity to avoid this reality.  AUSA Mitchell provided him numerous breaks during his January 2022 interview to course correct. Even after he refused, and continued to attempt to influence investigation witnesses in the following months, the government offered defendant a favorable plea disposition to resolve this case with a probationary sentence.  Defendant ultimately rejected theses offers.  It is this pattern of repeatedly failing to demonstrate remorse and accept responsibility for his actions that has led him here, and his arguments to the contrary are not supported by the facts and further undermine his credibility and claims of hardship.

---

[5] https://www.mk.co.kr/en/sports/11320584; https://www.espn.com/mlb/story/_/id/45225986/ex-mlb-star-yasiel-puig-let-go-kbo-team-returning-us.

**III. DEFENDANT'S CHARITABLE CONTRIBUTIONS**

Defendant asks this Court to treat his history of charitable giving and community involvement as a significant mitigating factor justifying a below-Guidelines sentence.  (Def. Pos. at 7-12.)  The law does not support this request.  Defendant's charitable activities, however laudable in isolation, are neither unusual nor exceptional for a person of his celebrity standing, and providing him a sentencing benefit on this basis would be precisely the type of privileged-class leniency that the Sentencing Guidelines were designed to prevent.  The U.S. Sentencing Guidelines are unambiguous on this point.  U.S.S.G. § 5H1.11 provides that "civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  This is not a close question.  Section 5H1.11 places charitable and civic service squarely in the category of "discouraged" factors, i.e., those that, absent truly extraordinary circumstances, do not justify a departure.  See U.S.S.G. § 5K2.0(d).

The Sentencing Commission's explicit policy choice to discourage such departures reflects a considered judgment that charitable work is simply not the type of unusual circumstance that distinguishes a case from the mine-run of defendants.  See United States v. Haversat, 22 F.3d 790, 795-96 (8th Cir. 1994) (reversing downward departure for white-collar antitrust defendant who offered charitable and community service activities as grounds for leniency).  The Haversat court further observed that the defendant's socioeconomic status was a but-for cause of his charitable record because the very privilege that

5

enabled him to commit and conceal his crimes also enabled him to build the charitable résumé he proffered as a shield at sentencing.

United States v. Morken, 133 F.3d 628 (8th Cir. 1998) is also persuasive. There, the Eighth Circuit vacated a downward departure, holding that the defendant's good works were "neither exceptional nor out of the ordinary for someone of his income and preeminence" in the community. See id. at 630 (citing Haversat, 22 F.3d at 795-96). As courts and commentators have recognized, "only wealthy defendants can make extraordinary [charitable] donations," and allowing such donations to drive sentencing outcomes "inherently considers a defendant's wealth and, by extension, a defendant's socioeconomic status." See 106 Iowa L. Rev. 873 (2021).

This reasoning applies with full force here. Defendant's financial resources, professional network, and social position afforded him opportunities for community leadership that are simply unavailable to the typical federal defendant sentenced before this Court. The charitable record he now presents was made possible by the same privileged circumstances that placed him in a position to commit the offenses of conviction.

Ironically, after attacking the credibility of cooperating witness Donny Kadokawa throughout trial, defendant now cites and relies upon his testimony to demonstrate defendant's charitable conduct for mitigation purposes. Kadokawa certainly expressed appreciation for defendant's high-profile attendance at his charity event in Hawaii, as well as the time he spent with children at that camp. But this same witness also had an emotional breakdown on the stand due to the horrific impact of defendant's conduct on his life (not to mention the $40,000 that defendant owed Kadokawa and to which

6

defendant has still not paid back).  This is exactly the government's point: while commendable, any charitable work by defendant is simply not so extraordinary as to warrant a below-Guidelines departure that would serve to ignore the severity of his wrongdoing.  Defendant befriended Bonilla and Kadokawa because it suited him and he discarded them the minute they were no longer useful to him.  As Kadokawa testified through tears, assisting the defendant with his gambling was memorable because "it [brought] back so [many] bad memories . . . the anger and frustration."  (Trial Tr., Day 4 at p. 104, line 24 – p. 105, line 19.)  Similarly, Bonilla testified that he assisted defendant with batting practice sporadically for years, for no compensation, but the minute law enforcement took Bonilla's phone, which contained the group chat messages that ultimately led to defendant's convictions, defendant never tried to contact him again despite years of alleged friendship.  (**Exhibit A.**)  Simply put, defendant only took an interest in them because he stood to benefit from them.

At bottom, even if the Court were inclined to consider defendant's charitable record as a § 3553(a) factor warranting a variance, it would need to find that the conduct is present to a degree that distinguishes this case from the typical case.  See U.S.S.G. § 5H1.11; United States v. Serafini, 233 F.3d 758 (3d Cir. 2000) (charitable works may support departure only if present "to an exceptional degree or, in some way, that makes the case different from the ordinary case in which the factor is present"); United States v. Crouse, 145 F.3d 786, 792 (6th Cir. 1998) (finding downward departure unsupported by defendant's civic contributions, which were not unusual for a prominent businessman).

7

Here, defendant's charitable involvement, however sincerely undertaken, falls squarely within the pattern of community engagement courts have repeatedly found insufficient: activity that flows naturally from professional success and social standing, and that does not in any way distinguish this case from other false-statements and obstruction-of-justice offenses before this Court.

Finally, the § 3553(a)(2)(B) goal of general deterrence weighs strongly against any below-Guidelines variance based on charitable work.  A sentence that departs meaningfully below the Guidelines based on conduct available only to defendants of means sends the message that wealth and celebrity status insulates one from meaningful accountability.  The Court should decline to give defendant's charitable activities dispositive weight.

## IV.   DEFENDANT'S FINANCES

Defendant's claim that he is financially ruined is unpersuasive. (Def. Pos. at 19.)  Defendant has three homes worth close to ten million dollars, with over $1.7 million in equity, and a $26,000 Cadillac Escalade.  (See PSR at ¶¶ 121-124.)  Despite his convictions and historical reputation, defendant continues to be financially successful.  He recently started his own sports brand company and, *after his convictions*, signed the biggest contract in Canadian professional baseball history which "position[s] him as the face of the Canadian Baseball League in its inaugural professional season."[6] Information he conveniently fails to apprise this Court of and material information that is nowhere to be found in the PSR.  For these reasons, the government maintains that his Court should demand

---

[6]  https://www.tsn.ca/mlb/article/cbls-maple-leafs-sign-former-mlb-slugger-puig-to-largest-contract-in-league-history/

strict compliance of defendant's financial disclosures as it does with every other defendant.

In any event, defendant's claim that "he does not have the ability to pay anything above a low-end fine [of $5,500]" is baseless, and not supported by the only financial records (which are incomplete) that Probation has received.  (Def. Pos. at 19.) Defendant has a significant net-worth, and his net-worth continues to increase given his recent historic contract and the other opportunities in professional sports defendant enjoys, as he concedes in his sentencing position.  (Def. Pos. at 13 n.6.)

**V.    A PROBATIONARY SENTENCE WOULD CREATE A SENTENCING DISPARITY**

A probationary sentence would create a sentencing disparity and would not be "just punishment" as defendant claims.  (Def. Pos. at 16-17.)  Defendant's comparison to other members of the Wayne Nix Gambling Business, such as Kagasoff, Funke, Fulton, and Hiljus, are unavailing.  (Id.)  Those individuals all demonstrated extraordinary acceptance of responsibility by pleading guilty to an Information and waiving several rights, including the right to a jury trial.  To be clear, and contrary to defendant's characterization of the government's sentencing position in his papers, the government does not seek, and this Court should not impose, a "trial tax."  Rather, by proceeding to trial, this Court, the parties, and a jury of defendant's peers witnessed, for nearly three weeks, the depths of defendant's lies and the full extent of his obstructionist conduct. In fashioning an appropriate sentence, this Court can consider all the evidence presented at trial, as well as the fact that defendant, unlike the other members of the Wayne Nix Gambling Business cited above, fails to demonstrate any remorse for his actions.

Additionally, Kagasoff, Funke, Fulton, and Hiljus pleaded guilty to less or equally serious crimes; the base offense level for Kagaoff and Funke was 12 (for operating an illegal gambling business), the base offense level for Fulton was 6 (for false statements) and 8 (for money laundering), and the base offense level for Hiljus was 16 (for subscribing to a false tax return).  Defendant's base offense level for obstruction of justice is 14.

Defendant Puig is also not similarly situated because those defendants reside, and intend to reside, in the United States during their terms of supervised release; defendant, on the other hand, intends to reside in Canada to play baseball.  A Supervisory U.S. Probation Officer involved in this matter informed the government that the U.S. Probation and Pretrial Services Office simply cannot supervise defendant while defendant is abroad.  Accordingly, defendant's contention that "subject[ing] him to conditions and reporting requirements" will "restrict his freedom in concrete ways" which is "itself a meaningful sentence" is false.  (Def. Pos. at 15-16.)  A probationary sentence permitting the defendant to reside abroad, to play baseball no less, would effectively result in a time-served sentence for a defendant who has not spent a single day in prison.  That is not justice.  That is a windfall and would create a sentence disparity because it would provide defendant with a more lenient sentence than individuals who accepted responsibility for equally serious, if not less serious, crimes.

Lastly, defendant's suggestion that imprisonment would be inappropriate because it would be a detriment to his mother, and other family, is not compelling.  (Def. Pos. at 12-14.)  That is true for all defendants so he is not uniquely situated.  To the extent

10

defendant is claiming that imprisonment is inappropriate because he personally cares for his mother, that argument is also unavailing considering he is living in Canada to play baseball while she resides in Miami.  (PSR ¶ 66.)

In sum, the government maintains that this Court impose the following sentence: (1) a low-end Guidelines sentence of 18 months' imprisonment; (2) a three-year term of supervised release, with the terms and conditions recommended by the Probation Office; (3) a monetary fine of $55,000; and (4) a $200 special assessment.